UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

CLIFTON SCOTT DILLEY                     :
    *Plaintiff,*                      :
                                         :
VERSUS                                   :
                                         :   CIVIL NO. 19-391-BAJ-EWD
STATE OF LOUISIANA,                      :
DEPARTMENT OF PUBLIC SAFETY              :
AND CORRECTIONS, AND                     :
OFFICE OF STATE POLICE,                  :
AND KASHA DOMINGUE                       :
    *Defendants.*                     :

## <u>PLAINTIFF'S MEMORANDUM IN OPPOSITION TO<br>DEFENDANT KASHA DOMINGUE'S MOTION FOR SUMMARY JUDGMENT</u>

# TABLE OF CONTENTS

| | | |
|---|---|---|
| **TABLE OF CONTENTS** | | **i** |
| **TABLE OF AUTHORITIES** | | **ii** |
| **I.** | **INTRODUCTION** | **1** |
| **II.** | **LAW AND ARGUMENT** | **3** |
| | **A. Factual Background and Trooper Domingue's Stories** | **3** |
| | 1) Trooper Domingue's Story at the Scene (July 10, 2018, shortly after 3:02 a.m.) | 7 |
| | 2) Trooper Domingue's Story 15 Hours Later in Sergeant Ward's Interview (July 10, 2018 at 6:33 p.m.) | 8 |
| | 3) Trooper Domingue's Story in Her Internal Affairs interview (December 15, 2020) | 8 |
| | 4) Trooper Domingue's Story in Her Internal Affairs interview (December 15, 2020) | 9 |
| | 5) Trooper Domingue's Story in her Deposition (January 12, 2023) | 10 |
| | 6) Story Advanced in Motion for Summary Judgment | 11 |
| | **B. Trooper Domingue is Not Entitled to Qualified Immunity** | **12** |
| | 1) Trooper Domingue violated Mr. Dilley's constitutional right to be free from excessive force. | 13 |
| | 2) Domingue was on notice that shooting Mr. Dilley in the back while fleeing from a minor traffic stop was a clear violation of Mr. Dilley's Fourth Amendment right to be free from excessive force. | 18 |
| | 3) Domingue was on notice that shooting Mr. Dilley in the back while fleeing form a minor traffic stop was a clear violation of Mr. Dilley's Fourth Amendment right to be free from excessive force. | 18 |
| **III.** | **CONCLUSION** | **22** |

# TABLE OF AUTHORITIES

Cases                                                                Page(s)

*Allen v. Hays*,                                                          15
    2023 U.S. App. LEXIS 6795, (5th Cir. Mar. 21, 2023)
*Blair v. Harris*,                                                       13
    993 F. Supp. 721,727 (ED Mich. 2014)
*Brosseau v. Haugen*,                                                  20,22
    543 U.S. 194, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004)
*Cole v. Carson,*                                                      22,23
    935 F.3d 444 (5th Cir. 2019)
*Collie v. Barron*,                                                     3,14
    747 Fed. Appx. 950, (5th Cir. 2018)
*Freeman v. Gore*,                                                        2
    483 F.3d 404, 410-11 (5th Cir. 2007))
*Graham v. Connor*,                                                   2,3,14
    490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)
*Griggs v. Brewer*,                                                      13
    841 F.3d 308, 312 (5th Cir. 2016)
*Hanks v. Rogers*,                                                   13,14,15
    853 F.3d 738, 745 (5th Cir. 2017)
*Lytle v. Bexar Cty., Tex.*,                                            20
    560 F.3d 404, 417 (5th Cir. 2009)
*Mason v. Lafayette City-Parish Consol. Gov't*,                        14,15
    806 F.3d 268, 276 (5th Cir. 2015)
*McCullough v. Wright*,                                                 21
    824 F. App'x 281, 284 (5th Cir. 2020),
*Mullenix v. Luna,*                                                   3,20,22
    577 U.S. 7, 136 S. Ct. 305, 193 L. Ed. 2d 255 (2015)
*Pearson v. Callahan*,                                                  13
    555 U.S. 223, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)
*Perron v. Travis*,                                                  13,20,22
    2021 U.S. Dist. LEXIS 60018, at *10 (M.D. La. Mar. 29, 2021)
*Plumhoff v. Rickard,*                                                 20
    134 S.Ct. 2012, 2023 (2014)
*Poole v. City of Shreveport*,                                         15,21
    13 F.4th 420, 424 (5th Cir. 2021)
*Porter v. Epps*,                                                      2,13
    659 F.3d 440, 445 (5th Cir. 2011)
*Roque v. Harvel*,                                                       3
    993 F.3d 325, 334 (5th Cir. 2021)
*Sahota v. Cobb*,                                                       13
    CIV.A. 14-2722, 2015 WL 6835480, at *3 (W.D. La. Nov. 6, 2015),
    judgment       entered, CIV.A. 14-2722, 2015 WL 6830755 (W.D. La. N(
    2015)

*Sauls v. Hutto,*     21
    304 F. Supp. 124, 132 (E.D. La. 1969)

*Savoy v. Stroughter,*     16
    2021 U.S. Dist. LEXIS 57005, at *12 (M.D. La. Mar. 25, 2021)

*Scott v. Harris,*     14
    550 U.S. 372, 383, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007).

*Tennessee v. Garner,*     3
    471 U.S. 1, 11 (1985))

*Terry v. Hubert,*     13
    609 F.3d 757, 761 (5th Cir. 2010)

*Terry v. Ohio,*     3
    392 U.S. 1, 20-22, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)).

*Thomas v. Great Atlantic and Pacific Tea Co., Inc.,*     16
    233 F.3d 326, 331 (5th Cir. 2000)

*Tutrix v. Travis,*     21
    595 F. Supp. 3d 488, 511 (M.D. La. 2022)

*Waller v. Hanlon,*     15
    922 F.3d 590, 599 (5th Cir. 2019)

*Young v. Broussard,*     23
    189 So. 477, 480–81 (La. Ct. App. 1939)


Statutes     Page(s)
42 U.S.C. § 1983     1

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

CLIFTON SCOTT DILLEY          :
     *Plaintiff,*             :
                            :
VERSUS                     :
                            :     CIVIL NO. 19-391-BAJ-EWD
STATE OF LOUISIANA,         :
DEPARTMENT OF PUBLIC SAFETY   :
AND CORRECTIONS, AND      :
OFFICE OF STATE POLICE,     :
AND KASHA DOMINGUE      :
     *Defendants.*           :

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
## DEFENDANT KASHA DOMINGUE'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Clifton Scott Dilley, through undersigned counsel, respectfully submits this opposition to Defendant Trooper Kasha Domingue's *Motion for Summary Judgment* (Doc. 94).

