# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISIANA

CLIFTON SCOTT DILLEY     *

          *

    Plaintiff,          *

          *

          *

VERSUS           *      CIVIL NO. 3:19-cv-391-BAJ-EWD

          *

STATE OF LOUISIANA,      *

DEPARTMENT OF PUBLIC     *

SAFETY AND CORRECTIONS,   *

OFFICE OF STATE POLICE,     *

AND KASHA DOMINGUE      *

          *

    Defendants.        *

* * * * * * * * * * * * * * * * * * * *

# Declaration of John J. Ryan

Pursuant to 28 U.S.C. § 1746, I hereby declare as follows:

1. My name is John Ryan. I have been actively involved in police practices and law enforcement since 1981. I was an active police officer for twenty years in Providence, Rhode Island. In the final year of my active career and since my retirement in June of 2002 from police services, I have been involved in police and law enforcement practices as a private consultant regarding law enforcement issues.

2. My education includes a Bachelor of Science Deg7ree in the Administration of Justice from Roger Williams University in Bristol, Rhode Island; a Master of Science Degree in the Administration of Justice from Salve Regina University in Newport, Rhode Island and; a Juris Doctor Degree from Suffolk University Law School.

3. From 1993 until 2002 I served as an adjunct faculty member in the graduate Administration of Justice Program at Salve Regina University in Newport, Rhode Island. In that capacity I was responsible for graduate courses on Constitutional Issues in Law Enforcement; Police

1

Exhibit M

Misconduct/Civil Liability; Managing Police Organizations; Contemporary Issues in the Justice Field; Juvenile Justice; Mental Health Law; and Business Crime.

4. I am currently the co-director of the Legal and Liability Risk Management Institute along with James Alsup, and Lou Reiter.  In that capacity I author and edit the institute's legal update service for law enforcement.  This update service and an archive of all articles that I have written can be found at and www.llrmi.com.  Additionally, I provide multiple on-line video roll-call trainings annually for both the road and jail operations. This on-line roll-call series is a subscription service offered by the Legal & Liability Risk Management Institute.

5. As part of the Legal and Liability Risk Management Institute I also conduct policy, training and operations reviews for law enforcement agencies and jails throughout the United States.  These reviews focus on the manner in which agencies treat the critical tasks in law enforcement and jail operations.  As part of these reviews I assist agencies in identifying areas in policy, training and operations that may be improved upon to bring the agency within the legal mandates and generally accepted practices in law enforcement and jail operations.

6. Since 1993, I have conducted numerous training sessions for public employees.  Participants in this training have included law enforcement officials, school officials, attorneys and judges. Training I have provided are detailed in my CV.

7. I am a former police Captain of the Providence Police Department in Providence, Rhode Island where I served for twenty years before retiring in 2002.  During my tenure as a police officer I served in the following capacities: patrol officer in both the Patrol Division and the Tactical Unit; a detective in the Detective Bureau; a sergeant in the Patrol Division; a lieutenant in the Patrol Division; Director of Training; Director of the Department's Office of Public Affairs and; Director

of the Department's Administrative Staff. During most of my career I also took an active role in researching and authoring department policy.

8. Since my retirement in June of 2002, I have taught numerous courses on police policy and procedure, arrest, search and seizure, use of force, police pursuits, dealing with the mentally ill, emotionally disturbed, and suicidal, domestic violence, law enforcement's response to autism, law and best practices in the internal affairs process, civil liability for law enforcement agencies, and specialized courses for narcotics officers, SWAT commanders, and internal affairs officers. Participants in these courses have come from thousands of law enforcement agencies around the United States. Officers in attendance have come from departments with under ten sworn officers and departments with sworn officers numbering in the thousands. These programs are conducted numerous times annually throughout the United States and also include on-line courses on these topics for law enforcement.

9. The course on policy and procedure focuses on critical tasks in law enforcement and includes, inter alia, policy issues relating to use of force; police pursuits; domestic violence; sexual harassment and external sexual misconduct; off-duty conduct; hiring & retention issues; internal affairs; supervisory practices; search and seizure; property and evidence; care, custody and transport of prisoners as well as training issues relating to critical tasks in law enforcement.

10. The programs on High Risk Critical Tasks/Best Practices in Law Enforcement includes instruction on Use of Force including inter alia: dealing with individuals of diminished capacity i.e. emotionally disturbed, mentally impaired; and suicidal, excited delirium, as well as persons with disabilities and use of electronic control devices; Search-Seizure and Arrest; Pursuit and Emergency Vehicle Operation; Care, Custody, Control, and Restraint of Prisoners; Domestic

Violence; Off-Duty Conduct; Sexual Harassment, Discrimination, and Misconduct; Selection and Hiring; Internal Affairs; Special Operations; and Property and Evidence.

11.  As a co-director of the Legal & Liability Risk Management Institute I regularly research and draft policies for law enforcement agencies and jails relating to high-risk critical tasks including use of force, arrest-search & seizure, pursuit, emergency vehicle operation, special operations, internal affairs, hiring and selection-retention of officers, care-custody-control & restraint of prisoners, sexual harassment-discrimination & sexual misconduct, domestic violence, arrest procedures, care, custody, and control of persons with disabilities, and dealing with the mentally ill. In addition, I write, record, produce, and distribute on-line training videos for law enforcement nationwide.

12. Since 2002, I have been involved in the auditing of law enforcement operations throughout the United States conducting several audits annually based on either a need or as a proactive measure of agency performance in the high liability areas of the road and jail operation. I have been involved in assisting dozens of departments nationally through these audits in developing policy, training, and enhancing operations for law enforcement services.

13. My experience, training and background are more fully described in the attached curriculum vitae, which I incorporate by reference to this report.

14. I have reviewed the following materials to date regarding this case: See Schedule D

15. This expert report is based upon the materials provided to this date. The opinions presented in this report are based upon my specialized experience, training and knowledge of police practices as well as my continued research and work with law enforcement nationally. This work includes conducting training for law enforcement around the United States as well as auditing the policies and operations of law enforcement agencies around the United States. My opinions are provided

with a reasonable degree of certainty within the fields of law enforcement, police activity and police administration and supervision. I am familiar with police civil litigation and know the normal phases of discovery. I recognize that there may be additional documentation as the case progresses. If additional material is produced, I shall be prepared to supplement this report.

16. At the outset it is important to note that this report is based upon the facts as presented by the material and specifically avoids drawing conclusions based upon credibility issues of the parties.

<u>Deposition of Clifton Dilley</u>

17. Dilley testified as follows about how much he had to drink throughout the afternoon and up until this incident: "Like, two beers and, like, maybe two or three Red Bull vodkas." (36).

18. Dilley stated that he smoked marijuana at 2:00 a.m. on July 10, 2018. (36). Dilley acknowledged that this would have been about an hour before the incident. (36).

19. Dilley stated the following about who made the decision to get in the car and head down Perkins Road: "Going home because we were going back to AJ's, because remember I said there was girls there. Well, we missed our shot at the bar, so we were gonna go over there." (42).

20. Dilley testified to the following about where the individuals were sitting in the car: "Driver, Jamaal, front seat, left side. Tokyo, passenger, front seat, right side, me, Scotty, back left, behind the driver. And I don't know how to spell Jeremiah, but he was on the back right behind Tokyo." (44).

21. Dilley testified that he personally did not have any weapons inside of the vehicle. (45-46).

22. Dilley further testified to the following about the drive: "So, we went from Reggie's to Jamaal's house, I guess, to get some weed, because I didn't get out the car. And then got back in, we were going to AJ's to go hang out with the girls." (46).

23. Dilley stated the following about how long he had been in the car until they were pulled over: "I guess 40 minutes to an hour. I guess that timing, I guess." (47). Dilley acknowledged that he saw the lights from the trooper's vehicle after the illegal U-turn was made. (48).

24. Dilley stated the following about where Mire pulled over: "He made -- yes, sir. He pulled over behind the Village Grocery." (48).

25. Dilley acknowledged that there was marijuana in the vehicle when it was stopped. (49).

26. Dilley testified to the following about Trooper Domingue when the car was stopped behind Village Grocery: "I remember, I mean, she had her gun up, getting him out, telling him to get out the car." (50). Dilley then testified that Trooper Domingue may have had a taser out. (50). Dilley further testified about Trooper Domingue was holding: "Something, because I mean, I just happened to look back to may left and see her holding something up . . . Telling him to get out the car from like the back left taillight, about that far." (50).

27. Dilley further described the following about what happened after the vehicle was stopped: "And then he gets out and walks back to her car. They're doing whatever and here he is next to Tokyo in the -- he's in the passenger seat on the front right. He runs up and says run. And we all looked at each other like what the fuck, and I just kinda ran, yeah." (50-51).

28. Dilley acknowledged that Jamal Mire told everybody to run. (51).

29. Dilley stated that Tokyo Sconiers did not run from the vehicle stop. (51).

30. Dilley testified to the following about whether he was drunk when he ran from the car: "I'd say more high than drunk since I had freshly smoked a blunt." (52).

31. Dilley stated that he did not have any outstanding warrant at the time he ran. (53).

32. Dilley reported the following about the direction that he ran: "I had to round the car as close to the light, the back -- back, left taillight as possible and I then -- I know I can't jump a ten-foot fence

so there was like a three-foot white one once I rounded that corner that I saw, because I didn't really have a plan of getting out the car. I just kind of ran. Once I rounded the corner I saw the white fence, so I said I'm going to jump over that. But I didn't make it that far." (57).

33. Dilley testified to the following about whether he noticed that he was running in the direction of the police officer: "Well, I wouldn't say I was running in the direction of the police officer, because she was -- it was a angled lane I would say, because she was angled to my right and I had to go through this gap which was the amount of distance I have before she's close to me and the edge of this car. So, I made -- I made the gap and as I passed her that's when she shot." (57-58).

34. Dilley stated that he had his phone in his right hand when he started running. (64). Dilley described the phone as an "iPhone 8, black. Very cracked." (64).

35. Dilley also stated that he had a fidget spinner in his pocket and described it as follows: "It's like for ADHD or you can't like stay still, fidgety, and you hold the middle of it and you flip the sides, and it spins. That's about it. Keeps your brain busy." (64).

36. Dilley further described his phone, "Yes, no case. Completely, about shattered because I don't have a case on it. It's a all glass iPhone 8." (64).

37. Dilley testified that from his memory Trooper Domingue did not tell him to stop. (64).

38. Dilley stated the following about what happened after he ran in the direction of the fence and the trooper's vehicle: "I passed her up and then got shot in the back. Then she hopped on top of me and she was shaking my right hand, I guess, to maybe drop my phone. And I didn't want to break my phone at the time, so I kind of resisted a little bit to set my phone down." (66).

39. Dilley further testified, "She gets on top of me. She shoots. Gets on top. Hand, goes for hand. Shakes it. And I resist to put it down. Then I put my arms behind my back, and then she goes, wallet, keys, phone. What is this, talking about the fidget spinner. I said fidget spinner, spin it. And

she threw it on the ground. And then she goes -- that's what Tokyo is like, I'm over here, you can come get me and he's got his hands out the window . . . And she walks over there, gun up. Got the -- I am handcuffed and I'm kind of looking back to see like if he's okay, because I mean I didn't know what the hell happened to me. And then he walks past me. He says are you okay. I said I think so or I guess so. And that's when I think he turned to the car, I mean, she puts him in the car. And then all that goes by and then the ambulance and then another officer appears. That is when she sat me up, and I was able to kind of scuffle my legs under me. She said, kinda, do like that. Try to get your legs under you. I was able to -- these are my legs. I was able to kind of get like an open Indian-sitting crisscross, and then what felt like one arm pulled up, nothing. Put down, up, down, and I was like what's wrong with my legs? She says it's a taser after effect. It will wear off. Then I remember a spiky haired blonde dude and another officer kind of, like, a taser, like a soft--” (67-68).

40. Dilley testified that Domingue told him that she had tased him and she did not tell him that she shot him. (68). Dilley stated that he thought he had been tased. (68).

41. Dilley stated the following about whether Domingue ever struck him with her hands or her fists: “Just the shaking of the phone.” (70).

42. Dilley stated the following about when he was first told that he was shot: “I rolled in and then a Dr. Scott came up to me and said -- we did a fist bump, what's up. He said, well you have been shot, and I was, like, well, thanks for being the first person to be honest.” (73).

43. Dilley testified that he does not recall Domingue saying anything to him in the sequence before he was shot. (106).

44. Dilley reported the following about his overall injuries from this shooting: “The bullet hit my spine. It went in my spinal canal, so the injuries, the residual injuries from that were -- kind of a

quick summary. Left foot does not move, it has drop foot; the right foot at the time did not move. It came back within therapy. Everything was pretty weak. I could basically just wiggle my legs. My upper body was decent enough to be able to pick my butt up to do a transfer. But they had -- to give an example they had to use the little sliding board and do like that to get me in the transport wheelchair to go to the therapy place." (136).

<u>Deposition of Jamaal Mire</u>

45. Mire acknowledged that he was in the vehicle with Dilley on July 10, 2018 and Mire described Dilley as a acquaintance. (16).

46. Mire acknowledged that he was the driver of the vehicle. (18).

47. Mire stated the following about if he had anything to drink at Reggie's or any other bars before this incident: "In fact, I think I was intoxicated . . . I think I did have a few drinks that night." (18).

48. Mire stated the following about how many drinks he had: "I couldn't tell you. I would assume that if I go out or if I went out, I had a couple of drinks." (18).

49. Mire acknowledged that he made the U-turn on Perkins and that a state trooper was behind him at this time. (19-20).

50. Mire testified to the following about whether he pulled over on Perkins: "No. Well, whenever I made the U-turn, the first thing that I did was pull over." (21).

51. Mire testified as follows about whether he went behind a strip mall where Village Grocery is located: "I couldn't tell you exactly like where it was. I just remember it -- I don't know if it was behind a building or in front of a building." (21).

52. Mire stated the following about why he hopped the fence: "Because the first thing that the state trooper did whenever she was getting me out of the car was call five -- or she called multiple units to the scene." (22).

53. Mire testified to the following about whether he had been smoking marijuana in the car shortly before being pulled over: "I don't recall. Like I don't remember." (24).

54. Mire testified to the following about his conversation with the state trooper: "She asked me where I was coming from, what I was doing, who I was with, and I want to say I answered as honestly as possible." (34).

55. Mire stated that he presented the trooper with a valid license and that he had proof of insurance on the vehicle. (35).

56. Mire testified to the following about why he ran: "Because she called other units to the scene." (36).

57. Mire further stated, "Yes, I just heard more units and I got scared." (37). Mire reported the following about why he was scared: "Just because of the previous things I've seen or had seen on like the law enforcement and how all the bad things and the negative things that, you know, are blown up on social media and all of that stuff. I was scared." (37).

58. Mire stated the following about telling the other occupants of the vehicle to run: "Whenever I took off from the cop I yelled run. Why? I have no idea. I couldn't tell you why I told them to run. I would assume because I'm scared, I was scared for some reason, they should be too, I couldn't tell you exactly why or other than that." (37).

59. Mire further stated the following about why he told the other occupants to run: "I don't know. That's what -- the only reason I could think of is because I'm so scared, they should be too. You know, it was a reaction." (38).

60. Mire acknowledged that he was later arrested by the state police at his mother's house. (40).

61. Mire testified that there were no weapons in the car that he knows of. (41).

62. Mire stated the following about if he knows where Dilley went after Mire yelled run: "I found out that he was shot by the cop. So I would assume he ran towards the cop or something, I have no idea." (42).

63. Mire testified that he did not witness Dilley being shot by the state trooper. (42).

64. Mire stated that he did not have any outstanding warrants at the time he was pulled over by the trooper. (43).

65. Mire acknowledged that he did not see the direction of Dilley when he was running from the car. (45).

66. Mire testified that he did not see the trooper pull her firearm from her holster. (47).

67. Mire testified that he never heard the state trooper say the word, "TASER". (47).

68. Mire further testified to the following about if he heard Trooper Domingue say anything: "As far as her saying a tazer or giving a warning, I didn't hear anything in that manner. As far as gunshots, I heard that as soon as I hit the fence. So that's why I said I don't recall, I didn't hear any of that." (53).

69. Mire stated the following about whether he recalled Trooper Domingue telling him to get out of the vehicle: "I don't remember her telling me to get out, I just remember following directions as far as her getting me out of the car and walking me to her vehicle and asking me questions alone and me getting scared enough, whenever she called the units, for me to take off." (55).

### Deposition of Kalief Rasean Sconiers

70. Sconiers stated the following the following about being pulled over: "Well, whenever we made the U-turn, the lights got flicked on behind us. We pulled over behind a -- I want to say it was a Mexican supermarket, some form of smaller corner store, market type thing. Jamaal gets out of the vehicle, gives his license to the state trooper." (23-24).

71. Sconiers stated the following about what Jamaal Mire did: "When he got out of the vehicle, he walked to the back of the vehicle, gave the state trooper his license. She said -- I'm assuming that she said that she was going to go run his license. So she turns around to go back to the vehicle and he takes off running. Then he comes back to the vehicle." (24-25).

72. Sconiers testified to the following about what Mire said when he got back to the car: "He says, "Drop everything and run."" (25-26).

73. Sconiers stated the following about his reaction to what Mire said: "I turned around and looked at Scotty and said, "Dude, don't run." Like, "Why are you going to run?"" (26).

74. Sconiers testified that Dilley ran. (26).

75. Sconiers stated the following about what he did: "I stayed in my seat with my seatbelt on." (26).

76. Sconiers testified to the following about what he witnessed Dilley do: "He ran towards the back of the vehicle, kind of did like a little jig move, ran past the state trooper, and then after that, I heard a loud bang and he fell to the ground." (27).

77. Sconiers reported the following about remaining in the vehicle for this entire event: "Yes, sir, until I told the state trooper that I was in the vehicle, and she came and pulled me out of the vehicle." (29).

78. Sconiers stated the following about if he heard the trooper say anything to Dilley: "Yes. I believe she said, "Stop right there." (38). Sconiers stated that Dilley did not comply. (38).

79. Sconiers testified as follows about whether he ever heard the trooper state the word "taser": "No. Only when I asked if he got tased. That was when she told me, yeah, he got tased, "Yes, he got tased."" (38).

80. Sconiers stated the following about if he actually saw the shooting of Dilley: "Yes. I didn't realize that he was being shot. I thought he was getting tased. I never heard a taser gun go off, so I thought that's what it was." (38-39).

81. Sconiers stated the following about what the trooper said to him when she approached the car: "Excuse my language, but "Get out of the fucking car." (40-41).

