

**JOHN BEL EDWARDS**
GOVERNOR

**Lamar A. Davis, Colonel**
DEPUTY SECRETARY

## State of Louisiana
*Department of Public Safety and Corrections*
*Public Safety Services*

### RECEIPT

I, <u>Tpr. Kasha Domingue,</u> acknowledge that I have received the below listed document(s) in reference to Case #20-022:

1. Final Letter

_____3/16/21 1500_____ / _____[signature]_____ / _____Troop A/E_____
DATE/ TIME / SIGNATURE / TROOP/SECTION

_____[signature] Cpl Joshua Kerry_____
DELIVERED BY:

<span style="color:red">Once the receipt has been signed, please scan and email a copy to Internal Affairs. Please mail the original to:</span>

RETURN RECEIPT TO:   LSP INTERNAL AFFAIRS
P.O. BOX 66614
BATON ROUGE, LA 70806

**RECEIVED MAR 22 2021 by Internal Affairs**

Date: 03/11/2021



JOHN BEL EDWARDS
GOVERNOR

*Lamar A. Davis*, COLONEL
DEPUTY SECRETARY

### State of Louisiana
*Department of Public Safety and Corrections*
*Public Safety Services*

MARCH 11, 2021
4750/0501/MMG/21-23453
HQ-1-456

Trooper Kasha Domingue
Louisiana State Police- Troop A

**VIA PERSONAL DELIVERY**
IA# 20-022

Re: **TERMINATION**

Dear Trooper Domingue:

Your response to my notice of intention to terminate you from the State Police service has been received by me. You merely stated that you disagree with and dispute the facts and conclusions in the letter, but did not provide any additional evidence or information for me to consider. I find that your termination is warranted.

Pursuant to the authority granted by State Police Commission Rules 12.1 and 12.2, you are hereby notified that effective at 4:30 p.m. on Tuesday, March 16, 2021, your employment as a Louisiana State Trooper is terminated for the following reasons:

On Tuesday, July 10, 2018, shortly after 0300 hours during a traffic stop in East Baton Rouge Parish, you shot Mr. Clifton Scott Dilley in the lower right side of his back, causing a spinal cord injury and paralysis. Approximately two minutes after the shooting, you transmitted over the Region 1 Radio Communications system, "Taser deployed." Several troopers responded to the scene to assist. It was approximately 20 minutes after the shooting before you advised anyone that you had actually shot Mr. Dilley, which delayed the appropriate response to the event. During a criminal investigation into the shooting, your statements made to Trooper Barry Ward to justify your use of deadly force were not consistent with the video evidence from a nearby security camera. When you were interviewed by Internal Affairs investigators, you ultimately admitted that you did not intend to discharge your firearm at Mr. Dilley. Critical video and audio evidence of the event was not available because you did not even have your Body Worn Camera (BWC) powered on at the time. Further investigation determined that you failed to record on your BWC an earlier use of force on July 9, 2018, and routinely failed to properly record traffic stops and enforcement actions on your BWC. Your performance of your duties in the manner herein described was grossly below the standards expected of a trooper with the Louisiana State Police (LSP) and belies your ability to continue to be employed as a trooper.

On July 9, 2018, you were assigned to LSP Troop A, C-Team, which worked the night shift beginning at 1800 hours that date and ending at 0600 hours on Tuesday, July 10, 2018. At the time you were assigned a fully marked 2015 Chevrolet Tahoe, which was not equipped with an in-car camera system. Also, you had two Axon Body 2 BWCs[1] assigned to you.

Region 1 Radio Communications logs and recordings show that at approximately 0302 hours on July 10, 2018, you radioed in a traffic stop at LA 423 and Potwin on a Red Saturn SUV with license plate 422CCK. At approximately 0306 hours, you transmitted over the radio, "A-50 Region-1, 108[2], (unintelligible), Potwin Street, (unintelligible), Taser deployed."

