EXHIBIT
2



# Louisiana Department of Public Safety & Corrections
## Office of State Police
### Shooting Report



John Bel Edwards
Governor

Kevin W. Reeves, Colonel
Superintendent

## CASE HISTORY

| | |
|---|---|
| **Case Number:** | 18-7457 |
| **Case Date:** | July 10, 2018 |
| **Offense:** | Police Shooting - Internal |
| **Offense Date:** | July 10, 2018 |
| **Offense Time:** | 3:02 AM |
| **Investigation Officer:** | Trooper Barry Ward |

## LOCATION

| | |
|---|---|
| **Address:** | 14510 Perkins Road Apt#. 1 Baton Rouge, Louisiana 70810 |
| **Parish:** | East Baton Rouge Parish |
| **Type:** | Business |
| **Description:** | Village Grocery |
| **Cross Road:** | Potwin Drive |

## SUBJECT

**Name:** Trp. Kasha Chamblin Domingue - L.E.O. Under Investigation

**Photo(s):**



| | |
|---|---|
| **Additional Information:** | LSP Officer Involved Shooter (A-50)Data #2649 |
| **Birth Date:** | ▮▮▮▮▮▮ |
| **Gender:** | Female |
| **Race:** | White |
| **Height:** | 5'6 |
| **Weight:** | 125 lbs |

| Case Number: | 18-7457 | Offense: | Police Shooting - Internal |
|---|---|---|---|
| Case Date: | July 10, 2018 | Offense Date: | July 10, 2018 |
| Investigation Officer: | Trooper Barry Ward | Offense Time: | 3:02 AM |

**Address:** 

**Contact List:**

**ID List:** 1. DL Number ▮▮▮ DL Louisiana

**Name:** Jamaal K. Mire Jr.

**Photo(s):**



**Additional Information:** Driver, Arrested

**Birth Date:**

**Gender:** Male

**Race:** Black

**Height:** 5'6

**Weight:** 140 lbs

**Address:**

**ID List:** 1. DL Number ▮▮▮ / DL Louisiana

**Charges List:**
1. [L.R.S. 32 - 82] Traffic: Driving on Divided Highways
2. [L.R.S. 14 - 108] Law Enforcement: Resisting an Officer
3. [L.R.S. 40 - 966] Drugs: Penalty for Distribution or Possession with Intent to Distribute Narcotic Drugs Listed in Schedule I; P

**VICTIM**

**Name:** Scott Larry Clifton Dilley

DPSC Investigation 2

| Case Number: | 18-7457 | Offense: | Police Shooting - Internal |
| Case Date: | July 10, 2018 | Offense Date: | July 10, 2018 |
| Investigation Officer: | Trooper Barry Ward | Offense Time: | 3:02 AM |

Photo(s):



Additional Information: Victim, Sustained single gunshot wound to back, right side.

| Birth Date: | ███████ |
| Gender: | Male |
| Race: | White |
| Height: | 5'11 |
| Weight: | 198 lbs |
| Address: | ███████ |
| ID List: | 1. DL Number ███ 67██ Louisiana |

**WITNESS**

Name: Kalief Rasean Sconiers

Photo(s):



DPSC Investigation 3

| Case Number: | 18-7457 | Offense: | Police Shooting - Internal |
|---|---|---|---|
| Case Date: | July 10, 2018 | Offense Date: | July 10, 2018 |
| Investigation Officer: | Trooper Barry Ward | Offense Time: | 3:02 AM |

| | |
|---|---|
| Additional Information: | Front Right Passenger, Alias "Tokyo" |
| Birth Date: | ███████ |
| Gender: | Male |
| Race: | Black |
| Height: | 5'9 |
| Weight: | 125 lbs |
| Address: | ███████ |
| Contact List: | 1. ███████ |
| ID List: | 1. DL Number ███████ / ID Georgia |

## LAW ENFORCEMENT WITNESS

| | |
|---|---|
| Name: | M/T Barry Ward |
| Additional Information: | Case Agent |
| Address: | 7919 Independence Blvd. Baton Rouge, Louisiana 70806 |
| Contact List: | 1. ███████ Business Phone |

| | |
|---|---|
| Name: | S/T Gustave Bethea |
| Additional Information: | LSP Case Assist |
| Address: | 1450 Poydras Street New Orleans, Louisiana 70112 |
| Contact List: | 1. ███████ Business Phone |

| | |
|---|---|
| Name: | Inv. William Cox |
| Additional Information: | LSP Scene Assist |
| Address: | 7919 Independence Blvd. Baton Rouge, Louisiana 70806 |
| Contact List: | 1. ███████ Business Phone |

| | |
|---|---|
| Name: | M/T Michael Daniel |
| Additional Information: | LSP Scene Assist |
| Address: | 7919 Independence Blvd. Baton Rouge, Louisiana 70806 |
| Contact List: | 1. ███████ Business Phone |

| | |
|---|---|
| Name: | Trp. Keith Bennett |

DPSC Investigation 4

| Case Number: | 18-7457 | Offense: | Police Shooting - Internal |
|---|---|---|---|
| Case Date: | July 10, 2018 | Offense Date: | July 10, 2018 |
| Investigation Officer: | Trooper Barry Ward | Offense Time: | 3:02 AM |

**Additional Information:** LSP Scene Assist

**Address:** 7919 Independence Blvd.
Baton Rouge, Louisiana 70806

**Contact List:** 1. ███████ Business Phone

---

**Name:** Sgt. Brit Forbes

**Additional Information:** LSP Scene Supervisor

**Address:** 7919 Independence Blvd.
Baton Rouge, Louisiana 70806

**Contact List:** 1. ███████ Business Phone

---

**Name:** T.S.O. Randy Hidalgo

**Additional Information:** TSO, Audio/Video Technician

**Address:** 7919 Independence Blvd.
Baton Rouge, Louisiana 70806

**Contact List:** 1. ███████ Business Phone

---

**Name:** Tfc. James McGehee

**Additional Information:** Data #2451, A-23, Fourth responder to scene. Marking paint on crime scene.

**Address:** 17801 Highland Road
Baton Rouge, Louisiana 70810

**Contact List:** 1. ███████ Business Phone

---

**Name:** Tfc. Burnell Thompson III

**Additional Information:** Data #2455, A-27, First responder to scene.

**Address:** 17801 Highland Road
Baton Rouge, Louisiana 70810

**Contact List:** 1. ███████ Business Phone

---

**Name:** Trp. Matthew Wallace

**Additional Information:** Data #2794/ A-36, Second responder to scene. Took photos on scene.

**Address:** 17801 Highland Road
Baton Rouge, Louisiana 70810

**Contact List:** 1. ███████ Business Phone

---

**Name:** S/T Brian Jefferson

**Additional Information:** Data #2364/ A-63, Third responder to scene.

**Address:** 17801 Highland Road
Baton Rouge, Louisiana 70810

*CONSENT PROTECTED AND IN ACCORDANCE WITH THE TERMS OF CONFIDENTIALITY AGREEMENT 3:11-CV-00000-BAJ-EWD PURSUANT TO AND SUBJECT TO RECORD DOC. 411*

**DPSC Investigation 5**

| | | | |
|---|---|---|---|
| **Case Number:** | 18-7457 | **Offense:** | Police Shooting - Internal |
| **Case Date:** | July 10, 2018 | **Offense Date:** | July 10, 2018 |
| **Investigation Officer:** | Trooper Barry Ward | **Offense Time:** | 3:02 AM |

**Contact List:** 1. 2████ Business Phone

## VEHICLE

| | |
|---|---|
| **Type:** | Vehicle - Automobile |
| **Year:** | 2008 |
| **Make:** | Saturn |
| **Model:** | Vue |
| **Color:** | Red |
| **VIN:** | ████████ |
| **Registration:** | ████ |
| **State:** | Louisiana |
| **Owner:** | 1. Jamaal K. Mire |
| **In Custody:** | No |

| | |
|---|---|
| **Type:** | Vehicle - Automobile |
| **Year:** | 2012 |
| **Make:** | Chevrolet |
| **Model:** | Tahoe |
| **Color:** | White |
| **VIN:** | ████ |
| **Registration:** | A-50 |
| **State:** | Louisiana |
| **Owner:** | 1. Kasha Chamblin Domingue |
| **In Custody:** | No |

## PROPERTY

| | |
|---|---|
| **Description:** | Glock 17 |
| **Type:** | Weapon - Firearm |
| **Category:** | Evidence |
| **Quantity:** | 1 |
| **Serial Number:** | ████ |
| **Condition:** | Good |
| **Seized From:** | 1. Kasha Chamblin Domingue |
| **Seized Date:** | Jul 10 2018 12:00AM |
| **Seized Parish:** | East Baton Rouge |
| **In Custody:** | No |

**\*\*CONFIDENTIAL \*\*** 3:19-cv-00391-BAJ-EWD PROVIDED SUBJECT TO AND IN ACCORDANCE WITH THE TERMS OF CONSENT PROTECTIVE ORDER AND CONFIDENTIALITY AGREEMENT [REC. DOC. 41]

**Photo(s):**



## ATTACHMENT

1 Scene Photos/ Evidence Tracking
2 Total Station Scale Diagram
3 Troop-A Initial Scene Photos
4 Dilley Interview
5 Tpr. Domingue Photographs
6 Crime Lab Scientific Analysis Report
7 Jamaal Mire Arrest Warrant
8 Mire Arrest Report (18-8368)
9 Village Grocery Search Warrant
10 Village Grocery Surveillance Video
11 LSP Radio Communications
12 Audio Overlay of Surveillance Video
13 Tpr. Domingue Interview
14 LSP Training Academy Memo
15 LSP Training Academy Records
16 Tpr. Domingue Use of Force Reports
17 Tpr. Domingue Taser/ IRS Reports
18 Axon Body Worn Camera Diagnostic Reports
19 Dilley Medical Records/ Search Warrant OLOL
20 Audio/ Video Files, Misc. Case Notes

## INITIAL COMPLAINT

DPSC Investigation 7

| Case Number: | 18-7457 | Offense: | Police Shooting - Internal |
|---|---|---|---|
| Case Date: | July 10, 2018 | Offense Date: | July 10, 2018 |
| Investigation Officer: | Trooper Barry Ward | Offense Time: | 3:02 AM |

On July 10, 2018, Louisiana State Police (LSP) Troop-A contacted LSP, Criminal Investigations Division, Region-1, Detectives in regard to an officer involved shooting incident that occurred on Perkins Rd. at Potwin Dr., Baton Rouge, LA. The case was assigned to M/T Barry Ward and investigated under case report number 18-7457.

## NARRATIVE

On Tuesday, July 10, 2018, at approximately 0302 hours, Louisiana State Police (LSP), Troop-A, C-Team, Trooper Kasha C. Domingue/ #2649 (A-50) attempted to conduct a traffic stop at Perkins Road near Siegen Lane on a 2008 red Saturn Vue, bearing Louisiana license plate number (          ) occupied by multiple persons. The driver of the vehicle, Jamaal K. Mire Jr. (B/M, DOB:          ) failed to pull his vehicle to the immediate shoulder of Perkins Road and continued traveling east. He later turned onto Potwin Drive, pulling behind a business (Village Grocery, 13510 Perkins Road) and into a rear parking lot.

Upon arrival at this location, Mire exited the vehicle and Tpr. Domingue made contact with him. A few moments later, Mire fled the scene on foot while shouting toward his vehicle for the remaining occupants to run. Upon this action, the rear driver's side passenger, Scott L. Dilley (W/M, DOB:          ) also fled the vehicle on foot. During this time, Tpr. Domingue fired a single round from her department issued firearm (Glock 17, 9mm pistol) striking Dilley in the lower right back near his side. Dilley was later transported to Our Lady of the Lake Regional Medical Center (OLOL) for treatment where he was later admitted. LSP, Troop-A supervisors contacted LSP, Criminal Investigations Division, Region-1, Detectives to investigate the shooting event.

