UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

CLIFTON SCOTT DILLEY                                        CIVIL ACTION

VERSUS

STATE OF LOUISIANA, ET AL.                            NO. 19-00391-BAJ-EWD

### RULING AND ORDER

On July 10, 2018, Louisiana State Trooper Kasha Domingue shot Clifton Scott Dilley in the back during a traffic stop, leaving Dilley, who was unarmed, paralyzed from the waist down. In this action, Dilley seeks damages from Trooper Domingue, as well as her then-employers, the Louisiana State Police, the Department of Public Safety and Corrections, and the State of Louisiana. Now Trooper Domingue moves for summary judgment, arguing that Plaintiff has failed to produce evidence to support his constitutional claim of excessive force. Plaintiff opposes Defendant's motion.

For the following reasons, Defendant's motion will be denied.

**I. BACKGROUND**

    **A. Summary Judgment Evidence**

The facts set forth below are drawn from the parties' competing statements of material fact and the competent summary judgment evidence submitted in support of these pleadings.

At approximately 3:00 a.m. on July 10, 2018, Trooper Domingue observed a red Saturn make an illegal U-turn on Perkins Road in Baton Rouge, Louisiana. (Doc. 94-

7 ¶ 3, *hereinafter* "Trooper's SOF"). Trooper Domingue initiated a traffic stop, and the Saturn's driver—non-party Jamaal K. Mire, Jr.—pulled into a parking lot behind a store. (*Id.* ¶ 5). Dilley was a passenger in the car, and he and Mire had been drinking alcohol and smoking marijuana at some point before the stop. (*Id.* ¶¶ 15, 16). The Saturn was also later found to contain marijuana and a digital scale. (*Id.* ¶ 18).

After stopping, Mire exited the vehicle and approached Trooper Domingue's vehicle with his arms raised and hands visible.[1] (*Id.* ¶ 7). Mire remained at the front of Trooper Domingue's vehicle while Trooper Domingue began to run his information. (*Id.* ¶ 10). During this time, Trooper Domingue noticed there were multiple other people in the Saturn, which was "moving and swaying back and forth. (*Id.* ¶ 11). Trooper Domingue could not discern exactly how many people were in the vehicle, but knew it was more than two. (*Id.* ¶ 11, 12).

Suddenly, before the traffic stop concluded, Mire ran from Trooper Domingue's vehicle to the right side of the Saturn, yelled "run" to the occupants, and continued off along a wooden fence that ran parallel to both cars. (*Id.* ¶¶ 21, 22). Mire claims he fled because Trooper Domingue called multiple units to the scene. (*Id.* ¶ 23). Inside the Saturn, Dilley sat in the rear left passenger seat, and non-parties Kalief Sconiers and Jeremiah, whose last name is unknown, sat in the front passenger seat and the rear right passenger seat, respectively. (*Id.* ¶ 25). When Mire yelled "run," Sconiers remained in his seat. (*Id.* ¶ 33). Dilley and Jeremiah, however, exited the Saturn. (*Id.* ¶¶ 39, 40).

---

[1] The parties dispute whether Trooper Domingue instructed Mire to exit the vehicle. (Doc. 98-23 ¶ 7).

2

The parties dispute some of the precise details of the events that follow Mire's flight.[2] What is undisputed is that within a matter of seconds, Trooper Domingue fired a bullet into Dilley's back. He was left paralyzed from the waist down. Dilley was unarmed and on foot. (*See* Doc. 94-1 at 16). Also undisputed is that a real-time video recorded by a security camera mounted to the wall of the Village Grocery Store captured those fateful seconds. The U.S. Court of Appeals for the Fifth Circuit instructs that "we assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene." *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011) (citing *Scott v. Harris*, 550 U.S. 372 (2007)). Accordingly, the Court describes what is depicted in the security video.

The security camera is positioned on the wall of the store and looks down across a stretch of parking lot perhaps three or four car lengths wide. (Doc. 98-3, *hereinafter* "Security Video"). The footage, although lacking audio and in black and white, shows in detail the moments leading up to and following Dilley's exit from the car.