## I.     INTRODUCTION

On July 10, 2018, Defendant Trooper Kasha Domingue shot Plaintiff, Clifton Scott Dilley, who was unarmed, in the back as he was attempting to run away from her during a traffic stop. Mr. Dilley was the passenger in a vehicle Trooper Domingue stopped for making an illegal u-turn. Mr. Dilley filed suit against Trooper Domingue pursuant to 42 U.S.C. § 1983 for violating Mr. Dilley's Fourth Amendment right to be free from excessive force. (Doc. 1.) Mr. Dilley also filed suit against Trooper Domingue under state law, based on negligence, and against Louisiana State Police for failing to properly supervise and train Trooper Domingue, as well as for its vicarious liability for Trooper Domingue's actions.

In her motion for summary judgment, Trooper Domingue asserts that she is entitled to qualified immunity because Plaintiff (1) "cannot prove an undisputed [sic] material fact exists as to whether Domingue violated his constitutional rights," and (2) "cannot provide the court with any prior precedent showing the constitutional right Domingue allegedly violated was clearly established on July 10, 2018."  (Doc. 94-1, p. 2.)  As more completely discussed below, many of the facts alleged by Trooper Domingue to support her "objective reasonableness" for shooting Mr. Dilley are disputed.  Trooper Domingue herself has given multiple differing and competing accounts of what happened that night, what she perceived, and why and how she shot Mr. Dilley. Video evidence, however, clearly shows that Trooper Domingue shot Mr. Dilley as he was running ***away*** from her, and when he posed no threat to her or anyone else.  Additionally, clear precedent exists to support that Trooper Domingue's actions were excessive and in violation of Mr. Dilley's due process rights.  Both of Trooper Domingue's arguments fail, and she is not entitled to summary judgment.

Trooper Domingue is not entitled to qualified immunity because (1) she violated Mr. Dilley's constitutional rights, and (2) her actions were objectively unreasonable in light of clearly established law at the time of the incident.  *Porter v. Epps*, 659 F.3d 440, 445 (5th Cir. 2011) (citing *Freeman v. Gore*, 483 F.3d 404, 410-11 (5th Cir. 2007)).

Trooper Domingue violated Mr. Dilley's Fourth Amendment constitutional right by using excessive and unreasonable force. *See Graham v. Connor*, 490 U.S. 386, 394, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989).  To prevail on an excessive force claim, "[a] plaintiff must show (1) an injury, (2) which resulted directly and only from the use of force that was clearly excessive, and (3) the excessiveness. . . was clearly unreasonable." *Collie v. Barron*, 747 Fed. Appx. 950, 952 (5th Cir. 2018) (citations omitted). Unreasonableness and excessiveness are viewed "from the

perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20-22, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)). Mr. Dilley is paralyzed (Dilley Dep., pp. 136-137, ll. 12-1) because Trooper Domingue shot him in the back as he was running away, unarmed, from a traffic stop. The surveillance video clearly shows this series of events. Trooper Domingue's conflicting accounts of her ***perception*** of the events - at the least - create an issue of disputed fact concerning the unreasonableness and excessiveness of her actions. *See, e.g.*, *Roque v. Harvel*, 993 F.3d 325, 334 (5th Cir. 2021) (where court rejected officer's argument asserting entitlement to qualified immunity on basis that plaintiff's evidence was insufficient due to the officer's subjective version of events).

Trooper Domingue's conduct also violated clearly established law in light of the facts and context of the specific circumstances that Trooper Domingue confronted. *See Mullenix v. Luna*, 577 U.S. 7, 136 S. Ct. 305, 193 L. Ed. 2d 255 (2015). Mr. Dilley was the passenger of a vehicle that was stopped for making an illegal u-turn. Trooper Domingue's shooting Mr. Dilley in the back as he fled the scene of the traffic stop is such a violation of clearly established law that it is obvious. Shooting an unarmed, fleeing suspect who poses no objectively reasonable threat is unconstitutional. *Brosseau v. Haugen*, 543 U.S. 194, 198–99 (2004) (citing *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)).

## II. LAW AND ARGUMENT

### A. Factual Background and Trooper Domingue's Stories

At approximately 3:02 a.m., Trooper Domingue spotted a red Saturn making an illegal u-turn on Perkins Road in Baton Rouge, Louisiana. (Attached as Exhibit "A," Domingue Deposition (hereinafter referred to as "Domingue Dep."), p. 13, ll. 20-22 and Attached as Exhibit "B," Ward

Deposition taken on January 25, 2023, (hereinafter referred to as "Ward Dep. I"), pp. 43-44, ll. 25-7.) Trooper Domingue activated her siren, and the Saturn eventually turned on Potwin Street and stopped in a parking lot belonging to the Village Grocery Store. (Domingue Dep., p. 14, ll. 15-24 and Ward Dep. I, p. 44, ll. 8-12.) Trooper Domingue can be heard breathlessly[1] calling in the stop. (Attached as Exhibit "C," Synchronized Surveillance Video 02:13:58; Domingue Dep., p. 85, ll. 13-18 and pp. 86-87, ll. 23-8.)[2]

Shortly after the stop, the driver, Jamaal Mire, exits the Saturn at Trooper Domingue's request.[3] (Ward Dep. I, p. 45, l. 21; Mire Dep. p. 56 ll 5-8.) Mr. Mire remains at the front of Trooper Domingue's squad vehicle for a couple of minutes. (Ward Dep. I, p. 46, ll. 4-12; Domingue Dep. p. 44 13-16) After a couple of minutes, Mr. Mire decides to run away and yells for the other passengers in his Saturn to run.[4] (Domingue Dep., pp. 16-17, ll. 20-1; Ward Dep I.; p. 78, ll. 13-

---

[1] It is unclear whether the fact that Trooper Domingue had been involved in a traffic stop earlier in the evening played a role in her demonstrably heightened mental state in the call. In that earlier stop, a passenger in the stopped car ran; she pursued him on foot; deployed her taser after him as he ran; and ultimately was unable to stop the passenger from alluding her. (Ward Dep. I, p. 120, ll. 4-19; Ward Dep. II, p. 61, ll. 3-5; Domingue Dep., pp. 159-160, ll. 17-15.)

[2] The parties stipulated to the authenticity of all documents and items produced in discovery by the State and Trooper Domingue, including audio and video recordings. (Attached as Exhibit "V" is Ward Deposition taken on February 16, 2023, (hereinafter referred to as "Ward Dep. II,", pp. 5-6, ll. 23-21.)

[3] Mr. Mire and Mr. Dilley both said that Trooper Domingue ordered Mr. Mire to get out of the car. (Mire Dep., p.56, ll. 1-8; Dilley Dep., p. 50, ll. 3-8.) At her deposition Trooper Domingue asserted that Mire exited the Saturn on his own, and this caused her to be concerned. (Domingue Dep., pp. 14-15, ll. 25-5.)