82. Sconiers stated the following about trooper pointing a gun at him: "Pointed it at my head. Yes, she did." (41).

83. Sconiers testified that the trooper did not physically assault him. (41-42).

<u>Deposition of Sergeant Barry Ward</u>

84. Ward stated the following about whether Trooper Domingue ever told him that this incident was an accident: "No, sir." (14).

85. Ward stated the following about what he saw when he got to the scene of the incident: "When I arrived on the scene, looking at this, there were several marked units with their overhead lights going, parked next to the Village Grocery. Her troop commander, Captain Kevin Devall, was on the scene, as well. We sometimes have a -- well, we usually have a liaison when we work other shootings from other agencies. And a liaison will be a sergeant or a lieutenant, someone who can -- we just need to know evidence. We're not there to get a statement from the particular officer involved in the shooting, but we need to know if -- if evidence is in a field or in another block or something to that effect. This particular scene, there was no liaison. I approached Captain Devall first and I asked him if there was a troop liaison. He said, "She's sitting over in her unit." I had no idea when I approached A-50, that Kasha Domingue was the one sitting in the unit and she was the one that was involved. It was only after speaking with her that I realized she is the one involved in the shooting." (38-39).

86. Ward described the following about how Trooper Domingue's car and the stopped vehicle were positioned: "So I guess it would be on the -- the northwest side of the building, the parking lot on -- that is, the rear parking lot of the Village Grocery off of Potwin Drive. There is a fence line that separates the parking lot from the private residence. A vehicle had pulled up facing in a southeasterly direction. Her unit was kind of offset from that, just to the left. And she had some articles on the hood of her patrol vehicle, was A-50. And I think it was a driver's license, a weight scale and some green vegetable matter, where we later discovered was marijuana. When I approached her, I did not know that there was evidence on the other side of her vehicle at that time. That -- I learned that moments later." (40).

87. Ward stated the following about the lighting at the scene: "There was plenty of lighting out there, from what I saw. It -- there was some ambient street lighting from, I think, the street across from Potwin. As a matter of fact, I even have on my diagram a -- a street light in the upper right-hand corner. And I believe there was some street lighting attached to the building on the rear of Village Grocery." (42).

88. Ward testified to the following about what Domingue told him concerning the traffic stop: "She identified a restaurant. I forget which. It was a fast food restaurant, and I think she said the vehicle was traveling towards LSU. I think that's -- I think it's four lanes; two lanes in either direction. The vehicle first went to the right and then made a U-turn completely through, like, it was going to turn into the restaurant but then continued. And that -- that is a traffic violation." (43-44). Ward then continued, "She said that -- she said that she called the stop in when it -- when the vehicle made the flip and when it pulled in behind -- I'm sorry, when it made the flip, it continued a little bit, and then they pulled in behind the Village Grocery on Potwin." (44).

89. Ward stated the following about when the traffic stop was actually called in: "Correct. I recall asking our TSO when he -- when he married up the radio traffic with the video traffic, and we -- we've got to be specific with this because they will record at different frames per minute. So we -- we did have a question coming in over the radio in the traffic stop and when later on, a -- a 108 distress call was called in. So based on what she told me, I understood that she had called the stop in somewhere on Perkins. But the stop was actually called in after the vehicle had come to a rest on -- on Potwin, which is -- I don't know the time frame -- a few moments." (44-45).

90. Ward testified to the following about what Domingue told him happened after the traffic stop: "She said the -- she got the driver out. She could smell a strong odor of, I believe – I believe it was alcohol. At some point, I think she might have -- she might have said both alcohol and marijuana, but -- but she did say, "Alcohol" at first, and she did attempt to run him. When I say, "Run him," it's through a database to check to see if he has any warrants. She said that she -- he – she kept telling him to put his hands on the hood of the car, hood of her patrol unit, which was a Chevy Tahoe, sits a little higher, while she was around standing in the driver's side door, running, using her MDT, mobile data terminal. She said that he -- she had to tell him a couple times to leave his hand on the – on the hood. And then, he took off running." (45-46).

91. Ward further testified to the following about what Domingue told him about the incident at the scene: "At the scene, she said, when he took off running, the passenger got out of the vehicle, referring to the one that she shot, and ran around the side and reached in. Got – got out from the rear driver's side, ran around the back of the vehicle and reached in to the passenger side and said, "Now, now, now." She said that she came around. She withdrew her taser. I don't recall if she said verbal commands or not. I -- I don't recall that portion. She said that when he started approaching her -- this would be Scott Dilley -- when he started approaching her, she transitioned from her taser

to her firearm. She wasn't sure exactly when or how she did that. She dropped to a knee, took up a firing position and discharged a round to him, because he was charging her." (46-47).

92. Ward testified to the following about video records of the scene: "Correct. When -- when I first approached her and introduced myself and asked her name and realized within a few moments she was the officer involved in the shooting, I looked over and she had a -- a body worn camera attached to her lower-left pocket of her shirt. So I immediately looked over to see if -- if any lights were illuminated or anything, just to see that it was on. And there were no lights illuminated on it. I asked her about the camera. I asked her if it was – there was a recording. I asked her about the dash camera and looked up into the dashboard where a dash camera would be. And that could confirm there was no dash camera in there." (49).

93. Ward stated the following about a tear in Domingue's pants at the scene: "It was at the point when she was speaking with Major Cain. When she finished with him, she was standing there next to me, by the front driver's side wheel well. I'm taking and making a lot of phone calls, too, because I've got rank and I'm directing other detectives. I realized that we had an -- an occupant. Because what I want y'all to understand is that even though troop personnel on the scene know what happened, I don't. I don't know that a person name Scott Dilley is involved. I don't know that he's at the hospital. So as I'm learning this, I'm calling letting my supervisors know and directing people to go to these different scene locations. So as she gets out and I'm doing this, I turn and look, and I can see she has a very noticeable tear on her lower-right trouser leg in her knee area. And I get down and I inspect it, and I can see that there's -- there's blood in there, that she's sustained a -- a pretty -- not serious, but a very noticeable abrasion, and ask her if that's a part of it. And she was unable to tell me what it was." (51-52).

94. Ward testified to the following about whether he asked Domingue to give a formal statement: "We -- we ask. We -- we generally don't, as a rule of thumb, we don't like to speak with the officers that day in a formal statement. But -- but we are required to ask. So I did approach her and asked her if she wanted to give a statement and she said, "Yeah, that's fine, I'll be happy to." So I asked Bill Cox if he would arrange for transport to bring her to CID." (70).

95. Ward reported the following about Domingue giving the statement: "So we had Brian Jefferson. I don't recall, there was one other one there, I don't recall who was there. And Kasha Domingue was sitting in there. I came in and sat down at the table and just gave her an overview over what we're going to do. I said, "We're going to go into another room that's -- that's down the hallway, there's going to be a video camera in there and we're going to do a formal interview. We'll have to read you your rights." Something to that effect. At that moment, Hillar Moore, the District Attorney, walks into the room, and he sits down at the table with me. Not uncommon he comes to our scenes . . . So as he sat down at the table, I expressed to him what was -- what we were doing. And then, Kasha Domingue volunteered. She said, "You know..." I think she said, "...bits and pieces are coming to me and I think I'd like to get my knee checked out." . . . So we arranged to have her -- Lieutenant Mark Jones take her to the hospital to have her knee checked out." (75-76).

96. Ward stated the following about Trooper Thompson calling this event in to EMS as a Taser deployment: "Correct, correct. So you -- you have to look at -- I mean, you're talking a -- less lethal weapon, a taser, and a lethal weapon, a firearm. So in the time frame, you have a person who's been gunshot and his gunshot wound was in his -- the back of his torso. I think Trooper McGehee called the desk, the troop desk, on an unrecorded line, and said, "Hey, sarge, he's been shot, he ain't tased, you need to tell the ambulance to step it up." So you're getting into life and death situations there." (84).

97. Ward stated the following about whether Domingue knew she shot Dilley at the scene: "On the scene, yeah. The scene and in the interrogation, she knew she shot him and was justifying why she shot him." (85).

98. Ward stated the following about why Domingue would have called this in as a taser event: "It goes back into what I learned later on in the investigation with her training, with what we learned over how she became a trooper. Fast forward to that scene. I understand people can get in the height of a situation, get confused. But to go that long and not be able to explain it, is incompetent . . . Let -- let me expound upon that. We go through a great deal of training to become Louisiana State Troopers. We're entrusted with a great deal of authority. I'm issued a firearm, several firearms. My training can lead to take a citizen's life. We have to be at the top of our game every second of everyday. You cannot, you cannot taser someone or shoot someone and be confused on what you did and not call medical. You cannot do that. That's why I said it goes back to our training." (87).

99. Ward reported the following about the interview with Dilley at the hospital: "Yes. Trooper Keith Bennett went and conducted that interview at the hospital. I believe, it was a recorded interview, so I had the -- the audio recording. It was not video-recorded. From what I -- I understand was, Scott Dilley had been out at Reggie's Bar with his friends. They met, Jeremiah was there. And he – he didn't identify the guy. He talked about a traffic stop. He said that they had been smoking a blunt, a marijuana blunt, in the vehicle. The smell might have been present. He talked about how he ran from the vehicle, that he was running alongside the vehicle and how she turned. He actually requested to draw a diagram of it, and he did draw one which is included, and it's about the size of a quarter. But when you compare that together with Trooper Domingue's, it is a more clear and accurate depiction of what actually occurred. He talked about being tasered. He was told he was tasered. He couldn't feel his legs. And that when he got to the hospital that they -- they told him he

had been shot. Keep in mind that he, in his toxicology, he did show positive for alcohol and drugs. He had been given morphine prior to detectives' arrival, for the pain of the gunshot, and still gave a more accurate depiction and draw a diagram of what occurred, than what Trooper Domingue has ever given to date." (93-94).

100.     Ward stated the following about the diagram that Domingue drew in this case: "Yes. This is a -- a diagram that Kasha Domingue and I worked on together during her interview and interrogation. This was audio and video-recorded when this was made" (113).

101.     Ward reported the following about whether Domingue drew the diagram: "Partially. So what I do in -- in commonly in all of my officer-involved shootings, is I want to know the placement of an officer. I do want to know proximity of where they were, and in a lot of shootings, sometimes there's multiple officers. And we want to make sure we know who's where at what point. So in an effort to speed this up, I draw the overview of the scene. So I drew Perkins Road, Potwin Drive, the fence line, the words "not to scale" and I put the vehicles in there, with the direction of travel. The lines between the vehicles were all drawn by Kasha Domingue." (113).

102.     Ward testified to the following about what Domingue said about the diagram: "She could not commit to any one route, any one way, how Scott Dilley ran, how she ran and that's indicative of the lines that she drew. Just -- whether you're a layman or a seasoned investigator, you can't make heads or tails of what she's trying to communicate with this diagram. And she refused to sign it." (114).

103.     Ward explained the following about Dilley's diagram: "This is a -- sheet of paper. First of all, when you review the audio recording of Trooper Bennett interviewing Scott Dilley at the hospital, Scott Dilley requested to -- to draw a diagram. This -- that's not -- that does not appear to be Keith Bennett's handwriting. I don't think. I supervised him for a little while. It could -- it

could be. But it looks like a -- a sheet of notebook paper that has some notes on what was on the scene. It may -- you know, it may be Keith Bennett's handwriting. On the side, is a small diagram about the size of a quarter and it's two vehicles, and it shows a door open on the driver's side on both vehicles and it's got two arrows on it. And the arrows indicate the direction that Scott Dilley was traveling, the direction that Kasha Domingue was traveling on foot and the initials "SD" for Scott Dilley." (118).

104.     Ward stated the following about whether Dilley's diagram is accurate based on the video: "Yes, that's an accurate depiction of what – what occurred, according to the video." (119).

105.     Ward stated the following about Domingue having another use of force incident earlier on the night of the Dilley incident: "She -- I'll make a point of reference that in the -- in the interview and interrogation with her, she went into a great amount of detail over a traffic stop that was very similar to the one with Scott Dilley. A traffic stop, they lost -- or lost sight of the vehicle, they found it, people ran, she used her taser, a bag of drugs was located. She had a – a quite a bit of detail on that scene and they were remarkably similar to the Scott Dilley case, which was just a couple of hours apart." (120).

106.     Ward stated the following about CID losing control of the investigation: "It means, they normally -- if I have a – if we get called sheriff's office investigation, or even a trooper investigation, they'll come out. Usually only a captain or a major, will just visit the scene, "What do you guys need?" When they came out and realized that we may have a trooper who may not be truthful, the video shows something different, we have a person shot in the back, I lost control of it, meaning they were calling the shots now. And that's never happened before. So we were -- myself, I was the primary case agent, Bill Cox was my co-case agent, Brit Forbes was my sergeant,

Draper Crain was my lieutenant. We were not calling the shots. Ward said that his superiors in the State Police started calling the shots over what was going to happen." (130-131).

107.     Ward testified to the following about what happened next: "He -- we had different steps that we wanted to do as far as interviewing people. Like, I did not -- I did not want to interview Kasha Domingue that day.· That -- I didn't get to make that decision. Lieutenant Colonel White and Hillar Moore made that decision. That's why it was done on that day. And if you look at the hour, like, I hadn't gone home yet. So I got called out, woken up at 3:30. She didn't come to the interview room until, like, five o'clock that night. And then, even on top of that, they discontinued the interview. So it -- I was completely removed. I knew -- I knew that things were happening on a command level that shouldn't be happening." (131-132)

108.     Ward further stated the following: "At the end of the day, I felt -- let me – let me frame this. So in the interview -- you see the interview room. We have an over watch interview room that's a computer screen. Normally, I'll have -- I'll interview with my co-case and my rank will be in there and at sometimes will text in questions or whatnot, or "Hey, take a break. Let's come out and discuss this." But that's the support staff that I need. They were not in there. The room was filled with Colonel Kevin Reeves, Lieutenant Colonel Adam White, Major Bob Brown and others. "As I go through interview and interrogation with Kasha Domingue, she showed signs of distress, because I'm -- I'm interrogating her." (132).

109.     Ward further stated, "I know that she's not telling me the truth, but they're directing how it's going. And then, as we -- when she starts crying and we take that second break, when we come back -- like, if you've watched the video, you see that I'm actively interrogating her, and you see that the trooper with me says, "Hey." He gets a text from the room, "Y'all need to stop." So I step out, I go back over there and the Colonel, Major Brown, Adam White, they're all saying, "Stop

the interview." We're trying to find out why we're stopping the interview. When you're interrogating, that's not when you stop, that's when you go forward. They said, "It looks bad to see a woman crying on video." And that was it, the interview was stopped. When I went home that night, I knew something was different about this investigation with how they were trying to handle it." (133-134).

Domingue Interview July 10, 2018 [18:50 hours] (Recorded-Summary not verbatim)

110.      I would note that during the interview, Domingue was not identifying Dilley by name however his name is used here for clarity.

111.      Domingue asked the investigator if cameras at the Village Market was checked and the investigator informed her the investigators had looked at the video. Domingue said she remembered bits and pieces and wanted to see the footage. The investigator said that they had the footage and they would show it during the interview but he wanted to get her perception first.

112.      Domingue reported that she was held back at the academy and indicated it was a long story. Domingue stated that she was a three-year veteran of the state police. Domingue indicated that she was professional boxer and had been rated number 1 in the world.

113.      Domingue described a stop that occurred earlier in the night where a passenger in the vehicle stopped was moving in a manner where she believed may lead to a shooting. Domingue described that the passenger in that stop fled, and she utilized her TASER but it was not effective and he got away. Domingue noted that a quantity of marijuana, cocaine and pills were recovered and the driver with the vehicle was apprehended by another officer.

114.      Domingue was asked to provide a narrative of the events involving the stop of the vehicle in which Dilley was an occupant.

115.          Domingue noted that she had just cleared the troop from the prior investigation/arrest when she observed the vehicle in which Dilley was a passenger operating in front of her and suddenly veer right and then came around at her. Based on the erratic driving Domingue thought something was wrong and activated her lights.  Domingue said that the vehicle went passed her without stopping so she turned around to go after the vehicle and calling in that the vehicle was not stopping.  Domingue said the vehicle slowed down and when it got to Potwin it took a right. Domingue said the car did not stop until pulling in behind the grocery store.  Domingue said that she could see other occupants in the vehicle and they were moving around real fast.  Domingue reported that the driver got out of the vehicle and was waving his arms (see video statement). Domingue said she asked the driver if he was okay. Domingue said she told the driver to come back toward her and he began reaching into the car at which point she told him to keep his hands where she could see them.  Domingue said that the driver responded, "I'm just getting" twice causing her to again tell him to keep his hands where she could see them.  She said the driver quickly pulled out his hand and said "see this is all I got" and Domingue noted that the driver had his ID.

116.          Domingue reported that she called the driver over again asking if he was alright. Domingue said the driver indicated he was alright and when she asked him about the way he had turned around, the driver said he was just bringing some friends home. Domingue said she could smell alcohol and marijuana.  Domingue reported that the driver indicated that the group had just come from Reggie's.  Domingue said that the driver was moving his hands around (see video) and when asked, denied having any weapons. Domingue said she told the driver to just put his hands on the car for her.  Domingue said the driver gave her his ID and upon being asked said that he only had one beer earlier in the night.  Domingue indicated that she could see the guys moving

around inside the car. Domingue reported that she asked about weapons in the car and the driver said he didn't know and that he didn't think so. Domingue said she then asked if anybody in the car had a weapon and again he responded that he did not think so. Domingue described that she told the driver to stand there while she moved to her open door and open computer to input the driver's information.

117.	Domingue said she observed the driver slowly putting his hands down by his waist and she told him again to put his hands where she could see them. Domingue described that the driver kept looking back at his car, while she tried to watch the driver, the occupants in the driver's car and at the same time, was inputting information into the MDT.

118.	Domingue said that when the driver again started to move his hands down and she told him to keep his hands on the hood, the driver "just bolts." Domingue described that when the driver ran off she came around the corner of her door and grabbed her TASER and the driver went to the opposite side, the passenger side and opened both the rear and front doors and said "now, now." Domingue said that at this point she did not know what was happening. Domingue described that the driver leaned into the vehicle (see movement on video), at which point she thought, "I'm about to get shot." Domingue said she backed up and at some point, she doesn't know how or when, she transitioned to her firearm.