Security camera video evidence obtained from Village Grocery shows that the driver (identified as Jamaal Mire, Jr.) exited the driver's door and approached the front of your unit. You briefly spoke with Mr. Mire at the left front of your unit. Mr. Mire at times had his hands on the hood of your unit, and at times moved away from that position. After approximately two minutes, Mr. Mire ran from the left side of your unit to the right (passenger) side of the Saturn and away from the scene. The unidentified occupant in the rear of the passenger side of the Saturn exited and ran towards the front of the Saturn. The occupant in the rear passenger seat on the driver's side (Mr. Clifton Scott Dilley) exited the driver's side rear door and fled towards the rear of the Saturn. At the same time, you were advancing towards the rear of the Saturn, unholstered your firearm with your right hand, and as Mr. Dilley ran past you and between the two vehicles, you tracked him with your firearm and fired one round. Mr. Dilley immediately fell to the ground near the front right side of your unit and you went to the ground as well. You then stood up near the front right side of your unit before walking out of the camera's view. Shortly after, you walked into the camera's view on the right side of your unit, unholstered your firearm with your right hand, and approached the Saturn. You took the front seat passenger (Mr. Kalief Sconiers), who had remained in the vehicle, into your custody.

Troopers Burnell Thompson, James McGehee, Matthew Wallace, and Brian Jefferson heard the transmission that you had deployed your Taser and needed assistance and responded to the scene. Trooper Thompson was first to arrive at approximately 0308 hours according to Region 1 Communications records. Trooper Thompson's BWC was activated while he was on the scene. You did not tell Trooper Thompson that you had shot Mr. Dilley. You advised Trooper Thompson that two people fled and gave him a description of them, which he transmitted on the radio.

---

[1] On March 13, 2018, you were issued two Axon Body 2 BWC at Troop I, bearing serial number x81141172 referred to as Camera A in this letter, and bearing serial number X81132508 referred to as Camera B in this letter, as well as docking station X79036814.

[2] 108 means officer needs assistance, life in danger.

Trooper Domingue
March 11, 2021
Page 3

At approximately 0309 hours, you radioed Region 1 Communications the name and driver's license of the driver that ran. At approximately 0314 hours, Trooper Thompson radioed Region 1 Communications to request EMS to the scene to check on the subject that was tased.

According to Region 1 Communications records, at approximately 0311 hours, Trooper Wallace arrived on the scene. Trooper Wallace advised investigators that he observed Mr. Dilley lying on the ground complaining that he could not feel his legs, but did not think anything of it because he thought Mr. Dilley had only been "tased" because that's what you stated on the radio. Trooper Wallace activated his BWC on the scene when he assisted Trooper Thompson in searching the vehicle. You did not tell Trooper Wallace that you had shot Mr. Dilley.

According to Region 1 Communications records, at approximately 0314 hours, Trooper McGehee arrived on the scene. Trooper McGehee advised investigators that upon his arrival, he observed Troopers Thompson and Wallace at the Saturn, you in front of your unit, and Mr. Dilley face down on the ground to the right of your unit. Trooper McGehee noticed blood on the back right portion of Mr. Dilley's shirt and thought it was a lot of blood for a Taser deployment. Trooper McGehee asked you if the Taser prongs needed to be removed and at that time you told him that you had shot Mr. Dilley. Trooper McGehee confirmed with Region 1 Communications that EMS was still en route to the scene and contacted Sgt. William Shirley to advise it was a shooting and not a Taser deployment.

Trooper McGehee advised investigators that while on the scene, you told him that you were dealing with the driver of the suspect vehicle on the driver's side of your unit with his hands on the hood. The driver fled and you pulled your Taser. The doors of the vehicle opened and the other occupants began to flee. One occupant exited the vehicle and began running toward you. You retreated to the passenger side of your unit as you were backing up and gave loud verbal commands of *"stop, stop, stop."* The suspect continued toward you, you dropped your Taser and pulled your firearm, went down on a knee and fired one (1) shot. You showed Trooper McGehee the position you were in at the time of the shooting - on the front right passenger side of your unit next to the wheel well. Trooper McGehee marked the location of the vehicles, the bullet casing, Mr. Dilley's position of rest, and your firing position with paint. Trooper McGehee also took a photograph of Mr. Dilley's gunshot wound on the scene. Trooper McGehee instructed you to take a seat in your unit and to start typing a probable cause arrest narrative of the incident.