I, M/T Barry Ward/ #1783 was the on call detective this date and at approximately 0339 hours, was contacted by LSP Troop-A to respond to the scene. I arrived on the scene at approximately 0430 hours and began an investigation into the matter. I noticed the area to be business with mixed residential and was night time. The area was lighted with utility pole street lighting, partially illuminating the street and parking area. The nearby Village Grocery business had external lights affixed to the building, also partially illuminating the parking area. The weather was clear with an ambient temperature of approximately 72 degrees. The on-scene CID supervisor was Sgt. Brit Forbes/ #2242.

As I approached the crime scene area, I observed multiple LSP fully marked Chevrolet Tahoe vehicles parked on the North West side of the Village Grocery. I noticed multiple uniformed troopers in the area standing near the business. I then made contact with the Troop-A Commander, Captain Kevin Devall and asked if a point of contact for the crime scene was available. He then directed me to a female trooper sitting inside a nearby patrol vehicle who was later identified as Tpr. Kasha Domingue.

As I proceeded to her location, I noticed the fully marked Chevrolet Tahoe (A-50) had the overhead blue lights illuminate and flashing. The vehicle's front external alley light was also illuminated and pointed forward. Directly in front of and to the right of the Tahoe was a 2008 Saturn Vue. I also observed multiple drivers' licenses, a cellular telephone and a scale with a small clear plastic bag containing a green vegetable matter, suspected to be marijuana (Approx. 4g) lying on the hood of the patrol vehicle. I then observed Tpr. Domingue sitting in the driver's seat of the vehicle typing on a Mobile Data Terminal computer (MDT).

DPSC Investigation 8

I made contact with Tpr. Domingue and inquired about her well-being. She advised she was alright and was willing to cooperate with my investigation. I noticed her to be calm and responsive to questions. I asked her if she could advise of the circumstance of the shooting event so as to discover any evidence pertaining to the crime scene. She then began to detail the actions that led to the shooting.

She said she observed the vehicle make an illegal U-turn on Perkins Road near Siegen Lane directly in front of her. She attempted to conduct at traffic stop on the vehicle at that location. However, the vehicle continued further down the roadway and finally stopped at their present location. She had the driver exit the vehicle and made contact with him. She said she was speaking with the driver near the front driver's side quarter panel of her patrol vehicle. He had his hands on the hood and she was attempting to run his driver's license for a record. While speaking with the driver, she smelled a strong odor of what she believed was an unknown alcoholic beverage. After a few moments, the driver suddenly began to run from the scene on foot. As the driver fled in a direction near his vehicle, he shouted back to the occupants to "go." She then observed the remaining occupants begin to exit the vehicle. She observed the rear driver's side passenger exit and run around the vehicle to the passenger side. He opened the rear passenger door and began to reach in. She approached him at that time, while drawing her issued Taser. She gave him multiple loud verbal commands for him to show his hands. When the passenger failed to do so, she retreated backward and took up a kneeling position near the front passenger quarter panel of her patrol vehicle. She then transitioned from her Taser to her firearm. At that time, the passenger began running toward her; all the while she was telling him to stop. As the passenger approached her position, she fired a single gunshot striking him in an unknown location. He then fell to the ground in close proximity to her. She then managed to take him into custody and later take the remaining front seat passenger into custody as well.

I asked her if there were any video recordings of the shooting event. She advised she had recently transferred from Troop-I to Troop-A and had not yet been issued an in-car video camera. I was able to confirm there was no in-car camera mounted near the front passenger side windshield. I then noticed a black body worn camera affixed to the lower left portion of her uniform shirt, just above her duty belt. The camera did not have any lights illuminated at that time. Tpr. Domingue advised the camera was not working and was her back-up camera, as her previous camera had broken. She advised she had reported this to her supervisor, LT. Mark Jones. She said he took the camera earlier in the shift and advised her to wear her spare camera for the remainder of the shift.

While Tpr. Domingue was explaining the details of the shooting event, Major Doug Cain/ #1841, LSP Public Affairs Division, approached me and asked if I had an update of the details of the shooting, so as to further inform the LSP Chain of Command. I briefly relayed the known details at the time, but then directed him to speak with Tpr. Domingue. She then reiterated the same information to him as she had just relayed to me.

Tpr. Domingue was now outside of her patrol vehicle and continued cooperating with the investigation. I asked her about the items located on the hood of her patrol vehicle. She began to explain who the persons were in relation to the drivers' licenses and the property. I noticed at that time, she had a large tear in the right knee of her uniform trousers. Upon further inspection, I observed a red abrasion to the skin of her right knee under the open and torn trousers. She also had minor scuffing on her trousers on the left knee as well. I asked her if she could walk me through the events she had just detailed.

DPSC Investigation 9

She complied and began to demonstrate how the passenger exited the rear driver's side door and ran around the vehicle to the passenger side. At this location, he opened the rear passenger door and began to reach inside. She drew her Taser and began to shout loud verbal commands for him to show his hands. Upon his failure to comply with her instructions, she retreated backward in the direction of her patrol vehicle. She transitioned from her Taser to her firearm and dropped to her right knee near the front passenger side tire of her patrol vehicle. The passenger then began running toward her; all the while she was shouting loud verbal commands for him to stop. Due to his no-compliance to stop, she fired a single gunshot from her primary service firearm while in the kneeling position.

As Tpr. Domingue was describing this information, I noticed on the ground near the front passenger tire of her patrol vehicle, a single silver colored fired cartridge case. In the immediate area of the cartridge case were multiple small patches of what appeared to be blood stains on the concrete surface. Located a few inches from the blood stains was a gold colored object (Fidget Spinner) approximately 1-2 inches in length. Also in the immediate area, was a cellular telephone lying near the shrub line adjacent to a white fence.

White spray paint marked these objects as well as additional markings. I noticed white spray paint marking both vehicles around each tire and the license plate numbers of the vehicles were spray painted on the ground. On either side of the blood stains were lines with the letters (H) and (F). I asked what these marking meant. Tpr. James McGeHee/ #2451 (A-23) approached me while carrying a can of white spray paint. He informed me he had placed the markings on the ground and the (H) indicated the position of the passenger's head. The (F) indicated the position of the passenger's feet. I also noticed a small circle with the letters (FP) spray painted near the fired cartridge case. I asked him what the meaning of this was. He said that was Tpr. Domingue's *"Firing Position."* Tpr. Domingue was standing close by and confirmed this information. She said that was the position in which she went down to one knee (Indicating Right) to fire her firearm. I asked her if that was how she obtained the tear in her trousers and incurred the injury to her right knee. She responded that she did not know.

Assisting detective, M/T Michael Daniel/ #2023, had arrived and assisted in the investigation by photographing the scene and collecting the evidence **(Attachment #1)**. I also made contact with the remaining suspect vehicle occupant on the scene; who was handcuffed and in the rear of a nearby LSP patrol vehicle (A-64). He was identified as Kalief R. Sconiers (B/M, DOB: 09/25/1999). I asked Sconiers if he would be willing to accompany detectives back to LSP Headquarters (HQ) for a formal interview. He said he would and cooperated with detectives. Sconiers asked for his cell phone before leaving the scene. Assisting detective, Investigator, Bill Cox/ #9202, walked him to the suspect vehicle in an attempt to locate his cell phone. Sconiers identified the white iPhone, with a cracked face, lying on Trp. Domingue's patrol vehicle hood as belonging to him. This item was collected by Inv. Cox. Sconiers was then transported to LSP HQ by S/T Brian Jefferson/ #2364 (A-64) for an interview.

LSP, Troop-A personnel, Sgt. Daryl Davis/ #2024 and Tpr. Brady Cook/ #2518 arrived on the scene and composed a Total Station scaled diagram of the crime scene **(Attachment #2)**. I then approached Tpr. Domingue, who was isolated inside a nearby LSP Supervisor's patrol vehicle. I asked her if she would be willing to come to HQ for a formal interview. She responded that she would and was later transported to HQ by Inv. Cox. The suspect vehicle was later towed and stored by Road Runner Towing, 9101 Veterans Boulevard, Baton Rouge, LA 70807.

Earlier, assisting detective, Tpr. Keith Bennett/ #2575, went to OLOL and made contact with the injured suspect vehicle passenger, Scott Dilley. Tpr, Bennett located Dilley in the emergency room department and interviewed him while he was being treated. He was also accompanied by Tpr. Matthew Wallace/ #2794 (A-36). Tpr. Wallace escorted the ambulance from the scene to OLOL and remained with Dilley pending the arrival of detectives. It was later discovered that Tpr. Wallace took photographs, upon his arrival at the scene, which depicted Dilley on the ground shortly after the shooting event **(Attachment #3)**.

Tpr. Bennett conducted a recorded interview of Dilley after advising him of his rights per Miranda **(Attachment #4)**. Dilley stated in part, *"My buddy was driving and got stopped by a cop. He* (buddy) *ran, so I ran. I turned around and she* (Tpr. Domingue) *was right there pulling out what I thought was a Taser, but was a gun. I got to the second door of her squad car distance wise and boom I couldn't feel my legs. I could not walk. My legs folded up like lawn chairs."* Dilley was able to identify the front right passenger of the vehicle as Kalief "Tokyo" Sconiers. He was unable to identify the driver or the passenger seated next to him in the back passenger seat. He identified his position in the vehicle as seated on the driver's side rear seat. He further stated, *"She didn't tell me I got shot. She said it was a Taser and the officer she was with."* Dilley clarified the other officer she was with as the officer that soon arrived also told him he had been Tasered. This officer was later discovered to be Tfc. Burnell Thompson/ #2455. Dilley went on to say the group had been at Reggie's Bar in Tigerland, 1176 Bob Pettit Blvd., Baton Rouge, LA 70820. He also said he had earlier consumed three (3) beers and a vodka tonic.

Tpr. Bennett asked him to go back over the events of the evening. Dilley said he believed they had gotten pulled over due to an illegal U-turn. After pulling over, he heard her (Tpr. Domingue) say, *"Driver step out of the car."* *"He* (Driver) *had his hands up and gets his ID out. He talked to her and decided to run I guess. He came to the car and said run. He just ran. What are you supposed to do in that situation? I just ran. She tried to get up aggressively. I walked out, saw her and I tried to get away. That was that and pow, got shot."*

Tpr. Bennett asked him if he saw the trooper when he exited and what she was doing. Dilley said he saw the officer and she was getting her gun out. He further said, *"Because I know the whole law where you're not supposed to shoot a running civilian in the back. I thought it was a Taser the whole time until I got to the hospital and then I found out I was shot."* He was later able to identify the driver as, *"Jamaal"*, Tokyo's (Kalief Sconiers) friend. Tpr. Bennett asked Dilley if there were any narcotics in the vehicle at the time of the stop. Dilley said they had just smoked a *"Blunt"* (marijuana) inside the car moments before being stopped and believed the odor was fresh in the car.

Dilley went on to say she (Tpr. Domingue) was standing by the left (driver's side) headlight and he was two to three feet from her. He said he took maybe ten steps total and then a crawl. He tried to go between the two vehicles as he fled stating, *"I didn't touch her or anything. I literally passed her and got shot."* Dilley requested to draw a diagram of the scene. Dilley then drew a small sketch diagram on a sheet of paper to aid in the details of what happened, which is included and made part of this investigation.

It should be noted Tpr. Bennett had to gain Dilley's attention a couple of times during the initial portions of the interview. It was learned Dilley was given an unknown amount of Morphine by attending medical staff shortly after arrival at approximately 0400 hours. Tpr. Bennett later photographed Dilley's injuries and collected the

clothing he was wearing at the time of the shooting as evidence.

During that time, I concluded my investigation of the scene and proceeded to HQ for follow-up interviews. Upon arrival, I made contact with Tpr. Domingue who was located inside the detective's squad room with assisting troopers. She had previously been photographed by M/T Daniel in the uniform she was wearing at the time of the shooting event (**Attachment #5**). Additionally, Sgt. Patrick Jackson/ #2040, LSP Training Academy Firearms Instructor, had arrived at HQ to conduct a function check on Tpr. Domingue's firearm and to swap her firearm out with another. Sgt. Jackson's inspection of Tpr. Domingue's firearm concluded it was functional and in normal operating order. The inspection further showed Tpr. Domingue's Glock 17, 9mm pistol; serial number (LASP0670) contained sixteen (16) live rounds with a maximum magazine capacity of seventeen (17) rounds. Her two (2) spare magazines were fully loaded to capacity.