What it shows is this: the Saturn comes to a stop at the edge of the lot. (*Id.*

---

[2] Beyond these factual disputes, there are grave issues regarding the credibility of Trooper Domingue, whose story has changed dramatically over time, often in direct contradiction to the clear video evidence. (*See* Doc. 98 at 11–16). For example, in discussion with the detective who arrived immediately after the shooting, Trooper Domingue stated that she had backed up in response to Dilley "approaching her," "switched from her taser to her firearm, dropped to a knee and fired from there." (Doc. 98-22 p. 16:7–16). As explained further below, the video shows that this account is pure fable. In fact, Trooper Domingue was eventually indicted for aggravated battery and illegal use of a weapon for the shooting. (Doc. 98-14 at 8). Although she eventually entered an Alford plea—through which she maintained her innocence but admitted sufficient facts existed to convict her—to a lesser charge of obstruction of justice, as part of her plea she agreed to never again seek employment as a law enforcement officer. (Doc. 98-12 at 14). These details are not relevant at the summary judgment stage, however, as the Court "may make no credibility determinations." *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 245 (5th Cir. 2016) (quotation marks omitted). Moreover, the Court's view of the video evidence is that it alone is sufficient to defeat Trooper Domingue's motion.

0:17). Trooper Domingue's car stops behind it, at or just under a car length away and off screen but for headlights and part of the front left wheel well. (*Id.*). A fence that defines the edge of the lot runs along both cars to their right.

Mire emerges from the Saturn and walks back to Trooper Domingue's car, where he begins speaking with Trooper Domingue. (*Id.* 00:36–1:03). Trooper Domingue moves to the right off screen. (*Id.* 1:41). Mire hovers around the front left side of Trooper Domingue's vehicle. (*Id.* 1:03–2:35). Mire briefly moves off screen to the right and then reappears, where he pauses next to the hood of Trooper Domingue's vehicle. (*Id.* 2:36–2:51). Suddenly, Mire runs from the left side of Trooper Domingue's vehicle, crossing the gap between the cars, and continuing along the right side of the Saturn in the space between the vehicle and the fence. (*Id.* 2:51–2:53). He appears to pause briefly and duck his head at the front passenger window, possibly to yell "run" to its occupants, and then continues along the fence in front of the car and eventually out of sight. (*Id.* 2:51–2:58).

Immediately after Mire appears to pause at the front passenger window, Dilley opens his door and gets out of the car. (*Id.* 2:55–2:56). He is facing toward the security camera with his back to the Saturn. (*Id.* 2:56). At about the same time, Trooper Domingue hurries onto the screen from the left side of her car, approaches the Saturn, and comes face to face with Dilley as he emerges. (*Id.* 2:55–2:57).

As he sees her, he dashes off to his left, her right, running into the gap between the cars as if attempting to escape along the fence next to Trooper Domingue's vehicle. (*Id.* 2:57). Trooper Domingue does not stop moving forward toward Dilley. (*Id.* 2:55–

4

2:58). He crosses in front of her, beginning to flee, and Trooper Domingue appears to draw her weapon while swerving to the right to follow him. (*Id.* 2:57–2:58). At this moment the two are mere steps from each other. (*Id.* 2:57). Dilley runs into the space between the cars, illuminated by the taillights of the Saturn and the headlights of the squad car. (*Id.* 2:57–2:58). Trooper Domingue follows him while pointing with her gun. ((*Id.*). Again, she never stops moving towards Dilley. (*Id.* 2:55–2:58).

Dilley makes it about halfway between the two cars, heading toward the gap between the fence and the squad car. (*Id.* 2:57). Trooper Domingue is closer to the Saturn and chasing Dilley. (*Id.*). Dilley falls and Trooper Domingue traces his fall with the gun in her hand as she continues moving toward him. (*Id.* 2:57–2:58). She falls next to him. (*Id.* 2:58). His momentum carries him out of view to the side of Trooper Domingue's vehicle and next to the fence. (*Id.*) Trooper Domingue remains visible, rises to her knee, and then stands. (*Id.* 3:01). The foregoing, from Mire's flight to Trooper Domingue looking down at Dilley, takes around ten seconds.

The parties dispute certain facts. One of these is in what hand Dilley carried his cell phone and whether Trooper Domingue saw it as she hurried toward him. (Doc. 98-23 at 13–14).³ Dilley insists he carried it in his right hand, while Trooper Domingue says it was his left. (*See* Doc. 98 at 14 n.10). Trooper Domingue testified in her deposition that what Dilley had in his hand "didn't even focus in [her] brain at that time." (Doc. 98-1 p. 38:19–20). At no point does Trooper Domingue state that she thought Dilley was armed or that she thought the cell phone, if she did see it at all,

---

³ The Court notes that the security video does not resolve this issue.

5

was a gun.

The parties also dispute whether Trooper Domingue issued any warning to any of the Saturn's occupants, or to Dilley as he fled, and what that warning may have been. (Doc. 98-23 at 15–16).