[4] In his deposition, Mire says he ran because he overheard Trooper Domingue call other units to the scene and it scared him. (Mire Dep., p 37, ll. 1-4) Ward explained that she made no such calls according to the radio traffic logs that he reviewed. (Ward Dep. II, p. 86-87, ll. 21-3 ) Additionally, in his deposition Ward was shown an inadvertent body cam recording of earlier in the fateful shift, where Trooper Domingue can be seen talking on her cell phone and dramatically saying that she was going to bring the person arrested and present in her backseat past a drug bust where the drug dealers would know he "gave them up." (Domingue Dep., p. 184, ll. 22-24; also attached as Exhibit "G" is the subject body cam footage.) Ward explained that she was only pretending to talk on the phone and

18; p. 171, ll. 1-5; (Attached as Exhibit "D," Mire Deposition (hereinafter referred to as "Mire Dep."), p. 37 ll 19-20.)

The passenger in the back right side passenger side seat, known only as "Jeremiah," exits the vehicle and runs, and so does Mr. Dilley who is located in the left rear passenger seat. (Exhibit "C" at 02:16:33; Ward Dep. I, pp. 68-69 ll. 23-3 and p. 78, ll. 13-18.) The front seat passenger, Kalief Sconiers, does not run and remains in the Saturn. (Exhibit "C" at 02:16:33; Ward Dep. I, p. 69, ll. 2-6.) When Mr. Dilley opens the rear left passenger Saturn door to run, Trooper Domingue is at the driver-side front of her vehicle, which is situated more than a car length away. (Exhibit "C" at 02:16:32; Ward Dep. II p. 27, ll. 8-15 and 20-21.) Also attached is Exhibit "E" Screenshots of the Surveillance Video, Exhibit "E" DPSC 566 (Exhibit 9D in Ward Deposition II); and Exhibit "E" DPSC 567 (Exhibit 9E in Ward Deposition II.) Trooper Domingue continues to advance and starts to head in the direction of Mr. Dilley as he is exiting the Saturn. (Ward Dep. II, p. 38, ll. 10-18); Exhibit "C" at 02:16:34; Exhibit "E," DPSC 568 (Exhibit 9F of Ward Deposition II); and Exhibit "E" DPSC 573 (Exhibit 9K of Ward Deposition II). Mr. Dilley runs around the back of the Saturn into the open space between the Saturn and State Police vehicle, as Trooper Domingue continues to move forward.[5] As Mr. Dilley is running in front of and away from Trooper Domingue, Trooper Domingue pursues him, pulls her gun, aims and tracks Mr. Dilley with it. (Ward Dep. II, p. 39, ll. 2-20; p. 45 ll. 6; Exhibit "C" at 02:16:33-34; Exhibit "E" DPSC 574

---

using a technique called a "rat jacket." (Ward Dep. I, pp. 121-122, ll. 22-18.) He acknowledged that what Mire described at his stop was consistent with another "rat jacket" scheme by Trooper Domingue. (Ward Dep. I, p. 123. ll. 10-12; p. 123, ll. 16-20.) There was no radio traffic to corroborate that Trooper Domingue made either of those calls. (Ward Dep. II, pp 86-87, ll. 21-3.)

[5] While plaintiff is cognizant of the possibility that screenshots can distort the full appreciation of the events, as discussed in *Collie v. Barron*, 747 F. App'x 950, 952-53 (5th Cir. 2018) plaintiff offers them here to show where Trooper Domingue and Dilley were during the sequence of events, leading to the shooting. Plaintiff does not suggest that these screenshots are better than the video at showing the events as they transpired.

(Exhibit 9L of Ward Deposition II); and Exhibit "E" DPSC 575 (Exhibit 9M of Ward Deposition II). Mr. Dilley runs several steps past Trooper Domingue. (Ward Dep. II, p. 40, ll. 2-4; Exhibit "C" at 02:16:33; Exhibit "E" DPSC 576 (Exhibit 9N of Ward Deposition II). Trooper Domingue continues to rapidly advance toward Mr. Dilley, and then she shoots him in the back as he is running away from her. (Ward Dep. II p. 40 ll. 8-16; p.45 ll. 6-10; Exhibit "E" DPSC 578, (Exhibit 9P of Ward Deposition II); Exhibit "C" at 02:16:34; Exhibit "E" DPSC 577 (Exhibit 9O of Ward Deposition II). Mr. Dilley falls forward face down on the ground. (Ward Dep. II p. 41, ll. 20-22; Exhibit "C" at 02:16:35, Exhibit "E" DPSC 578 (Exhibit 9P of Ward Deposition II); Exhibit "E" DPSC 579 (Exhibit 9Q of Ward Deposition II). Trooper Domingue also loses her footing and stumbles forward on her right knee to land near where Mr. Dilley fell. (Ward Dep II p. 43, ll. 20-24; Exhibit "C" at 02:16:36; Exhibit "E" DPSC 580 (Exhibit 9R of Ward Deposition II); Exhibit "E" DPSC 581 (Exhibit 9S of Ward Deposition II); Exhibit "E" DPSC 582 (Exhibit 9T of Ward Deposition II); and Exhibit "E" DPSC 583 (Exhibit 9U of Ward Deposition II).)

She calls the shooting into dispatch as a taser event. (Ward Dep. II pp. 18-19, ll. 25-3 and Exhibit "C" at 02:17:42.) Other State Troopers almost immediately respond to her call and arrive at the scene within minutes of the shooting. (Ward Dep. I, pp. 82-83, ll. 21-14, Domingue Dep., p. 120, ll. 9-14.) They believe that Mr. Dilley has been tased and call emergency medical services ("EMS") as a taser event rather than as a shooting. (Ward Dep. I, pp. 83, ll. 15-19, Domingue Dep., p. 120, ll. 9-14; p. 121, ll. 10-13; and Exhibit "H," EMS Records.) Eventually, Trooper Domingue admits to the State Troopers at the scene that she shot Mr. Dilley. (Ward Dep. I, p. 14, ll. 9-15, Domingue Dep., pp. 121-122, ll. 14-7.) Dispatch is finally notified more than twenty minutes after

the encounter, at 03:27 a.m., that an ambulance is needed immediately because Mr. Dilley was shot rather than merely tased.[6] (Ward Dep. I, p. 104, ll. 11-19.)