119.	Domingue said she saw the door open "on this side" and a guy was getting out so she backed up toward the left and the guys was coming toward her. Domingue said she then backed to her right and told the subject to stop. Domingue said that the subject had something in his hand. Domingue said the guy was a big guy and something wasn't right. Domingue said that she backed up and the guy was coming toward her. Domingue said she was unsure if she tripped or purposely

took a knee or how it happened "but at some point, I fired." In reference to when she fired, Domingue said, "I don't know if I had hands on him at that point but I know we were close."

120.    Domingue said that she did not know what happened once they were on the ground, but she knew he still had something in his hands. Domingue described that Dilley was leaned over his hands with his hands by his chest (see video) and she told him to drop it. Domingue said that she did not know where the other 2 subjects were and that she held her weapon up in her left hand and was trying to grab Dilley with her right hand. While doing so, Domingue said she saw that there was another subject still in the car. Domingue described shaking Dilley's hand, while keeping her knee on Dilley's back. Domingue said that when she told Dilley to drop it, he responded that he did not want to mess it up. Domingue said that she then heard something fall to the ground. Domingue said that when the item flew from Dilley's hand he said, oh my phone.

121.    Domingue said the other passenger was moving in the car and she thought he was going to get out. Domingue said that she had been taught that they always shoot at the vehicle, so she moved off to the side after getting Dilley handcuffed. Domingue described that she then detained the passenger.

122.    Domingue said she asked Dilley why he had run at her and that Dilley responded , you tased me bro. Domingue said that she knew that Dilley saw her with the TASER out because he had come from the other side and that's when she was transitioning to her firearm "and he was already on top of me at that point."

123.    Domingue indicated that she is right-handed and wears her firearm on her rights side, but noted she is ambidextrous and uses both hands. Domingue said that when the driver fled, she drew her TASER and said TASER, TASER, TASER. Domingue described the flight of the driver as around the front of her vehicle, around the back of his car and to the passenger side of his vehicle

and she observed him open the front and rear door of his vehicle. Domingue indicated that as she watching what is occurring on the passenger side, she saw Dilley opening the door on the other side. Domingue said that when she saw Dilley getting out, she was at the back of the suspect vehicle and began telling Dilley to stop while at the same time she backed up. Domingue indicated that she was not sure if she backed to the right or if she backed to the left first.

124.        Domingue described Dilley as a big white guy and indicated that he ran at her and was close when she fired. Domingue said that her training kicked in and she reacted based on training. Domingue indicated that she was unsure when she transitioned to her firearm but agreed that upon seeing the subjects getting out of the vehicle and Dilley getting out of the vehicle, she began backing up.

125.        Domingue could not explain how her knee was injured and her pants were ripped.

126.        Domingue indicated that when Dilley was running at her she thought this was it. Domingue said that she thinks she may have bumped against the vehicle as she was trying to back away from Dilley. Domingue said she was thinking she needed to get an engine block between her and all of the subjects. Domingue said she could not remember the pull of her trigger on her firearm. Domingue said that notwithstanding Dilley's statements that he was subjected to a TASER deployment, Domingue knew that Dilley had been shot.

127.        Domingue reported that when other troopers arrived she still believed that the driver and occupant who fled were still in the area and something was going to happen.

128.        Domingue could not explain how one of the troopers on the scene, arrived at the location marked "FP" firing position at the scene.

129.        Domingue acknowledged that she knew she had her firearm in her right hand. Domingue stated that when Dilley came at her she knew she could not get away. Domingue said

she shot Dilley in his side and she didn't know if he was arcing over her when she shot. Domingue did not know if she was on her feet or was already on the ground when she shot. Domingue said that the subject was close and that she did not know if she may have been touching Dilley when she shot.

130.     Domingue said that when she tried to turn her BWC on, it was not doing anything. Domingue reported the camera was new to her. Domingue indicated that she did not know what her BWC recorded because it was taken from her at the scene. Domingue said she believed that the BWC was not functioning and may be defective.

131.     Domingue was shown the video from the business approximately 90 minutes into the interview. Domingue was then asked her reaction to the video and whether it refreshed her memory. Domingue said everything seemed so much faster. Domingue said that in the video it looked like the subject was to the side of her. [Ward says-2:16:35 is time of shooting-possibly a second or two off]. Ward confronted Domingue with video not showing her backing up. Domingue agreed that Dilley was passed her at time of shooting but said video was not what she saw. Domingue said she knows that Dilley was coming toward her and made contact at some point where Dilley touched Domingue and Domingue touched Dilley before Domingue fired. Domingue said she did not know she was that close to Dilley when he got out indicating that she thought she was back. As Ward confronted Domingue with inconsistencies between the video and her prior statements including a statement about her firing position made at the scene, Domingue indicated that she did not remember any of what was on the video. Domingue pointed to the computer with the video and indicated that the video was completely different from what she saw and what she experienced.

<u>Domingue Use of Force Report July 16, 2018 [00:31 hours]</u>

Travelling west on La 427 when the vehicle directly ahead of fully marked LSP patrol unit made an Illegal U-Tum on LA 427, heading east toward patrol unit Suspect vehicle did not stop as emergency lights and sirens were activated. LSP unit regained position behind suspect vehicle. The red Saturn SW continued to travel east. After passing multiple drive ways and side streets, the suspect vehicle turned south onto Potwin Street and quickly turned left behind the commercial business, Village Grocery. The driver, black male, immediately exited the vehicle but continued to reach into the vehicle. Driver was advised to show his hands and he leaned In and grabbed what was later known to be his identification. Driver approached LSP patrol unit and was asked if he had any weapons on his body or In his vehicle. Driver stated he did not have anything on him and laughed. When asked again If there were any weapons In the vehicle, driver stated he did not know but did not think there was. There were three other subjects in the vehicle that continued to move around causing the SUV to shake. The driver was asked If any Individuals In the vehicle had weapons and he said he did not know. A strong odor of alcoholic beverage and strong marijuana scent emitted from the driver. The driver stated they left "Reggie's" and he was "taking some guys home." The driver stated he had an alcoholic beverage earlier In the evening and looked back to the passengers and smiled at them. The driver put his hands In his pockets and was advised to keep his hands on the hood of the LSP patrol unit. The driver placed his hands on the hood and as the license plate was keyed Into the MDT, he began to slowly drop his hands toward his waste. I noticed the vehicle was not Insured and was registered to the driver. The driver was again advised to keep his hands on the hood where I could see them. The driver continued to look toward the vehicle, moved his hands again, yelled "now" as he ran toward the passenger side doors. Taser was grabbed but as trooper gave chase, observed both front and rear passenger doors on the right side of the vehicle open. Trooper drew

state issued service weapon as the right rear passenger, large black male, exited and Trooper lost site of driver. Rear passenger, white male, on left side exited as the Trooper was near the license plate area and charged through the Trooper with a black Item In his left hand. Suspect was struck in right side torso as the force from body contact knocked Trooper to the ground. Trooper crawled toward suspect as he struck the pavement and told him to drop it. Suspect had his arms beneath his body as he lay on his stomach. Trooper grabbed the left hand as the suspect said "no". Trooper vigorously shook the left hand of the subject and a black cell phone fell to the ground. Trooper lost visual of all other subjects. As the Trooper began to advance the vehicle, the front right side passenger, black male, stated that he would do what he was told. Front right side passenger was compliant and placed In the rear of fully marked LSP patrol unit for safely. Troopers began to arrive on scene Immediately and were advised there were two suspects at large. All Troopers on scene began to search the area and the vehicle. Trooper and suspect were cared for by EMS personnel. Suspect was transported via ambulance, front right seat passenger was placed In another LSP unit and original responding Trooper was removed from the scene by BOI Investigators. It is noted that this report was dated 6 days after her interview.

<u>Deposition of Kasha Domingue</u>

132.     Domingue stated the following about what she saw before the vehicle stop: "It was -- he was erratic driving before then. It was right in front of the Circle K. He was slowing down and speeding up, slowing down and speeding up and then kinda going back and forth in the lane and then made the U-turn in front of the Jack in the Box at the intersection – of Siegen and Perkins." (14).

133.     Domingue acknowledged that the driver eventually turned on Potwin and pulled into a parking lot behind the store. (14).

134.        Domingue testified that the driver of the vehicle got out on his own and she didn't ask him to. (15).

135.        Domingue stated the following about talking with the driver: "Yes, sir. I was talking to him during that time. I saw when he approached that he was young, so I wanted to talk to him about what was happening and how things were gonna go. I know a lot of young people when they get stopped are very nervous about what's gonna happen and how things are gonna go, so we did discuss that." (15).

136.        Domingue stated the following about how many occupants were in the vehicle: "I didn't know. I just knew that the – the movement of the whole car at once, when I saw the car move, sway back and forth, that there was a number of people in that vehicle. I just didn't know how many." (15-16).

137.        Domingue acknowledged that she did not have a dash cam in her vehicle. (16).

138.        Domingue acknowledged that her body camera was not on. (16).

139.        Domingue testified to the following about the driver running: "He gave a command to run or "now" or he said something and then ran, yes, sir." (16).

140.        Domingue testified to the following: "I had reason to believe that my life was in danger. I thought I was gonna die. I was aiming in on the right side of the vehicle where the driver had run, that I saw movement on the other side, and I lost -- I couldn't see the guy's hands. I could just see a head popping over and I'm aiming in on him. And I had already started running in that direction. And as I ran towards that direction and I saw that popping in and out from behind -- it was dark on that side. The light was coming from my left and there was darkness on the other side of where they were. I could just barely see them moving around. I didn't realize how many people were on that side. And then as I started to approach, all of a sudden, Mr. Dilley was on my left

side, and I turned and responded and addressed the threat at that point, which was whatever was closest to me in the situation. And I believe it all occurred within three seconds. My reaction time was somewhat delayed in responding to him as a direct threat." (21-22).

141.    Domingue testified to the following about if she is now saying that she intentionally shot Dilley: "I think it now becomes a matter of semantics, and I think that that's what happened in the IA interview, that it was three seconds' time. I had no -- when I consider intention, it's a thought process that goes through this is what I intend to do, and I did not have that luxury at that time. It was purely a reaction to saving my own life." (22-23).

142.    Domingue stated the following about if she cannot say whether she intentionally pulled the trigger or not: "I can't say." (27).

143.    Domingue testified, after a review of her prior statement, that she was aiming at the driver and not at Dilley. (33).

144.    Domingue testified that she saw something in Dilley's left hand. (39). Domingue further stated, "Later I was able to tell -- determine it was a cell phone because I got it out of his hand once he was on the ground." (39).

145.    Domingue further stated the following about the driver: "The first concern was he jumped out of the vehicle. And that's not something that we normally see. And then he reached into the car really fast and I didn't know what he was reaching for, so that was the first thing that put me on edge. And then he told me he had his driver's license and he started walking towards me. And I told him to stop and he kept walking, and he had his hands up in front of him. And then he walked over. He's like, "I'm just giving you this." So I -- that -- that part, once he got up to the car and he put his hands up on the hood, I felt that he was complying." (42-43).

146.         Domingue testified to the following about if she drew her taser: "I don't believe I ever said that. I always had my taser in the front. And I had my hand on my taser when I was talking to the driver at the beginning. And in his first response to run, that would have been my response to tase. But then when I got around the vehicle and I saw where they were on the opposite side, I went for my weapon." (60-61).

147.         Domingue stated the following about if she grabbed her taser: "I grabbed it. I didn't draw it." (61).

148.         Domingue testified to the following about when she knew that Dilley was shot: "When I took -- when I was going to take the handcuffs off of him and I was checking him, I knew that he was shot." (75).

149.         Domingue stated the following about having another use of force incident prior in the evening: "Yes, sir. There was a part where I deployed a taser, but it never made contact." (86).

150.         Domingue stated the following about if she recalls that she called the shooting in to dispatch as a taser deployment: "I don't remember. I've been told afterwards, but I didn't -- I have no recollection of even talking on the radio. I remember crawling in, because I tried to key up on my hand mic when I was on the ground with Dilley and it wasn't working. And he was telling me that -- you know, he was laughing and telling me no one was coming. And I opened the passenger door of my unit and crawled through and went to the driver's side to use my radio. And as I tried to key up, other people kept trying to come on asking me where I was. And so when they key up, I can't key up. So there's no communication at that point. And I'm -- and at that point I saw that there was somebody else in the car and he was yelling. And so that's when I got out and I took a knee and I aimed in on I believe it was Tokyo in the front right passenger side. And then he got

out and I walked him back to my unit. So I don't remember anything about -- other than just hearing them yell, "Where is she? Where is she?" over the radio." (120-121).

151.     Domingue testified to the following about what she meant by "Inability to call for assistance" in her use of force report: "My radio wasn't working." (145).

152.     Domingue testified to the following about what she meant by "Inability to disengage" in her use of force report: "I had nowhere to go once the command of "now" or "go," whatever it was, happened, and I started moving forward. I didn't know where to go. I didn't -- I didn't -- I was in it. There was too many of them. I didn't know where they were. I didn't know what they had or what was gonna happen." (146).

153.     Domingue stated the following about the active resistance that is referenced in the use of force report: "When I tried -- well, first of all, he ran at me at the rear of the vehicle instead of running away or staying in the vehicle. Had he stayed in the vehicle, none of this would have occurred. But the fact that he ran towards me during a traffic stop with my weapon drawn, that -- he was -- at that point became a threat. As far as once we got on the ro -- on the ground and I asked him to show me his hands and what he had in his hand, he did resist and would not give up his hands. He kept them underneath him, and I had to wrestle his arm to get whatever he had in his hand out of his hand." (148).

154.     Domingue testified to the following about completing her training after graduation: "Yeah. I had remedial training with other troopers and then completed -- we go to our units and then you go through FTO training, which I successfully completed." (165).

Video

155.    I would note that I have zoomed the video so that no action of Domingue or Dilley is lost, however there is a closer view of positioning and what actually occurred based on the objective video.

156.    As Dilley exits the left rear door of the vehicle, Domingue has some distance from him as well as the ability to disengage and take cover at her vehicle which is closer to her than the subject vehicle.



157.



158.

159.     Domingue quickly began to compress space, moving away from her vehicle and moving toward Dilley who was still getting out of the vehicle.  The movement can be seen through the change in positioning from each of the two vehicles.



160.

161.    The video is clear that Dilley ran toward the gap (note direction of Dilley's feet) between the officer and the subject vehicle and in the direction of the lower fence.



162.

163.    I would note that when the video is played in sequence, it is clear that there is no attempt by Dilley to run through Domingue and there is no body-contact between the two as Dilley attempted to flee.

164.    Domingue appears to try to reach out toward Dilley with her gun hand as he ran by her.



165.

166.        The position of Dilley, already past Domingue, is even more pronounced as
Domingue's right hand is thrust out toward Dilley's back.



167.

168.        Dilley is then depicted going to the ground.



169.

170.        As Dilley continued to the ground, Domingue is still up and her right hand is tracking

Dilley.



171.

172.        Dilley then lands on the ground and becomes obstructed by Domingue's vehicle



173.

174.     Domingue then can be seen falling to the ground on her own.



175.

176.     The relative positions of Domingue and Dilly when Domingue's leg hit the ground is

clear in the objective video.



177.

<u>Opinions</u>

178.    It is my opinion, based on my specialized background, education, training and experience as well as my continued research, authoring, auditing, consulting, and training on law enforcement practices nationwide that the use of deadly force by Domingue on Dilley was contrary to generally accepted policies, practices, training, and industry standards.

179.    There are several basic concepts trained to officers and embodied in policy and practice that must be applied to any use of force analysis.

180.    It is well understood in law enforcement that the use of force must be judged from the perspective of the officer on the scene, taking into account what the officer reasonably believed to be the circumstances at the time and not with 20/20 hindsight. While it is true that 20/20 hindsight does not have application to the force analysis it is taught that this is with respect to factual issues that are learned by the officer after the force was used, it does not apply to the infinite world of possibilities that may occur but did not. Officers are not allowed to use force based upon the

infinite world of possibilities which may occur but for which they have no objectively reasonable facts or evidence to support such a conclusion. Here, based on the objective video, there were no facts that would an officer, based on generally accepted practices and training, to conclude that Dilley posed an immediate threat of serious bodily harm or death to Domingue.

181.       Officers throughout the United States are trained in two formulas with respect to use of force decision-making and justification. The first of these formulas is a three-part test that parallels the mandates announced by the United States Supreme Court in *Graham v. Connor.*[1] The training directs officers to consider the seriousness of offense; whether or not the subject poses an immediate physical threat to the officer or anyone else; and finally, whether the subject is actively resisting or attempting to evade arrest by flight.

182.       Here, Dilley was a passenger in a vehicle stopped for a motor-vehicle violation, specifically an illegal U-turn, a very minor offense that was not committed by Dilley but rather the driver. While the act of flight by a passenger from the stop may have been a minor obstruction crime, there was certainly no serious crime committed by Dilley. While Domingue initially reported that Dilley ran at her and made body-contact with her, it is clear from the video and the physical evidence [shell-casing], that no such immediate threat of serious bodily harm or death occurred. Dilley did actively attempt to flee from a motor vehicle stop in which he was not the offending driver.

183.       The second formula was commonly referred to as the "Use of Force Continuum." While agencies utilize different force continuum models, all of the models recognize that officers have various subject control tactics available to them and that these tactics range from a low-level

---

[1] This formula is derived from *Graham v. Connor,* 490 U.S. 386 (1989) and can be found in law enforcement training lesson plans as well as Use of Force policies throughout the United States. See e.g. International Association of Chiefs of Police, Use of Force Model Policy 2005, IACP Model Policy Center, Virginia 2005.

intrusion, such as officer presence and verbal commands, to the highest level, which is deadly force. It should be recognized that even in those agencies that still use a force continuum, the continuum is not a ladder that must be climbed step by step. Instead, it is a presentation of various force options, each of which must be objectively reasonable under the circumstances with which the officer is faced. It is noted that due to confusion over application of such continuums, law enforcement is moving away from this concept and simply train "force options." It is recognized that many law enforcement agencies are moving away from the so-called "continuum" and moving toward a "Graham" decision-making model.

184.       It is noted that deadly force is the most significant force option an officer can choose. Officers are trained that the deployment of deadly force must be proportional to the threat faced by the officer at the time the force is used. Based on the objective video and the location of the gunshot wound on Dilley, it is clear that Dilley, in accord with law enforcement training, practice, and policy, was not an immediate threat to Domingue at the time of the shooting

185.       Officers throughout the United States are trained that they may use reasonable force to effect an arrest or accomplish a detention. It is not incumbent that the officer be under attack since such a requirement would preclude the use of force where a suspect actively resists by pulling or leveraging away from an officer. Officers may even use deadly force under limited circumstances to prevent escape.