According to Region 1 Communications records, Trooper Jefferson arrived on the scene at approximately 0318 hours. Trooper Jefferson's BWC was activated when he arrived and recorded him briefly speaking to you before he stopped the recording at approximately 0315 hours. Trooper Jefferson advised investigators that after he stopped

the BWC recording, you advised him that you had shot Mr. Dilley. Trooper Jefferson clarified that you shot him with your firearm and not your Taser. You explained to Trooper Jefferson that the suspect vehicle made a U-turn in front of and you made a traffic stop. You made contact with the driver, the driver took off running and yelled at the remaining occupants to run as well. Two occupants exited the vehicle and one ran towards you. You told Trooper Jefferson you were focused on the driver and preparing to deploy your Taser toward the driver when an occupant came at you from the right, you took up a defensive position on the right side of your vehicle, went down on one knee, drew your firearm and fired a shot. At that point Trooper Jefferson contacted Sgt. Gerald Varnado and informed him of the shooting.

According to Region 1 Communications records, Sgt. Varnado arrived on the scene at 0332. Sgt. Varnado advised investigators that upon his arrival he checked on you and observed a tear in your pants and scrapes to your knee. In order to report the injury, Sgt. Varnado asked you how you hurt your knee. You told Sgt. Varnado that during the stop, the driver fled, and shortly thereafter, the passenger seated behind the driver (Mr. Dilley) exited the car and began to approach you. You thought he had a weapon in his hand and you told him to stop. You were standing on the right side of your unit when you knelt down and fired at Mr. Dilley. You explained that you shot Mr. Dilley because he was not complying with your commands to stop and you felt threatened. You explained that you must have injured your knee when you knelt on it.

According to Region 1 Communications records, Lt. Mark Jones arrived on the scene at 0339. Lt. Jones advised investigator that at the scene, he asked about your well-being and you told him that you had a cut on your knee but you were ok. You told Lt. Jones that Mr. Dilley rushed at you and you either fell or went down on one knee.

As is customary, the LSP Criminal Investigations Division (CID) was notified of the shooting and Trooper Barry Ward, as the on call detective, was assigned as the lead investigator. Trooper Ward prepared a report that documented his contact with you on the scene. Trooper Ward observed you sitting in your unit typing, you appeared to be calm, and you responded that you were alright when he inquired about your well-being. When he asked you about the circumstances of the shooting, you gave him the following account:

> You observed the vehicle make an illegal U-turn on Perkins Road near Siegen Lane directly in front of you and you attempted to conduct a traffic stop on the vehicle at that location. The vehicle continued further down the roadway and finally stopped at the present location. You had the driver exit the vehicle and you made contact with him near the front driver's side quarter panel of your patrol vehicle. The driver had his hands on the hood as you ran his driver's license. While speaking with the driver, you smelled a strong odor of what you believed was an unknown alcoholic

Trooper Domingue
March 11, 2021
Page 5

beverage. After a few moments, the driver suddenly began to run from the scene on foot in a direction near his vehicle, and shouted to the occupants to *"go."* You observed the rear driver's side passenger exit and run around the vehicle to the passenger side, open the rear passenger door, and began to reach in. You approached him at that time, while drawing your issued Taser and gave him multiple loud verbal commands to show his hands. When the passenger failed to do so, you retreated backward and took up a kneeling position near the front passenger quarter panel of your patrol vehicle, and transitioned from your Taser to your firearm. At that time, the passenger began running toward you while you were telling him to stop. As the passenger approached your position, you fired a single gunshot striking him in an unknown location, he fell to the ground in close proximity to you and you managed to take him into custody. You then took the remaining front seat passenger into custody as well.