M/T Daniel later submitted Tpr. Domingue's firearm to the LSP Crime Lab for ballistics testing, along with the fired cartridge case from the scene. A scientific analysis report (SP-009662-18) later completed by Forensic Scientist, Kristi Ellington and conclusively showed the fired cartridge case matched Tpr. Domingue's Glock 17 firearm (**Attachment #6**).

After a brief moment of discussion with Tpr. Domingue about the process of the investigation, East Baton Rouge District Attorney, Hillar Moore entered the room and approached. I provided him with the initial information learned from the crime scene. Tpr. Domingue advised at that time, *"Bits and pieces"* of the incident were in her mind and she wished to take some additional time to compose her thoughts prior to being interviewed. Additionally, she said she would like to have her knee looked at by medical professionals. Tpr. Domingue then left HQ with her Shift Lieutenant, Mark Jones/ #1817, who transported her to Baton Rouge General Hospital where she was treated and released for the injury she sustained to her right knee.

Inv. Cox then conducted an interview of Kalief Sconiers at LSP HQ at approximately 0609 hours. This interview was audio/video recorded and made part of this investigation. Inv. Cox advised Sconiers of his rights per Miranda in which he advised he understood his rights and agreed to be questioned without an attorney present.

Sconiers said his friend *"Scotty"* (Dilley), *"The young man that was Tased,"* came to his house earlier in the evening and the two went to Reggie's Bar at approximately 2315 hours, via Uber. He met a new friend at the club identified as *"Jamaal"* and another person he did not know. He arranged for a ride home for him and Scotty with Jamaal and his friend. On the way home, he observed Jamaal make a U-turn in the middle of the street and then the officer turned on the lights behind them. Jamaal drove and turned into the Plaza. Jamaal exited the car and was speaking with the officer. After a few minutes, Jamaal ran by the car and shouted, *"Yo, run!"* He (Sconiers) decided not to run because he believed he had done nothing wrong. He then heard a gunshot go off and believed Dilley had been shot. After a while, he shouted back to the officer, *"Excuse me Officer, can you come get me out of the car please? I'm not trying to get shot. I just want to know what's going on."* She (Tpr. Domingue) approached him and told him to step out of the car, get on his knees and put his hands behind his back. He told her not to point her weapon at him and he informed her he was more than willing to comply. He was then placed in the back of a squad car.

Inv. Cox questioned him about the identity of the other vehicle occupants and additional details of the traffic

stop. Sconiers said he believed Dilley *"Panicked"* and ran from the car. He saw Dilley run in an opposite direction as the others that were running. Instead, Dilley ran toward the officer. Sconiers was unable to identify the other vehicle occupant. He said the other occupant was a *"big buff"* black male he only knew as *"Jeremiah."*

Inv. Cox brought the white iPhone from the scene into the interview. He asked for the passcode on the phone and advised him he was going to collect it pending an investigation. Sconiers voluntarily provided him with the passcode for his phone (Pin #331371). Inv. Cox then provided him with a receipt for the phone and returned his identification card. Sconiers was checked for any outstanding warrants, in which none were discovered. Sconiers was then released by detectives.

It was later discovered that the iPhone Inv. Cox collected from Sconiers actually belonged to Jamaal Mire.

M/T Daniel and I then conducted an audio/video recorded interview of Tfc. Burnell Thompson III/ #2455, (A-27) at approximately 0745 hours, which is included and made part of this investigation. Tfc. Thompson advised he heard the traffic stop over the police radio. A few moments later, he heard yelling on the radio and thought he heard the words *"Taser deployed."* He advised over the radio that he would be responding. Moments later, he was the first responding officer to arrive on the scene and discovered Tpr. Domingue had one suspect in the back of her patrol vehicle. The other suspect was a white male handcuffed behind his back and was rolling around on the ground next to her patrol vehicle. Tfc. Thompson observed Tpr. Domingue walking around the scene while wearing her hat.

He then went to check the vehicle and located what he suspected to be marijuana in the center console along with a small scale. He secured these items and placed them on the dashboard of Tpr. Domingue's patrol vehicle. He spoke with her briefly and she advised him a total of two suspects had fled the scene and were at large. He then got a description from her and dispatched that information over the radio. He described one of the suspects as a big and bulky male, without a shirt. He also dispatched over the radio a request for Emergency Medical Services (EMS) because he believed the suspect handcuffed on the ground had just been Tasered. He did not observe any blood at that time. He then left the scene in an attempt to canvass the area for the suspects at large. Prior to his leaving, he observed Tpr. Matthew Wallace/ #2794 arrive.

I asked him if Tpr. Domingue was speaking on the cell phone while on the scene. He said she was not. I asked him if she discussed with him the events that occurred earlier. He said she did. Tpr. Domingue advised him she had the driver out and told him to put his hands on the car and he (Dilley) ran toward her. She had his (Driver/ Mire's) identification and he kept putting his hands up. He then rose up and took off running. That was the time the remaining vehicle occupants also took off running. This was with the exception of an occupant he believed was in the back seat that did not run. Then he (Dilley) ran toward her. Tfc. Thompson said he believed the suspect on the ground had only been Tasered. Tfc. Thompson was unaware at the time the suspect had actually sustained a gunshot.

I questioned him about the recovery of the marijuana and the scale. As he was detailing this event, he indicated Tpr. Domingue had another drug stop earlier in the shift that he assisted with. I asked him about that traffic stop in which he indicated Tpr. Domingue had a drug arrest and provided some additional details. I asked if she displayed any behavior in which he might consider possible impairment or question her behavior. He said she did not display any irregular behavior and that nothing was out of the ordinary with her on the shift. He went on to say he knew her for the past eleven years.

During this time, Inv. Bill Cox drafted an arrest warrant (#LSP_2018_001688) for Jamaal Mire, the driver that fled on foot from the 2008 Saturn Vue (**Attachment #7**). Inv. Cox charged Mire in the affidavit with *1 Count of 32:82--Driving on divided highways, 1 Count of 14:108B (1) (c)--Resisting an Officer, and 1 Count of RS40:966E--Possession of marijuana, or synthetic cannabinoids.* The arrest warrant was issued and signed this date in East Baton Rouge Parish (19th JDC) by Commissioner, Nicole Robinson. Inv. Cox later filed a separate report regarding the arrest of Mire filed under case report number (18-8368) (**Attachment #8**).

Additionally, it was discovered the Village Grocery, 13510 Perkins Road, Suite 1, Baton Rouge, LA 70810, had external surveillance cameras affixed to the building and were possibly pointing in the direction of the traffic stop. Inv. Cox also prepared a search warrant (#LSP_2018_001690) in East Baton Rouge Parish (19th JDC) for the video recorder of the camera system (**Attachment #9**). The search warrant was issued and signed this date by Commissioner Nicole Robinson.

M/T Daniel went to the Village Grocery and served the search warrant upon the owner of the business. He, along with assisting LSP Technical Service Officer (TSO) Randy Hidalgo/ #1283, was able to secure the device. Upon review of the device, it was apparent the entire traffic stop was video recorded via this camera system (**Attachment #10**). TSO Hidalgo was able to determine the video recording time clock was off by a measure of approximately forty-eight minutes and fifteen seconds (48:15) early. The video (No Audio) depicted the following events: (Video Recorder System Date/Time: 07/10/2018)

- 02:13:48, the suspect vehicle and front portion of the patrol vehicle came into view of the camera.
- 02:14:15, the driver (Mire) exited the vehicle, retrieved his driver's license and held it up in the air. Mire walked to the front of the patrol vehicle.
- 02:14:39, Tpr. Domingue came into camera view and took the driver's license from Mire. Mire appeared to place his hands on the hood of the patrol vehicle shortly afterward. Tpr. Domingue's left foot remained partially in view for the next few moments before disappearing out of camera view. During this time, Mire was moving about this area and appeared to place his hands near his trouser pockets. The occupants of the vehicle can be seen moving around inside.
- 02:16:29, Mire suddenly began running toward the passenger side of the vehicle.
- 02:16:30, Mire appeared to slow momentarily near the passenger side doors, but continued running east along the parking lot edge/fence area.
- 02:16:32, the rear passenger door opened and the passenger (Dilley) began to exit. Tpr. Domingue came back into camera view.
- 02:16:33, Tpr. Domingue was seen running toward Dilley with her left arm forward. Dilley was partially out of the vehicle with his left foot on the ground. Tpr. Domingue continued to close the distance with Dilley. Tpr. Domingue was seen with her right hand near her firearm appearing to attempt to draw. The unknown passenger on the passenger side of the vehicle was seen exiting at this time as well. His head appeared over the top of the vehicle's roof.
- 02:16:34, Dilley had now fully exited the vehicle and began to run alongside the suspect vehicle toward Tpr. Domingue's patrol vehicle. Tpr. Domingue was still attempting to draw her firearm. Tpr. Domingue did a slight shuffle step and changed direction toward Dilley. Moments later Dilley had now run past Tpr. Domingue and she had now drawn her firearm from the holster.
- 02:16:35, Tpr. Domingue appeared to now be in pursuit of Dilley and fully extended her right hand, while brandishing her firearm. Dilley was seen in a falling motion. A small object, believed to be a fired

DPSC Investigation 14

cartridge case, was seen in the air between Tpr. Domingue and Dilley. It is at this point Tpr. Domingue possibly discharged her firearm at Dilley. Moments later, Dilley fell to the ground and Tpr. Domingue was also seen in a forward falling motion.

- 02:16:36, Tpr. Domingue fell to the ground landing on her right knee and then her left knee. Tpr. Domingue crawled on the ground toward Dilley on both of her knees.
- 02:16:38, Tpr. Domingue stood up.
- 02:16:40, Tpr. Domingue disappeared from camera view.
- 02:18:19, Tpr. Domingue's head came partially into view of the camera and then disappeared from camera view.
- 02:18:39, Tpr. Domingue reappeared into camera view and was seen standing upright. She appeared to be adjusting her duty belt.
- 02:18:40, Tpr. Domingue drew her firearm from the holster and began to approach the passenger side of the suspect vehicle.
- 02:19:27, Tpr. Domingue was seen escorting the passenger, who had his hands behind his back, to her patrol vehicle and the two disappeared from camera view.

I then contacted the LSP Communications Radio Room and requested an audio copy of the radio traffic at that time **(Attachment #11)**. I was also able to obtain a draft of the radio log transmission. A review of the radio recording revealed the following:

- 03:02:20, (SP-I39/ Mobile Radio) Tpr. Domingue dispatched the traffic stop over A-Dispatch-1: *"A-50 Region-1, LA 423 at Potwin with a red Saturn SUV, 422 Charlie Charlie Kilo, 422 Charlie Charlie Kilo."* During this transmission, Tpr. Domingue sounded to have labored breathing.
- 03:06:33, (SP-I39/ Mobile Radio) Tpr. Domingue dispatched traffic over A-Dispatch-1: *"A-50 Region-1, 108, (unintelligible), Potwin Street, (unintelligible/walk on radio traffic), Taser deployed."* During this transmission, Tpr. Domingue also sounded to have labored breathing and was speaking rapidly with an elevated voice tone.

It should be noted Tpr. Domingue's mobile radio transmission number appeared in the radio log as (SP-I39). This was her initial radio number issued at Troop-I. Her new radio number (SP-A50) had not yet been changed in the communications system at the time of the transmission.

Both surveillance store video and radio communications audio/video files were sent to TSO Hidalgo to match together. TSO Hidalgo later returned the two files that he matched as one **(Attachment #12)**. The files revealed Tpr. Domingue called in the traffic stop just as the two vehicles came to rest in the rear parking lot of the Village Grocery on Potwin Drive. The (108) distress call was made between the times after Dilley fell to the ground and Tpr. Domingue reappeared into frame prior to taking the passenger into custody.