### B. Procedural History

Plaintiff initiated this action on June 17, 2019, pursuing the following excessive-force related claims: (1) a constitutional individual capacity excessive force claim against Trooper Domingue; (2) a state law negligence claim against Trooper Domingue; (3) a state law *respondeat superior* liability claim against the State of Louisiana and the Louisiana State Police; and (4) a state law failure to supervise and train claim against the State of Louisiana and the Louisiana State Police. (Doc. 1). Now Trooper Domingue moves for summary judgment on the constitutional claim. (Doc. 94). Plaintiff opposes. (Doc. 98).

## II. LAW AND ANALYSIS

### A. Standard

The summary judgment standard is well-set: generally, to prevail, the moving party must show that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. 56(a). Here, however, Trooper Domingue invokes qualified immunity. Thus, the tables are turned, and Dilley "bears the burden to demonstrate the inapplicability of the defense." *Rogers v. Jarrett*, 63 F.4th 971, 975 (5th Cir. 2023) (quotation marks omitted). To meet this burden, Dilley must "(1) raise a fact dispute on whether his constitutional rights were violated by [Trooper Domingue's] conduct, and (2) show those rights were clearly established at

6

the time of the violation." *Id.* (quotation marks omitted).[4] Still, when conducting the qualified immunity analysis, the Court views all evidence and makes all reasonable inferences in the light most favorable to Dilley. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014).

### B. Analysis

#### i. Dilley has raised a fact dispute on whether his constitutional rights were violated

The Fourth Amendment prohibits an officer from using excessive or unreasonable force in the context of an arrest. *Graham v. Connor*, 490 U.S. 386, 394 (1989). To establish an excessive force violation, "a plaintiff must demonstrate (1) an injury, which (2) resulted directly and only from the use of force that was clearly excessive to the need; and the excessiveness of which was (3) objectively unreasonable." *Hutcheson v. Dallas Cnty., Texas*, 994 F.3d 477, 480 (5th Cir. 2021) (quotation marks omitted), *cert. denied*, 142 S. Ct. 564 (2021). "The second and third elements collapse into a single objective-reasonableness inquiry determined by the

---

[4] The qualified immunity defense remains "the law of the land." *Jamison v. McClendon*, 476 F. Supp. 3d 386, 409 (S.D. Miss. 2020) (Reeves, J.) (reviewing the history and expansion of the qualified immunity doctrine, and calling for its elimination). But for how long? Scholars and at least one jurist of the U.S. Court of Appeals for the Fifth Circuit have recently called for its ouster on the basis that the doctrine is founded on a legal fiction derived from a reconstruction-era scrivener's error that removed a determinative 16-word clause from the published version of 42 U.S.C. § 1983. *See* Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 CAL. L. REV. 201 (2023). Restored to its proper place, this clause "unequivocally negate[s] the original interpretive premise for qualified immunity." *See Rogers v. Jarrett*, 63 F.4th 971, 979 (5th Cir. 2023) (Willett, J., concurring). It is not this Court's role to cast aside qualified immunity here, particularly absent any argument from the parties. Indeed, only the Supreme Court can definitively "overrule" the defense. *Id.* at 981. For now, the undersigned commends Professor Reinert's scholarship, and joins Judge Willett's call for the Supreme Court to "definitively grapple with § 1983's enacted text and decide whether it means what it says—and what, if anything, that means for § 1983 immunity jurisprudence." *Id.*

crime's severity, the suspect's threat, and whether the suspect is actively resisting arrest or trying to flee." *Id.* (quotation marks omitted).

"The threat-of-harm factor typically predominates the analysis when deadly force has been deployed." *Harmon v. City of Arlington, Texas*, 16 F.4th 1159, 1163 (5th Cir. 2021). The Fifth Circuit instructs that "an officer's use of deadly force is not excessive, and thus no constitutional violation occurs, when the officer reasonably believes that the suspect poses a threat of serious harm to the officer or to others." *Id.* (quotation marks and alterations omitted). Put differently, "[t]he use of deadly force may be proper regardless of an officer's negligence if, at the moment of the shooting, he was trying to prevent serious injury or death." *Carnaby v. City of Houston*, 636 F.3d 183, 188 (5th Cir. 2011). Of course, the Court must "be cautious about second-guessing the police officer's assessment of the threat level." *Harmon*, 16 F.4th at 1163 (quotation marks and alterations omitted).

Here, the determinative question is whether Trooper Domingue could reasonably have believed that Dilley posed a serious threat of harm during the 3-second encounter beginning when Dilley emerged from the Saturn and ending when Dilley lay paralyzed from Domingue's bullet in his back. Although the parties offer somewhat divergent accounts, at this stage the security video is the best evidence of what occurred in those critical moments. *Carnaby*, 636 F.3d at 187.