Trooper Domingue's body camera was not powered on during the shooting, and her car was not equipped with a dash camera. (Ward Dep. I, p. 49, ll. 2-20; Domingue Dep., p. 16, ll. 12-19.) The foregoing is based predominantly on the investigation of Sergeant Barry Ward, as corroborated by the surveillance video. Trooper Domingue has given numerous inconsistent accounts, as summarized below:

**1) Trooper Domingue's Story at the Scene (July 10, 2018, shortly after 3:02 a.m.)**

Trooper Domingue's story at the scene to the arriving officers was that the driver ran, she pursued him, and then Mr. Dilley charged her while she was on the right side (passenger side) of her vehicle, where she dropped to a knee to take a firing position, and shot Mr. Dilley as he charged at her. (Ward Dep. II, pp. 15-16, ll. 20- 18; Domingue Dep., pp. 139 – 140, ll. 12-7.)

Master Trooper Barry Ward, now Sergeant Ward, was the on-call detective who was notified of an officer involved shooting at 3:39 a.m. (Ward Dep. I, pp. 38-39, ll. 12-14; pp. 103-104, ll. 19-9.) Trooper Domingue gave a detailed account to Sergeant Ward while at the scene. (Ward Dep. I, p. 39, ll. 10-18.) In that account, she said that the driver, Mr. Mire, ran. (Ward Dep. I, pp. 45-46, ll. 14-12) She grabbed her taser, and began to pursue Mr. Mire, when the backseat, driver-side passenger, (Mr. Dilley) exited the vehicle, ran around the Saturn, and began to reach in the passenger, right, side of the Saturn. (Ward Dep. I, p. 46, ll. 16-25.) At that moment, Trooper Domingue backed up, commanded Mr. Dilley to stop, took a knee, transitioned from her taser to her firearm and shot Mr. Dilley as he charged her. (Ward Dep. I, p. 47, ll. 1-8;

---

[6] The incident occurred in the 3:00 hour but the surveillance video erroneously shows the start at 2:00.

Ward Dep. II; Domingue Dep., pp. 55-58, ll. 20-4.)  She also walks through the sequence of

events for Sergeant Ward, who notices markings on the ground, and asks her about them. (Ward

Dep. I, p. 54, ll. 5-23.) Markings include where Mr. Dilley lay and the letters "FP," which

Trooper Domingue initially acknowledged meant where her firing position was (Ward Dep. I,  p.

57, ll. 2-25; Domingue Dep., p. 79 19-21) , Exhibit "F," Pictures from the Scene, DPSC 7.)

### 2) Trooper Domingue's Story 15 Hours Later in Sergeant Ward's Interview (July 10, 2018 at 6:33 p.m.)

While at the scene that morning of the shooting, Sergeant Ward and his team noticed a

surveillance camera attached to the Village Grocery store. (Ward Dep. I, p. 126, ll. 12-14.) Later

in the day, Sergeant Ward's team secured a search warrant for the camera footage and obtained

it. (Ward Dep. I, p. 126, ll. 14-16.) The recording did not match Trooper Domingue's story at the

scene. (Ward Dep. I, p. 128 l. 3-9; p. 130 l. 1-4.) Trooper Domingue's Troop Commander

demanded to see the video footage. (Ward Dep. I, p. 18 ll. 13-16.) When Trooper Domingue

returned to work that evening, this same Troop Commander drove her from Troop A (near

Highland Road and Interstate 10), where she was located, to headquarters approximately twenty

minutes away by car, for an interview with Ward and other members of his team. (Ward Dep. I,

p. 136, ll. 2-3 and ll. 16-18; Ward Dep. II, p. 98, ll. 17-20.)

As soon as the interview began (at the 24 second mark of the recording), Trooper

Domingue asked Sergeant Ward whether they were able to get any footage from the surveillance

camera. (Ward Dep. I, p. 114, ll. 9-13.) During the interview, Trooper Domingue's story changed

from that which she gave at the scene. (Ward Dep. I, p. 15 12-13 and Ward Dep. II, pp. 19-20 ll.

22-1.) Instead of saying that she saw Mr. Dilley run around and reach into the (passenger side of

the) Saturn, she stated it was the driver, Mr. Mire, who ran around to the other side of the car and

yelled, "now." (Domingue Dep., p. 23, ll. 15-19; p. 139, ll. 16-19, pp. 150-151, ll. 10-2.) She was

adamant that she then saw Mr. Dilley getting out of the car; so she backed up as he continued to run towards her, while she was commanding him to stop. (Domingue Dep., p. 64, ll. 7-13.) She said again that she transitioned from her taser to firearm. (Domingue Dep. p.67 ll. 15-19.) She said she could not remember if she intentionally took a knee, but she remembers him being over her, and they made contact either right when she fired or right before. (Domingue Dep. p. 64 ll. 19-25.)

### 3) Trooper Domingue's Story in Use of Force Report (July 16, 2018)

Six days after the July 10 evening interview, Trooper Domingue completed a "Use of Force Report." (Attached as Exhibit "I" and referenced as Exhibit "5" to Domingue's Deposition and Exhibit 20 to Ward Dep. II.) In the report, she writes, "Taser was grabbed but as trooper gave chase, observed both front and rear passenger doors on the right side of the vehicle open." (Domingue Dep. p.139, ll. 19-23 and Exhibit 5.) She went on in the report to say,

> Trooper drew state issued service weapon as the right rear passenger, large black male, exited and Trooper lost sight of driver. Rear passenger, white male, on left side exited as the Trooper was near the license plate area and charged through the Trooper with a black item in his left hand. Suspect was struck in right side torso as the force from body contact knocked Trooper to the ground.

(Domingue Dep. pp. 139-140, ll. 24-7 and Exhibit 5.)

### 4) Trooper Domingue's Story in Her Internal Affairs interview (December 15, 2020)

In her Internal Affairs Interview, which occurred on December 15, 2020, Trooper Domingue changed her story to say that she accidentally shot Mr. Dilley. She claimed she was aiming at the driver and/or other running passenger when Mr. Dilley suddenly appeared

> right next to me. I had my arm and my leg extended. I *think* he made contact right there because after that, we were falling to the ground. I don't know when the shot happened. I don't know if it happened when he made contact there or when we hit the ground. I have no idea. And I told them that at that time, that I didn't even know that he was shot until I was checking him again.

(Domingue Dep., p. 72, ll. 6-14.) Trooper Domingue went on to say that she found a "hole" in Mr. Dilley after several officers had arrived at the scene when she was checking to see if he had any weapons on him before removing his handcuffs. (Domingue Dep., p. 24, ll. 18-24; p. 30, ll. 9-13.) Trooper Domingue asserted that she did not know that she had shot him until she found the hole and assumed he did not have that "hole" when he arrived at the scene. (Domingue Dep. p. 32, ll. 8-16.) When asked about the story she gave to the other Troopers, to Sergeant Ward at the scene, and to Ward in her July 10, 2018, interview, she blamed Sergeant Ward. (Domingue Dep. pp. 57-58, ll. 8-4.) Several times during the interview she said "Barry," meaning Barry Ward, told me "this is what happened."[7] (Domingue Dep., p. 52, ll. 3-6.)

### 5) Trooper Domingue's Story in Her Deposition (January 12, 2023)

In her deposition, Trooper Domingue initially continues with the story advanced in her Internal Affairs interview, saying that she was aiming at the driver when Mr. Dilley suddenly appeared, she tensed her body, and "at some point he was shot." (Domingue Dep., p. 25, ll. 24-25.) Trooper Domingue also initially stated she could not say whether she intentionally pulled the trigger or not. (Domingue Dep., p. 27, ll. 22-25.) On the other hand, throughout the deposition, she asserts that when Mr. Dilley suddenly appeared, she addressed the threat nearest her. (Domingue Dep., p. 62, ll. 16-22; p. 115, ll. 8-18; p. 132, ll. 12-19.) In her deposition, Trooper Domingue was more adamant that Mr. Dilley ran into her, saying he either hit her arm or foot. (Domingue Dep.,

---

[7] Q: "So, Kasha, based on those three troopers that arrived at the scene shortly after the shooting, they all three mentioned that -- that you told them that Dilley was charging you or running at you. I can see that perception when he immediately gets out the unit and you're running toward him. I can see that. But they all say that it was on the right side of your unit that you told them that he was charging you, he was coming at you, you dropped to a knee, took a firing position and shot him. They all said that." A: "I don't remember telling anybody that. I remember Barry telling me that that's what he thought happened." (Domingue Dep., pp. 51-52, ll. 13-6.)

pp. 28-29, ll. 23-2.) She even double-downed on the claim she made in her Use of Force Report that Mr. Dilley "attacked" her. (Domingue Dep., p. 144, ll. 13-19.) She continued to also assert from the IA interview that she did not know Mr. Dilley had been shot until she found "the hole" in him. (Domingue Dep., p. 55, ll. 9-13 and p. 78, ll. 4-8.)  Trooper Domingue acknowledged that she never told anyone before her IA interview (which was more than two years after the shooting) that the shooting was an "accident." (Domingue Dep., p. 49, ll. 7-9.)[8]

### 6) Story Advanced in Motion for Summary Judgment

Now, in support of her motion for summary judgment, Trooper Domingue argues that she was threatened by the activity on the right side of the vehicle and drew her service weapon in response:

> "But when I came around and I saw that the -- the other two people on the other side were a threat to me, I drew my service weapon thinking that I was gonna die at that exact moment. So I was addressing the – what was going on on the right side of the vehicle, the passenger side of the vehicle…" As a result, Domingue did not see Dilley exit the vehicle or running toward her… Domingue gave the command to stop, but the vehicle occupants did not stop; they continued in the directions they were moving… Sconiers, who remained in the vehicle watching the events unfold, believes Domingue told Dilley "stop right there."… Once Dilley suddenly appeared on Domingue's left side in close proximity to her, Dilley became an immediate threat to Domingue… Domingue was trained to address the immediate threat; she reacted to the situation and acted to save her life.

(Doc. 94-1, pp. 6-7.)  The account that Trooper Dilly advances in her Motion for Summary Judgment does not comport with her contention in her deposition that she could not say whether she intentionally pulled the trigger, that she was aiming at the driver and/or other running passenger

---

[8] In her deposition, Trooper Domingue claimed that she had only seen the video of the incident one time prior to her deposition, (Domingue Dep., p. 66, ll. 8-13 and Domingue Dep., p. 89, ll. 12-15) but Trooper Ward testified that he himself allowed her to view the video repeatedly when she returned for attempted follow-up interviews after the initial July 10, 2018, interview. (Ward Dep. I, p. 34, ll. 13-21 and p. 35, ll. 2-7.)

when Mr. Dilley came into contact with her, or that she shot Mr. Dilley when he "attacked" her. It also is contradicted by the video itself.

Trooper Domingue goes on to argue that it was Mr. Dilley's fault for her shooting him, since he admittedly should have remained in the car and not run when his friend ran and yelled for his passengers to run as well (Doc. 94-1, p.12.); however, "it is well settled that comparative negligence does not apply to damages for federal constitutional rights violations." *Sahota v. Cobb*, CIV.A. 14-2722, 2015 WL 6835480, at *3 (W.D. La. Nov. 6, 2015), judgment entered, CIV.A. 14-2722, 2015 WL 6830755 (W.D. La. Nov. 6, 2015); quoting *Blair v. Harris*, 993 F. Supp. 721,727 (ED Mich. 2014).

### B. Trooper Domingue is Not Entitled to Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Perron v. Travis*, 2021 U.S. Dist. LEXIS 60018, at *10 (M.D. La. Mar. 29, 2021), quoting *Terry v. Hubert*, 609 F.3d 757, 761 (5th Cir. 2010) (quoting *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)). To defeat the qualified immunity defense, then, plaintiff must demonstrate that (1) the defendant violated the plaintiff's constitutional rights, and (2) the defendant's actions were objectively unreasonable in light of clearly established law at the time of the violation. *Id.*, relying on *Porter v. Epps*, 659 F.3d 440. "In excessive force cases, 'the second prong of the analysis is better understood as two separate inquiries: whether the allegedly violated constitutional rights were clearly established at the time of the incident; and, if so, whether the conduct of the defendants was objectively unreasonable in light of that then clearly established law." *Hanks v. Rogers*, 853 F.3d 738, 744 (5th Cir. 2017) quoting *Griggs v. Brewer*, 841 F.3d

308, 312 (5th Cir. 2016). Furthermore, "[i]f officers of reasonable competence could disagree as to whether the plaintiff's rights were violated, the officer's qualified immunity remains intact." *Id.* In cases where qualified immunity is raised as a defense "the burden shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Collie v. Barron*, 747 F. App'x 950, 952 (5th Cir. 2018).

1) **Trooper Domingue violated Mr. Dilley's constitutional right to be free from excessive force.**

"Excessive force claims are necessarily fact-intensive; whether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.'" *Hanks*, 853 F.3d at 745 (quoting *Deville*, 567 F.3d at 167, quoting *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)). In determining whether an officer's actions are excessive or unreasonable, courts have been directed to "slosh…through the factbound morass of 'reasonableness.'" *Mason v. Lafayette City-Parish Consol. Gov't*, 806 F.3d 268, 276 (5th Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 383, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). The U.S. Supreme Court has identified facts and circumstances in determining the reasonableness of a force to include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 386. The Supreme Court has also directed that the courts take into account "the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." The Supreme Court further directs that "the perspective of a reasonable officer on the scene" must be considered, and the officer's actions not be judged "with the 20/20 vision of hindsight." *Hanks*,

853 F.3d at 738. Additionally, "in an excessive-force case on summary judgment, like any other case, a court must accept as true the evidence of the nonmoving party and draw all justifiable inferences in that party's favor." *Mason,* 806 F. 3d at 276.

### 2) Trooper Domingue's actions were objectively unreasonable.

In this case, the evidence shows that Mr. Dilley was a passenger running from a traffic stop and away from Trooper Domingue when she shot him in the back.[9] The video shows Trooper Domingue moving rapidly toward Mr. Dilley as he exits the Saturn, pursuing Mr. Dilley as he begins to run away from her, then aiming and finally shooting him in the back as she continued to accelerate after him. (Ward Dep. II, p. 78, l. 24; Exhibit "C" at 02:16:35.) Under these circumstances shooting an unarmed fleeing passenger in the back in a traffic stop was unreasonable. *Allen v. Hays*, 2023 U.S. App. LEXIS 6795, at *7 (5th Cir. Mar. 21, 2023) (where court stated "that it is manifestly unreasonable for an officer to seize a suspect the officer knows is unarmed and not aggressive by shooting him dead"), citing *Poole v. City of Shreveport*, 13 F.4th 420, 424 (5th Cir. 2021); and *Waller v. Hanlon*, 922 F.3d 590, 599 (5th Cir. 2019).[10]

Trooper Domingue's evolving accounts of the shooting incident are simply her attempts to accommodate her actions as shown on the video. As this court has recognized, "well-supported suspicion of mendacity may serve as a legitimate basis for the fact finder's reasonable

---

[9] Sergeant Ward testified that Mr. Dilley's statement of events shortly after the incident, even under recently hospital administered morphine, was "a more clear and accurate depiction of what actually occurred." (Ward Dep. I, p. 94, ll. 10-13 and ll. 18-23.)

[10] It is important to note that in none of Trooper Domingue's iterations of events does she assert that Mr. Dilley was "armed." While she stated that she saw a black object in his hand, she expressly agreed that it was not an issue on which she focused on Mr. Dilley. (Domingue Dep., p. 39, ll. 1-12.) Additionally, even whether she saw a black object in Mr. Dilley's hand at all is a question of fact, since she asserts that Mr. Dilley had the phone in his left hand, and Mr. Dilley adamantly says the phone was in his right hand. It is very possible that Domingue knew about the phone only because she found it when Dilley was on the ground after being shot. (Domingue Dep., p. 39, l. 3; Dilley Dep., p.64, ll. 5-9.)

inferences concerning the ultimate facts at issue." *Savoy v. Stroughter,* 2021 U.S. Dist. LEXIS 57005, at *12 (M.D. La. Mar. 25, 2021)*, vacated on other grounds* 2022 U.S. App. LEXIS 5981, at *1 (5th Cir. Mar. 8, 2022) *(quoting Thomas v. Great Atlantic and Pacific Tea Co., Inc.*, 233 F.3d 326, 331 (5th Cir. 2000). Nothing about the event should be considered from Trooper Domingue's *stated* perspective, since she gave myriad versions of how she perceived the events and why she shot Mr. Dilley. Of particular note:

- Trooper Domingue has given widely varying accounts of her location when she initially made contact with Mr. Dilley,[11] the location where she shot Mr. Dilley,[12] and whether she used her taser or firearm.[13] (Ward Dep. II, pp. 19-20 ll. 25-1; p.89 ll. 8-13.)

- Trooper Domingue at various points has claimed that Mr. Dilly charged her (Domingue Dep., p. 140 ll. 3-7), that she believed he would run her over

---

[11] Even though she gave an elaborate description of the event in her July 10, 2018, interview where she says "I think I hit the [front] [sic] of the car backing up and then trying to go to the left and trying to go to the right, and then he started coming towards me and then we both kind of went off to the right side," (Domingue Dep., p. 68, ll. 14-19.) Trooper Domingue later acknowledged in her deposition that, consistent with the video, she never backed up. (Domingue Dep., p.130, ll 1-3.)

[12] In her deposition, Trooper Domingue continued to deny that she ever told anyone that she was at the right front side of her car, and said she had no knowledge whatsoever about the FP designation (which was at the right side of Trooper Domingue's patrol unit, Exhibit "F"), except that is what Sergeant Ward told her what happened. (Domingue Dep., pp. 78-79, ll. 23- 3 and p. 81, ll. 6-17.)

[13] When she was asked why she repeatedly said she grabbed her taser first, Trooper Domingue testified she meant, "I grabbed it. I didn't draw it." (Domingue Dep., p.61, ll. 4-6.) She could not reconcile this statement, however, with her explanation in her July 10, 2018, interview on why Mr. Dilley believed he was tased: "[Dilley] kept saying he was tased, he was tased. *I know he saw me with the taser c*oming out because he came from the other side. And I -- that's when I transitioned. He was already on top of me at that point and -- or coming towards me. So it was like it was -- *I know he saw I had the taser in my hand*, so I think that's why he thought that he was tased at that point instead of being shot. (Domingue Dep., p. 118, ll. 8-20 (emphasis added)) When confronted with her interview statements that she "transitioned" from taser to firearm, she blamed Ward, saying she was not even familiar with the term. (Domingue Dep., pp. 67-68, ll. 23-5.)

(Domingue Dep., p. 128 ll. 14-17), that he was attacking her (Domingue Dep., p. 144 ll. 17 -19), and that he contacted her (Domingue Dep., p. 24 ll. 3-6) (which are all directly contradicted by the video).

- Trooper Domingue has claimed, more recently, that she was focusing on and actually aiming her gun at the other runners when Mr. Dilley "suddenly" appeared, and she either accidentally shot him or "addressed the threat closest to her." (Domingue Dep., p. 25 ll. 1-6; p. 61, ll. 10-16; p. 115, ll. 12-16.)

This latest version mirrors the investigative findings in Sergeant Ward's final report describing what happened as Trooper Domingue was pursuing Mire: "During this time, she *suddenly* encountered Mr. Dilley as he was exiting the Saturn." (Ward Dep. I., p. 162, ll. 9-10.) When asked about this during his deposition, Sergeant Ward stated that his initial version of the "Investigative Finding" section in his report stated:

> [t]he surveillance video recovered from the Village Grocery depicted the actual events of what occurred in the officer-involved shooting of Trooper Domingue, which is previously detailed in this report. Trooper Domingue's initial statement on the scene, formal interview and use of force reports were all inconsistent with the facts discovered in this investigation.

(Exhibit "J," Typed Draft and Ward Dep. I, p. 161, ll. 12-20.) This was changed by supervisors. (Ward Dep. I, p. 162, ll. 13-18.)  Sergeant Ward further stated that when he told his supervisor that he and his team would be recommending criminal charges in their report, his supervisor responded, "They're never going to accept that. You better find another way." (Ward Dep. I, p. 153, ll. 16-19.) When directed to change that conclusion, Ward explained that he could not (Ward Dep I., pp. 154-155, ll. 23-2); and his supervisor eventually handed him a handwritten new version, which Ward explained he kept and brought to the deposition because he was so disturbed that it did not comport with he and his team's conclusions and what the video actually

depicted. (Ward Dep. I, p. 155, ll. 2-7 and Exhibit "K" Handwritten Draft.) The changed version on Dilley "suddenly" appearing became the theme of Domingue's story two years later and now.

Finally, Trooper Domingue acknowledged in her criminal case plea, that she falsely reported the incident as a taser discharge, made multiple statements that were inconsistent with the physical evidence and the evidence captured on video, misrepresented her firing position and falsely claimed Mr. Dilley made contact with her before or as she fired her weapon. (Domingue Dep., pp. 169-172, ll. 21-6 and Exhibit "L" Certified Court Transcript of Domingue Sentencing.) Trooper Domingue further admitted to listing false situational factors, including inability to disengage, in her use-of-force report, and she admitted to misrepresenting her standing position when Mr. Dilley exited the Saturn. (Domingue Dep., p. 170, ll. 7-13.) Trooper Domingue acknowledged that her false statements would have distorted the criminal investigation had there been no video surveillance. (Domingue Dep., p. 170, ll. 14-20.) It should be noted, however, that when asked about this in her deposition, Trooper Domingue denied agreeing to the factual basis despite representing to the court that she did not dispute the factual basis. (Domingue Dep., p. 168, ll. 10-19.)

Trooper Domingue's actions were objectively unreasonable. The video shows the other passengers running away when Mr. Dilley was exiting the Saturn, and more importantly it shows that as soon Mr. Dilley began getting out of the car, she veered and advanced ***toward*** him before taking out her gun, aiming at him and shooting him as he was escaping her.[14] (Exhibit "C" at 02:16:31 - 02:16:37) Additionally, Mr. Dilley made no attempt to reach, touch, grab, or swing at

---

[14] Regarding statements she made during the criminal investigation Sergeant Ward was asked: "In all of her statements to you and to everyone else, she always said she saw Mr. Dilley exiting the vehicle? Yes." (Ward Dep II., p. 29, ll. 11-15.)

Trooper Domingue. As such, Mr. Dilley posed no threat of great bodily harm to Trooper Domingue.

Mr. Dilley's testimony that he was running away from Trooper Domingue and the video supporting Mr. Dilley's account, combined with the "well-supported suspicion of mendacity" of Trooper Domingue, support the fact that Domingue used unreasonable force when she shot Mr. Dilley. Additionally, Law Enforcement Practices and Use of Force expert Jack Ryan opines, "[h]ere, based on the objective video, there were no facts that would [allow] an officer, based on generally accepted practices and training, to conclude that Dilley posed an immediate threat of serious bodily harm or death to Domingue. (Exhibit "M", Declaration of John J. Ryan, ¶ 180) Mr. Ryan goes on to conclude: "Officers are trained that use of force decisions have to be based on objective facts available to them at the time the force was used. Based on all of the foregoing, it is my opinion that former-Trooper Domingue's use of deadly force on Mr. Dilley [sic] was contrary to generally accepted policies, practices, training and industry standards on use of force. (Ex. "M," ¶ 188). Finally, after an exhaustive administrative review, State Police, while recognizing that her inconsistent statements could not be reconciled concluded that she "shot Mr. Dilley in the back, causing him to be paralyzed from the waist down, without any reliable justification." (Exhibit "N," LSP IA File - K. Domingue - 007-021, p. 017.) Accordingly, Trooper Domingue's shooting of Mr. Dilley in the back as he ran away from her at a traffic stop violated Mr. Dilley's Fourth Amendment constitutional right to be free from excessive force.

3) **Domingue was on notice that shooting Mr. Dilley in the back while fleeing from a minor traffic stop was a clear violation of Mr. Dilley's Fourth Amendment right to be free from excessive force.**

The U.S. Supreme Court directs courts in considering the second prong of qualified immunity defenses in the Fourth Amendment context to determine whether an officer's conduct

violated clearly established law in light of the facts and context of the specific circumstance that the officer confronted. *Perron v. Travis*, 2021 U.S. Dist. LEXIS 60018, at *12 (M.D. La. Mar. 29, 2021*), relying on Mullenix v. Luna*, 577 U.S. 7. An officer violates a clearly established right when the right's contours are sufficiently definite so that any reasonable official in the defendant's shoes would have understood that he was violating it. *Plumhoff v. Rickard,* 134 S. Ct. 2012, 2023 (2014).

The law was clearly established so that Domingue was on notice that shooting Mr. Dilley in the back when he ran from her and objectively presented no risk to her or anyone else was prohibited. It is clearly established that shooting an unarmed, fleeing suspect who poses no objectively reasonable threat is unconstitutional. *Brosseau v. Haugen*, 543 U.S. 194 (holding it is unreasonable for an officer to seize an unarmed, non dangerous suspect by shooting him dead); *Lytle v. Bexar Cty., Tex*., 560 F.3d 404, 417 (5th Cir. 2009) ("It has long been clearly established that, absent any other justification for the use of force, it is unreasonable for a police officer to use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others.") *Poole v. City of Shreveport*, 2020 U.S. Dist. LEXIS 245698, at *19 (W.D. La. Dec. 30, 2020) ("the Court finds that it was clearly established at the time of Poole's injury that it would have been unreasonable for a police officer to use deadly force against a fleeing suspect if the suspect did not present sufficient threat of harm to the officer or to others"); *Tutrix v. Travis*, 595 F. Supp. 3d 488, 511 (M.D. La. 2022) (every reasonable officer "would have known, beyond doubt, that intentionally shooting a fleeing and unarmed potential suspect twice in the back was objectively unreasonable under clearly established law.") *See also Sauls v. Hutto*, 304 F. Supp. 124, 132 (E.D. La. 1969) ("A bullet in the back is not Louisiana's penalty for fleeing to escape

arrest. Deadly force may be used only when life itself is endangered or great bodily harm is threatened.")

While qualified immunity protects all officers "but the plainly incompetent or those who knowingly violate the law," *E.g.*, *McCullough v. Wright*, 824 F. App'x 281, 284 (5th Cir. 2020), Domingue was not a reasonably competent officer. Sergeant Ward explained that because of comments Trooper Domingue made in her July 10, 2018, interview, he contacted the State Police Academy for her training records. When he called to inquire about the records, he was told, "[o]h, we knew this was going to come someday." (Ward Dep. I, p. 144, ll. 10-11.) Ward expressed consternation over what he learned: that the Academy commandant had recommended that she not be allowed to graduate with her class because of too many missed classes and because "Cadet Domingue has struggled from the onset of the class; both physically and mentally." (Ward Dep. I, pp. 144-145, ll. 13-5; Domingue Dep. p. 164, ll. 11-13; and Exhibit "O" Letter from Captain Williams.) Ward said that he reviewed the file, and she had a high number of low ratings on competency across the board in her supervisor reviews. (Ward Dep. II, pp. 10-14, ll. 5-12 and Exhibit "P" Supervisor Reviews.) As significant, her peers consistently reviewed her negatively, with multiple remarks related to her lack of credibility. (Ward Dep. I., p. 149, ll. 19-23, and Exhibit "Q," Peer Review also referenced as Exhibit 27 of Ward Dep. II.)

Despite these overwhelmingly negative supervisor and peer reviews, and the overall recommendation of the commandant that she not be allowed to graduate, Trooper Domingue was permitted to graduate and to undergo additional training before she became a full-blown trooper. (Exhibit "O.") As attested in the affidavit of Ryan (Exhibit "M"), Trooper Domingue's shooting Mr. Dilley in the back as he ran away from her when he presented no danger to her at a traffic stop demonstrates that she remained an incompetent officer at the time of the shooting and

should not have been on the road. (*See also* Ward Dep. II, p. 104, ll. 2-4) Trooper Domingue's performance at the State Police Academy supports this assertion.

Additionally, as this Court has recognized in *Perron*, conduct, such as this, can fall into a circumstance where the violation was so obvious so as to violate clearly established law, "even without a body of relevant case law." 2021 U.S. Dist. LEXIS 60018, at \*12-13, relying on *Brosseau* at 199, 160. *See also*, the en banc decision of *Cole v. Carson,* 935 F.3d 444 (5th Cir. 2019) (where on rehearing of the excessive force claim aspect of the case in light of *Mullenix*, the court found sufficiently clear the rule against shooting a mentally disturbed teenager holding a gun to his own head without warning when he posed no threat to officers.)

In *Cole*, the 5th Circuit affirmed the district court's factual findings that officers, without warning, shot a teenager who had been holding a gun to his head and posed no threat to them, despite the officers' evolving account of the events. Importantly, the officers' claimed that the mentally disturbed teenager had aimed his gun at them, but the district court found that the teenager had kept his gun aimed at his own head, based on a ballistic report showing that the bullet fired into his head was from his own gun. *Id.*

Similarly, the fact that Mr. Dilley was shot in the back belies Domingue's claim that she was a danger to her when she shot him. *See, e.g., Young v. Broussard*, 189 So. 477, 480–81 (La. Ct. App. 1939) (where the court found the night watchman's account that he shot a person who was coming at him in a threatening manner was undermined by the fact that the fatal shot struck the victim in his back). Sergeant Ward described his recognition of this issue and how he specifically asked Trooper Keith Bennett, who interviewed Mr. Dilley at the hospital the morning of the shooting, to check where Mr. Dilley had been shot. Trooper Ward explained:

> I had also gotten on the phone at that time with Keith Bennett and said, "I need to know where the gunshot wound is on Scott Dilley." In my mind, I -- I'm still thinking back to

the scene, "something's just not right about this." So on the phone with Keith Bennett, he says -- I -- I said, "He should have a gunshot wound in his lower-right section on the front." And he says, "No, he don't have a gunshot wound there." I said, "Keith, you're..." I said, "...walk, you need to be sure, walk back in there." He says, "I'm telling you there's no gunshot wound in his front-right." I said, "Walk back in there right now and you pull whatever bandage off you have to, and tell me where that wound is." He goes back in and says, "It's in -- it's in his back."

(Ward Dep. I, pp. 128-129, ll. 11-3.)

Furthermore, Trooper Domingue's ever-changing, self-contradicting statements, which are clearly not supported by the video evidence, suggest that Trooper Domingue knew her actions constituted a violation of the rule against using lethal force against a fleeing person when that person poses no threat of harm. Her distortions of the truth, particularly her story that Mr. Dilley attacked her, indicate that she knew that without objective support that Mr. Dilley posed a danger to her, she should not have shot him. Her fabrications demonstrate a "consciousness of guilt," and that she knew shooting Mr. Dilley under the actual circumstances, rather than her shifting articulated justifications, constituted  a constitutional violation.

## III. CONCLUSION

Mr. Dilley was the unarmed passenger in a vehicle stopped for making an illegal u-turn. While he should not have attempted to flee the scene, his doing so did not justify being shot in the back.  Trooper Domingue's actions were objectively unreasonable and a clear violation of Mr. Dilley's constitutional rights.  Trooper Domingue's many attempts to justify her actions by fabricating various stories that paint a picture of Mr. Dilley as an aggressor should be seen for what they are:  proof that Trooper Domingue knew that her actions were unreasonable and a

violation of the law.  Qualified Immunity is not meant to protect people who behave like Trooper

Domingue.  Accordingly, her motion for summary judgment should be denied.

Respectfully Submitted,

/s/ Donald J. Cazayoux, Jr.
Donald J. Cazayoux, Jr. (20742)
J. Lane Ewing, Jr. (29854)
Cazayoux Ewing, LLC
257 Maximilian Street
Baton Rouge, LA 70802
Telephone: 225-650-7400
Facsimile: 225-650-7401
E-mail: don@cazayouxewing.com
E-mail: lane@cazayouxewing.com
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| CLIFTON SCOTT DILLEY | : | |
| *Plaintiff,* | : | |
| | : | |
| VERSUS | : | |
| | : | CIVIL NO. 19-391-BAJ-EWD |
| STATE OF LOUISIANA, | : | |
| DEPARTMENT OF PUBLIC SAFETY | : | |
| AND CORRECTIONS, AND | : | |
| OFFICE OF STATE POLICE, | : | |
| AND KASHA DOMINGUE | : | |
| *Defendants.* | : | |

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing *Plaintiff's Memorandum in Opposition to Defendant Kasha Domingue's Motion for Summary Judgment* was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be emailed to all counsel of record.

Baton Rouge, Louisiana this 30th day of March, 2023.

/s/ Donald J. Cazayoux, Jr.
DONALD J. CAZAYOUX, JR., #20742
J. LANE EWING, #29854
CAZAYOUX EWING, LLC
257 Maximilian Street
Baton Rouge, Louisiana 70802
Telephone: (225) 650-7400
Facsimile: (225) 650-7401
don@cazayouxewing.com
lane@cazayouxewing.com
*Attorneys for Plaintiff*