186.       Deadly force policy and training directs that officers may use deadly force when the officer faces an immediate threat of serious bodily harm or death. There is nothing in the objective video to show that Dilley ever posed a threat of serious bodily harm or death to Domingue. It is clear from Domingue's statement after she watched the video that she recognized that the threat she reported in her statement was not supported by the video evidence.

187.     Under limited circumstances, officers may use deadly force to prevent escape. Policies that include a prevent escape provision generally direct officers that deadly force may be used to prevent escape when the officer has probable cause/knows that the subject has committed a violent felony/forcible felony that included the infliction or threatened infliction of serious bodily harm or death and by his/her escape that pose an imminent threat to some other person. There is no indication anywhere in the materials that Dilley, a passenger in a vehicle stop for an illegal U-turn, had committed an act known or for which Domingue had probable cause to believe included a violent felony. Thus, using deadly force on Dilley as he ran from Domingue was contrary to generally accepted policies, practices, training, and industry standards. I would note that Domingue did not indicate that she shot at Dilley to prevent escape.

188.     While avoiding credibility determinations, it is important to note that the objective video contradicts the statement of Domingue with respect to Dilley running toward her and making body contact. Officers are trained that they cannot act out of subjective fear when confronted with something they have not faced before. Officers are trained that use of force decisions have to be based on objective facts available to them at the time the force was used. Based on all of the foregoing, it is my opinion that former-Trooper Domingue's use of deadly force on Mr. Dilly was contrary to generally accepted policies, practices, training and industry standards on use of force.

189.     At this stage of my review, I do not know if I may be asked to review additional documents. Should I be asked to review any additional documents, I will be prepared to render additional opinions or supplement the opinions stated within this report.

190.     At this point in the development of this case, I do not know whether I will be using any demonstrative aids during my testimony. Should I decide to use any such tool; I will assure that they are made available for review, if requested, prior to their use.

191.     My fees for these professional services are outlined in the attached retainer agreement.

192.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 30th day of March 2023, in LaPlace, Louisiana.

s/*John J. Ryan*
John J. Ryan

## CONSULTATION FEE SCHEDULE AND EXPENSE POLICY

Clifton Dilley v State of Louisiana, et al. • Donald J. Cazayoux, Jr., Attorney • Jack Ryan, Expert

**Preliminary discussions of cases:** We welcome telephonic discussions of potential cases. There is no charge for this service.

**Cases accepted for consultation:** There is a flat case development fee when cases are accepted for consultation, development, and preparation. This case development fee is non-refundable.

### FEE SCHEDULE:       $ 8,500.00

The case development fee covers **all** work done in Providence, RI area. This includes document review and evaluation, discovery and investigation of additional materials, research, written reports and affidavits, telephone, and copying. It also includes all follow-up discussions and reviews of additional materials. If you desire to come to Providence, RI area for case conferences, there is no extra charge for this service or time and we will be glad to assist in making local arrangements. The case development fee also covers **brief** meetings with you and your associates when we are in your locale on other matters and our schedule permits. Written reports are prepared only when specifically requested by you or your firm.

We have a flat rate rather than an hourly fee structure for several reasons. First, a flat fee promotes a better professional relationship and allows you to understand the costs you and your firm will incur at the outset. Second, we want to be an integral part of your case development to the fullest extent appropriate. The fee is structured to encourage you to draw upon this involvement and experience and to utilize us fully. Only then can we give you the best possible advice and be able to fully assist in presenting your case. When you consider our involvement with your case, we don't want you to feel constrained by the thought that the meter is running. Our experience in police civil litigation cases offer strategies, tactics, and demonstrative trial aids makes us a valuable resource in preparation, discovery and case development. Our experience in conducting training on liability issues and police agency audits provides you with a source of current and pragmatic knowledge of police practices.

**Expanded cases:** are those, which require much more time and generally involve agency pattern and practice, negligent retention, wrongful termination and other personnel related matters. Such cases require extensive documentation review. - personnel records, administrative hearing transcripts, and/or administrative investigation files and adjudications. We can usually determine whether yours is an expanded case during our initial discussion or soon after the initial review of materials based on time.

Initials: _DJC_

**Expedited cases:** are those cases in which a report or evaluation is required within two (2) weeks of the date Legal and Liability Risk Management Institute are retained in the matter and result in an additional $2,500 expedite fee.

Initials: _DJC_

**Depositions, testimony, on-site inspections, and conferences:** We will normally try to arrange our travel schedule to ensure meeting with you and your associates prior to deposition or testimony. Depositions are very taxing on both the deponent and the person(s) conducting the deposition. Therefore, it is our policy limit a deposition day to a maximum of eight (8) hours including breaks.

**Depositions in Providence, RI area: $2500. per day or part thereof**
_Deposition Fees must be paid prior to all depositions._

Initials: _DJC_

**Work away from Providence, RI area: $2500.00 per day or part thereof plus a $1000.00 fee for travel days:**

Initials: _DJC_

**Expenses at actual cost:** Airline travel will be at coach fare. When travel coincides with other business, costs are billed proportionally. Ground expenses, hotel, meals and incidentals are billed at actual cost. We reserve the right to require prepayment of these expenses.

Initials: *DJC*

**Revised reports:** After final report has been accepted supplemental reports and review of additional material will be invoiced at $250.00 per hour.

Initials: *DJC*

**Case Material:** Non-Digital will be digitized for case development at a rate of $200.00 per hour.

Initials: *DJC*

**Payment requirements:** The case development fee is required before we review your material. Other fees and expense reimbursement are due when we arrive at your location unless other written arrangements are agreed upon. All bills are payable, in any other case, within 30 days of the work performed. We reserve the right to charge a fee of one percent (1%) per month on the outstanding balance. The tax identification number to be used for Legal and Liability Risk Management Institute/Law Enforcement Risk Management Group, Inc., Federal ID 81-0692135

**Professional relationship:** You are entering into a professional relationship with Legal and Liability Risk Management Institute for litigation consultant assistance with your case. **You and your firm, not your client or opposing litigants, are our client.** You and your firm are solely responsible for payment of our professional services. Any fee and/or expense incurred for deposition by the opposing side reverts to your firm if that entity fails to fulfill this obligation or if a court order reduces the fee or expense charge. Your firm is responsible for the increment should the court reduce the fee or expense charged. Please do not ask us to wait for reimbursement from your client. We also do not accept payment directly from your client unless prior arrangements have been agreed upon.

**Agreement:** This document constitutes a contract for our professional services in return for your agreement to reimburse us according to the terms and conditions of this document. The contract is governed by the terms and conditions set forth herein. This contract is intended to be enforceable under the laws of the State of Indiana or in the State in which the services are rendered, at the discretion of Legal and Liability Risk Management Institute.

AGREED TO:

8/22/22

_____
Date

*Don Cazayoux*
_____
Signature

ACCEPTED:

12/02/2021

_____
Date

_____
Legal and Liability Risk Management Institute

Legal and Liability Risk Management Institute
Law Enforcement Risk Management Group, Inc.
700 N. Carr Rd, #595, Plainfield, IN 46168
Federal ID 81-0692135
317-386-8325  www.llrmi.com

**Please send all material for review and case development to the Plainfield, IN
address or electronically to: amanda.napier@llrmi.com**

# SCHEDULE A

## John "Jack" Ryan

700 N. Carr Rd, #595
Plainfield, Indiana 46168
Office (317) 386-8325
Cellular Phone: (401) 692-1555
FAX (317) 386-8228
Email: jackryan2@cox.net

## EDUCATION

| | |
|---|---|
| 1990-1994 | Juris Doctorate, Cum Laude, Suffolk University Law School |
| 1986-1990 | Master of Science, Administration of Justice, Salve Regina University |
| 1981-1986 | Bachelor of Science, Administration of Justice, Roger Williams University |

## EMPLOYMENT

2002-        Police Practices Consultant, Trainer, Auditor
2003-        Co-Director, Legal Liability Risk Management Institute
1993-2002    Adjunct Professor, Salve Regina University
             Administration of Justice Graduate Program
             Courses:

        Constitutional Issues in Law Enforcement
        Police Civil Liability
        Juvenile Justice
        Mental Health Law
        Managing Police Organizations
        Business Crime
        Contemporary Issues in the Administration of

Justice 1982-2002        Police Officer, Providence Police Department

| | |
|---|---|
| 1982-1985 | Patrol Officer, Patrol Division |
| 1985-1987 | Patrol Officer, Tactical Division |
| 1986- 1997 | SWAT Team, as Patrol Officers, Sergeant, and Lieutenant (1 of 4 Team Commanders) |
| 1987-1988 | Detective, Detective Division |
| 1988-1992 | Sergeant, Patrol Division |
| 1992-1995 | Lieutenant, Patrol Division |
| 1995-2000 | Director of Training |
| 1995-2001 | Department Public Information Officer |
| 1997-2001 | Captain, Administrative Staff Division |
| 1998-2001 | Director of Administration |
| 2001-2002 | Research and Policy |

    \* As Director of Administration for the Providence Police Department-Supervisory
    Responsibilities included:

- Administrative Staff
- Advisor to Chief of Police and Internal Affairs
- Fleet Operations
- Human Resource Bureau
- MIS
- Property/Evidence
- Prosecution Bureau

# SCHEDULE A

- Public Information Office
- Record Bureau
- Training Division

1981-1982 Private Security/Retail

- Uniformed Security
- Retail Store Detective
- Night Supervisor overseeing uniform security as well as store detectives

## CERTIFICATIONS:

2009      Certified with TASER by the Muncie Indiana Police Department

## AWARDS:

1999      Salve Regina University, Alumnus, Distinguished Service Award
1994      American Jurisprudence Award, Trial Practice
1992      American Jurisprudence Award, Constitutional Law
1991      Moot Court Outstanding Performance Award

## LAW ENFORCEMENT ACHIEVEMENT AWARDS:

1996      Chief's Award, Off-Duty Shooting in Progress Arrest
1987      City Council Award, Off-Duty Breaking and Entering Arrest
1986      Rhea Archambault (Officer of the Year) Award
1982-2002   Over 35 Letters of Commendation

## PROFESSIONAL AFFILIATIONS:
Rhode Island Bar Association Fraternal
Order of Police Providence Police
Association
International Municipal Lawyers Association

## ADMITTED TO PRACTICE OF LAW:
State of Rhode Island, November 1994
District of Rhode Island Federal Court, June 1995

## VOLUNTEER ORGANIZATIONS:
Northern Rhode Island Vikings Junior Hockey Association, President 2002-2004 Northern
Rhode Island Vikings Junior Hockey Association, Board Member 1998-2003

## CASE CONSULTATIONS:
January 2014: Jenny Rebecka Royal v. City of Blythe, Superior Court of Richmond County,
Georgia, Civil Action File No: 2012RCCV735 (Deposed 2/24/17) (Defense) August 2014:
Johnathan Rose et al, v. County of Sacramento, et al, U.S. District Court Eastern District of
California, Case No. 2:13-cv-01339-TLN-EFB
(Testimony 9/22/17) (Plaintiff)
June 2015: Nathan Felts v. Valencia County, et al., U.S. District Court for the District of New
Mexico, No: 1:13-cv-1094 MCA/RHS, (Testimony 10/17/17) (Defense)
December 2015: Estate of Dillon McGee v. Madison County, Tennessee, et al., U.S. District,
U.S. District Court for the Western District of Tennessee Eastern Division, No.: 1:15-1069,
(Deposed 7/31/17) (Defense)
September 2016: Sacchetti, Manganelli, et al. v. Gallaudet University, et al., U.S. District Court
for the District of Colombia. Case No.: 1:15-cv-455-RBW (Deposed 6/19/17)(Plaintiff)

# SCHEDULE A

November 2016: Estate of Brunette, et al. v. City of Burlington, U.S. District Court of Vermont, No.: 2:15-cv-61. (Deposed 7/26/17)(Defense)

December 2016: Katherine Elizabeth Sikes, individually and as Administrator of the Estate of Gary Thomas Latimer v. City of Douglasville, a municipal Corporation of the State of Georgia; Chief Chris Womack, Mayor Harvey Persons, Damon Partin, and Officer Michael McDonald, U.S. District Court for the Northern District of Georgia, Atlanta Division. Civil Action No.: 1:15-cv-03111. (Deposed 5/10/17)(Defense) February 2017: Estate of Marquez Smart by Randall Smart & Brenda Bryant as Administrators of the Estate and Heirs of Deceased v. The City of Wichita, Wichita PD, Officers Lee Froese & Aaron Chaffee. U.S. District Court for the District of Kansas. No.: 2:14-cv-02111-EFM-JPO. (Deposed 8/29/17)(Defense)

March 2017: Sureshbhai Patel v. City of Madison, et al. U.S. District Court for the Northern District of Alabama. No. 5:15-cv-00253-VEH. (Deposed 7/28/17)(Defense) May 2017: Stephen Horn v. City of Covington, et al. U.S. District Court, Eastern District of KY-Covington. No.: 2:14-cv-73-DLB (Deposed 8/30/17)(Defense)

June 2017: Tyrone Zwiegart v. Clinton County, et al. U.S. District Court for the Southern District of Illinois. No.: 3:16-cv-01182-MJR-RJD. (Deposed 9/16/17)(Defense)

July 2017: Sandra Harris, Special Administrator of the Estate of David Harris, Deceased, v. Village of Calumet Park, et al. Circuit Court of Cook County, IL, County Department, Law Division. No.: 2014-L-009643. (Deposed 9/07/17)(Defense)

June 2017: Maria Touchet, Personal Representative for Estate of Rudy Baca v. Valencia County and Seth Chavez. New Mexico Thirteenth Judicial District Court. No.: D-1314- cv-201501125. (Deposed 10/30/17)(Defense)

July 2017: Chaundraya Goodwin, Admx. V. Ohio State Highway Patrol. No.: 2016- 00864. Court of Claims of Ohio. (Deposed 10/31/17)(Defense)

October 2017: Baltimore PD v. Officer Caesar Goodson. Trial Board (Employment Disciplinary Hearing). (Testimony 11/6/17)(Defense)

August 2016: Jamie Nelson, et al. v. City of Elizabethtown, et al., U.S. District Court, Western District of KY at Louisville, Case No.: 3:16-CV-429-DJH. (Deposed 12/4/17)(Defense)

April 2017: Megan McGuire v. Douglas County, et al. U.S. District Court-District of Nebraska. No.: 8:16CV4. (Deposed 2/1/18)(Defense)

November 2017: Derrick Wynn v. City of Griffin, et al. U.S. District Court for the Northern District of Georgia, Newnan Division. No. 3:16-cv-94-TCB. (Deposed 2/13/18)(Defense)

August 2017: Neuroth v. Mendocino County, et al. U.S. District Court – Northern District California. No.: 3:15-cv-03226-RS. (Deposed 3/12/18)(Plaintiff)

July 2017: Estate of John Livingston, Tyrone Bethune, Christine Broom, Michael Cardwell, Ryan Holloway, and Wesley Wright v. Kehagias. U.S. District Court, Eastern District of North Carolina. No.: 5:16-cv-906. (Deposed 4/12/18)(Defense)

March 2018: Moses Stryker v. The City of Homewood; Chief Jim Roberson; Jason Davis; Brian Waid; and Frederick Blake. U.S. District Court, Northern District of Alabama, Southern Division. No.: 2:16-cv-00832-VEH. (Deposed 4/17/18)(Defense) January 2018: Jon Luer, et al. v. St. Louis County, MO. U.S. District Court, Eastern District of Missouri. Case No.: 4:17-cv-767 NAB. (Deposed 5/22/18) (Defense) February 2017: Darren A. Dickerson v. County of Camden, et al., U.S. District Court, District of New Jersey. No.: 1:14-cv-06905. (Deposed 6/13/18)(Defense)

December 2017: Francois Severe v. City of Miami and Antonio Vicente Torres, IV. District Court for the Southern District of FL. No. 17-cv-22153-DPG. (Deposed 7/2/18)(Defense)

December 2016: Joshua Skinner v. Alexander Tower, Eric Shepard, Brian Claffy, and Michael DeFiore. U.S. District Court for the District of Vermont. Civil Case No.: 2:16- cv-127. (Deposed 7/23/18)(Defense)

February 2017: Thomas Pryor v. County of Camden, et al., Superior Court of New Jersey, Law Division, Civil Part. No.: L-2767-15. (Testimony 7/27/18)(Defense)

# SCHEDULE A

May 2016: Sheila Brawley, Mother and Next Friend of Rhaykeem D. Samuels, a minor, v. City of Madison, et al., Circuit Court Third Judicial Circuit Madison County, Illinois, Case No.:15-L-1505 (Deposed 8/15/18)(Defense)

January 2016: Clark v. Village of Grayslake, et al., Circuit Court of Lake County, (Deposed 8/17/18) (Defense)

May 2016: Robert Bryant v. Camden County Police Department, Jose Gonzalez, and Officer Jacob Levy, Superior Court of New Jersey, Law Division, Docket No.: L-3505-15. (Testimony 9/6/18) (Defense)

April 2018: Anthony Wilson and Kimberly Wilson, the parents of Martez Wilson, and the Estate of Martez Wilson v. Douglasville, Officer Coylee Danley, Officer Andrew Smith, Sgt. Caldwell, EMT Sean Flack and paramedic Brian Porterfield. U.S. District Court, Northern District of Georgia. CAFN 1:17-cv-00634-ELR.
(Deposed 9/7/18)(Defense)

May 2018: Angela Ainley v. City of South Lake Tahoe, et al. Federal Court Eastern District of California. No. 2:16-cv-00049-TLN-CKD. (Deposed 9/12/18) (Plaintiff) January 2018: Cajun Snorton as administrator of the estate of Nicolas Thomas v. Smyrna Police Lt. Kenneth Owens, et al. U.S. District Court, Northern District of Georgia. No.: CAFN 1:17-cv-01036-RWS. (Deposed 9/14/18) (Defense)

May 2018: Estate of Tashi S.Farmer, et al. v. LVMPD, et al. U.S. District Court, District of Nevada. No. 2:17-cv-01946-JCM-PAL. (Deposed 10/19/18) (Defense)

October 2018: John Hernandez, et al. v. City of Sacramento, et al. Eastern District of California. No. 2:17-cv-02311-JAM-DB (Deposed 11/30/18) (Plaintiff)

October 2018: Carolyn Giummo, et al. v. Robert Olsen, et al. U.S. District Court for the Northern District of Georgia. Civ. A. No. 1:15-cv-03928-TCB.
(Deposed 12/7/18) (Defense)

November 2018: Bill Stanley, Administrator of The Estate of Brandon Stanley v. Bobby Joe Smith and David Westerfield. U.S. District Court, Eastern District of Kentucky, London Division. No.: 6:16-cv-00264-REW-HAI. (Deposed 12/20/18) (Defense)

July 2016: Tad Woods v. Geraldine Martinez, Twelfth Judicial District Court, State of New Mexico, Case No.: D-1215-CV-2013-00689. (Testimony 1/16/19) (Defense) July 2016: Bethany Anderson, et al. v. City of Westlake, OH, et al. Court of Common Pleas, Lorain County, OH. No.: 18-CV-194655. (Deposed 1/25/19) (Defense)

December 2018: Smith v. County of Santa Cruz, CA. No. 17-6594 LHK, S.S. v. County of Santa Cruz, CA. No. 17-5095 LHK. U.S. District Court – ND California.
(Deposed 3/8/19) (Plaintiff)

July 2014: Fraternal Order of Police v. City of Camden, et al., U.S. District Court for the District of New Jersey, Civil Action No.:1:10-cv-01502 (Testimony 3/18/19) (Defense) September 2018: Jamie Ann Cox, individually and as successor in interest for Humberto Rosario Martinez, Deceased, et al. v. City of Pittsburg, et al. U.S. District of N.D. Cal. No.: 3:17-cv-04246-RS.
(Deposed 3/25/19) (Plaintiff)

October 2017: Mario Alberto Madero, Jr., et al. v. City of Prairie Village, Kansas, et al. District Court of Johnson County, Kansas. No.: 18-CV140.
(Testimony 4/16/19) (Defense)

May 2017: Keith Childress, Sr., et al. v. LVMPD, et al. U.S. District Court, District of Nevada. No.: 2:16-cv-03039-JCM-NJK. (Deposed 4/18/19) (Defense)

December 2018: Amanda Hoskins/Jonathan Taylor v. Knox County, et al. U.S. District Court, Eastern Kentucky Division. No.: 17-cv-84. (Deposed 5/21/19) (Defense) December 2017: State of New Jersey v. P.O. Joseph P. Reiman. Superior Court of N.J., Criminal Division. Criminal Complaint # 1201-W-2017-000360.
(Testimony 5/22/19) (Defense)

March 2019: United States of America v. Nicholas Romantino. District Court of New Jersey, Camden Vicinage. Crim. No. 18-673 (RBK)
(Testimony 6/7/19 and 9/10/19) (Defense)

February 2018: Yvonne Mote, as Personal Representative of the Estate of Shane Watkins, deceased v. Steven Moody, et al. U.S. District Court for the Northern District of Alabama; Northwest Division. No.: 3:17-cv-00406-AKK. (Testimony 6/27/19) (Defense)

# SCHEDULE A

May 2018: Rashawn Quaneece Middleton, as Personal Representative of the Estate of Roy Howard Middleton, SR., deceased v. Sheriff David Morgan (Escambia), et al. U.S. District Court, Northern District of Florida, Pensacola Division. No. 3:17-cv-00346- MCR-GRJ. (Deposed 7/8/19) (Defense)

May 2018: Velvet Clowers v. Union City and John Does 1 through 4. Superior Court of Fulton County, GA. No.: 2017CV298022. (Deposed 8/14/19) (Defense)

February 2019: Roger Dean Gillispie v. City of Miami Township, et al. U.S. District Court, Southern District of Ohio, Western Division. No. 3:13-cv-00416-TMR-MRM. (Deposed 9/4/19) (Defense)

November 2018: Tiffany Washington, et al. v. Crystal Marlowe, et al. Jefferson Circuit Court, Kentucky. No.: 10-CI-001183. (Testimony 10/1/19) (Defense)

June 2018: Celia Sanchez and Oscar Salas, Statutory Death Beneficiaries of Erik Emmanuel Salas-Sanchez v. Mando Kenneth Gomez, Alberto Rivera, Pamela Smith and the City of El Paso, TX. U.S. District Court, Western District of Texas, El Paso Division. No. 3:17-cv-00133-PR. (Deposed 9/13/19) (Defense)

April 2019: Lisa G. Finch v. City of Wichita, Kansas. U.S. District Court for the District of Kansas. No.: 18-cv-1018-JWB-KGS. (Deposed 10/2/19) (Defense)

May 2018 Trinita Farmer v. Las Vegas Metropolitan Police Department, US District Court for the District of Nevada, Case No. 2:18-cv-00860-GMN-VCF (Deposed 10/25/19) (Defense)

August 2018 Fleming v. Albuquerque, Second Judicial District Court Bernalillo County, New Mexico, Case No. D-202-CV-2014-5954 (Testimony 11/8/19) (Defense) September 2018 Charles Mills v. William Clogston, III, Individually and in his Official Capacity as Scott County Deputy Sheriff, et al., Case No. 5:18-cv-00025-DCR (Deposed 1/22/20) (Defense)

March 2019 Joey Brockman v. City of Falmouth, Case No. 18-CI-00012 (Deposed 2/5/20) (Defense)

February 2020 Garrett Collick, et al., v. William Paterson University, et al., Case No. 2:16-cv-00471 (KM-JBC)(Deposed 2/6/20) (Defense)

June 2019 Patrick Cornely v. Camden County Corrections, Docket No. CAM-L-4671-17 (Testimony 2/25/20) (Plaintiff)

July 2019 Hurtado v. Cobb County, GA. Case No. 18-A-963-3 (Deposed 3/9/20)(Defense) November 2019 Finley v. Loggains, City of Jonesboro. Case No. 3:18-cv-55-DPM (Deposed 4/30/20)(Defense)

January 2020 Nakiya Moran v. Calumet City, et al., Case No. 1:17-cv-02027 (Deposed 5/11/20 & 6/12/2020)(Defense)

December 2019 James Griffin v. Donald Wright, II, et al., Civil Action No. CV-2018- 903480 (Deposed 5/13/20)(Defense)

April 2020 Arterburn v. Eddy's Chevrolet Cadillac, LLC, Case No. 2018 CV 000683 (Deposed 6/8/20)(Plaintiff)

December 2019 Murrietta v. City of Fresno, Case No. 1:18-at-00152 (Deposed 6/29/20)(Plaintiff) January 2020 Lankford v. Plumerville, Case No. 4:19-cv-00619-JM (Deposed 7/14/20)(Defense) March 2020 Ghaisar v. U.S., Case No. 1:19cv1224 (Deposed 7/29/20)(Defense)

October 2018 Rudavsky v. City of South Burlington, Case No. 2:18-cv-25 wks (Deposed 8/27/20)(Defense)

February 2019 Herndon v. Henderson Police Department, et al., Case No. 2:19-cv-00018- GMN-NJK (Deposed 9/16/20)(Defense)

September 2020 Martin, et al. v. City of San Jose, et al., Case No. 3:19-cv-01227-EMC (Deposed 9/28/20)(Plaintiff)

March 2019 Estate of Marco Gomez v. Village of Forest Park, et al., Case No. 18 CV 910 (Deposed 11/20/20)(Defense)

January 2020 McLemore v. Columbus Consolidated Gov't, et al., Case No. 4:19-cv- 00090-CDL (Deposed 12/4/2020)(Defense)

December 2020 Moore v. City and County of San Francisco, Case No. 3:18-cv-00634-SI (Deposed 12/22/20)(Plaintiff)

October 2020 Mobley v. Underwood, Case No. 0:19-cv-03223-JFA-SVH (Deposed 1/14/21)(Defense)

February 2020 Jok v. City of Burlington, Civil Action No. 2:19-CV-70 (Deposed 1/21/21)(Defense)

# SCHEDULE A

September 2020 Virgil v. City of Newport, Case No. 16-CV-222 (Deposed 2/24/21)(Defense)
February 2020 Mendez v City of Chicago, Case No. 1:18-cv-05560 (Deposed 3/18/21)(Plaintiff)
March 2021 Ramos - FCMS #200815-09122 (Testimony 4/8/21)(Defense)
April 2021 Anderson v Lyon County, Case No. 3:20-cv-00435-LRH-WGC (Deposed 4/20/21)(Defense)
October 2019 Lobato v LVMPD, Case No. 2:19-cv-01273-RFB-EJY (Deposed 4/27/21)(Defense)
July 2020 Andy Martin v City of San Jose, Northern District of California, Case No. 3:19-cv-01227-EMC (Testimony 5/18/21)(Plaintiff)
May 2021 Antwon Rafael Gallmon, Jr. v Forest Acres Police Department, Case No. 3:17-cv-00059-TLW-PJG (Deposed 5/26/21)(Defense)
January 2020 Meli v City of Burlington, Civil Action No. 2:19-cv-71 (Deposed 6/2/21)(Defense)
August 2020 O'Kelley v Pickens County, Civil Action No. 2:17-CV-0215-RWS (Deposed 8/10/21)(Defense)
May 2020 Crowe v Steward, Case No. 5:20-cv-00203-REW-MAS (Deposed 8/26/21)(Defense)
May 2021 Lucas v County of Fresno, Case No. 1:18-cv-01488-DAD-EPG (Deposed 10/01/21)(Plaintiff)
March 2021 Pizer v City of Rock Hill, Case No. 0:20-cv-03620-JMC-SVH (Deposed 10/27/21)(Defense)
February 2021 Estate of Napouk v LVMPD, Case No. 2:20-cv-01859-JCM-BNW (Deposed 11/3/21)(Defense)
July 2021 Estate of Soheil Antonio Mojarrad v. William Brett Edwards and City of Raleigh, NC, Civil Action No. 5:20-cv-397-FL (Deposed 11/8/21)(Defense) August 2021 Latimer v William Patterson University, Docket No. PAS-L-421_20 (Deposed 11/22/21)(Defense)
November 2020 Daniel Shaham, Dec. v California Highway Patrol, 2:17-cv-01075-TLN- JDP3 (Deposed 11/23/21)(Plaintiff)
February 2020 Tate v City of Chicago, No. 18 CV 07439 (Deposed 11/29/21)(Plaintiff) March 2019 Haines v Frank, Civil Action-Law December Term, 2017 No. 2017 (Testimony 12/1/21)(Defense)
March 2017 Pollard v Columbus Consolidated Government, et al., Civil Action File No: SC-19-CV-1150 (Deposed 12/15/21)(Defense)
December 2021 Steffel, et al. v The City of Jefferson, Missouri, et al., Case No. 20AC-CC00145 (Deposed 12/16/21/(Defense)
November 2020 Randall Johnson, Dec. v City of Redding, Case No. 2:19-cv-01722-JAM-DB (Deposed 12/20/21)(Plaintiff)
April 2021 Travis Scott King, et al. v Ronald Davis, et al., Case No. 3:19-cv-07722 VC (Deposed 1/3/22)(Plaintiff)
November 2021 Katie Whitworth v Mark Kling, et al., Case No. 4:21CV-00025 LPR (Deposed 1/10/22)(Defense)
October 2020 McCree v Chester Police Department, et al., Case No. 0:20-cv-00867- MGL- PJG (Deposed 2/14/22)(Defense)
September 2021 Haidon v Danaher, Case Action No.: 3:19-cv-00119 (SRU) (Deposed 2/25/22)(Defense)
April 2015: Ingram v. Camden County, et al., U.S. District Court, District of New Jersey, Civil Case No. 1:14-cv-05519 (Deposed 6/13/18)(Testimony 3/22/22)(Defense)
December 2020: Darnel Banks v. Cortez Maxwell and Country Club Hills, Case No. 19-cv-542 (Deposed 3/25/22)(Defense)
September 2021: Ahmad Norwood v. Calumet City, Case No.: 2018 L 010991 (Deposed 3/30/22)(Defense)
September 2021: Ryan Thomas v. Calumet City, Case No.: 2018 L 010798 (Deposed 3/30/22)(Defense)
December 2021: Tapia v. City of Albuquerque, Case No.: D-202-CV-2019-06610 (Deposed 3/31/22)(Defense)
May 2021: Pope, et al. v. Hill, et al., Civil Action No.: STSV2021000286 (Deposed 4/12/22)(Defense)
December 2021: Gomez v LVMPD, et al., Case No.: 2:20-cv-1589-RFB (Deposed 4/18/22)(Defense)
January 2021: Ford v Glasgow, Civil Action No. 20-CI-89 (Deposed 4/9/21)(Testimony 4/19/22)(Defense)

# SCHEDULE A

October 2021: Estate of Hale v Justin Swope, et al., Case No.: 5:20-CV-178-TBR (Deposed 5/23/22)(Defense)

September 2020: Ethan Marks v Minneapolis Police Officers, Case No.: 20-CV-01913 (Deposed 6/15/22)(Plaintiff)

March 2022: Eric Lurry v. City of Joliet, Case No.: 20-CV-4545 (Deposed 6/21/22) (defense)

August 2021: Tuggle (Cuevas) v City of Tulare, Case No.: 1:19-cv-01525-NONE-SAB (Deposed 7/19/22)(Plaintiff)

June 2019: AJA Seats, et al. v. Village of Dolton, et al. Circuit Court of Cook County, IL. No.: 2016-L-010353. (Deposed 8/20/19) (Testimony 8/2/22) (Defense)

January 2022: Thomas Barbosa, Dec. v. Shasta County, Case No.: 2:20-cv-02298-JAM-DMC (Deposed 8/18/22)(Plaintiff)

March 2021: Clark and Hardin v. Meade County, KY, Civil Action No.: 3:17-CV-00419-DJH (Deposed 8/23/22)(Defense)

May 2018: Estate of Luke Stewart v. City of Euclid, et al., Case No. 1:17-cv-02122 (Deposed 9/9/22)(Testimony 10/31/22)(Defense)

November 2021: State of Washington v Burbank; Collins and Rankine, Case Nos.: 21-1-01286-6; 21-1-01287-4; and 21-1-01288-2 (Testimony 11/23/22)(Plaintiff)

October 2022: Bruce Washington, et al. v Randy Smith, et al., Civil Action No.: 2:22-CV-632 (Deposed 11/28/22)(Defense)

June 2021: Danny Ojeda v Tucson Police Department, Case No.: C20202521 (Deposed 11/29/22)(Defense)

March 2022: The Estate of Eric Lurry, Jr. v City of Joliet, Case No.: 20-CV-4545 (Testimony 11/30/22)(Defense)

August 2022: Ariel Hill & Jamal Wood v City of Chicago, Case No.: 2017-L-7368 (Deposition 12/12/22)(Defense)

May 2022: Epps v Anderson County Sheriff's Office, Case No.: 8:22-cv-00934-TMC-KFM (Deposition 12/14/22)(Defense)

July 2022: Jaddo v City of Stamford, Case No.: 3:21-cv-00350 (Deposition 12/20/22)(Defense)

December 2021: Fair v LVMPD, et al, Case No.: 2:20-cv-01841-JCM-BNW (Deposition 1/19/23)(Defense)

June 2021: Coequyt v. Holien and City of Redwood, Case No.: 0:20-cv-01178-PJS-TNL (Testimony 1/25/23)(Plaintiff)

July 2022: Timothy Ellis v City of Providence, William Dukes, Jr. and Dustin Winstead, Case No.: 4:17-cv-00042-JHM-HBB (Deposition 1/27/23) (Defense)

November 2021: Estate of Byron Williams, et al. v LVMPD, et al., Case No.: 2:21-cv-01346 (Deposition 2/6/23) (Defense)

December 2022: James v City of Chicago, et al., Case No.: 21-cv-6750 (Deposition 2/10/23)(Plaintiff)

April 2021: Jeffrey Lilley v Wood County, et al., Case No.: 22-CV-08 (Deposition 2/14/23)(Plaintiff)

May 2019: Johnny Banks v. Shelby Hawkins and City of Shannon Hills. U.S. District Court Eastern District of Arkansas. No.: 2:18-cv-00039-BSM.
(Deposed 7/29/19)(Testimony 3/16/23)(Defense)

July 2022: Richter, et al. v City of Norwich, et al. Case No.: KNL-CV16-6032558-S (Deposition 3/21/23)(Defense)

February 2023: Tully v Lynch and Tully v Bloomfield. Case No.: USDC 1:22-CV-233 and NMDC D-1116-CV-202200176 (Deposition 3/27/23)(Defense)

January 2023: Pacheco v City of Stockton. Case No.: 2:20-CV-01404-TLN-KJN (Deposition 3/28/23)(Plaintiff)

# John "Jack" Ryan

700 N. Carr Rd, #595
Plainfield, Indiana   46168
Office (317) 386-8325
Cellular Phone: (401) 692-1555
FAX (317) 386-8228
Email:   jackryan2@cox.net

## PUBLICATIONS:

- Law and Best Practices for Successful Police Operations, 12 High Risk Critical Tasks That Impact Law Enforcement Operations and Create Exposure to Liability Litigation (2007, 2010, 2013, 2016, 2018 and 2021 editions)
- Legal and Liability Risk Management Manual Guide -The Law and Best Practices of Successful Jail/corrections Operations (2009 and 2016 editions)
- Recent Developments in the Use of Force, Excessive Force by Law Enforcement, Touro Law Review, Vol. 24, Number 3 (2008)
- 25th Annual Section 1983 Civil Litigation, by Practicing Law Institute Video/Audio-The Unbiased Witnesses in Law Enforcement Litigation. Vol. 1, Section 8 (2008)
- Legal & Liability Issues in SWAT, Emergency Response and Special Operations (2006)
- Public Safety Media Relations (Manual and Guide) (2005)
- School Legal Update (2005)
- Critical Tasks in Law Enforcement, A Legal Guide for Officers and Supervisors (2005) (Annual)
- Arrest, Search & Seizure (2005) (Annual)
- Legal & Liability Issues for Hostage Negotiators (2005)
- Use of Force (2005)
- Administrative Investigations in Law Enforcement Agencies (2004)
- Law Enforcement Legal/Liability Update (2004)
- Civil Liability and Risk Management for Law Enforcement Agencies (2003)
- Case Law on Critical Tasks in Law Enforcement (2003)
- Legal Guide to Administrative Investigations (2003)
- Policy Development for Public Safety Agencies (2002)
- Legal and Liability Issues in Public Schools (2001)
- Rhode Island Law Enforcement Officers' Guide to Criminal Procedure (2000)
- Rhode Island Law Enforcement Officers' Bill of Rights, A Guide to Investigations and Hearings (2000)

## PUBLISHED ARTICLES:

- Qualified Immunity, Suffolk Law Alumni Magazine, Suffolk University, Boston (2022)
- United State Court of Appeals for the Ninth Circuit Holds, Pre-Trial Detainees have Due Process Right to Adequate Safety Checks Video Monitoring is Insufficient-Direct View Safety Checks Required (2022)
- Neck Restraints, Choke Holds/Carotid Holds, What Law Enforcement Policy/Training Tells Us, The Medical/Scientific Debate, What the Cases Tell Us (2020)
- Law Enforcement Response to Unlawful Assemblies Protests and Riots (2020)
- Duty to Intervene Duty to Render Aid (2020)
- Prone/Restraint/Positional  Asphyxia/Compression  Asphyxia  (2020)
- Law Enforcement Practices During a Pandemic (2020)

# SCHEDULE B

- NYMIR Law Enforcement Newsletter, a publication of the New York Municipal Insurance Reciprocal. "Understanding Exculpatory Evidence and How it May Impact Convictions – The U.S. Supreme Court Provides Further Explanation of Brady v. Maryland," pp. 2, 6-7 (2018)
- 2006  Legal and Liability Risk Management Manual Guide – The Law and Best Practices of Successful Jail/Corrections Operations (2009 and 2016)
- Public Risk, published by the Public Risk Management Association, January 2006, Vol. 21, No. 2, "A Continuing Story Taser™ Policies for Police Departments Continue to Evolve," pp. 14-17 (2006)
- Public Risk, published by the Public Risk Management Association, March 2006, Vol. 21, No. 3, "Freeze" Off-Duty Firearms and Intervention: Avoiding Tragedy and Liability," pp. 16-18 (2006)
- Public Safety Media Relations (Manual and Guide) (2005)
- Administrative Investigations in Law Enforcement Agencies (2004)
- Crime and Justice International May/June Vol. 20, No. 80, "High Speed Vehicle Pursuit," pp. 30-34; "Developing Trends in Stop & Frisk" p. 35; "Fighting Words Directed at a Police Officer: Viability and Liability," pp. 36-37 (2004)
- Crime and Justice International July/August Vol. 20, No. 81, "Law Enforcement Liability Issues-Agency or Individual Officer's Response to Misconduct by Others May Create Agency or Individual Liability," pp. 29-30 (2004)
- Public Risk, published by the Public Risk Management Association, July 2004, Vol. 19, No. 6, "Handcuffs: How to Manage the Risk," pp. 14-17 (2004)
- The Law Enforcement Trainer published by American Society of Law Enforcement Trainers, Vol. 19, No. 3, May/June, "Training Liability In The Use of Deadly Force" pp. 24-28 (2003)

## 2022 Legal Updates Archive
- U.S. Supreme Court Update: Vega v Tekoh, No. 21-499 (June 2022)

## 2021 Legal Updates Archive
- U.S. Supreme Court Update: Rivas-Villegas v Cortesluna, No. 20-1539 (October 2021)
- U.S. Supreme Court Update: Bond v City of Tahlequah, No. 20-1668, Per Curiam Decision (October 2021)
- U.S. Supreme Court Update: Bond v City of Tahlequah, No. 20-1668, Petition for Certiorari (September 2021)
- U.S. Supreme Court Update: Torres v Madrid, No. 19-292 (March 2021)
- U.S. Supreme Court Update: Caniglia v Storm, No. 20-157 (May 2021)

## 2020 Legal Updates Archive
- U.S. Supreme Court Update: Kansas v. Glover, No. 18-566 (April 2020)
- U.S. Supreme Court Update: Ybarra v. City of Chicago, No. 946 F.3d 975 (7th Circuit 2020) (May 2020)

## 2019 Legal Updates Archive
- U.S. Supreme Court Update: DUI Blood Draw on Unconscious Driver (July 2019)
- U.S. Supreme Court Update: The Existence of Probable Cause to Arrest May Defeat a First Amendment Claim as a Matter of Law (June 2019)

## 2018 Legal Updates Archive
- An Unarmed Individual Has Been Shot – Is the Officer Always Wrong? (July 2018)
- United States Supreme Court: *Sause v. Bauer*, 138 S. Ct. 2561 (July 2018)
- The United States Supreme Court Decides Privacy Issues Related to Cellular Phone Records (June 2018)
- United States Supreme Court Decides that an Arrest with Probable Cause Can Still Violate the Arrestee's First Amendment Rights (June 2018)
- United States Supreme Court: The Automobile Exception Does Not Permit the Warrantless Entry of a Home or its Curtilage in Order to Search a Vehicle Therein (May 2018)

# SCHEDULE B

- United States Supreme Court: Possessor of Rental Car has Right to Privacy Even When No on Rental Agreement (May 2018)
- United States Supreme Court Grants Qualified Immunity in Case of Woman with Mental Impairment Shot by Officer (April 2018)
- The United State Supreme Court Grants Summary Judgment and Qualified Immunity to D.C. Officers in False Arrest Case (January 2018)

## 2017 Legal Updates Archive
- Understanding Exculpatory Evidence and How It May Impact Convictions: The United States Supreme Court Provides Further Explanation of Brady v. Maryland (2017)
- United States Supreme Court Rejects 9th Circuit Provocation Theory in Deadly Force Confrontation (2017)
- Using Force on Persons in Medical Emergencies: United States Court of Appeals for the 6th Circuit in a Published Decision Applies New Analysis (2017)
- U.S. Supreme Court Grants Appeal in Arrest Lawsuit (2017)
- U.S. Supreme Court Clarifies "Clearly Established Law" for Qualified Immunity in Deadly Force (2017)
- U.S. Court of Appeals for Fourth Circuit Finds Police Department Social Media Policy Unconstitutional & Punishment of Two Officers Under That Policy to be Unconstitutional (2017)
- U.S. Supreme Court to Examine Provocation Theory in Law Enforcement Shootings (2017)

## 2016 Legal Updates Archive
- Private Health Care Contractors May Also Be Liable for a Civil Rights Violation (2016)
- Reasonableness of Entry as Force When There Is a Use of Flash Bangs As Part of Entry (2016)
- Use of Restraint Chairs (2016)
- United States Court of Appeals for the 4th Circuit Decides Limitations on TASER™ Use (2016)
- US Supreme Court Finds Child's Statements to Teachers May Sometimes be Used Against Abuser Even Though Child is Unavailable for Cross-Examination (2016)
- US Supreme Court Finds That Evidence Seized During Unconstitutional Stop May Not Be Excluded (2016)
- US Supreme Court Distinguishes Breath Test from Blood Test under Implied Consent Statutes that Criminalize a Refusal-Warrantless Blood Test Violates Fourth Amendment (2016)
- US Court of Appeals Distinguishes Use of Force (TASER™) on Persons of Diminished Capacity (2016)
- US Supreme Court Finds That Electronic Control Weapons Are Protected Under the Second Amendment's Right to Bear Arms (2016)
- Mail Policy in Jails (2016)
- Jail Staff Not Deliberately Indifferent to Pre-Trial Detainee Medical Needs (2016)
- Post-TASER™ Confession: Is a Waiver Knowing and Voluntary? (2016)
- US Court of Appeals for the 4th Circuit Decides Limitations on TASER™ Use and Announces Use of Force Analysis When Dealing with Persons of Diminished Capacity (2016)

## 2015 Legal Updates Archive
- US Supreme Court: Shooting at Fleeing Vehicles (2015)
- US Supreme Court: Use of Force on Pretrial Detainees Judged by Objective Reasonableness Standard (2015)
- US Supreme Court: No Answer to Whether ADA Applies When Officers are Dealing with a Mentally Impaired, Violent and Armed Subject (2015)
- US Supreme Court: Absent Reasonable Suspicion Police Extension of a Traffic Stop in Order to Conduct a Dog Sniff Violates the Constitution's Shield Against Unreasonable Seizures (2015)

## 2014 Legal Updates Archive
- US Supreme Court: Are Knock and Talks Restricted to the Front Door of a Residence? (2014)

# SCHEDULE B

- US Supreme Court: Officers Must Act Reasonably Not Perfectly (2014)
- US Supreme Court: Cellular Device Search Incident to Arrest (2014)
- US Supreme Court: Shooting at Vehicle & 4th Amendment (2014)
- US Supreme Court: Summary Judgment in Use of Force Cases (2014)
- US Supreme Court: When Does an Anonymous Report Amount to Reasonable Suspicion? (2014)
- US Supreme Court Clarifies Consent and Co-Occupants (2014)

## 2013 Legal Updates Archive
- US Supreme Court: Can Officer Pursue Fleeing Misdemeanor Suspect into Home or Residential Curtilage (2013)
- US Supreme Court: Pre-Custody and Un-Mirandized Silence to Questions by Law Enforcement May Be Commented on by the Prosecutor at Trial (2013)
- Forced Blood Draw for DUI (2013)
- US Supreme Court: Narcotics Sniffing Dog & 4th Amendment Search (2013)
- US Supreme Court: K-9 Alert Establishes Probable Cause to Search Vehicle (2013)

## 2012 Legal Updates Archive
- US Supreme Court: Exigent Entry Based on Belief of Imminent Violence (2012)
- US Supreme Court: Intentional Violation of Miranda Rule and the Impact on Subsequent Warned Confession (2012)
- Taser™ Used to Subdue Non-Compliant 73-Year-Old (2012)
- US Supreme Court: Visual Strip Searches at Jail Intake of Persons Being Placed in General Population Need Not Be Supported by Reasonable Suspicion (2012)
- Facebook© and the First Amendment Rights of Police Officers (2012)
- US Supreme Court: A Convicted Prisoner May Not be in Custody for Miranda Purposes (2012)
- US Supreme Court: A Determination of Probable Cause by a Magistrate Will Generally Protect Officers/Investigators from Liability (2012)
- Fourth Amendment Protection Applies to Placing GPS on Vehicle (2012)
- How Eyewitness Identification Will Be Reviewed When There is No Improper Conduct by Law Enforcement (2012)

## 2011 Legal Updates Archive
- Federal Liability for Pursuit (2011)
- Court Applies Graham in Deciding that Use of the TASER® was Unconstitutional (2011)
- Officers Being Recorded by Citizens While Working (2011)
- TASER® Probe Mode, Secondary Impact and Liability (2011)
- US Supreme Court: Prosecution Must Present Actual Forensic Analyst in Court (2011)
- US Supreme Court Clarifies Miranda Warnings and Juveniles (2011)
- US Supreme Court: Exclusionary Rule (2011)
- Fleeing from Law Enforcement in a Vehicle is a Violent Crime (2011)
- Indiana Supreme Court: A Person Cannot Resist Officer (2011)
- U.S. Supreme Court Clarifies Destruction of Evidence Exigency (2011)
- Picketing Funerals and the First Amendment (2011)
- Statements Taken During On-Going Emergency are Admissible at Trial (2011)

## 2010 Legal Updates Archive
- Use of Taser™ in Drive-Stun Mode on Protestors: Objectively Reasonable in 2nd Circuit (2010)
- 9th Circuit TASER® Case Re-visited (2010)
- Use of Force: Pre-Shooting Conduct and Suicide by Cop Cases (2010)
- US Supreme Ct: Search of Officer's Text Messages from Department Issued Pager Was Reasonable (2010) (Co-Authored with Lou Reiter)

## 2009 Legal Updates Archive
- US Court of Appeals for the Ninth Circuit Restricts the Use of TASER™ (2009)

# SCHEDULE B

- Michigan v Fisher: U.S. Supreme Court Clarifies Exigent Home Entries (2009)
- TASER™, the Target Zone, Policy & Training (2009)
- TASER™ International, Inc. Warns Against Targeting the Chest with Electronic Control Devices (2009)
- Taser® On Non-Compliant Arrestee (2009)
- Exam Violated Rights of White and Hispanic Firefighters (2009)
- Three 2009 U.S. Supreme Court Cases Impacting Law Enforcement (2009)
- Ashcroft v. Iqbal and Law Enforcement Supervisory Liability (2009)
- AZ v. Gant: Inventory Searches of Motor Vehicles (2009)
- AZ v. Gant: Commentary & Misinterpretations (2009)
- AZ v. Gant: Final Case Judgment & What It Means to Law Enforcement (2009)
- An Unreasonable Delay in Bringing a Suspect to Court May Render the Suspect's Confession Inadmissible (2009)
- US Supreme Court Changes Qualified Immunity Rules for Civil Rights Lawsuits Against Law Enforcement (2009)
- U.S. Supreme Court Further Diminishes Reach of Exclusionary Rule (2009)

## 2008 Legal Updates Archive
- Summary of Arguments: U.S. v. Herring, AZ v. Gant (2008)
- Preview of 2008-2009 U.S. Supreme Court Cases Impacting Law Enforcement (2008)
- Hostages & The Legal Duty to Protect (2008)
- Negotiator Liability (2008)
- Hostages & the Legal Duty to Protect (2008)
- An Investigator's Road Map to Out of Court Statements (2008)
- Managing Law Enforcement Liability Risk (2008)
- Handcuffing as Excessive Force (2008)
- Vehicle Checkpoints (2008)
- Supreme Court Decides Incident to Arrest –Vehicle Case (2008)
- Covert Video Surveillance (2008)
- Compelled Substance Abuse Testing (2008)
- Liability Exposure in Special Operations (2008)
- Sexual Misconduct, Sexual Harassment and Sexual Discrimination Series with Lou Reiter: Part 1: Introduction to Sexual Misconduct & Agency Liability (2008)
- Sexual Misconduct, Sexual Harassment and Sexual Discrimination Series with Lou Reiter: Part 2: Policy v. Custom / Operational Policy & Failure to Have a Policy (2008)
- Sexual Misconduct, Sexual Harassment and Sexual Discrimination Series with Lou Reiter: Part 3: Failure to Train & Failure to Supervise (2008)
- Sexual Misconduct, Sexual Harassment and Sexual Discrimination Series with Lou Reiter: Part 4: The Need for Policy and Training, and Avoiding Deliberate Indifference (2008)

## 2007 Legal Updates Archive
- Garrity Issues in Law Enforcement Series: Part 1: Garrity and the Administrative Interview (2007)
- Garrity Issues in Law Enforcement Series: Part 2: Immunity Granted Under Garrity (2007)
- Garrity Issues in Law Enforcement Series: Part 3: Compulsion as the Triggering Mechanism (2007)
- Garrity Issues in Law Enforcement Series: Part 4: Civilian Review Boards and Garrity (2007)
- Garrity Issues in Law Enforcement Series: Part 5: Are Off-Duty Incidents within the Scope of Garrity? (2007)
- Garrity Issues in Law Enforcement Series: Part 6: Once Immunized, Officer Must Tell the Truth (2007)
- What Happens When the Plaintiff Cannot Identify Which Officer Beat Him? (2007)
- Training Liability in Use of Deadly Force (2007)
- Supreme Court to Hear Incident to Arrest –Vehicle Case (2007)
- Cellular Phones/Digital Devices and Search Incident to Arrest (2007)

# SCHEDULE B

- Vehicle Stops: Does a Motorist Have a Privacy Interest in Their License Plate? (2007)
- Model Policy: Off-Duty Action (2007)
- U.S. Supreme Court Decides Passenger Privacy Case (2007)
- No Liability in Search Warrant Execution (2007)
- Persons with Disabilities (2007)
- Off-Duty Murder Not Under "Color of Law" Thus, No Agency Liability (2007)
- Georgia v. Randolph: Police Cannot Use the Consent of a Co-Occupant to Make Entry in Order to Search for Evidence to be used Against the Opposing Occupant Who Is Present and Objects to the Entry (2007)
- U.S. Supreme Court Decides on Scott v. Harris - Vehicle Pursuit Implications (2007)
- U.S. Supreme Court to Decide Privacy Interests of Passenger (2007)
- Court Dismisses Lawsuit Based Upon Death of Emotionally Disturbed Person (2007)
- Anticipatory Search Warrant: United States v. Grubbs (2007)
- Anonymous Calls and Reasonable Suspicion Standard (2007)
- Scott v. Harris: Summary of Oral Arguments (2007)
- Municipal Insurance Pool Not Liable: Robbery and Murder by Police Trainee (2007)
- Cocaine Discovered in Auto Leads to Probable Cause to Arrest All Occupants (2007)
- LEO's Duty to Protect Persons from 3rd Party Harm (2007)
- Ramming During Pursuit Viewed as Deadly Force (2007)
- Companion with Gun May Provide Reasonable Suspicion for Pat-Down (2007)

**2006 Legal Updates Archive**
- Duty of Officer's to Intervene when Observing an Excessive Use of Force (2006)
- The Law of Citizen Contacts and Stop and Frisk (2006)
- Positional Asphyxia (2006)
- Seizure at Gunpoint (2006)
- Pepper Spray (2006)
- Beanbag Rounds (2006)
- U.S. Supreme Court Upholds Canine Sniffs of Vehicles (2006)
- Liability Based on Agency or Individual Failure to Intervene (2006)
- Legal/Liability Issues in the Training Function (2006)
- Overview of Police Liability (2006)
- Deadly Force to Prevent the Escape of a Violent Felon (2006)
- Bite and Hold Canines: Warning Required Before Release (2006)
- Reasonableness of Handcuffing during a valid "Terry Stop" (2006)
- Focus on Liability Reduction and Better Performance (2006)
- Dealing with the Mentally Ill and Emotionally Disturbed in the Use of Force (2006)
- Use of Deadly Force: Pre-Shooting Conduct and the 21 Foot Rule (2006)
- Consent Searches of Motor Vehicles (2006)

**Other Articles**
- US Supreme Court Places New Restrictions on Search Incident to arrest in Vehicles (2009)
- "Use of Force-Policy and Training Considerations" (2004)

**From the LLRMI Jail/Corrections Article Archive**
- 8th Cir: A Foreseeable Suicide May Create Liability (2010)
- The United States Court of Appeals for the Ninth Circuit Upholds the Blanket Strip Search Policy of San Francisco County (2010)
- Strip Searches for Institutional Security in a Jail or Lock-up Setting (2009)
- 1st Cir: Strip Search in Jails / Detention Centers (2009)
- 2nd Cir: Strip Search in Jails / Detention Centers (2009)
- 3rd Cir: Strip Search in Jails / Detention Centers (2009)
- 4th Cir: Strip Search in Jails / Detention Centers (2009)

# SCHEDULE B

- 5th Cir: Strip Search in Jails / Detention Centers (2009)
- 6th Cir: Strip Search in Jails / Detention Centers (2009)
- 7th Cir: Strip Search in Jails / Detention Centers (2009)
- 8th Cir: Strip Search in Jails / Detention Centers (2009)
- 9th Cir: Strip Search in Jails / Detention Centers (2009)
- 10th Cir: Strip Search in Jails / Detention Centers (2009)
- 11th Cir: Strip Search in Jails / Detention Centers (2009)
- 9th Cir: Dental Care in Jails / Detention Centers (2009)
- 9th Cir: Jail (Officer) Failure to Follow Doctor's Orders (2009)
- 9th Cir: Strip Search and Self Surrender (2009)
- Classification of Arrestees Upon Entry into a Jail (2009)
- Duty to Protect Prisoners from Assault (2009)
- Handling Grievances in a Jail / Detention Setting (2009)
- Identity Verification (2009)
- Failure to Provide Medication in Jail / Detention Setting (2009)
- Inmate Mail – PLRA and Allegations of Rights Violations (2009)
- 9th Cir References 8th Amendment and Nutrition Requirements for Inmates (2009)
- Inmates and Freedom of Religion (2009)
- Strip Search Substitute / Subterfuge (2009)
- Use of Force in Jails / Detention Centers (2009)

**From the LLRMI Law Enforcement Model Policy Electronic Control Devices website**
- Model Policy - Electronic Control Devices (multiple years)
- In-Custody Deaths and Excited Delirium (2007)

**From LLRMI Legal Questions Answered website**
- Can Pointing a gun be considered a use of force? (2010)
- Off-Duty Carry by Reserve Officers (2009)
- Agency and Personal liability in failure to provide shooting training (2009)
- Involuntary Transport to Station for Identification (2008)
- Questioning a passenger during a traffic stop (2008)
- Bingo Hunting and Privacy Interests in License Plate (2008)
- Using Dog Sniff's for Probable Cause to Obtain Search Warrant (2008)
- Garrity application with EMS (2008)
- Truant Officer Questioning Student - at request of Superintendent (2007)
- Dorm Room Searches. Response at school-training.com (2007)
- "Fruits of the Poisonous Tree" - A Miranda Example (2007)
- Releasing Mug Shots to the Media (2007)
- Joint Liability in Multi-Agency Operations (2007)
- Miranda after confession given during non-custody interview (2007)
- No-Knock clause in search warrants (2007)
- Court requirements for police training on EDP's (2007)
- Responding to an Open House Party (2007)
- Officer with search warrant gets door shut in face... OK to enter? (2007)
- Miranda and Detention during Search Warrant Execution (2007)
- Creating a Use of Force Report (2007)
- Failure to Protect (2007)
- Interviewing/Interrogating Students on Campus (2007)
- Probable Cause, and taking a person to police stations (2007)
- Vehicle Search Consent (2007)
- Need for search warrant for vehicle towed to private lot (2007)
- Reasonable expectation of privacy in information supplied to a third party (2007)
- First Appearance Hearings & the 48/72 Hour Window - City & Officer Liability (2007)

# SCHEDULE B

- Citizen Complaint Recordings (2007)
- Hiring and the Probationary Period (2007)
- Permission to search during stop & Robinette decision (2007)

\*\*\* Note: articles published electronically on a weekly basis and archived- available at www.patc.com and www.llrmi.com

# SCHEDULE C

## John "Jack" Ryan

700 N. Carr Rd, #595
Plainfield, Indiana 46168
Office (317) 386-8325
Cellular Phone: (401) 692-1555
FAX (317) 386-8228
Email: jackryan2@cox.net

**CONFERENCE PRESENTATIONS/TRAINING SESSIONS:**

| | | |
|---|---|---|
| 2023 | LLRMI "Jail Operations and Best Legal Practices" Anchorage, AK April |
| 2023 | LLRMI 5 Day "Use of Deadly Force and Officer Involved Shooting" LaPlace, LA March |
| 2023 | Constitutional Review of the Griffin Police Department, Griffin, GA March |
| 2023 | Conway Police Department Training, Conway, SC. "Emerging Legal Trends & Liability Management for Tactical, SWAT & Emergency Response Operations" March |
| 2023 | Kentucky League of Cities, Frankfort, KY. "12 High Risk Critical Task" February |
| 2023 | Kentucky Association of Counties and Kentucky League of Cities, Frankfort, KY. "Emerging Legal Trends & Liability Management for Tactical, SWAT & Emergency Response Operations" February |
| 2023 | Michigan Chief of Police Conference, Grand Rapids, MI. "Managing Risk in Today's Environment" February |
| 2022 | Kentucky Jailers Conference, Lexington, KY. "Understanding Response to Resistance from an Administrative Standpoint" December |
| 2022 | Kentucky Sheriff's Association Conference. Owensboro, KY. "Current Law and Best Practices for a Profession Sheriff's Office" December |
| 2022 | Tennessee Law Enforcement Training Officers Association. Gatlinburg, TN. "Emerging Legal Trends & Liability Management for Tactical, SWAT & Emergency Response Operations" November |
| 2022 | LLRMI Use of Force Conference and Certification. Las Vegas, NV. "The Law and Best Practices with Respect to Law Enforcement Use of Force?" November |
| 2022 | LLRMI Jail/Correction Liability, Risk Management, and Legal Issues. Las Vegas, NV. "Emerging Legal Trends" November |
| 2022 | LLRMI Supervising, Managing, and Legal Issues for Protests, Demonstrations, and Civil Unrest Operations. Las Vegas, NV. "First Amendment Rights of Protestors Fourth Amendment Rights" November |

# SCHEDULE C

2022    LLRMI National Internal Affairs Training & Certification. Las Vegas, NV. "Compelled Garrity Statements" November

2022    Georgia Local Government Risk Management Services – "Emerging Legal Trends" October

2022    Tennessee County Services Association Conference – "Entity Liability – How Policies, Custom, Training and Supervision Impacts Your Entity" October

2022    Clearwater Florida National Internal Affairs Conference – "Legal Updates in Internal Affairs Investigations" September

2022    Minot North Dakota Police Seminar – "Use of Force" September

2022    FBINAA Leadership Seminar – "Mastering Leadership, Supervisor Liability" August

2022    United Counties Council of Illinois Conference – "Emerging Legal Trends" July

2022    Tennessee Association of Chiefs of Police – "Emerging Legal Trends" July

2022    Vermont League of Cities and Towns – "Law Enforcement Independent Civilian Oversight"

2022    Maryland Municipal League Police Executive Association – "Decision Making" April

2022    International Municipal Lawyers Association – "The Law Enforcement Response to Assemblies/Protests/Unlawful Assemblies/Riots" April

2022    LLRMI Use of Force Conference and Certification "Training Officers, Lesson Plans, Policy Development, Officer Safety and Community Expectations Reducing and Influencing Agency Liability" – April

2022    LLRMI  National Internal Affairs Training and Certification Conference. Franklin, TN "Compelled (Garrity) Statements" April

2022    Legal and Liability Risk Management Institute Online Virtual Training – "Use of Force" March

2022    Springdale Police Department Training "Use of Force/De-Escalation" February

2022    Southern Illinois Criminal Justice Summit "Policing Demonstrations, Protests, and Civil Unrest" February

2022    Georgia Sheriffs' Association "New Sheriff's Conference", February

2021    LLRMI National Internal Affairs Training & Certification. Las Vegas, NV. "Investigating Citizen Complaints for Field Supervisors" December

2021    LLRMI 5 Day Mastering Performance Supervision, Leadership and Management. Las Vegas, NV. "What Police Reform and Accountability Means to Supervisors" December

2021    CRL Conference "Staying Ahead of the Losses: Policies, Training and Supervision that Stays Ahead of the Risks" November

2021    CRL Conference "The Changing Environment of Law Enforcement and How It Impacts Coverage, Claims and Risk Control" November

# SCHEDULE C

2021    Alabama Municipal Attorney Association, Gulf Shores, AL. "Use of Force Training Policy in the Reform Movement" October

2021    Law Enforcement Liability Risk Management Conference, Franklin, Tennessee, "Staying Ahead of Liability: Policing in the Reform Movement" October

2021    Platte County Sheriff's Office. Kansas City, MO. "Emerging Law Enforcement Legal Trends: Policing in the Reform Movement" October

2021    Local Government Insurance Trust, Maryland, "The Law and Best Practices of Successful Police Operations" September

2021    Illinois Mobile Team Unit 9, "Implicit Bias – De-Escalation – Procedural Justice: A Call for Change in Law Enforcement Training and Operations" June

2021    Arkansas City Attorney's Association Virtual CLE: - "Analyzing the Derek Chauvin Trail" June

2021    Legal and Liability Risk Management Institute Online Virtual Training – "Policing in Police Reform Times" June

2021    Kentucky Jailers Association. Bowling Green, KY. "Legal Update for Law Enforcement and Jails" June

2021    CRL Conference "De-Escalation: Training, Policy and How De-Escalation is Impacting Use of Force" May

2021    LLRMI Tactical, SWAT & Emergency Response Operations Seminar. St. Louis, MO. "Emerging Legal Trends & Liability Management for Tactical, SWAT & Emergency Response Operations" May

2021    LLRMI National Internal Affairs Training and Certification Conference. Smyrna, TN. "Garrity in Today's Changing Environment" April

2021    LLRMI Jail/Correction Risk Management, Liability and Loss Control Conference. Smyrna, TN. "Emerging Legal Trends for Jails and Correction" April

2021    LLRMI Tactical, SWAT & Emergency Response Operations Conference. Smyrna, TN. "Emerging Legal Trends and Liability Management for Tactical, SWAT and Emergency Response Operations" April

2021    West Michigan Tactical Officers Association "SWAT Liability" March

2021    CRL Conference "Current State of Law Enforcement Reform Post- George Floyd" March

2021    Southern Illinois Criminal Justice Training Program. Effingham, IL. "Implicit Bias" March

2021    Central Illinois Police Training Center. Peoria, IL. "Implicit Bias" March

2021    Southwestern Illinois Law Enforcement Commission. Belleville, IL. "Policing Demonstrations, Protest and Civil Unrest" March

2021    Kentucky Sheriff's Association Annual Conference. Bowling Green, KY. "Emerging Legal Trends and Best Law Enforcement Practices" February

# SCHEDULE C

| | |
|---|---|
| 2021 | Legal and Liability Risk Management Institute Online Virtual Training – "Procedural Justice and Legitimacy of Authority" January |
| 2021 | Legal and Liability Risk Management Institute Online Virtual Training – "Managing Demonstrations, Protests, Civil Disobedience, Legal and Liability Issues" January (1.5 hours) |
| 2020 | Legal and Liability Risk Management Institute Online Virtual Training – "De-Escalation – Reducing Intensity" December (1.5 hours) |
| 2020 | Georgia Sheriffs' Association Emerging Legal and Liability Trends "What Every Sheriff Needs to Know" December |
| 2020 | Tennessee Trainers Association Conference, "Current Issues Impacting Law Enforcement" November |
| 2020 | Madison Police Department Legal Update Training November |
| 2020 | CRL Risk Control Conference "Political Unrest, Cultural Movement" October |
| 2020 | Practising Law Institute- "Use of Force" October |
| 2020 | SWAT Training, Providence Police Department September |
| 2020 | CRL Conference "Police Reform, Implicit Bias, Procedural Justice, De-Escalation and Legislative Action on Police Reform" September |
| 2020 | VRSA Duty to Intervene in Unreasonable Force/Duty to Render Aid During a Use of Force Event Webinar August (1 hour) |
| 2020 | IMPG Online Presentation- "How Current Events are Impacting and Shaping Law Enforcement" August (1 hour) |
| 2020 | Legal and Liability Risk Management Institute Online Webinar Training- "How Current Events are Impacting and Shaping Law Enforcement" August (2 hours) |
| 2020 | Legal and Liability Risk Management Institute Online Webinar Training- "Law Enforcement Personnel and Implicit Bias During Interactions with Citizens and Suspects" July (1.5 hours) |
| 2020 | VRSA Carotid Restraint Webinar July (1.5 hours) |
| 2020 | TML: How Current Events Are Affecting Police Tactics and Policies Webinar July (1.5 hours) |
| 2020 | VRSA Arrestee Restraint Webinar July (1.5 hours) |
| 2020 | Nampa, Idaho. "Emerging Legal Trends & Liability Management for Tactical, SWAT & Emergency Response Operations" June |
| 2020 | Policing Demonstrations, Protest and Civil Unrest Webinar Training June (2 hours) |
| 2020 | TML: Crowd Control Webinar June (1 hour) |
| 2020 | SWAT Training, Providence Police Department June (2 hours) |

# SCHEDULE C

2020    CLM, A Member of the Institutes Online Webinar Training- "Covid-19 & Correctional Facilities: Mitigating both Transmission and Liability" April (1 hour)

2020    Legal and Liability Risk Management Institute Online Webinar Training- "Covid-19 Law Enforcement Operations in the Midst of a Pandemic" April (1 hour)

2020    Legal and Liability Risk Management Institute Online Webinar Training- "Use of Force: Moving Forward" April (1 hour)

2020    Lexington, South Carolina. "SWAT & Emergency Response Operations" March

2020    Smithfield, Rhode Island. "Arrest, Search and Seizure" February

2020    Danville, Virginia. "Arrest, Search and Seizure" February

2020    Champaign, Illinois. "Emerging Legal Trends & Liability Management for Tactical, SWAT & Emergency Response Operations" February

2020    Champaign, Illinois. "ILEAS Policing Demonstrations, Protest and Civil Unrest" February

2020    San Diego, California. Civil Rights & Governmental Tort Liability Seminar. "Litigation Skills Workshop" January

2019    Dawsonville, Georgia. "Emerging Legal Trend & Liability Management for Tactical, SWAT & Emergency Response Operations" December

2019    Charlotte, North Carolina. County Reinsurance Annual Conference. "Emerging Issues Related to Law Enforcement Liability and Risk Management" November

2019    Sandy, Utah. LLRMI Tactical, SWAT & Emergency Response Operations Seminar. November

2019    Las Vegas, Nevada. "Supervision Leadership" October

2019    Las Vegas, Nevada. "Lost Control Risk Management" October

2019    Las Vegas, Nevada. "Advanced Internal Affairs" October

2019    Lafayette County Sheriff's Office, Missouri. "Emerging Legal Trends for Law Enforcement" & "Legal Update for Law Enforcement and Jails" October

2019    County Risk Sharing Authority, Ohio. "Legal Update: Emerging Trends in Law Enforcement" October

2019    Arkansas Association of Chiefs of Police Conference, Rogers, AR. "Emerging Legal Trends and Best Law Enforcement Practices" September

2019    Kentucky Sheriff's Association Annual Conference. Bowling Green, KY. "Emerging Legal Trends and Best Law Enforcement Practices" September

2019    Texas Association of Counties, multiple locations "Emerging Legal Trends and Liability Management for Tactical, SWAT and Emergency Response Operations" August

# SCHEDULE C

2019    Kentucky Association Chiefs of Police Annual Conference. Owensboro, KY. "Law and Best Practices Update" July

2019    LLRMI Tactical, SWAT & Emergency Response Operations Seminar. Franklin, TN. "Emerging Legal Trends and Liability Management for Tactical, SWAT and Emergency Response Operations" July

2019    SPIAA Training Conference, Kansas City, MO. "Law and Best Practices Update and the Impact of Liability on Officer Wellness." July

2019    LLRMI Liability Management for Tactical, SWAT & Emergency Response Operations Training Seminar. Fort Worth, TX. "SWAT Legal and Best Practices" July

2019    Rhode Island Bar Association Annual Meeting "Section 1983 Litigation" June

2019    Local Government Insurance Trust, Maryland. "Emerging Legal Trends and Best Law Enforcement Practices" June

2019    Michigan Municipal Risk Management Authority. Livonia, MI. "Emerging Legal Trends and Liability Management for Tactical, SWAT and Emergency Response Operations" May

2019    Tennessee Trainers Association Conference, Franklin, TN. "Emerging Legal Trends and Best Law Enforcement Practices" May

2019    LLRMI Risk Management and Loss Control for Law Enforcement Conference, Cape Coral, FL "Law Enforcement Litigation and Legal Trends" May

2019    LLRMI Tactical, SWAT & Emergency Response Operations Seminar. Cape Coral, FL. "Emerging Legal Trends and Liability Management for Tactical, SWAT and Emergency Response Operations" May

2019    Missouri Public Risk "Law and Best Practices for Patrol" and "Law and Best Practices for Investigative Operations" April

2019    Georgia Sheriff's Association "Mastering Supervisor and Liability Management" April

2019    New Jersey Police Chiefs Association "Legal Update and Contemporary Best Practices in Law Enforcement" April

2019    IMLA Mid-Year Seminar, Washington D.C. "Section 1983: Trending Issues and Hot Topics" March

2019    University of Georgia, Athens, GA "Law and Best Practices Update" March

2019    LLRMI Jail/Correction Risk Management, Liability and Loss Control Conference. Las Vegas, NV. "Emerging Legal Trends for Jails and Correction" February

2019    LLRMI Tactical, SWAT & Emergency Response Operations Seminar. Las Vegas, NV. "Emerging Legal Trends and Liability Management for Tactical, SWAT and Emergency Response Operations" February

2019    IMLA Online Webinar "Use of Body Worn Camera Video at Trial" February

2018    LLRMI Liability Management for Tactical, SWAT & Emergency Response Operations Training Seminar. Grand Prairie, TX. "SWAT Legal and Best Practices" December

# SCHEDULE C

2018        KLC Instructor Simulator Conference "All Use of Force Training and Use of Force Shoot, Don't Shoot Decision Making" November

2018        Missouri Public Risk "Emerging Legal Trends and Best Law Enforcement Practices" November

2018        TN PRIMA "Legal Update" November

2018        Cookeville Police Department, TN "Supervisor Liability" November

2018        Virginia "The Law and Best Practices of SWAT Operations and Tactical Command" October

2018        Georgia Local Government Risk Management Services – Georgia Law Enforcement Training "Law and Best Practices of the High-Risk Critical Tasks in Law Enforcement Including Use of Force, Deadly Force, Dealing with Person of Diminished Capacity, Pursuits, and Special Operations" October

2018        Texas Commission on Law Enforcement Annual Conference "Emerging Legal Trends – Impact on Police Operations" October

2018        Midwest Public Risk Fall Conference, MO. "Emerging Legal Trends – Impact on Law Enforcement" October

2018        Kentucky Association of Counties "Emerging Legal Trends for Attorneys" October 2018Manassas Park Police Department, VA. "Emerging Legal Trends in Law Enforcement" October

2018        Arkansas Association of Chiefs of Police- "Emerging Legal Trends in Law Enforcement" September

2018        International Municipal Lawyers Association Webinar Training- "Officer Involved Shootings" August

2018  Twin River Management Group, Lincoln, RI. Casino Security Staff Training- "Active Shooter and Other Critical Incidents, Use of Force, Self-Defense, Citizen's Arrest, and Law and Best Practices." July

2018        LLRMI Emerging Legal Trends and Liability Management for Tactical, SWAT & Emergency Response Operations Training Seminar, Georgetown, TX. "SWAT Legal and Best Practices" July

2018        Michigan Association of Chiefs of Police- "Emerging Legal Trends in Law Enforcement" June

2018        RI Bar Association Annual Meeting "Officer Involved Shootings and Pursuits: Law, Litigation and Best Practices" June

2018        VML Insurance Programs, Virginia "Policing Demonstrations, Protest, and Civil Unrest" Legal, Liability Issues, First and Fourth Amendment Protections. May

2018        FBINAA Louisiana Chapter, "Legal Update: Emerging Trends in Law Enforcement". April

# SCHEDULE C

2018        South Dakota Police Chief's Association Joint Training Conference, Deadwood, SD. "Legal Update: Case Law Impacting Law Enforcement and Jail Operations". April

2018        LLRMI Risk Management and Loss Control for Law Enforcement Conference, Cape Coral, FL "Emerging Legal Updates Impacting Liability, Lawsuits, Policies and Procedures". April

2018        MCLE New England, Boston, MA. "Police Misconduct Litigation" March

2018        VML Insurance Programs, Virginia "Policing Demonstrations, Protest, and Civil Unrest" Legal, Liability Issues, First and Fourth Amendment Protections. March

2018        Hanover County Sheriff's Office, Hanover, VA "Legal Update: Emerging Trends in Law Enforcement" March

2018        Palm Beach Police Department, Palm Beach FL "Policing Demonstrations, Protest, and Civil Unrest" Legal, Liability Issues, First and Fourth Amendment Protections. March

2018        Alabama Association of Chiefs of Police Conference, Montgomery, AL "Legal Update: Emerging Trends in Law Enforcement" February

2018        VML Insurance Programs, Virginia "Policing Demonstrations, Protest, and Civil Unrest" Legal, Liability Issues, First and Fourth Amendment Protections. February

2018        "Law of Use of Force" University of Arkansas School of Law, Fayetteville, AR. February

2018        "Law Enforcement in the Current Environment of Protests, Video, and Lawsuits" Salve Regina University, Newport, RI. February

2018        Alabama Sheriffs Association "Emerging Legal Trends and Best Law Enforcement Practices" Montgomery, AL, January (8 hours)

2018        Legal and Liability Risk Management Institute Online Webinar Training- "Demonstrations, Mass Protests, and the Occupy Movement" January (1 hour)

2017        Legal and Liability Risk Management Institute Online Webinar Training- "Use of Force: Moving Forward" December (1 hour)

2017        Tennessee Association of Chiefs of Police- "Protest and Demonstrations: The Interplay Between First and Fourth Amendment Rights" December (6 hours)

2017        County Reassurance Conference- "Emerging Trends and Law Enforcement Liability" Phoenix, AZ, November (2 hours)

2017        International Municipal Lawyers Association- "Law and Best Practices in the Use and Implementation of Body Worn Cameras" October, Niagara Falls, NY (2 hours)

2017        Legal and Liability Risk Management Institute Jail/Correction Risk Management, Liability and Loss Control Conference- "Emerging Litigation and Legal Trends" October, Cape Coral, FL (5 hours)

2017        Vermont League of Cities Annual Conference- "Emerging Legal Trends" October (2 hours)

# SCHEDULE C

2017      Virginia Association of Chiefs of Police- "Emerging Trends in Law Enforcement"

2017      Kentucky Sheriffs Conference- "Emerging Trends in Law Enforcement"

2017      Kentucky Council on Crime & Delinquency- "Emerging Trends in Jails and Corrections"

2017      Twin River Management Group, R.I. – Security staff training. June (8 hours)

2016      Defense Research Institute, Austin, Texas

2015      International Municipal Lawyer's Association. Officer Involved in Shootings and Qualified Immunity Post Plumhoff

2015      IADLEST, International Association of Director of Law Enforcement Standards and Training. "Training Liability" and "Emergency Liability Trends"

2015      Georgia Jail Association's Annual Conference -High Risk Critical Task in the Jail Operation, Savannah Georgia

2015      Arkansas Association of Chiefs of Police Annual Meeting -Law and Best Practices for Policing in Trying Times.

2015      South Carolina Municipal Association's Annual Meeting for Elected Officials – Law Enforcement for Trying Times

2015      Texas Commission on Law Enforcement, training for 750 Law Enforcement trainers

2015      National Internal Affairs Investigators' Annual Conference – Law Enforcement Liability and the Interplay on the Internal Affairs

2013      Suffolk University Law School, "Policy in Trying Times" Boston Massachusetts

2013      Police K-9 Magazine, National Handler Instructor Training Seminar and Annual Conference for K-9

2013      Practising Law Institute- Annual Conference Section 1983 Civil Rights Litigation Program

2012      Developed a Training Program for Law Enforcement and attorneys dealing with Use of Force; Electronic Control Devices; and Sudden Custody Death.

2012      National Internal Affairs Investigation Association Annual Conference- Use of Force and Sudden in Custody Death

2012      Sheriff's Association New Sheriff's Conference Legal Update and Best Practices for Sheriffs

2012      Texas Commission Law Enforcement Officer on Standards and Education annual conference for Texas Trainers/ "Legal Issues for Law Enforcement Trainers"

2012      Practising Law Institute- "Mass Protest" 29th Annual Conference Section 1983 Civil Rights Litigation Program

2010      PRIMA, Law Enforcement Risk Management Program

# SCHEDULE C

2010        National Internal Affairs Investigators Association Annual Conference, Indianapolis, Indiana

2010        Annual Conference of the National Council of County Association Executives 2009
                Utah Highway Patrol – Law Enforcement Pursuit Operations

2009        Practising Law Institute- Annual Conference Section 1983 Civil Rights Litigation Program

2009        National Conference for Public Risk Managers.

2009        Continued training programs for Public Agency Training Council throughout the United States to include, Policy Development and Implementation, Arrest Search & Seizure, Use of Force, Civil Liability Issues, Liability Issues for Narcotics Officers, Legal Issues for Tactical Operations, Liability Issues in Public Schools and Internal Affairs

2009        Georgetown Law Center/Civil Rights Litigation, Session 1 "Strip Searches in Jails," Session 2 "Tasers"

2008        Practising Law Institute- Annual Conference Section 1983 Civil Rights Litigation Program

2008        Texas Commission on Law Enforcement Standards and Education "Liability Management for Law Enforcement Trainers

2008        Association of American Law Schools Annual Conference- "Law Enforcement Policy and Training/Use of Force & Pursuit in the Aftermath of Scott v. Harris"

2007        Continued training programs for Public Agency Training Council throughout the United States to include, Policy Development and Implementation, Arrest Search & Seizure, Use of Force, Civil Liability Issues, Liability Issues for Narcotics Officers, Legal Issues for Tactical Operations, Liability Issues in Public Schools and Internal Affairs

2007        Georgetown Law Center/Civil Rights Litigation: Session 1 "Law Enforcement Policy and Training in Use of Force"; Session 2: "Law Enforcement- the ADA and Persons of Diminished Capacity."

2007        South Dakota Annual Conference for Chiefs and Sheriffs- "Legal Update on High Liability Issues in Law Enforcement"

2007        Pennsylvania Chiefs of Police- "Legal Update on High Liability Issues in Law Enforcement"

2007        International Municipal Lawyer's Association Annual Conference- "Garrity and the Administrative Interview"

2007        Practising Law Institute- "Use of Force" 24th Annual Conference Section 1983 Civil Rights Litigation Program

2007        25th Annual Section 1983 Civil Litigation, by Practising Law Institute Video/Audio-The Unbiased Witnesses in Law Enforcement Litigation. Vol. 1, Section 8

2006        Continued training programs for Public Agency Training Council throughout the United States to include, Policy Development and Implementation, Arrest Search & Seizure, Use of Force, Civil Liability Issues, Liability Issues for Narcotics Officers, Legal Issues for Tactical Operations, Liability Issues in Public Schools and Internal Affairs

# SCHEDULE C

2006 Georgetown Law Center/Civil Rights Litigation "Police Misconduct" §1983

2006 National Internal Affairs Investigators Association Annual Conference, Gatlinburg Tennessee "Use of Force and the Internal Affairs Process"

2006 Georgia Bar Association "ICLE", Atlanta Georgia "Evaluating Police Liability Claims"

2005 Legal and Policy Issues in the Use of Force- throughout United States

2005 Georgetown Law Center/ Civil Rights Litigation "Less-Lethal Force"

2005 Arrest, Search & Seizure, and Questioning-throughout United States

2005 Civil Liability and Risk Management in Law Enforcement-throughout United States

2005 Internal Affairs/Administrative Investigations- throughout United States

2005 PRIMA National Conference-Milwaukee "Use of Force" and "Critical Tasks in Law Enforcement"

2005 National Sheriff's Association Annual Conference-Louisville "Legal Issues in Administrative Investigations"

2005 National Leagues of Cities and Towns (Risk Consortium)-Seattle "Identifying Contemporary Risks in Law Enforcement Liability"

2004 Legal and Liability Issues in Public Schools, throughout United States

2004 Policy Development for Law Enforcement Agencies, throughout United States

2004 Civil Liability and Risk Management for Law Enforcement Agencies, throughout United States

2004 Legal Issues in Narcotics Operations, throughout United States

2004 Critical Legal Tasks for Patrol Officers, Illinois Mobile Training Unit

2004 Georgetown Law Center/Civil Rights Litigation-§ 1983

2004 Rhode Island Bar Association Annual Conference- "Stop in the Name of the Law"

2004 Oklahoma Attorney General's Annual Conference "Policy Summit" Policy session for Police Executives

2004 Texas Commission Law Enforcement Officer on Standards and Education annual conference for Texas Trainers/ "Legal Issues for Law Enforcement Trainers"

2003 Legal and Liability Issues in Public Schools, throughout United States

2003 Policy Development for Law Enforcement Agencies, throughout United States

2003 Civil Liability and Risk Management for Law Enforcement Agencies, throughout United States

# SCHEDULE C

2003        Advanced Internal Affairs, Myrtle Beach, SC, Las Vegas, NV.

2003        Georgetown Law Center/Civil Rights Litigation-§1983

2003        Georgia Internal Affairs Investigators Annual Conference

2003        Tennessee Chiefs' Association Conference Training

2003        Alaska Chiefs' Association/FBINAA Executive Development Conference

2003        Office of Corporation Counsel/Metropolitan Police, Washington D.C.

2003        International Law Enforcement Educators and Trainers Association Annual Conference/Chicago "Trainers and Use of Force Liability"

2002        Legal and Liability Issues in Public Schools, throughout the United States

2002        Policy Development for Public Safety Agencies, throughout the United States

2002        International Association of Law Enforcement Planners National Conference, Long Beach, California

2002        National Internal Affairs Investigators Association National Conference, Tampa, Florida

2001        Legal Issues in Use of Force Seminar, Salve Regina University

2001        Advanced Internal Affairs Seminar, Las Vegas

2000        Police Misconduct/Racial Profiling, Georgetown University Law Center

2000        International Crime Prevention, University of Warwick, UK.

2000        Criminal Procedure Update Seminar, Salve Regina University

1999        Law Enforcement Officers' Bill of Rights Seminar, Salve Regina University

1998        Police Media Relations Seminar, Salve Regina University

1997        Police Civil Liability Seminar, Salve Regina University

1995        Basic Training for Detectives, Rhode Island State Police

1993        Search and Seizure in Schools, Rhode Island Legal/Educational Partnership


**CURRICULUM DEVELOPMENT:**

2005        Jail Liability Issues

2005        Arrest, Search & Seizure, and Questioning

2004        Legal Issues/ Case Law Update for Narcotics Investigators

2004        Legal and Liability Issues for Tactical Commanders

2004        Investigation of Officer Involved Shootings

# SCHEDULE C

2003  Legal Issues in Administrative Investigations

2003  Civil Liability and Risk Management for Law Enforcement Agencies

2002  Policy and Procedure for Law Enforcement Agencies

2002  Legal and Liability Issues in Public Schools

1993  Graduate Course, Police Civil Liability

1993  Providence Police Academy Entry-Level, 22 Week Program Revamp

**Dilley v State of LA Material Reviewed Schedule D**

1. DPSC 588- Trooper Internal Radio Communication
2. DPSC 738- Interview of Domingue
3. Use of force report
4. Use of Force Report-Taser
5. DPSC 189- Full Surveillance Video
6. Use of force report
7. Use of Force Report-Taser
8. *5.1 - DPS - State Documents*
   a. DPSC 1-751
   b. DPSC Axon 1-52
   c. DPSC Employment 1-165
   d. DPSC Investigation 1-35
   e. DPSC Policies-Procedures 1-21
   f. DPSC Recruiting 1-8
   g. DPSC Training 1-396
   h. Insurance Policy Markup (ORM 1-36)
   i. ORM 1-36
9. DPSC 189- Full Surveillance Video
10. DPSC 588- Trooper Internal Radio Communication
11. DPSC 738- Interview of Domingue
12. **5.1- DPS-State Documents**
    a. DPSC 1-751.pdf
    b. DPSC Axon 1-52.pdf
    c. DPSC Employment 1-165.pdf
    d. DPSC Investigation 1-35.pdf
    e. DPSC Policies-Procedures 1-21.pdf
    f. DPSC Recruiting 1-8.pdf
    g. DPSC Training 1-396.pdf
    h. Insurance Policy Markup (ORM 1-36).pdf
    i. ORM 1-36.pdf
13. **Clifton Dilley Deposition**
    a. CliftonDilley_1.pdf - CliftonDilley_41.pdf
    b. CliftonDilley_COND.pdf
    c. CliftonDilley_LinkPDF.pdf
    d. CliftonDilley_PDFTran.pdf
14. **Kasha Domingue Deposition**
    a. Deposition of Kasha Domingue 1-12-23.mpg
15. **Jamaal Mire Deposition**

    a.   JamaalMire.txt
    b.   JamaalMire_(1).xmef
    c.   JamaalMire_1.pdf
    d.   JamaalMire_COND.pdf
    e.   JamaalMire_LinkPDF.pdf
    f.   JamaalMire_PDFTran.pdf

**16. Trp. Barry Ward Deposition**
    ***a. Audio from Shellie***
        i.   2023-01-25-093955-001.mp3
        ii.   2023-01-25-093955-002.mp3
    b.   Authentication Discussions.docx
    c.   Trooper Barry Ward.ptx
    d.   Trooper Barry Ward.txt
    e.   Trooper Barry Ward_cond_N.pdf
    f.   Trooper Barry Ward_full.pdf
    g.   ward.exh.pdf
    h.   Working copy ward depo.pdf

**17. Kasha Domingue 12-15-2020 Interview**
    a.   2855 12.15.2020 Transcription Full.pdf
    b.   2855 12.15.2020 Transcription Mini.pdf
    c.   12-15-2020 Interview with Kasha Domingue.mpg

**18. IA File**
    a.   From Jennie Pellegrin To AJ Krouse (sending Kasha Domingue IA File 20-022).pdf
    b.   Tab 1 - Bates 001 - 059.pdf
    c.   Tab 10 - Bates 190 - 192.pdf
    d.   Tab 11 - Bates 193 - 194.pdf
    e.   Tab 12 - Bates 195 - 202.pdf
    f.   Tab 2 - Bates 060 - 082.pdf
    g.   Tab 3 - Bates 083 - 086.pdf
    h.   Tab 4 - Bates 087 - 122.pdf
    i.   Tab 5 - Bates 123 - 131.pdf
    j.   Tab 6 - Bates 132 - 143.pdf
    k.   Tab 7 - Bates 144 - 173.pdf
    l.   Tab 8 - Bates 174 - 178.pdf
    m.   Tab 9 - Bates 179 - 189.pdf
    ***n. Audio - Video files - Bates 203 - 220***
        i.   AudioVideo files - Bates 203 - 220.pdf
        ii.   Interview - Bill Shirley 120820 - Bates 208.mp3
        iii.   Interview - Brian Jefferson 112420 - Bates 209.mp3

    iv.    Interview - Burnell Thompson 112420 - Bates 212.mp3

    v.    Interview - Gerald Varnado 120920 - Bates 206.mp3

    vi.    Interview - James McGehee 112420 - Bates 210.mp3

    vii.    Interview - Kasha  Domingue 121520 B - Bates 204.mp3

    viii.    Interview - Kasha Domingue 121520 A - Bates 203.mp3

    ix.    Interview - Kasha Domingue 121520 C - Bates 205.mp3

    x.    Interview - Mark Jones 120820 - Bates 207.mp3

    xi.    Interview - Matthew Wallace 112420 - Bates 211.mp3

    xii.    Supplemental Video - 061518 0953 pm - Bates 220.mp4

    xiii.    Supplemental Video - 062918 0109 pm - Bates 219.mp4

    xiv.    Supplemental Video - 070418 0703 pm - Bates 218.mp4

    xv.    Supplemental Video - 070518 0226 am - Bates 217.mp4

    xvi.    Supplemental Video - 070518 0407 am - Bates 216.mp4

    xvii.    Supplemental Video - 070918 0855 pm - Bates 214.mp4

    xviii.    Supplemental Video Review Bates 213 - 220.docx

    xix.    Supplemental Video Review Bates 214 - 220.docx

    xx.    Village Grocery Store Video - Bates 213.mp4

**19. 5.1- DPS-State Documents**

    a.    DPSC 1-751.pdf

    b.    DPSC Axon 1-52.pdf

    c.    DPSC Employment 1-165.pdf

    d.    DPSC Investigation 1-35.pdf

    e.    DPSC Policies-Procedures 1-21.pdf

    f.    DPSC Recruiting 1-8.pdf

    g.    DPSC Training 1-396.pdf

    h.    Insurance Policy Markup (ORM 1-36).pdf

    i.    ORM 1-36.pdf

**20.    94.1 Memorandum in Support Motion for Summary Judgment on QI**

    a.    94.0- Motion for Summary Judgment by K. Domingue.pdf

    b.    94.2- Exhibit A, Deposition of Domingue.pdf

    c.    94.3- Exhibit B, Deposition of Kalief.pdf

    d.    94.4- Exhibit C, Deposition of Mire.pdf

    e.    94.5- Exhibit D, Deposition of Dilley.pdf

    f.    94.7- Statement of Undisputed Material Facts.pdf

    g.    94.6- Exhibit E, Video.pdf

    h.    94.8- Proposed Order.pdf