You walked Trooper Ward through the scene and demonstrated how the passenger exited the rear driver's side door and ran around the vehicle to the passenger side, opened the rear door and began to reach inside. You said you drew your Taser and began to shout for him to show his hands, you retreated backward toward your unit, you transitioned from your Taser to your firearm and dropped to your right knee near the front passenger side tire of your unit. The passenger began running toward you as you shouted for him to stop, and when he did not comply, you fired one shot while in the kneeling position.

Trooper Ward observed a single silver colored fired cartridge casing on the ground near the front passenger tire of your unit with small patches of blood stains on the concrete. The casing's location had been marked by Trooper McGehee with white spray paint. Each vehicle's tires had been marked, the license plate numbers spray painted on the ground, and the location of Mr. Dilley's head and feet as indicated by "H" and "F." Trooper Ward also observed a small circle with the markings "FP" near the casing, which had been marked by Trooper McGehee as your firing position. You confirmed to Trooper Ward that this was the position in which you went down on one knee to fire your gun. Trooper Ward observed a large tear in the right knee of your uniform pants and a red abrasion to your right knee, as well as scuffing on the left knee of your pants. When he asked you if that was how you got the tear and injury to your knee, you told Trooper Ward that you did not know.

Trooper Ward asked you if there were any recordings available of the event and you advised him that you did not have an in-car video camera yet. Trooper Ward noticed that you had a BWC (identified by the serial number as Camera A) affixed to the lower left portion of your uniform shirt just above your duty belt, but none of the camera's lights were illuminated. When Trooper Ward asked about your BWC, you advised him that the camera was not working and it was your "back-up camera," as your previous camera had broken. You further advised that you had reported this to your supervisor, Lt. Mark Jones.

At approximately 1833 hours on July 10, 2018, you voluntarily participated in a recorded interview with Troopers Ward and Gus Bethea, after being advised of your Miranda rights. During the interview, you recounted the circumstances of a traffic stop you had made on July 9, 2018, during the same shift, which stop resulted in the seizure of drugs and money. During that traffic stop, a passenger fled, you chased after him and deployed your Taser.

Regarding the traffic stop of Mr. Mire, you explained that Mr. Mire's u-turn was erratic. He did not pull over immediately, but pulled over behind a building in an area you were familiar with. When you contacted Mr. Mire, you told him to keep his hands where you could see them. In speaking with him he advised he was just bringing friends home from Reggie's. You smelled alcohol and marijuana and Mr. Mire admitted to drinking a beer earlier. You explained that the passengers in the car were moving around. You asked Mr. Mire if he had any weapons, and he replied no, but when you asked if there were any weapons in the car he advised that he did not know. You told Mr. Mire to keep his hands on the hood while you sat in your unit with the driver's door open running Mr. Mire's information on your MDT. He kept looking back at his car, and you tried to watch him, the occupants and run his information. He kept smiling, and then abruptly took off running toward the passenger side of his vehicle. You ran around the corner of your opened driver's door and grabbed your Taser with your left hand, yelled "Taser, Taser, Taser," and started to follow him. Mr. Mire opened up both the front and rear passenger doors and shouted, "Now! Now!" You then observed him lean in the vehicle, possibly to get a weapon, and you believed at that time that you were about to get shot. You started to back up, and you weren't sure how or when, but you transitioned to your firearm. Another occupant, a black male possibly with no shirt on, exited the passenger side. You noticed the driver's side rear passenger door open and an occupant (Mr. Dilley) began running toward you. You backed up to the left, he kept coming at you, you backed to the right and shouted, "Stop, stop, stop!" You noticed he was a big guy and had something black in his hand and felt that "something wasn't right." As he kept coming toward you, you backed up and didn't know if you tripped or purposely took a knee. You fired a shot and knew you and Mr. Dilley were really close at the time, and you may have even had your hands on him. You explained that you were both on the ground, you could see something still in his hands, and you told him to drop it. Mr. Dilley told you that he did not want to mess it up and while you were still holding your firearm, you shook his hand to see what he was holding. Your knee was in Mr. Dilley's back and he told you he could not move. You continued to shake his hand, eventually causing his cell phone to fly out of it. You were not sure how you got Mr. Dilley handcuffed, but you did it with one hand. You then noticed one passenger remaining in the vehicle, moved off to the side, and kept cover on him with your firearm in your right hand. You approached the passenger and took him into custody. You advised Trooper Ward that you asked Mr. Dilley why he ran at you and he responded, "You tased me bro, you tased me." You knew that he saw you with a Taser in your hand so you thought that was why he thought he had been tased instead of shot.

LSP IA File - K. Domingue - 013

In trying to explain your perspective surrounding your use of deadly force, you told Trooper Ward that you thought, "This is it." You believed that Mr. Dilley was coming at you to distract you to turn in that direction so the others could come for you. You believed Mr. Dilley was going to get you down and the others were going to "get the best" of you and there was nowhere for you to go. You thought they were all going to come after you and you were in a position to be hurt by them. You knew that you had your firearm at the time and that you shot Mr. Dilley because you felt threatened. You thought that he was either on top of you or above you at that point where you could not get away and you did not know where the others were. You did not know when you actually pulled the trigger and how you got to the ground. You knew you were close to him and you "at least got him (Mr. Dilley) somewhere in his side." You were adamant that you knew you did not tase Mr. Dilley.

Trooper Ward played the surveillance camera video and attempted to address the inconsistencies between your description of the event and the video. You explained to Trooper Ward that everything happened faster than it seemed on the video. You agreed that it looked like Mr. Dilley was on the side of you when you fired. You explained that what you saw on the video was not how it happened when you were on the scene, and "it's something far from what I experienced." You advised Trooper Ward that if you were in the same position, you would do the same thing again. You stated, "I can tell you what I see here, but I told you what I saw there, like that's two different experiences."

When Trooper Ward asked about your BWC, you advised him that you had two cameras. You were having problems with one camera and had reported it to Lt. Jones. Lt. Jones could not get the camera to work so he told you to wear your other camera. You advised Trooper Ward that was the first time you had used that particular camera and it had run for a long time on your prior traffic stop because you were counting a lot of money. You advised that you believed neither one of your cameras was functioning properly.

Your BWCs were sent to the manufacturer, Axon Enterprises for analysis. A report was provided to Trooper Ward that determined that both of your BWCs were properly functioning. The report and your BWC audit trails show that Camera A that you were wearing during your shift on July 9 and 10, 2018, was not fully charged. In fact, that BWC had not been docked and charged to 100% since June 30, 2018 at 11:42:19 CDT. The report further shows that your BWC was not even powered on until 03:18:16 CDT, which is after the traffic stop and shooting of Mr. Dilley. Your contention that your BWCs were not functioning is not supported by the evidence. Furthermore, the audit logs show that you had in fact used Camera A prior to July 9, 2018.

Upon conclusion of the criminal investigation into your shooting of Mr. Dilley, the case was submitted to the East Baton Rouge Parish District Attorney's Office. On October 1, 2020, you were indicted by a grand jury on one count of La. R.S. 14:34.7 - Aggravated Second Degree Battery[3], and one count of La. R.S. 14:94 - Illegal Use of Weapons or Dangerous Instrumentalities[4]. You subsequently entered a plea of not guilty and are awaiting trial.

On December 15, 2020, you were interviewed by IA investigators Sgt. James Jefferson and Trooper Kevin Ducote, with your attorney present. During your interview, you told IA investigators that when Mr. Mire fled, your initial intent was to draw your Taser, but by the time you had run to him, he was already reaching into the vehicle. You could not see his hands so you drew your firearm. You did not notice Mr. Dilley until he was right next to you. You believed that the two of you even made contact and that is why the two of you fell to the ground. You did not know when your gun fired. You explained that you froze and you just braced for impact. You believed you were going to get hit and be on the ground fighting for your life. In spite telling Trooper Ward that you fired your gun because you believed your life was threatened, you told IA investigators that you did not intend to pull the trigger. You related that you must have fired your gun when you braced for impact or when you hit the ground. You did not know you shot Mr. Dilley until you realized he had a bullet hole in him.

IA investigators advised you that your BWCs had been analyzed by Axon and there were no issues with either camera except that they were not charged. You responded, "I can't answer to that." IA investigators also informed you that they had reviewed several of your recordings and you did not activate the camera until several minutes after the events began. You advised that you thought you had manually turned on your camera properly for every event, but you were just getting used to the cameras. You explained that you took responsibility for the issues regarding your BWCs.

Furthermore, Lt. Jones did not corroborate your claim that he knew your BWCs were not functioning. Lt. Jones advised IA investigators Sgt. Jefferson and Trooper Ducote that your first day on his shift at Troop A, he asked you about your BWCs. You advised him that you were having issues with them and he told you to immediately go to

---

[3] LA. R.S. 14:34.7, Aggravated Second Degree Battery states in pertinent part:
A.     Aggravated second degree battery is a battery committed with a dangerous weapon when the offender intentionally inflicts serious bodily injury.
...

[4] La. R.S. 14:94, Illegal Use of Weapons or Dangerous Instrumentalities, which states in pertinent part:
A.     Illegal use of weapons or dangerous instrumentalities is the intentional or criminally negligent discharging of any firearm, or the throwing, placing, or other use of any article, liquid, or substance, where it is foreseeable that it may result in death or great bodily harm to a human being.
...

Headquarters and get them fixed. Lt. Jones advised that when you returned to Troop A from the Legislative Detail, he again inquired about your BWCs and you told him they were working and he specifically reiterated that it was your responsibility to ensure your cameras were working.

IA investigators reviewed your BWC recordings as well as Troop A desk log entries and found the following:

On June 15, 2018, according to the Troop A Desk Log, you were dispatched to Jennifer Jean Dr. near Tigerland Market to work a crash that occurred on LA 30 and LA 327, and you arrived on scene at approximately 9:21 p.m. According to the audit trail for Camera A, you did not press the event button on Camera A to start recording the incident until 9:53:17 p.m., approximately 32 minutes after you arrived on scene.

On June 29, 2018, according to the Troop A Desk Log, you were dispatched to a crash on LA 327 west of Ben Hur Rd. You arrived on scene at approximately 11:54 p.m., and made an arrest for Driving While Intoxicated ("DWI") at approximately 12:02 a.m. According to the audit trail for Camera B, you did not press the event button on Camera B to start recording the incident until 1:09:07 a.m., approximately one hour and fifteen minutes after you arrived on scene and after the suspect was already placed under arrest and in the back of your unit.

On July 4, 2018, according to the Troop A Desk Log, at approximately 7:01 p.m., you made a traffic stop on I-110 at Chippewa St. According to the audit trail for Camera A, you did not press the event button on Camera A to start recording the incident until 7:03:01 p.m., approximately two minutes after you made the stop.

On July 5, 2018, according to the Troop A Desk Log, at approximately 2:21 a.m., you made a traffic stop on Veteran's Memorial Blvd. at Harding Blvd. According to the audit trail for Camera A, you did not press the event button on Camera A to start recording the incident until 2:26:39 a.m., approximately five minutes after you made the stop.

On July 5, 2018, according to the Troop A Desk Log, at approximately at 3:48 a.m., you put yourself out with A-77 on LA 415 north of LA 985, and you made an arrest for DWI at approximately 3:54 a.m. According to the audit trail for Camera A, you did not press the event button on Camera A to start recording the incident until 4:07:46 a.m., approximately 9 minutes after you made the stop and after the suspect was already placed under arrest and in the back of your unit.

Trooper Domingue
March 11, 2021
Page 10

On July 5, 2018, according to the Troop A Desk Log, you were dispatched to a crash on LA 42 south of US 61 and arrived on scene at approximately 10:13 p.m. According to the audit trail for Camera A, you did not press the event button on Camera A to start recording the incident until 10:23:01 p.m., approximately ten minutes after you arrived on scene.

On July 9, 2018, according to the Troop A Desk Log, you made a traffic stop at approximately 7:44 p.m. During this traffic stop, you deployed your Taser at a suspect who fled the scene, and ultimately made an arrest. According to your Taser download, you deployed your Taser at 19:44:04. The deployment of your Taser should have activated your BWC. A review of the audit trail for Camera A shows that your BWC was not powered on at the time you deployed your Taser, and therefore, could not be activated by the Taser deployment to record the use of force. You did not press the event button on Camera A to start recording the incident until 8:55:46 p.m., approximately one hour and 11 minutes after you made the initial traffic stop and after the suspect was already placed under arrest and in the back of your unit.

In addition to the criminal and administrative investigations, the discharge of your firearm on July 10, 2018 was reviewed by the Use of Force Review Board. After considering the investigations, evidence, and recommendation of the Use of Force Review Board, I have determined the following:

On July 10, 2018, at approximately 0306 hours, you communicated via radio that you deployed your Taser, when you in fact had shot Mr. Dilley in the back. You subsequently denied that you intended to deploy your Taser and instead shot Mr. Dilley because you feared for your life. During the administrative investigation, you claimed that you did not intend to discharge your firearm. The inconsistencies in your statements cannot be resolved. The evidence infers that you did actually intend to deploy your Taser at Mr. Dilley instead of your firearm, but you denied such. Your sworn statement to IA investigators is that you had your firearm unholstered because you feared for your life, but did not intend to discharge your firearm at Mr. Dilley. The outcome is the same – you shot Mr. Dilley in the back, causing him to be paralyzed from the waist down, without any reliable justification. I find that your actions violated the following:

1) Louisiana Revised Statute 14:39 - Negligent Injuring, which states in pertinent part:

    A.    Negligent injuring is either of the following:
        (1)    The inflicting of any injury upon the person of another by criminal negligence[5].

---

[5] La. R.S. 14:12 provides, "Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender's conduct amounts to a

Trooper Domingue
March 11, 2021
Page 11

    2) Louisiana State Police Policy and Procedure Order 901- Code of Conduct and Ethics, Section 3- Conformance to Laws, which states in pertinent part:

        i) A commissioned officer shall conform to, and abide by, the laws of the United States, the State of Louisiana, all other states of the United States and subdivisions thereof.

        ...

    3) Louisiana State Police Policy and Procedure Order 901- Code of Conduct and Ethics, Section 26- Use of Firearms, which states in pertinent part:

        i) The use or handling of a firearm in a careless or negligent manner, or the unjustified endangerment of human life, is strictly forbidden and shall only be in accordance with P.O. 238, Use of Force.

You failed to ensure that your BWC was properly charged, powered on, and activated to record your enforcement activities on July 9 and 10, 2018, including two traffic stops and uses of force. You also failed to properly record numerous other enforcement activities that were required to be recorded as detailed above. Your actions violated Louisiana State Police Policy and Procedure Order 1115- Body Worn Camera & In-Car Camera Systems, which states in pertinent part:

Section 5 – ACTIVATION
...
iii) Officers equipped with the BWC or in-car camera system recording equipment shall record all traffic stops, foot pursuits, arrests and / or incidents. Officers shall also record other events, situations, and circumstances including, but not limited to: armed encounters, acts of physical violence and felonious activity. Officers are not required to record informal, non-law enforcement related contact with the public, but shall activate the recording if the encounter becomes adversarial. ...The operator is authorized to mute the audio or pause the recording of the BWC and / or in-car camera system when the operator is not in the immediate presence of the individual(s) being interviewed, investigated, detained or arrested.

...

---

gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances."

LSP IA File - K. Domingue - 018

Trooper Domingue
March 11, 2021
Page 12

Section 6 – RESPONSIBILITIES
i) BWC/ In-car Camera Systems Operator
   a) The BWC / in-car camera systems Operator shall:
      ...
      3) Ensure the BWC equipment is properly charged prior to the beginning of each tour of duty and replace the BWC with a sufficiently-charged camera when any BWC does not have sufficient power to operate effectively.

On July 10, 2018, you negligently handled your department issued Glock 17 9 mm pistol resulting in you shooting Mr. Dilley in the back. When explaining the circumstances surrounding the discharge of your firearm, you gave multiple inconsistent versions of the event, including actions which are not supported by the only video of the incident. You also failed to ensure your BWC was charged and activated in accordance with policy, which resulted in crucial video and audio evidence relating to the traffic stop and shooting not being recorded. Additionally, on multiple other occasions where you made traffic stops, made arrests, and/ or used force, you failed to properly record the activity. These actions violated Louisiana State Police Policy and Procedure Order 901- Code of Conduct and Ethics, Section 12- Unsatisfactory Performance, which states in pertinent part:

i) A commissioned officer shall maintain a competency level sufficient to properly perform his duties and assume the responsibilities of his position. Officers shall perform their duties in such a manner as to maintain the highest standards of efficiency. Unsatisfactory performance may be demonstrated by:
    ...
   b) An unwillingness or inability to perform assigned task.
   c) A failure to conform to work standards established for the officer's rank, grade or position.
   d) A failure to take the appropriate action on the occasion of a crime, disorder or other matter deserving attention.
   ...

You shot Mr. Dilley in the back, resulting in his being paralyzed from the waist down and are facing prosecution for felony charges as a result. Immediately after the shooting, you radioed to Region 1 Communications that you had tased Mr. Dilley, which delayed the appropriate responses to the shooting. You gave multiple inconsistent accounts of the incident. You failed to charge and/or activate your BWC to record the traffic stop and the shooting, as well as multiple prior incidents, in accordance with policy. Your conduct violated Louisiana State Police Policy and Procedure Order 901- Code of Conduct and Ethics, Section 4- Conduct Unbecoming an Officer, which states in pertinent part:

    i)    A commissioned officer shall conduct himself at all times, both on and off-duty, in such a manner as to reflect most favorably on himself and the Department.

    ii)    Unbecoming conduct is defined as conduct which:
- a) Brings the Department or any of its subdivisions into disrepute.
- b) Reflects discredit upon the officer as a member of the Department.
- c) Impairs the operations or efficiency of the Department, the officer, or state service.
- d) ...
- e) May reasonably be expected to destroy public respect for State Police Officers and/or confidence in the Office of State Police.

In support of these allegations, I have the reports compiled by CID and IA, with all recordings and documents gathered or made a part thereof, including but not limited to statements from the troopers who responded to the scene, as well as Mr. Mire, Mr. Sconiers, and Mr. Dilley. This also includes the video from Village Grocery, Region 1 Communications records, records relating to your Axon BWCs and their issuance, Troop A desk logs, and any and all records created documenting the scene and response to the shooting by LSP and EMS, all of which are included in the CID and/or IA reports, and any other evidence specifically identified in this letter.

You have the right to appeal this action to the State Police Commission. The time limits and procedure for appealing are contained in Chapter 13 of the State Police Commission Rules. A copy of Chapter 13 can be obtained from the State Police Commission. Their current mailing address is P.O. Box 66555, Baton Rouge, LA 70896-6555. Their current telephone number is (225) 925-7057 and their fax number is (225) 925-7058.

Any questions you may have regarding your benefits upon termination should be directed to the Louisiana State Police Retirement System. Their telephone number is (225) 295-8400, and their address is 9224 Jefferson Hwy Baton Rouge LA 70809. Questions regarding any other benefits may be addressed to the Department of Public Safety Human Resources Office. Their telephone number is (225) 925-6067 and their address is 7979 Independence Blvd., Suite 201, Baton Rouge, LA 70806.

Sincerely,

Colonel Lamar A. Davis
Superintendent, Louisiana State Police

c: Lt. Col. M. Doug Cain, II
Lt. Col. Chavez Cammon
Major John Riles
Captain Greg Graphia
Internal Affairs
Office of Legal Affairs
Human Resources Management

**CONFIDENTIAL**
PROVIDED SUBJECT TO AND IN ACCORDANCE WITH THE TERMS OF CONSENT PROTECTIVE ORDER & CONFIDENTIALITY AGREEMENT [REC. DOC. 41] 3:19-cv-00391-BAJ-EWD