Later this same date, troopers made contact with Jamaal Mire at his residence in Baton Rouge. Mire was taken into custody on the warrant charges and was transported to LSP HQ. Tpr. Bennett and Inv. Cox interviewed Mire at approximately 1516 hours, after advising him of his rights per Miranda. This interview was audio/video recorded and made part of this investigation.

Mire advised in part, they had gotten pulled over earlier in the morning from an illegal U-turn. After getting pulled over, they were all *"Kinda spooked."* The trooper told him to step out of the vehicle and approach her. He complied with her commands and then placed his hands on the hood of her vehicle. He did not know

if the trooper searched him or not. Upon answering her questions, he said he *"Immediately got spooked."* He did not recall what her specific questions were, but said her speaking on the *"intercom"* made him spooked because he *"Has a lot of stuff going on and couldn't get into no trouble."* After he took off, everyone in the car took off as well and then he heard a gunshot. He then jumped over a fence and kept going.

Tpr. Bennett questioned him about the vehicle and the occupants. Mire advised the vehicle was registered to him. He identified the front passenger seat occupant as Kalief (Sconiers). He identified the rear seat passenger as *"Scotty, the one who got shot,"* as one of Kalief's friends. He was unable to identify the other unknown passenger in the vehicle. He had just met him earlier at Reggie's bar in Baton Rouge.

Tpr. Bennett questioned him about whether they had any narcotics in the vehicle at the time. Mire initially denied any drugs saying, *"No one had drugs in the car, for real, no one had drugs in the car."* After further questioning, Mire relented and advised, *"We all pitched in."* He then said his friend had the drugs, but he was not using drugs and driving. They had all *"smoked weed"* at the house prior to getting in the car. Mire went on to say he had just bonded out of parish prison on gun and drug charges.

Tpr. Bennett asked Mire how much he had to drink earlier in the evening. He advised he only had one (1) beer at Reggie's. They left Reggie's and were going to meet up with some female friends. He made a U-turn based on this meeting and was pulled over. Tpr. Bennett asked him if he told the other occupants in the vehicle to run after he had started to flee on foot. He confirmed he did so by saying, *"Whenever I got by the car."*

Inv. Cox asked him why he pulled over behind the building and not immediately on the shoulder of the road. He said he did not know. Mire said, *"I was literally in shock."* Inv. Cox asked if he saw the trooper speaking on the radio. He confirmed he did and said, *"She said something about units and something right after that."* He commented whatever she said, it scared him enough for him to take off. When asked as to the reason for his running, he said he was so scared *"It was a blackout type of thing."* Inv. Cox further questioned Mire on the identity of the unknown occupant in the vehicle. Mire advised he just met the person in the club earlier in the evening and did not know his identity. Inv. Cox further questioned him on the events of the evening in regard to how they got to the club. Mire advised he drove Kalief and Scotty to the club, which refuted Sconier's earlier claim they took an Uber to the club.

At approximately 1653 hours, M/T Daniel and I interviewed Tfc. James McGehee at LSP HQ. This interview was audio/video recorded and made part of this investigation. Tfc. McGehee advised he heard *"108, Taser deployed"* over the police radio and while en route to the scene, he overheard Tfc. Thompson arrive on the scene. He overheard Thompson dispatch over the radio that two (2) subjects had fled the scene on foot and provided a description. Upon his arrival on the scene, he pulled his vehicle to the right of Tpr. Domingue' patrol vehicle. He observed Tfc. Thompson and Tpr. Wallace at the suspect's vehicle. Tpr. Domingue was seen in front of her vehicle. He then observed a white male face down on the ground to the right of Tpr. Domingue's patrol vehicle. He checked on the suspect on the ground and noticed blood on the back right portion of his shirt. He then spoke to Tpr. Domingue and asked if the Taser prongs needed to be removed. He thought to himself, *"That's a lot of blood for a Taser."* Tpr. Domingue then said to him, *"I shot him."* He said he believed she was still in shock. He confirmed EMS was still en route to the scene and contacted Troop-A, Sgt. William Shirley/ #2178 by phone to advise it was not a Taser deployment, but a shooting.

M/T Daniel asked him what his actions were after he telephoned Troop-A. He said he tried to find the shell casing and assess the suspect's wounds. He noticed the wound to the suspect appeared to be located on his back right side and believed the wound was a *"Through and through."* He then began marking the crime

scene with paint. He also spoke with Tpr. Domingue about the details of the stop. She told him the position she was in at the time of the shooting event was on the front right passenger side of her patrol vehicle next to the wheel well. She advised him she was dealing with the driver of the suspect vehicle on the driver's side of her patrol vehicle with his hands on the hood. During that time, the driver fled and an occupant of the suspect vehicle exited and began running toward her. She retreated to the passenger side of her patrol vehicle as she was backing up. She gave loud verbal commands of *"Stop, stop, stop."* The suspect continued forward toward her, she went to a knee, dropped her Taser, pulled her firearm and fired one (1) shot. He said he was calm, but shaken up and still in shock from the whole ordeal.

M/T Daniel asked how she sounded on the radio transmission. He said she is usually calm on the radio, but talks a little fast. He could tell by her transmission she was a *"Little amped up"* and decided to immediately proceed to her location. He said he had been working with her for the previous month to month and a half and learned her normal tone of voice over the radio. M/T Daniel asked him if he had an in-car camera operating at the time of his arrival. He said it possibly was, but he turned his lights off prior to arrival on the scene to keep from scaring off the suspects who had fled. M/T Daniel asked him who took the initial photographs of the scene. He said it was a combination of himself and Tpr. Wallace. He confirmed he took the photograph of the suspect on the ground and Tpr. Wallace was holding his shirt up to expose the gunshot wound.

I then asked him about the marking paint. He said he was marking the scene with white paint. I also asked him about a particular marking on the scene marked as (FP). He said he made that marking based on what Tpr. Domingue told him as being her *"Firing Position."* He asked her where she took a knee. She then pointed to the location on the ground and he marked it with a circle and (FP).

I asked him if he could advise of the circumstance in which Tpr. Domingue learned she had fired her firearm. He believed coming from her, she knew she had fired a gunshot. She had her Taser out at first, but then went to her firearm. He said, *"After she shot, she dispatched over the radio that she had Tasered the suspect, but didn't realize it and was in the mindset of the Taser."*

I asked him if he knew of the circumstance in which Tpr. Domingue dropped to her knee and fired her firearm. He said he understood from Tpr. Domingue, when the driver first began to run, she pulled her Taser. During that time, the doors of the suspect vehicle opened and the remaining occupants began to flee. One of the occupants began running toward her. She began to back up while up yelling, *"Stop, stop, stop."* At that point, he believed she dropped her Taser, while still retreating backward, pulled her firearm, took a knee and fired a shot. I asked him if the description he provided was him guessing what he thought had happened, or what he learned from Tpr. Domingue. He responded by saying, *"That's kinda what she told me."* I asked him to be specific in what she told him. He reiterated she told him she pulled her Taser, dropped to a knee and transitioned to her firearm.

I asked him if he knew of the circumstances in which the suspect was handcuffed and then taken out of handcuffs. He said he believed Tpr. Domingue handcuffed him at the time he was detained. The handcuffs were removed upon the arrival and at the direction of the EMS supervisor. I asked him if anyone on the scene contacted Troop-A to advise the suspect was not Tasered, but in-fact shot. He advised he telephoned Sgt. Shirley on the Troop-A desk and advised of the situation and to notify EMS.

I asked him if he knew of the circumstance in which Tpr. Domingue's knee was injured. He was aware of her injury, but did not know how she sustained it. He instructed her to take a seat in her patrol vehicle and believed EMS would treat her injury upon their arrival. He also advised her to start typing a probable cause

arrest narrative of the incident. I asked him if he had been contacted by Tpr. Domingue at any time during the day to discuss the events. He said he had not. He said he only spoke with her a few times on shift after the incident to determine if she was alright. They did not discuss any specifics of the shooting event.

M/T Daniel and I then interviewed S/T Brian Jefferson/ #2364 at 1712 hours. This interview was audio/video recorded and made part of this investigation. S/T Jefferson advised while on a traffic stop, he overheard Tpr. Domingue dispatch what he believed were *"Signs of trouble, she was breathing hard"* over the police radio. While en route to the location, he overheard on the radio *"Taser deployed."* He said he took note of that because he downloaded Tpr. Domingue's Taser for an incident that occurred earlier in the shift. Upon his arrival, he observed Tfc. Thompson and Tpr. Domingue's patrol vehicles. He then observed the red suspect SUV with the doors opened while Tfc. Thompson and Tpr. Wallace conducted a search. He noticed Tpr. Domingue standing near a suspect face down on the ground at the front right side of her patrol vehicle. He assumed the suspect was Tasered. He observed *"A little blood"* coming from the suspect's side. The suspect was conscious and alert, so he proceeded to leave the scene to begin to search for the suspects that had fled.

During that time, Tpr. Domingue approached him and advised one suspect was detained in the back seat of her patrol vehicle. He then turned his body camera off because he believed the scene was under control. Tpr. Domingue asked him if she could speak with him about the situation. She told him, *"I shot the guy, he came at me."* She said she made a traffic stop because the suspect vehicle made a U-turn in front of her. She stopped the vehicle and made contact with the driver. The driver took off running and yelled at the remaining occupants to run as well. Two occupants exited the vehicle and one began running toward her. She told him she was previously focused on the driver and was preparing to deploy her Taser toward the driver. During that time, the occupant was coming at her from the right. She then took up a defensive position and went down on one knee. She drew her firearm and fired a shot. He said at that point, Tfc. Thompson arrived and began dispatching information in regard to the scene.

M/T Daniel asked him what Tpr. Domingue's demeanor was over the radio when the initial stop was called in. He said it was normal. He said he did not recall hearing the (108) signal being dispatched. However, he believed he heard *"Tussling noises"* over the radio. He made note because it sounded like the situation Tpr. Domingue encountered earlier in the shift.

M/T Daniel asked him if his body camera was activated at the time. He believed it was, but turned it off when the scene was secure. He asked if the conversation he had with Tpr. Domingue was recorded on his body camera or vehicle dash camera. He said it was not. M/T Daniel asked him if she advised what side of the vehicle she was on when she fired the shot. He said she told him she was on the right side of her patrol vehicle where she *"Took a defensive position."* M/T Daniel asked him if anyone was around while this conversation was occurring. He said it was just he and Tpr. Domingue. He was asked when he discovered the suspect had been shot. He said he learned of the gunshot when Tpr. Domingue informed him she had shot the suspect. Prior to this, he just assumed the suspect had only been Tasered. He then made contact with Shift Sergeant Gerald Varnado/ #1505 and informed him of what Tpr. Domingue had just told him.

I asked him if he was the person on the scene who handled the crime scene entry log. He confirmed he was. I asked him if he could go over the order of arriving units responding to the scene. He advised Tfc. Thompson was the first unit, Tpr. Wallace was the second unit, he (S/T Jefferson) was the third unit and Tpr. McGeHee was the fourth unit to arrive. I asked him about the circumstance in which Tpr. Domingue approached him on

the scene and asked to speak with him. He reiterated the details of what he observed upon his arrival. As he was checking on the suspect's condition, he noticed Tpr. Domingue appeared to be *"exasperated,"* but ok. He further described this to be appearing normal, but possibly tired or excited about the incident. He noticed the tear in her trouser leg at that time. I asked him what she said to him specifically. She approached him and said, *"Can I talk to you for a second? Are you miked up?"* Meaning was his microphone turned on. He then turned the body camera off. She went over with him what had happened in the incident that he previously detailed. She told him she said to the occupant something to the effect of, *"Hands, hands, let me see your hands, show me your hands."* She then told him she shot the suspect. He asked her if she shot him with her Taser. She responded by saying, *"No, I shot him with my gun."* He confirmed he was told this information prior to Tpr. McGehee's and EMS' arrival on the scene.

He later confirmed he transported the detained suspect, Kalief Sconiers, to LSP HQ for an interview. He was asked if he had any conversations with anyone on shift or Tpr. Domingue in regard to the shooting event. He said he had not.

M/T Daniel and I then re-interviewed Tfc. Thompson at 1741 hours. This interview was audio/video recorded and made part of this investigation. Tfc. Thompson went back over the details of the incident in which he stated earlier in the day. He went on to say he knew Tpr. Domingue from his time in the military, when she also served in the military. He said she was also a previous boxer in the Lafayette area prior to her becoming a trooper. I asked him if he had spoken to Tpr. Domingue since the incident about what happened. He said he did not.

Later this same date, S/T Gustave Bethea/ #2423 and I interviewed Tpr. Domingue at LSP HQ at 1833 hours. During this time, East Baton Rouge Parish District Attorney, Hillar Moore and staff were present and monitored the interview. Due to Tpr. Domingue being directly involved in the shooting event, I advised her of her rights per Miranda **(Attachment #13)**. She advised she understood her rights and was willing to answer questions without an attorney present. This interview was audio/video recorded and made part of this investigation.

Prior to the interview beginning, Tpr. Domingue stated, *"Should I have somebody present. Am I supposed to have someone with me?"* She commented that she *"Didn't do anything wrong and didn't have anything to hide."* I advised her that she did not have to speak with me if she chose not to. She said she, *"Just wants to get back to work. If this is part of that happening, then I want to do that."* I then informed her of the difference between an administrative investigation and a criminal investigation. I advised her I was conducting a criminal investigation and my part had nothing to do with her being able to get back to work. After additional explaining of the differences of the two types of investigations by S/T Bethea and me, she agreed to be questioned without an attorney present.

I questioned Tpr. Domingue about her military history and established a dialogue with her on commonalities in an attempt to gain her confidence. She appeared to be open and forthcoming with information in regard to her past and her initial introduction to state police. She detailed previous events in her history and advised she was a prior professional boxer. Additionally, she advised she was *"Held back"* from her LSP Academy graduation. She did not elaborate on any further details of this revelation. She went on to detail her past educational and work history. Tpr. Domingue also mentioned having some previous use of force encounters.

I asked her about a traffic stop she had earlier in the shift, which resulted in a drug arrest (Case Report (#18-

7446). She then detailed the events of the traffic stop having dialogue with the driver and occupants. She detailed the conversations she had with the driver. She advised of the situation in which the passenger fled the vehicle with a black bag in hand. During this flight, she shouted to him, *"Taser, Taser, Taser."* She then deployed her Taser. She further detailed the arrest and going back to Troop-A to download her Taser data. She further advised of how a bystander discovered the bag and she went back and recovered marijuana on the ground. She went on to detail the discovery of additional contraband in the vehicle at the time of the stop.

I then asked her to describe the events of the traffic stop which resulted in the shooting event. She proceeded to detail being on patrol at Perkins Road near Siegen Lane and making contact with the suspect vehicle. She observed the vehicle make an abrupt swerve to the right and then back to the left resulting in a U-turn. She perceived this action as abnormal which led her to believe something may be wrong inside the vehicle. She illuminated her overhead blue emergency lights on her patrol vehicle in an attempt to conduct a traffic stop. She turned around and got behind the suspect vehicle. The driver refused to pull over to the immediate shoulder of the road and she called in her traffic stop over the police radio. The vehicle slowed down and turned right onto Potwin Drive. The vehicle continued traveling slowly, but turned quickly behind a nearby business. The driver soon exited the vehicle and she asked him if he was ok. She observed the driver reach back into the vehicle and she told him to keep his hands where she could see them. He told her he was just getting something. He then displayed his identification to her by holding it up in his hands. She motioned him to approach her at her vehicle and she again asked him if he was alright. She asked him what had happened and questioned him as to why he didn't stop for her immediately instead of continuing. He told her he was bringing some friends home.

During that time, she said she smelled on him what she perceived to be alcohol and marijuana. She questioned him further about where he had been and who he was with. The driver advised her they had been at Reggie's bar. She noticed at that time, he was moving his hands over his head and she instructed him to place his hands on her vehicle. She told him to stop moving around so much and questioned him about how much he had to drink. She asked him if something else was going on. He responded no and she began to notice the remaining occupants in the vehicle moving around inside. She asked him if there were any weapons inside the vehicle. He responded that he didn't know. She asked him if anyone in the vehicle had a weapon and he responded to her he didn't think so.

With her driver's door open, she began to run him through her Mobile Data Terminal (MDT). She noticed at that time, he began to move his hands slowly toward his waist. She again instructed him to place his hands on her vehicle. He complied and began looking back at his vehicle. She was now trying to watch him, the vehicle occupants and interact with her MDT. The driver pulled his hands off of the vehicle and she again told him to place his hands on the hood.

During that time, the driver abruptly took off running toward the passenger side of his vehicle. She immediately ran around the corner of her opened door and grabbed her Taser. She observed the driver run to the opposite side of his vehicle. He opened up both front and rear passenger doors and shouted *"Now, now."* She observed him lean into the vehicle and she believed at that time, *"I'm about to get shot"* and backed up. During that time, she was unsure as to when or how she transitioned to her firearm. She then noticed the rear driver's side passenger door open and an occupant began running toward her. She backed up to the left and he continued toward her. She then backed up to the right and shouted, *"Stop, stop, stop."* She noticed he had something in his hand, but had the other hand back. She described him as being a big guy and further advised *"Something was not right."* He was still coming toward her and she continued to back up.

DPSC Investigation 20

She was unsure if she tripped or purposely took a knee, but at some point she fired. She was unable to determine if she had her hands on him at the time or not. She said she knew they were close.

She said she didn't know what happened once they went to the ground. She could see he still had something in his hands. She told him to, *"Drop it, drop it."* He said to her he didn't want to mess it up. She became aware at that time two occupants were out and she did not know where they were. She had her firearm out (indicating holding it in her left hand) while motioning reaching with her right hand to secure the suspect. She said she was shaking his hand to discover what he was holding and had her knee in his back. The suspect stated to her at that time, *"I can't move, I can't move."* She told him to be still and to drop the object he was holding. He again told her he didn't want to mess it up. She then heard the object striking the ground repeatedly. Due to it being dark in that location, she shook his hand vigorously and observed the object fly out. At that point the suspect identified the object as being his cell phone.

While she was attempting to subdue the suspect, she noticed a remaining passenger in the vehicle moving around. She was unsure how, but handcuffed him using one hand. She managed to get the other handcuff on the suspect and noticed the remaining vehicle occupant moving around more. She moved off to the side, while keeping cover on the occupant with her firearm using her right hand. She approached the suspect vehicle and made contact with the occupant. He stated to her, *"Why are you pointing that gun at me? I didn't do nothing."* She instructed him to get out of the car, get on his knees and turn around. She handcuffed him and he again told her he didn't do anything. She advised him for her safety and his, she was going to detain him and place him in the back of her patrol vehicle.

She questioned him about the identity of the other vehicle occupants. He responded to her that he didn't know. She then asked the suspect lying on the ground why he ran at her. He responded to her saying, *"You Tased me Bro, you Tased me."* At that time, Tfc. Thompson arrived on the scene. She didn't know what happened or how anything happened from there. However, she did know she was bleeding. She also felt blood on her hands. She did not know how much interaction she had with the suspect. He kept saying to her, *"He was Tased, he was Tased."* She went on to say she knew he saw her with her Taser coming out because he came from the other side. He was already *"On top of her at that point."* That was the time she transitioned. She went on to say she knew he saw she had a Taser in her hand, which is why he thought he had been Tasered instead of being shot. She said she didn't know how it all happened or how close they were. However, she knew they were close.

I asked her where she was located when she observed the initial traffic infraction. She said it was Perkins Road at Siegen Lane near the Jack-In-The-Box restaurant. I asked her where she was when she initially called in the stop. She said she had just made the flip at that location and utilized her in-car mobile radio. I asked her what she was wearing and carrying when she exited her vehicle upon making the traffic stop. She advised she was wearing a department issued uniform and department issued firearm as well as a baton and chemical agents on her duty belt. She advised her Taser is the first thing she goes for every time; indicating it was habit.

I asked her, in regard to the stop, if she remembered which hand she used to draw her Taser. She said she did not know. I asked her if she could determine how many occupants were in the vehicle after the driver exited. She said she believed there were four (4) additional occupants, but was unsure as to the exact number due to them moving around inside. She said she could later see that it was three (3) remaining occupants. I asked her about the dialogue she was having with the driver when she made initial contact with him. She said he just kept taking his hands off of her car and was looking back at his vehicle. She kept telling him to keep his hands

where she could see them.

I asked her if she was right or left handed. She said she was right handed and carried her firearm on her right side. She carried her Taser on her left front side. I asked her how she draws her Taser. She said she uses both hands. She went on to say when she was a boxer, she could use both hands equally. I clarified this and asked if she was ambidextrous (being able to use both hands equally proficient). She said she was. I asked her to describe the manner in which she utilized her Taser and what she might have said during that time. She responded, saying after the driver abruptly fled on foot, she yelled, *"Taser, Taser, Taser,"* reached for her Taser and started to follow him. She further detailed she went around her driver's side door (indicating drawing her Taser with her left hand) to give chase. I asked her if she saw him open the passenger side doors of the suspect vehicle. She said she did and heard him say, *"Now, now, now."* She said as soon as the doors opened, she began to back up and started to transition from her Taser to her firearm. She indicated at that time, she was on the passenger side of her patrol vehicle and observed the rear passenger approaching her from her left (on the driver's side). She said she was unsure if she backed to the left or backed to the right first, but he was just coming. She was unsure about the transitioning, but knew they were up close.

I asked her if she could determine the race of the driver of the suspect vehicle. She said she believed he was possibly mixed race, black and white. I also asked her if she could identify the race of the occupant that exited on the rear driver's side. She said he was white. I asked her if she was giving any verbal commands. She said she was saying, *"Stop, stop, stop."* I asked if she had her Taser in her hand at that time. She said she did.

She went on to describe the driver's actions at the passenger side of the suspect vehicle. She said he definitely opened the two doors and leaned inside. She then observed a *"Big guy"* get out of the passenger side of the vehicle. She said her first thought was, *"This guy is reaching for a weapon."* I asked her to describe the big guy. She said he was a big black male possibly wearing a tank top or no shirt at all.

I asked her to describe the circumstance in which she said she backed up. She said when she saw the driver open both doors, the big guy get out and him (Driver) reaching in is when she started backing up. When she backed up is when she observed the other occupant on her left (driver's side of suspect vehicle) coming out. She described this suspect as a tall white male with his hands up over his head. She was aware of her patrol vehicle lights shining on him and her silhouette being visible. She was telling him, *"Stop, stop, stop."* She was unsure if she went to the left or right first at that time. She didn't know which direction he was coming, just in her direction. He was close to her when she fired, but does not know if they had already gone to the ground or what had happened at that point.

I asked her to describe how and when she transitioned from her Taser to her firearm. She said she *"Wished she could."* She had gone over it repeatedly in her mind. She detailed training in the past in regard to transitioning from Taser to firearm and had no prior experience and was *"Whatever was taught."* She said, *"It just kinda happened."* I asked her if she knew how many steps she took backward. She said she did not know. I then asked her about the injury to her knee and how she sustained it. She said that's the part she doesn't know. She knows she was on the ground with the guy, but doesn't know how and when that exactly happened. She said she was also scuffed up on her hands and was *"Kinda beat up."*

I asked what was going on in her mind at the moment she transitioned to her firearm and observed the suspect exit the vehicle. She said, *"This is it."* I asked her to expound upon that meaning. She said he was running at her. When she first dealt with the driver, she had a feeling something wasn't right. She further advised when

DPSC Investigation 22

she had the suspect on the ground, prior to handcuffing, *"If he swings on me, I'm going to be fighting four of them."* She said she knew something was wrong because the driver kept looking around and back at the car while laughing. She said this was one of those stops where she was going to have him get someone to drive him home because if she did anything, she was going to have to contend with the occupants.

I asked her if the *"This is it"* moment was when the white male occupant on the driver's side exited. She said it was. I asked her to describe that moment. She believed she possibly hit the front of her patrol vehicle as she was backing up. She tried to go to the left and then to the right and she started coming toward her. She said she was trying to get the engine between her and the occupants. She was aware at that point she did not have any cover.

I asked her if she knew she had a firearm in her hand based on her earlier transition statement. She said yes she did. I asked her if the *"This is it"* moment was the time in which she pulled the trigger. She said she didn't know and that he just kept coming. I also asked her what was going on in her frame of mind the moment she pulled the trigger on her firearm. She said she didn't know. She said, *"I can't say that I recall pulling it."* She said she didn't remember the actual pull. She said he (Dilley) kept saying to her she had Tasered him. Although, she knew she had not Tasered him. She was unable to offer any additional details in regard to this action.

She went on to describe how she was trying to utilize her portable radio she carried on her belt. However, it would not work and she heard it *"Beeping."* She described how any altercation she gets in; the battery becomes detached and resets itself causing a beeping noise. She said at some point she also heard her body camera beeping. She was unsure as to which device was beeping. I asked her how she called on the radio for help. She said because her portable radio wouldn't work, she went around to the driver's door of her patrol vehicle and called in the information on the stop via her in-car mobile radio. She was unaware if she ran around the front or back of her patrol vehicle. I asked her if she knew at that point the suspect had been shot. She said yes she did. She knew he had not been Tasered.

I asked her if she had any conversations with the responding troopers. She said she spoke with Tfc. Thompson about the description of the suspects that fled on foot. I asked her if she provided any information to the responding troopers about the details of the shooting event. She said she told someone the suspect on the ground had not been Tasered, but shot. She said, *"I got him, I know I got him, but don't know where."*

I asked her about the white paint markings on the ground marked as (FP) and discussed the earlier interaction I had with her on the scene. I asked her if she recalled that interaction. She responded with *"maybe."* She knew that was the location they went to the ground. I asked her to help clarify if I had misunderstood from the initial discussion on the scene if that was where she had gone to a knee and fired her firearm. She said that was the part she doesn't remember. I then showed her a photograph taken on the scene by responding troopers depicting the (FP) markings on the crime scene. I asked her if she recalled telling troopers on the scene the location of her firing position. She said she didn't see any troopers marking the scene.

I asked her to draw a diagram of the scene and plot on the drawing where she was at the time of the shooting. I also assisted her with the drawing of the diagram of the placement of the vehicles and street location. She drew a few assorted diagonal lines near the front of her vehicle trailing over to the suspect vehicle. I asked her about her location in regard to transitioning and firing her firearm. She indicated her position when she was backing up and hit the front of her patrol vehicle. I asked her what her position was when she pulled the trigger and if the suspect was in front of her. She paused a moment and said he was coming toward her and

she was lower than he was. She said at that moment she thought, *"This was it."* I asked her what she meant by *"it."* She said, *"I thought they were going to hurt me."* I asked her if she believed she was in a position to be hurt. *She said, "Yeah, cause he's not stopping, I'm yelling stop, stop, stop; he's got something in his hand and he's coming at me. I knew I couldn't go back this way anymore. I knew my only chance was to run out this way; if I'm gonna run, they are gonna get me in my back and I don't know where the other two are. I know I tried to head toward this side, but I don't know what happened at that point."* I asked her if she knew what hand her firearm was in at that time. She responded it was in her right hand. I asked if she could tell if the suspect running at her had anything in his hand. She said he had something black in his hand. I asked her if she recalled what she dispatched over the police radio after the shooting. She said she remembered saying *"108,"* but didn't think she said anything after that, other than asking for help. I asked her if she rendered aid to the suspect on the ground. She said she did by speaking with him and searching for the wound.

I then showed her a second photograph taken on the scene by responding troopers depicting the suspect on the ground face down. The photograph showed white paint ground markings around the suspect's head and feet as he was lying on the ground. Additionally, it showed a white circle around a fired cartridge case and around the tires of her patrol vehicle. However, it did not show the white painted circle with the (FP) designation. I asked her at what point did she inform any trooper of her firing position that was marked, which was depicted in the earlier photograph. I informed her I was trying to explain the differences in the two photographs. I asked her if it was just a misunderstanding. She said it was a possibility. I then attempted to have her sign the diagram she assisted me with. I first signed the diagram, but she declined to do so. Tpr. Domingue stated, *"But I don't know if this is factual. I don't know, like I don't remember being on that, I, I know that I ended up on that side of the car, I don't know how I got there."*

At that point in the interview, we took a break from the questioning. I offered her the opportunity to exit the room and for her to gather her thoughts, if she needed. She declined to leave the interview room during that time and waited for our return.

We returned a few minutes later and resumed questioning. I first asked her what brand radio she was issued. She confirmed she had an EF Johnson portable radio. She went on to say she did not have any sleep since the time of the shooting incident and the current interview.

I asked her what she meant when she talked about the *"This is it"* moment and if she believed she was in any danger of being hurt. She said, *"Yeah, I thought all of them were going to come after me at that point."* I asked her about the cell phone the suspect was carrying in his hand at the time and if he demonstrated any behavior in which she may have felt threatened. She said, *"I just saw that it was something black in his hand. That's it, that's all I saw."*

I reviewed with her previously mentioned details about the information she had stated. I then asked her if she knew she had her firearm in her right hand. She replied, *"I believe so."* I asked her if she knew when she pulled the trigger. Her response was, *"I don't know."* I asked her if she knew for a fact that she was not Tasering the suspect. She said, *"Yes."* I asked her if she was shooting the suspect because she felt threatened by him. She responded by saying, *"Yes, I think he was on top of me, above me, or somewhere where I knew that I could not get away. Wherever or however it happened, it was just me and him and I didn't know where the others were. I guess thinking this was it, he is gonna get me down and the rest of them are gonna get the best of me. There was nowhere for me to go."* I asked her if she knew the possible

location of the impact of her fired round on the suspect or what portion of his body was visible to her when she pulled the trigger. She said, *"I think he was starting to turn. I think his arm came over me, but I know I at least got him somewhere in his side."* I asked her when she knew she had got him in the side. She said she knew when they were down on the ground. I asked her if she was on both feet when she shot. She said, *"I don't know, because I don't know when I actually shot. He was very close to me. I don't even know if I had a hand on him or not."* I asked her for clarification about being on the ground. She said she didn't know. I asked her if she fell down and then she shot. She responded that she didn't know.

I asked her if she remembered our earlier conversation on the scene in regard to her body worn camera. She said she did remember and further commented she had turned the camera back on to see if it was actually working. She had turned it on and off because it wasn't doing anything when she was trying to turn it on. I commented to her that I noticed her body camera wasn't working when I first met with her earlier in the day, while on the scene. She said she turned it off and on and thought to herself, *"The battery is probably dead."* She further advised she had been having problems with her cameras. I asked her how long she had that particular camera. She said it was the first time she had used that camera. She further advised she did not have a camera when she was at Troop-I. She commented that she was recently assigned to the Louisiana State Legislative Detail and upon completing the assignment, she was transferred to Troop-A where she was issued body worn cameras. She indicated she was unsure as to how to use it, but was being assisted by troop personnel. She said her first camera wasn't working like it was supposed to. She reported this to her supervisor, Lt. Mark Jones, and he was unable to get it to work. He then instructed her to use her other camera. She commented how she let her camera run for a lengthy time on the earlier traffic stop because she was counting a lot of currency. She said her camera was taken, therefore she does not know exactly how much was recorded. I asked her for clarification as to which body camera was broken. She said her initial camera that recorded the earlier traffic stop was the one not functioning properly and was surrendered to her Shift Lieutenant. The camera she was wearing at the time of the shooting event, she believed was not working properly either.

I asked her how the camera is turned on. She said it has to be double clicked. She further advised she didn't know if it would turn on when other nearby troopers turned on their cameras or emergency lights. She further advised her camera would not activate when Lt. Jones turned his camera on in order to test the functionality of her camera. I asked her if she had problems in the past with the camera she was wearing at the time of the shooting event. She said it was the first time she had used that particular camera. She advised she heard sometimes they get a *"Bad batch"* of cameras.

I asked her if she had an in-car camera. She said she did not. She commented how she was in pool units for most of her time as a trooper. When she was assigned to the legislative detail, she received another marked patrol vehicle from a trooper who had just turned in that vehicle. She had to turn in that patrol vehicle to Troop-I and be issued another patrol vehicle from Troop-A. She said she had that particular patrol vehicle since the last day of the Legislature, sometime in June, 2018. That vehicle did not have an in-car camera installed in it.

I then played for her on a laptop computer the surveillance video from the Village Grocery of the traffic stop in question. She then pointed out the movement of the occupants in the suspect vehicle. She also commented on not being able to see the driver's hands. After her viewing the video footage, I asked if it helped refresh her memory of the events and how to explain some of the evidence on the scene. She said, *"He was running towards me, I don't know much more than that. I was trying to decide if I was going to fight or stay or*

*what."* She commented that everything was so much faster in real than what was being shown on the video. I explained to her there were some discrepancies in her statements and what was shown on the video and asked if she could help me figure them out. I further explained there appeared to be some gaps in her statement and I needed her to help fill in some of those gaps.

I then showed her the two previous photographs taken on the scene by assisting troopers. I replayed the video again for her as well. She commented that the suspect was beside her as she fired. I pointed out that this was a discrepancy as to her earlier statement on the scene that she was kneeling by the front passenger tire when she fired. I stopped the video at a position when it appeared she had just discharged her firearm. I pointed out to her the locations of her and the suspect. I also pointed out the object seen in the air between her and the suspect. I asked her if it was possibly the suspect's cell phone. She advised he still had it in his hands at that time. I then pointed out her previous statements didn't match what was being shown on the video and asked if she could help explain the differences. I then pointed out her position when she fired her firearm with her right hand forward holding her firearm and the suspect's position had passed her. I pointed out to her she had earlier commented that she knew she had her firearm and not her Taser in her hand. I further pointed out that she stated she had backed up prior to firing her firearm. However, the video did not show her backing up at any time. I asked her if the freeze frame of the shot was a fair assessment of being the most possible time she fired her firearm. She concurred with the assessment. I also pointed out the suspect appeared to be running away from her at that time. I asked her what was going on in her mind at that particular moment in time. She said, *"I never, I never saw him running away from me, that's the point. This is not what I saw out there. All I knew is he was coming, I know we made contact at some point where he touched me, I touched him before I fired, but I don't know when or how that happened. All I knew was he was coming and I was yelling stop, stop, stop and that's all I had."*

I pointed out to her that she used deadly force and there had to be an answer for her actions. I commented to her I needed to explain why she used deadly force at that particular time. She said, *"Because that's not what I saw. All I saw was somebody coming at me and I'm yelling at him to stop and I don't know where everybody else is; that's the only thing I can; I don't know where he came from."* At that point she appeared to become visibly upset through her voice and facial gestures. She said, *"I didn't realize I was that close to him when he came out. I thought I had backed up enough to be able to fend for something, but I didn't realize. It's like I turned around and he was right there, he's coming at me. That's the only thing I remember."* She again showed signs of becoming visibly upset through the same manner. I explained to her I was trying to get the details of the investigation right. She said, *"I don't want this to be wrong and I don't want it to not match up."* I pointed out to her I did not observe her back up in the video and then pointed to the photograph of the (FP) painted circle. I explained that she could not have fired from that position. She said, *"I don't remember any of this, I don't remember it."* I pointed out the details of the evidence on the scene and what her statement on the scene was about the shooting event. I asked her if it was a possibility she was confused on the scene. She said, *"That's what I thought happened. That's what I saw. That's what I felt happened to me. Over and over again I keep saying right or wrong, if I was in the same position, I would do the same thing again. I didn't feel like I had any other choice."* I asked her if it was possible she had told some troopers on the scene about her kneeling firing position which was later marked with paint. She said, *"Yeah, but I don't know, I don't know what."* I asked her if it was fair to say Tpr. McGehee marked the place on the ground based on what she had told him about her firing position. She said, *"I don't, I don't know. Like I'm seeing something completely different than what I saw happen out there. That is something far from what I experienced."* During this point of the interview, she again became visibly upset in the same

manner as described. I pointed out the importance of accurately describing the details of an event as police officers. She stated, *"I can tell you what I see here, but I told you what I saw there; like this is two different experiences."*

At this point in the interview, we took another break and stepped out of the room. Tpr. Domingue was also offered the opportunity to leave the interview room, in which she did. After a brief moment to discuss the interview findings with supervisors, Tpr. Domingue was called back into the interview room and the interview was discontinued at that time.

The following day, Wednesday, July 11, 2018, I went to the LSP Training Academy to research Tpr. Domingue's previous statement about being held back from her academy class. Training records obtained by Lt. Len Marie/ #2106 revealed Tpr. Domingue alleged multiple injuries she sustained during training. These alleged injuries resulted in her missing approximately eighty-eight (88) hours of mandatory training. The training standards were that she could miss no more than 10% of mandatory training according to Peace Officer Standards and Training (POST) Council. Because of these missed hours, she was held back from being assigned to a troop until she could make up the training through the LSP Training Academy (**Attachment #14**).

Training records also showed Tpr. Domingue was a Louisiana POST certified police officer on December 16, 2015, through the Louisiana State Police Training Academy (**Attachment #15**). She was further certified on her primary Glock 17, 9mm pistol [redacted] with a total score of 107 out of a possible 120. She was also previously certified on her Taser during the LSP Training Academy on September 23, 2015. She had additional certificates for Intoxilyzer 9000, Advanced Roadside Impaired Driving Enforcement and Strategic Self-Defense Grappling Tactics (SSGT).

Tpr. Domingue also made mention of previous Use of Force incidents and her frequency for utilizing her Taser. I requested and later received a total of four (4) Use of Force reports generated by Tpr. Domingue since her date of employment (**Attachment #16**). The most recent Use of Force report she filed on July 16, 2018, detailed her involvement in the shooting event on July 10, 2018.

On Monday, July 16, 2018, Inv. Cox and I went to Dilley's residence, [redacted], in an attempt to speak with him about the shooting event. Dilley was reported to be at the Baton Rouge Rehabilitation Center recovering from the gunshot wound. I spoke with his mother, Deborah Higginbotham (W/F, DOB: 07/27/1967) via cell phone [redacted], who advised her son would not be available to speak with detectives without an attorney present. Additionally, she declined to name the attorney representing her son.

On Tuesday, July 17, 2018, Sgt. Forbes and I went to Troop-A to collect previously requested documentation and Tpr. Domingue's two (2) body worn cameras. I received the material from Cpt. Devall and issued a receipt for the cameras (**Attachment #17**). Included in the files were two (2) Taser download reports. The reports showed her Taser was last deployed on July 9, 2018, at approximately 19:44:04, via trigger, for duration of one (1) second. The Taser was downloaded via USB Connect at 02:09:10 hours on July 10, 2018. No further deployments were discovered between that time and the shooting event.

Also included was an LSP Investigative Reporting System (IRS) Incident report (#18-7446) and booking documents Tpr. Domingue prepared in regard to a traffic stop she made earlier in her shift on July 9, 2018. The report details the events of a traffic stop resulting in a fleeing occupant, Use-Of-Force (Taser

Deployment) with a drug seizure and arrest. Many of the details in this report appeared to be similar to the details she provided in the later traffic stop which resulted in the shooting event.

On Wednesday, July 18, 2018, Inv. Cox and I again met with Tpr. Domingue and her attorney, Floyd Falcon Esq. at LSP, HQ. After reviewing basic facts learned in the investigation with her and her attorney, a request was made for a follow-up interview. At that time, Tpr. Domingue advised she had no additional information to provide detectives in regard to the investigation.

Detectives made another follow-up interview request, via telephone, with Atty. Floyd Falcon on Thursday, July 19, 2018. The following day, Atty. Falcon telephoned to advise he spoke with Tpr. Domingue and she reiterated she had no further information to add.

On Friday July 27, 2018, detectives again met with Tpr. Domingue and her attorney, Floyd Falcon Esq. at LSP, HQ. Detectives again reviewed basic facts learned in the investigation and asked if Tpr. Domingue would be able to clarify some discrepancies discovered in the investigation. Again, she advised she had no further information to provide.

The Axon body worn camera footage was later recovered from evidence.com and made available for this investigation. The camera footage obtained was from Tpr. Domingue and the responding troopers on the scene. One of Tpr. Domingue's body worn cameras (SER. #X81141172) had only a single recording. It began recording on 07/10/2018 at 01:55:16Z (07/09/2018, 8:55:16 PM/ CDT) whereby, Tpr. Domingue was seated in the driver's seat of her patrol vehicle. The view was primarily of the driver's side door, dashboard and partial steering wheel. The view outside the driver's side window was clear. It showed it was night time and she was parked in the Buffalo Wild Wings parking lot, 7524 Bluebonnet Blvd., Baton Rouge, LA 70810. She had arrested an individual (Alton Lee Thornton, B/M, DOB: 11/03/1997) and exchanged a few brief comments with him. She then dispatched, via police radio, she was clear from the scene, was *"10-15"* (with arrest) and en route to Troop-A with her arrestee and provided the mileage of her patrol vehicle at that time. Other LSP and East Baton Rouge Parish Sheriff's Office (EBRSO) patrol vehicles could be seen in the parking lot through the window. Tpr. Domingue began driving and soon appeared to be talking on her cell phone about information regarding the arrest. She was also seen speaking with Tfc. Thompson through the open driver's side window while at a traffic light. The video concluded at 02:01:47Z (07/09/2018, 9:01:47 PM/ CDT) for a total run time of six minutes and thirty-one seconds (6:31).

Tfc. Thompson's body camera (SER. #X81127889) began recording on 07/10/2018, at 08:12:44Z (07/10/2018, 03:12:44 AM/ CDT) whereby, he was seen walking in the rear parking lot of the Village Grocery. He approached the driver's side of the red Saturn Vue, which had the driver's side door open. There was no audio initially recorded and he was seen putting on protective gloves. Shortly after arriving at the vehicle, he leaned inside and Tpr. Wallace could be seen leaning in the passenger rear side of the vehicle. The audio was activated during this time. He briefly spoke with Tpr. Wallace about possible contraband in the console of the vehicle and asked Tpr. Wallace if his camera was on.

After he exited the interior of the vehicle, Tpr. Domingue's patrol vehicle came into view. It could be seen with the overhead blue emergency lights illuminated and the driver's side alley light illuminated and pointed directly at the driver's side of the Saturn. He began walking toward his patrol vehicle and mentioned he had previously called for EMS. Tfc. Thompson entered his patrol vehicle and drove away. He then appeared to be pointing his flashlight through various windows of his patrol vehicle. He also appeared to be searching for the suspects that fled as he previously described. The video concluded at 08:17:24Z (07/10/2018, 3:17:24 AM/

CDT) for a total run time of four minutes and forty seconds (4:40).

A second body camera video (SER. #X81127889) was also recorded for Tfc. Thompson. The recording occurred a few minutes later on 07/10/2018 at 08:19:51Z (07/10/2018, 3:19:51 AM/ CDT) whereby he was seen approaching a blue trash dumpster on a residential street. There was initially no audio being recorded. Blue flashing lights were later illuminated on the street and he was seen approaching an open carport at a private residence. Tfc. Thompson drew his Taser and pointed the affixed laser dot sight ahead of him in the carport area. The audio portion of the video was activated at that time. A white external motion light was illuminated under the carport as he approached. He re-entered his vehicle and continued patrolling. Radio traffic could be heard in the background of troopers on the scene. Troopers were making requests for a "10-78" (ambulance) and the on-call detectives list. The video concluded at 08:26:31Z (07/10/2018, 3:26:31 AM/ CDT) for a total run time of six minutes and thirty-nine seconds (6:39).

Tpr. Wallace's body camera (SER. #X81268541) began recording on 07/10/2018, at 08:14:04Z (07/10/2018, 03:14:03 AM/ CDT) whereby, he was seen searching the interior rear passenger seat area of the Saturn Vue. Tfc. Thompson could be seen standing in the open driver's side door searching that area. There was initially no audio portion to the video. Tpr. Wallace exited the vehicle and walked around the rear, where his audio portion was then activated. He walked back to his patrol vehicle to retrieve protective gloves and walked past S/T Jefferson. Tpr. Wallace commented to him in regard to "966 & 967" (Marijuana/ Cocaine). He retrieved his gloves, put them on and re-approached the Saturn Vue. The video concluded at 08:16:39Z (07/10/2018, 3:16:39 AM/ CDT) for a total run time of two minutes and thirty-five seconds (2:35).

Tpr. McGehee's body camera (SER. #X81131860) began recording on 07/10/2018, at 08:31:16Z (07/10/2018, 03:31:16 AM/ CDT) whereby, he was seen standing next to Dilley, who was lying face down on the ground. An EMS technician was next to Dilley rendering aid. There was no initial audio portion to the video. Tpr. Wallace was seen handing him a small digital camera. Tpr. McGehee walked back to his patrol vehicle and an ambulance was seen on the street. The audio portion of his video was activated during that time. EMS personnel were seen rolling a gurney near Dilley's location. EMS personnel placed a bandage over the gunshot wound to Dilley's lower right back and they were conversing with him. Parts of the conversation were unintelligible. However, Dilley was overheard telling EMS staff, "I got Tased." He also commented about not being able to feel his feet.

While EMS personnel were preparing Dilley for transport, Tpr. Domingue could be seen sitting in the driver's seat of her patrol vehicle. Dilley later commented about not being able to move his shoulder. Tpr. McGehee asked Dilley what his address was and he responded accordingly. Dilley was placed onto a spine board and then onto the gurney. The video concluded at 08:38:12Z (07/10/2018, 3:38:12 AM/ CDT) for a total run time of six minutes and fifty-seven seconds (6:57).

S/T Jefferson's body camera (SER. #X81135330) began recording on 07/10/2018, at 08:13:3816Z (07/10/2018, 03:13:38 AM/ CDT) whereby, he was seen driving in his patrol vehicle and arrived on the scene after a few moments. He was then seen walking in the rear parking lot of the Village Grocery and walked past Tpr. Wallace. The two exchanged comments about contraband in the vehicle. He approached Tpr. Domingue, who was standing near Dilley on the front right passenger side of her patrol vehicle. He greeted her and she responded, "Hey, is your camera on." S/T Jefferson replied "umm huh" and asked her where the other suspect went. Tpr. Domingue responded that he took off. She commented about only one who didn't run. S/T Jefferson commented about a bystander he previously observed at a gas station. The video

concluded at 08:15:30Z (07/10/2018, 3:15:30 AM/ CDT) for a total run time of one minute and fifty-three seconds (1:53).

Tpr. Domingue's two issued Axon body worn cameras (BWC) (SER #X81132508 & #X81141172) were later analyzed by Axon Product Compliance Manager, Bryan Chiles. Reports were made for both cameras' diagnostic findings in regard to the camera's operability **(Attachment #18)**. A report for camera (#X81132508), believed to be the camera Tpr. Domingue was having troubles with and turned in to her shift supervisor, LT Mark Jones, showed the Executive Summary as follows:

Primary Findings:

- *The BWC was not powered on before 17:58:33 on July 10, 2018.*
- *The BWC shut down due to a low battery on June 30, 2018 at 07:21:22 CDT and was not powered on again until it was placed in the Axon Dock on July 10, 2018 at 17:58:33.*
- *The BWC was placed in Stealth Mode on June 29, 2018 and did not give audible or physical low battery indications on June 29 or June 30, 2018.*
- *There were no faults or errors that would indicate the BWC was defective between June 15, 2018 and July 10, 2018.*

BWC and Dock Log Analysis:

- *The BWC and Axon Dock's logs uploaded to Evidence.com between June 15, 2018 and July 10, 2018 were obtained from the Evidence.com administration site on July 30, 2018.*
- *The logs indicate that on July 10, 2018, the camera was not powered on until it was placed into the Axon Dock at 17:58:33 CDT.*

Summary:

- *The Axon Body 2 BWC with serial number X81132508 was not powered on during the shooting incident on July 10, 2018 at approximately 03:06 CDT.*
- *The BWC fully charged in an Axon Dock on June 26, 2018. The battery was depleted over 13 hours of usage between June 26, 2018 and June 30, 2018. The BWC automatically shut down on June 30, 2018 at 07:21:22 CDT. It was not powered on again until July 10, 2018 at 17:58:33 CDT, after the incident in question.*
- *The BWC was placed in Stealth Mode on June 29, 2018 at 08:11:14 by the Status Button being pressed and held for over 10 seconds. For this reason, the BWC did not give audible or physical notifications of the low battery status on June 29 or June 30, 2018. The Status Button was pressed 3 times on June 30, 2018, illuminating the battery LED in red for 8 seconds each time, indicating the low battery status.*
- *No faults or errors were found in the logs between June 15, 2018 and July 10, 2018 that would indicate the BWC was defective in any way, other than not having enough battery power to remain powered on June 30, 2018.*

Due to this camera being dormant for a total of ten (10) days prior to the shooting event, it was determined this was the camera in possession of Lt. Jones. He is the one who powered on the camera and placed it in an Axon docking station. This was done after the shooting event on July 10, 2018 at 17:58:33 CDT, in order to download any available data. No faults or errors were discovered to be a factor in the operation of this camera. It is believed the camera was inadvertently placed into *"Stealth Mode"* (will not give audible and visual notifications) in June, which could possibly lead an officer to conclude the camera was malfunctioning.

A report for camera (#X81141172) was also made. This was the camera Tpr. Domingue was wearing during the initial traffic stop resulting in an earlier arrest. This report showed the Executive Summary as follows:

Primary Findings:

- *The BWC was powered on and recorded an event video, initiated by Axon Signal Vehicle, at 20:55:46 CDT on July 9, 2018 and was powered off at 21:01:47 CDT.*
- *The BWC was powered up on July 10, 2018 at 03:18:16 CDT, but was not powered up at 03:06 CDT.*
- *The BWC shut down due to a low battery on July 10, 2018 at 03:45:44 CDT and was not powered on again until it was placed in the Axon Dock on the same day at 17:31:08.*
- *There were no faults or errors that would indicate the BWC was defective between June 15, 2018 and July 10, 2018.*

BWC and Dock Log Analysis:

- *The BWC and Axon Dock's logs uploaded to Evidence.com between June 15, 2018 and July 10, 2018 were obtained from the Evidence.com administration site on August 6, 2018.*
- *The logs indicate that the BWC was functional and powered on at times between July 9 and July 10, 2018, but running on a low battery. The BWC was not powered on at the time of the incident at 03:06 CDT.*

July 9, 2018:

- *The logs indicate that the BWC was powered on using the power switch on July 9, 2018 at 20:37:39 CDT and had a reported battery capacity of 21%. The BWC had last been docked and fully charged (to 100%) on June 30, 2018 at 11:42:19 CDT. 5.*
- *An Event recording was started on July 9, 2018 at 20:55:46 via an Axon Signal Vehicle trigger and recorded until the BWC was powered off at 21:01:47 CDT using the power switch. The BWC was powered on again at 21:01:52 CDT using the power switch with the battery capacity reported at 18%. The BWC began issuing audible and physical low battery notifications (4 fast beeps/vibrations every 20 seconds). The BWC was powered off via the power switch at 22:58:00 CDT.*

July 10, 2018:

- *The BWC was powered on via the power switch on July 10, 2018 at 02:06:22 CDT with the battery*

*capacity reported at 4% and began issuing low battery notifications. The BWC was then powered off using the power switch at 02:09:02 CDT. The camera was powered on again using the power switch at 03:18:16 CDT with the battery capacity still reported at 4% and began issuing low battery notifications. As part of the design of the Axon Body 2 BWC, to prevent data corruption due to low battery voltage, the BWC automatically shut down at 03:45:44 CDT with a battery capacity reported at 1% and the battery voltage close to a level that could not keep the microprocessor powered on.*

- *There were no further entries recorded in the logs until the BWC was placed in the Axon Dock on July 10, 2018 at 17:31:08 CDT.*
- *The camera was powered on for a total of 13 hours, 44 minutes, and 20 seconds since the battery was fully charged on June 30, 2018, which is longer than the expected runtime of 12 hours.*
- *There were no faults or errors found in the logs that would indicate the camera was defective in any way.*

Summary:

- *The Axon Body 2 BWC with serial number X81141172 was powered on and recorded an event, initiated via Axon Signal Vehicle on July 9, 2018 at 20:55:46 CDT and recorded until 21:01:47 CDT when it was powered down.*
- *The BWC was powered on again on July 9, 2018 at 21:01:52 CDT and began issuing low battery indications at 22:57:15, then was powered off at 22:58:00 CDT.*
- *The BWC was not powered on during the shooting incident on July 10, 2018 at approximately 03:06 CDT. The BWC was powered on and then off briefly via the power switch at 02:06:22 to 02:09:02 CDT on July 10, 2018 and was not powered on again until 03:18:16.*
- *The BWC was removed from an Axon Dock fully charged on June 30, 2018. The battery was depleted over 13.5 hours of usage between June 30, 2018 and July 10, 2018. BWC automatically shut down due to low battery on July 10, 2018 at 03:45:44 CDT.*
- *Not faults or errors were found in the logs between June 15, 2018 and July 10, 2018 that would indicate the BWC was defective in any way.*

This camera was determined to be the one Tpr. Domingue was wearing at the time the shooting occurred. This camera recorded an earlier event lasting six minutes and thirty-one seconds (6:31), which was previously mentioned. In this event, Tpr. Domingue was seen in the driver's seat of her patrol vehicle at the Buffalo Wild Wings parking lot. Additionally, this camera began issuing low battery audible notifications nearly two hours after this recording on July 9, 2018 at 22:57:15 CDT and was then powered off. This camera was again powered on and then off on July 10, 2018 at 02:06:22 to 02:09:02, showing a battery life of 4% remaining. This was approximately one hour before the shooting event. This camera was again powered on July 10, 2018 at 03:18:16 CDT, minutes after the shooting occurred. This camera automatically shut down due to low battery on July 10, 2018 at 03:45:44 CDT. This is most likely the reasoning the camera was not powered on when I made initial contact with Tpr. Domingue sometime after 04:30 hours the same date.

Lt. Jones later placed the camera in the Axon docking station after the shooting event on July 10, 2018 at 17:31:08 CDT, in order to download any available data. No faults or errors were discovered to be a factor in the operation of this camera. The report indicated the battery was nearly depleted and was not powered on at the time the shooting occurred.

I had previously prepared an affidavit for a search warrant (LSP_2018_001760) for Dilley's medical records at OLOL on Wednesday, July 25, 2018 (**Attachment #19**). The warrant was issued and signed that date by Honorable Judge, Richard Anderson. The search warrant was delivered to Susan Dixon, OLOL Risk Manager that same date for process. The records were returned on July 30, 2018, and revealed the following information:

*Dilley arrived at OLOL via ambulance at 0354 hours on July 10, 2018. He was treated in an emergency trauma room for a gunshot wound of his back (Lumbar spinal cord injury). A toxicology screen was taken at approximately 0402 hours which showed positive for Opiates, THC (Marijuana) and he had a blood alcohol concentration of 30.4mg/dL (BAC .030g%). Follow-up testing showed Dilley sustained a closed fracture of the fourth lumbar vertebra (L4 and L5) with a Lumbar spinal cord injury and acute pain due to the trauma. He showed no movement from the pelvis down and had no movement of his Gluteus Maximus. CT images showed bullet fragments within the spinal canal at the lumbar region of the L3/L4. Records showed the bullet track appeared to enter in the posterior right flank with bullet fragments, air and a small amount of blood demonstrated in the subcutaneous fat and Para spinal musculature of the L4 level. In addition to the lumbar spine, bullet fragments and a small amount of blood involve in the right psoas muscle.*

*Findings: Status post-acute gunshot wound to the lumbar spine. Acute comminuted posttraumatic fractures are involving the right L4 lamina, pedicle, transverse process, facet, and spinous process. Additional fractures involve the inferior right L3 facet. Multiple bullet fragments and bone fragments involve the central canal at this level, extending cephalad within the central canal to the L2-L3 level. Large bullet fragment is lodged within the left side of the spinal canal inseparable from the left L4 superior facet and pedicle, which are presumed also to be fractured along with the left L3 inferior facet.*

*Impression: 1. Shattered acute comminuted posttraumatic fractures extensively involving the L4 posterior elements with complete disruption of the right L3-L4 facet joint and partially involving the left L3-L4 facet joint. Large bullet fragments and no new bone fragments involve the central canal at the L3-L4 level extending cephalad to the L2- L3 level.*

Dilley was admitted for treatment and later discharged on July 12, 2018, whereby he transferred to the Baton Rouge Rehabilitation Center for continued physical therapy. It should also be noted the bullet fragment described in Dilley's medical records remained inside his body, therefore, was not made available for ballistics testing at the LSP Crime Lab.

On Tuesday, July 31, 2018, Attorney Lane Ewing Esq. of the Cazayoux/Ewing Law Firm in Baton Rouge contacted state police in an effort to make his client (Dilley) available for an interview as previously requested. It was learned Dilley was still being treated at the Baton Rouge Rehabilitation Center and was confined to a wheelchair. Additionally, Dilley was suffering from a loss of feeling in both of his feet as well as requiring use of a colostomy bag and catheter. Atty. Ewing revealed multiple attorneys were representing Dilley in different aspects of the case. We discussed making arrangements to meet Dilley's physical needs and accommodate any and all attorneys involved in the matter. I awaited him to further contact me with a request for date, time and location of the proposed interview.

On Thursday, August 2, 2018, I telephoned Atty. Ewing in an effort to schedule the meeting. I left a message

and did not hear back from him or his law firm. As of the close of the investigation, Dilley was unavailable for any further questioning.

As of report date, the fourth remaining occupant of the suspect vehicle had not yet been identified or contacted for interview. The three remaining occupants all confirmed they met the unknown person earlier that night at Reggie's bar. Sconiers could only identify him as *"Jeremiah."* All efforts to identify and locate him were to no avail.

All supporting audio/video files, recorded interviews and documents gathered are included and made part of this investigation (**Attachment #20**).

### Investigative Findings

The investigation revealed on Tuesday, July 10, 2018, at 0302 hours, Tpr. Domingue stopped a red Saturn Vue behind Village Grocery on Potwin Drive in Baton Rouge. The vehicle was occupied with four (4) occupants. Jamaal K. Mire Jr. was the driver of the vehicle. Kalief Sconiers was seated in the front passenger seat. Scott Dilley was seated in the rear driver's side passenger seat. An unknown person identified as "Jeremiah" was seated in the rear passenger seat.

Tpr. Domingue conducted an identity check with only Mire outside of the vehicle. Mire abruptly ran away toward the passenger side of the Saturn and told the remaining occupants to run. Sconiers did not run and remained inside the vehicle. "Jeremiah" exited the vehicle and ran in the same direction as Mire. Dilley exited the vehicle and ran between the Saturn and the front of Tpr. Domingue's patrol vehicle. Tpr. Domingue ran around her opened driver's side door in order to pursue Mire. During this time, she suddenly encountered Dilley as he was exiting the Saturn. Tpr. Domingue advised upon encountering Dilley, she believed, "This is it." She then drew her firearm and fired a single shot striking Dilley in his lower right back near his side. Dilley was later transported to OLOL by EMS.

### Conclusion

No criminal charges have been filed as of report date. The case will be forwarded to the East Baton Rouge Parish District Attorney's Office for further review.

**INVESTIGATION OFFICER**

*M/T Barry Ward /1783*

Trooper Barry Ward

**INVESTIGATION SUPERVISOR**

SGT Brit Forbes

**CONFIDENTIAL**
3:19-cv-00391-BAJ-EWD
PROVIDED SUBJECT TO
AND IN ACCORDANCE WITH THE TERMS OF
CONSENT PROTECTIVE ORDER AND CONFIDENTIALITY AGREEMENT
[REC. DOC. 411]