Having reviewed that video in real time, a reasonable jury could find that Domingue's conduct violated a constitutional right. Dilley was unarmed and fleeing on foot from a traffic stop for a minor traffic violation. *See Deville v. Marcantel*, 567

8

F.3d 156, 167 (5th Cir. 2009) ("[O]fficers must assess not only the need for force, but also "the relationship between the need and the amount of force used."). Trooper Domingue makes much of the brief time span, emphasizing that she "had mere seconds to react to Dilley suddenly appearing." (Doc. 94-1 at 22). But assuming Dilley did pose a threat to Trooper Domingue when he first emerged from the car, "an exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased." *See Roque v. Harvel*, 993 F.3d 325, 333 (5th Cir. 2021) (quoting *Lytle v. Bexar Cnty.*, 560 F.3d 404, 413 (5th Cir. 2009)). Crucially, the video shows that when Trooper Domingue fired her gun, Dilley was already running away from her, and not towards her, and therefore he no longer posed a threat even if he did so initially. *See Poole v. City of Shreveport*, 13 F.4th 420, 425–26 (5th Cir. 2021) ("[A]n officer violates clearly established law if he shoots a visibly unarmed suspect who is moving away from everyone present at the scene."). That Trooper Domingue shot Dilley in the back supports the reasonableness of this assessment of the video evidence.

Trooper Domingue also argues that her assessment of the threat posed by Dilley was reasonable because of the phone in his hand, claiming that a reasonable officer could have believed Dilley was armed. (Doc. 94-1 at 21–22). But her own testimony indicates that the phone was not a factor in her decision to shoot Dilley. (Doc. 98-1 p. 38:19–20 ("[what Dilley had in his hand] didn't even focus in my brain at that time.")). Additionally, the parties dispute which hand the phone was in and whether Trooper Domingue saw it at all. (Doc. 98-23 at 13–14; Doc. 98 at 18 n.10).

9

The result is another genuine dispute of material fact. *See Poole*, 15 F.4th at 425 (approving denial of summary judgment where lower court found "that a jury could conclude that Poole was visibly unarmed when shot.").

Finally, the parties dispute whether Trooper Domingue gave a warning, and what the substance of it was, (Doc. 98-23 at 15–16), raising yet another material issue that must be decided by the jury. *See Poole*, 15 F.4th at 425 ("Even when a suspect is armed, a warning must be given, when feasible, before the use of deadly force.").

In sum, the undisputed video evidence is sufficient for a jury to find that Trooper Domingue's actions were objectively unreasonable. The additional disputes over material issues merely supplement what the video on its own makes clear: Plaintiff has carried his burden at the first step of the qualified immunity analysis.

### ii. Dilley's constitutional rights were clearly established at the time of the alleged violation

This much is also clear: it is objectively unreasonable for an officer to use deadly force absent "probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Tennessee v. Garner*, 471 U.S. 1, 3 (1985); *see also Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319, 338 (5th Cir. 2020) ("*Tennessee v. Garner* prohibits the use of deadly force without an immediate threat and without a warning when one is feasible."). In other words, on the night she shot Dilley, Trooper Domingue unquestionably had "fair warning" that she could not use deadly force during a traffic stop for a minor infraction absent a significant threat from Dilley. *Lytle*, 560 F.3d at 417 ("It has long been clearly established that, absent any other justification for the use of force, it is

10

unreasonable for a police officer to use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others."). Plaintiff has carried his burden to show that the law was clearly established at the time Trooper Domingue used deadly force against him, and Trooper Domingue's qualified immunity defense fails.

In sum, Plaintiff has established a fact dispute regarding whether Trooper Domingue used excessive force when she shot him, and that when Trooper Domingue discharged her service weapon the law clearly prohibited deadly force absent a significant threat. *See Rogers*, 63 F.4th at 975. Trooper Domingue's qualified immunity defense fails. Plaintiff's excessive force claim will be submitted to the jury.

### III. CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendant Kasha Domingue's **Motion For Summary Judgment (Doc. 94)** be and is hereby **DENIED**.

**IT IS FURTHER ORDERED** that a telephone status conference be and is hereby **SET** for February 1, 2024, at 3:00 p.m. for the purpose of selecting a new trial date and related deadlines. Dial-in instructions will be emailed to counsel.

Prior to the conference, counsel shall meet, confer, and select among the following four-day trial settings: June 24-27, 2024; July 15-18, 2024; and August 12-15, 2024.

Baton Rouge, Louisiana, this 27TH day of November, 2023

_____
**JUDGE BRIAN A. JACKSON
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA**