UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **CLIFTON SCOTT DILLEY** | : | |
| *Plaintiff,* | : | |
| | : | |
| **VERSUS** | : | |
| | : | CIVIL NO. 3:19-cv-00391-BAJ-EWD |
| **STATE OF LOUISIANA,** | : | |
| **DEPARTMENT OF PUBLIC SAFETY** | : | |
| **AND CORRECTIONS, AND** | : | |
| **OFFICE OF STATE POLICE,** | : | |
| **AND KASHA DOMINGUE** | : | |
| *Defendants.* | : | |

### PLAINTIFF'S MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE OR LIMIT THE TESTIMONY OF MR. HARRY MCCANN, DEFENDANT'S PURPORTED EXPERT WITNESS

MAY IT PLEASE THE COURT:

Plaintiff, Clifton Scott Dilley, through undersigned counsel, respectfully submits this memorandum in support of his motion to exclude or limit the testimony of Mr. Harry McCann, defendant's purported expert witness.

### I. INTRODUCTION AND BACKGROUND

Clifton Scott Dilley filed this 1983 action against former state trooper Kasha Domingue because Trooper Domingue shot Mr. Dilley in the back as he ran away from the trooper during a traffic stop in the early morning hours of July 10, 2018.[1] (Doc. 1, Ex. 6, Surveillance Video, and Ex. 7, Use of Force Report.) Trooper Domingue had stopped the red Saturn in which Mr. Dilley was travelling for making an illegal u-turn. (Ex. 7 and Ex. 4, Deposition of Trooper Barry Ward,

---

[1] Mr. Dilley also included in his Complaint an action against the Louisiana Department of Public Safety and Corrections under a theory of respondeat superior as Domingue's employer and under a negligence theory for failing to properly train and supervise Trooper Domingue. Louisiana Department of Public Safety and Corrections filed a *Rule 12(c) Motion for Judgment of Pleadings* on the basis of state sovereign immunity under the 11th Amendment on October 10, 2023, and the motion was granted on October 16, 2024. A *Joint Motion for Entry of Consent Judgment to Dismiss the State of Louisiana Pursuant to Fed.R.Civ.Proc. 12(b)(1) or in the Alternative Fed.R.Civ.Proc. 12* was filed on March 20, 2025, to dismiss the Louisiana Department of Public Safety and Corrections, which was signed on March 27, 2025.

at p. 43, ll. 14-17.) The driver, Jamall Mire, had exited his Saturn and remained at the front outside of the trooper's patrol vehicle for several minutes when he decided to run. (Ex. 9, Video Stills DPSC 563, also attached as Exhibit 5 to Exhibit 1, McCann's Dep.) Mr. Mire ran past his Saturn and yelled for his three passengers to run. (Ex. 4, at p. 171, ll. 3-5, Ex. 10, at p. 51, ll. 3-4.) While one of his passengers remained in the car, two ran, including Mr. Dilley. (Ex. 9, at DPSC 576 and Ex. 4, at p. 68, ll. 12-14.) Trooper Domingue pursued and shot Mr. Dilley in the back, partially paralyzing him from the waist down. (Ex. 9, at DPSC 576-579, Ex. 6, at 16:35, and Ex. 10, Dilley Dep. at pp. 136-137, ll. 24-1.)

Trooper Domingue radioed the shooting in as a taser event; so when officers arrived shortly after the call, they did not realize that Mr. Dilley had been shot. (Ex. 4, at p. 83, ll. 10-19.) It was not until several minutes after the call that Trooper Domingue admitted Mr. Dilley had been shot. (Ex. 4, at p. 14, ll. 9-15.) Proper emergency assistance was not dispatched until approximately twenty-three minutes after the shooting. (Ex. 4, at p. 104, ll. 6-19.)

Trooper Domingue had not activated her body camera before the shooting, and her car did not have a dash cam. (*Id.* at p. 49, ll. 2-20.) She told an elaborate story to multiple officers at the scene that Mr. Dilley had gotten out the backseat driver's side of the car, ran around to the other side of the car, reached in, turned around and ran at her, as she backed up, transitioned from her taser to gun, took a knee at the right front side of her patrol vehicle, and shot him as he made contact with her. (Ex. 4, at pp. 46-47, ll. 13-12.)

Investigating officer Trooper Barry Ward, after noticing a security camera located on the adjacent Village Grocery store, drafted and executed a search warrant, which allowed him to secure the video later that day. (Ex. 4, at p. 126, ll. 12-16.) After going home for several hours, Trooper Domingue went to State Police headquarters and participated in a recorded interview

with Trooper Ward. (*Id.* at p. 32, ll. 6-13.) During that interview, Trooper Domingue revealed that she knew of the existence of the surveillance video, and then changed her story from the original one. (*Id.* at pp. 114-115, ll. 9-18.) In this new story, Trooper Domingue advised that it was Mire who reached into the right side of the car, explaining that she thought she was about to be shot by him. (Ex. 5, Deposition of Trooper Kasha Domingue, at pp. 63-64, ll. 20-3.) She said she then "noticed that this door opened on this side and now there's [Dilley] going out this way towards me ." (*Id.* at p. 64, ll. 7-9.) She said she transitioned from her taser to her firearm before shooting him as he made contact with her. (*Id.* at p. 64, ll. 4-6.)

In this interview with Trooper Ward, Trooper Domingue claims to have seen Dilley running toward her. She explained:

> "And I backed up to the left, and he's heading towards me this way. And I backed up to the right and I said, 'Stop, stop, stop.' And he had something in his hand, but he had his other hand back. And he was a big guy. And they were–I don't– there was just something that wasn't right. And I– he starts coming towards me and I backed up. And I don't know if I tripped or purposely took a knee, but at some point, I fired. And I don't know if I had hands on him at that point. I know we were close."

(*Id.* at pg. 64, ll. 10-25.)

Six days later she gave a somewhat different statement in her Use of Force Report:

> "Rear passenger, white male, on left side exited as the trooper was near the license plate area and charged through the trooper with a black item in his left hand. Suspect was struck in right side torso as the force from the body contact knocked trooper to the ground."

(Ex. 7, at DPSC 630.) She further claimed in her report that Mr. Dilley had suddenly attacked her. (*Id.* at DPSC 629.) She continued to assert that her Taser was "grabbed" before transitioning to her gun. (*Id.*)

Two years later, December 15, 2020, Trooper Domingue gave an interview with State Police Internal Affairs, where she again changed her story. In this interview, she claimed it was an accident, that she was aiming at the driver and/or other fleeing

passenger when Mr. Dilley appeared. (Ex. 8, Trooper Kasha Domingue's Internal Affairs Interview 12/15/2020, at pp. 14-15, ll. 25-15, 71.) She asserted she did not know she shot him until several other officers were there and she saw 'the hole' in his back while removing his handcuffs. (*Id.* at pp. 14-15, ll. 22-4.)

In her deposition, she did not stick to any one of the earlier stories, claiming that she was aiming at the driver, was addressing the threat/person closest to her, that the shooting was accidental, and that Mr. Dilley attacked her. (Ex. 5 at p. 22, ll. 1-6, p. 27, ll. 20-21, p. 144, ll. 17-19.)

The central issue of this 1983 action is whether Trooper Domingue used excessive force when she shot Mr. Dilley. Mr. McCann concludes that "it is my opinion to a reasonable degree of professional certainty that based on the totality of he circumstances [twenty-six of which he describes, some dubiously] Trooper Domingue's actions and use of force were [sic] not excessive and therefore objectively reasonable and understandable based on her perception of the events." (Ex. 2, Expert Report of Harry McCann at p. 17.) While acknowledging Trooper Domingue's many inconsistent and varied accounts of how and why she shot Mr. Dilley, Mr. McCann explains away these discrepancies as related solely to Trooper Domingue's faulty recall of a stressful event. He chose to credit one of her later stories of the shooting, the one that she made in her Internal Affairs interview, that because of tunnel vision and focus on Mire, and the other running passenger, "Jeremiah," she did not see Mr. Dilley until the last possible moment. (Ex. 1, Deposition of Harry McCann, at p. 51, ll. 4-21, and p. 48, ll. 9-23, and Ex. 2, at p. 17.) As basis of his testimony on Trooper Domingue's recall, in addition to believing the initial interview should have occurred later than it did, Mr. McCann also said he relied on a study that contained observations regarding altered perceptions of officers involved in a shooting. (Ex. 3, "Officer-

Involved Shooting: Reaction Patterns, Response Protocols, and Psychological Intervention Strategies" by Laurence Miller.)

Additionally, of the twenty-six identified "circumstances" supporting his opinion, he agreed that the most important factor in his analysis revolved around whether Mr. Dilley was running toward or away from Trooper Domingue when she shot him. (Ex. 1 at p. 58, ll. 3-14.) Mr. McCann opines that Mr. Dilley was running towards Trooper Domingue when she shot him. (*Id.* at p. 108, ll. 3-11.) He bases this opinion on Domingue's perceptions, the video and on his sub-opinion of when Trooper Domingue shot Mr. Dilley. He opined that Mr. Dilley must have been shot when he was running toward or parallel with Trooper Domingue because in his viewing of the video he saw no muzzle flash and because he determined that the object seen in the air as Dilley began to fall was not an ejected bullet casing. (*Id.* at pp. 108-109, ll. 12-22.)

### A. Legal standards for the Admissibility of Expert Testimony

As this Court has recognized:

> Pursuant to Federal Rule of Evidence 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" if the preconditions of the rule are met. Namely, that:
>
>> a. the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>>
>> b. the testimony is based on sufficient facts or data;
>>
>> c. the testimony is the product of reliable principles and methods; and
>>
>> d. the expert has reliably applied the principles and methods to the facts of the case.

*Bargher v. White*, 2021 U.S. Dist. LEXIS 100253, at 8-9 (M.D. La. May 26, 2021).

A threshold issue is whether the expert is qualified based on "knowledge, skill, experience, training, or education" to offer an opinion on the subject matter for which the expert is tendered. Fed. R. Evid. 702. *E.g., United States v. E.R.R. LLC*, 2020 U.S. Dist. LEXIS 92918,

at 7 (E.D. La. May 28, 2020). If the expert is qualified on the particular subject matter, the trial court is asked "to serve as the gatekeeper for expert testimony by making the determination of whether the expert opinion is sufficiently reliable." *Bargher v. White*, 2021 U.S. Dist. LEXIS 100253, at 8-9 (M.D. La. May 26, 2021)., relying on *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988-89 (5th Cir. 1997) (internal citations omitted). While Plaintiff recognizes that "rejection of expert testimony is the exception and not the rule," *Id.*, Plaintiff suggests that Mr. McCann is not qualified to issue an opinion on memory, perception, and credibility, and further, that his opinion on the reasonableness of Defendant's use of force based on her perception and on "incorrect facts" lacks reliability. *See Guillory v. Domtar Indus.*, 95 F.3d 1320, 1330-31 (5th Cir. 1996) (where the court affirmed district court's exclusion of expert whose opinion was not based on facts in the record but on altered facts and speculation designed to "bolster" a party's position.)

    B. **Mr. McCann's Expertise and Opinions**

Mr. McCann has previously been qualified as an expert in use of force, prison classification, prison rape elimination, police policy and procedure, and in custody death. (Ex. 1, at p. 13, ll. 5-11.) He acknowledged that in this case he was not seeking to be qualified in other areas of expertise besides those. (Ex. 1, at p. 13, ll. 12-16.)

Mr. McCann's foremost opinion is that Trooper Domingue's use of force was "not excessive, and therefore objectively reasonable and understandable based on her perception of the events" under the "totality of the circumstances." (Ex. 2, at p. 17.). He explained that he relied on several other opinions as "building blocks" to this overriding opinion. (Ex. 1, at p. 13, ll. 12-18.) These "building blocks" consist of his determination of Trooper Domingue's perception and recollection of the event, various other "human factor" type opinions, and his opinions of what was shown on the video. (Ex. 2, at p. 17.)

Before addressing any of the twenty-six circumstances that Mr. McCann identifies as underlying the basis of his opinion that Trooper Domingue's use of force was reasonable and understandable, Mr. McCann in his report states, "In this case, Trooper Domingue's perspective and belief was that she was in immediate danger for her life, and it is my contention that this perception and belief was well founded, objectively reasonable and a cornerstone to the events that unfolded." (Ex. 2, at p. 9.) He goes on to discuss Desmedt's Use of Force paradigm and his observation that there should be "latitude both for errors in perception and for less-than-perfect performance" in use of force incidents. (*Id.* at p. 12.) In his deposition, when asked to identify Trooper Domingue's faulty perceptions, he explained that they "were more after the fact than during the fact, ...and that was exhibited by her, again, inability to explain exactly what happened at that particular time." (Ex. 1, at pp. 87-88, ll. 25-4.) Mr. McCann opined extensively on her recollections of the incident, landing on one particular story to support his opinion, namely because of her "tunnel vision" focus on Mr. Mire and Jeremiah, "she really didn't see Dilley until the last possible moment." (*Id.* at p. 48, ll. 10-11, and Ex. 2, at p. 17, circumstance 16.)

In addition to the "tunnel vision" opinion, Mr. McCann cites other behavioral, psychological or cognitive factors in some of his twenty-six supporting circumstances, including Trooper Domingue not knowing the "whereabouts" of Mr. Mire and Mr. Jeremiah, and Mr. Dilley's ignoring of Trooper Domingue's warnings. (Ex. 1, at p. 45, ll. 15-25, p. 48, ll. 9-11, pp. 53-54, ll. 8- 3.) He also identified Mr. Dilley having a cell phone in his hand as a factor, but when asked why he considered this a factor when Trooper Domingue herself at least initially said that what he had in his hand "didn't even focus in my brain at the time," he opined that, even though she stated that, seeing an object in his hand "has to have an impact" and that "it is

part of the process of something could happen to me with that something in his hand." (Ex. 5, at p. 38, ll. 19-20, and Ex. 1, at p. 133, ll. 1-11.)

Mr. McCann combined a psychological analysis of memory and perception with his interpretation of the video to conclude that Mr. Dilley was running toward Trooper Domingue when she shot him. (Ex. 1, at p. 55, ll. 18-19, p. 58, ll. 6-8, p. 107, ll. 15-16, p. 108, ll. 5-6.) Additionally, to arrive at the opinion that Mr. Dilley was running toward Trooper Domingue, he had to disregard Trooper Domingue's acknowledgment when she was viewing the video during her interview with Trooper Ward that Mr. Dilley was past her when she shot. (Ex. 1, at pp. 120-122, ll. 17-6.) He also had a very specific opinion on when Trooper Domingue actually fired at Mr. Dilley based on another opinion: that the object in the air seen in the video and screenshots as Mr. Dilley is lurching forward (Ex. 10, at DSPC 578, and Ex. 6, at time stamp 16:35) could not have been a bullet casing because the object appeared too large to be a 9mm bullet casing. (Ex. 1, at p. 109, ll. 1-7.)

## II. ARGUMENT

Although Mr. McCann lacks any qualifications to issue any opinions regarding credibility, recall, or perception, he opines, "[I]t is my contention that this perception and belief [by Domingue that 'she was in immediate danger for her life'] was well founded, objectively reasonable and a *cornerstone* to the events that unfolded." (emphasis added) (Ex. 2, at p. 9.) Because of the unreliability and unhelpfulness of this *cornerstone* opinion, his opinion that "Trooper Domingue's actions and use of force were not excessive and therefore objectively reasonable and understandable based on her *perception* of the events" is also unreliable. (emphasis added) (Ex. 2, at p. 17.) Similarly, his opinions on when Trooper Domingue was being truthful and when she was not are also unreliable and render all his opinions regarding the

reasonableness of her actions unreliable. Additionally, his opinion regarding the reasonableness of force is also unreliable because he relies on facts not shown or supported in the video, which he cites as showing Mr. Dilley running toward Trooper Domingue when she shot him.

### A. Mr. McCann's purported testimony on human perception and memory lacks reliability and should be excluded

Expert testimony must be based on a reliable foundation and must be reliable and relevant. *Guillory v. Domtar Indus.*, 95 F.3d 1320, 1330-31 (5th Cir. 1996), discussing *Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).* In "soft sciences" like social sciences or human factors, including use of force analysis, while "methodological precision might be diminished, other indicia of reliability like professional experience, education, training, and observations are considered." *Day v. Baton Rouge City Police*, 2020 U.S. Dist. LEXIS 223670, at 9 (M.D. La. Nov. 30, 2020), relying on *United States v. Simmons*, 470 F.3d 1115, 1123 (5th Cir. 2006) & *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999); however, the existence of sufficient facts and a reliable methodology is in all instances mandatory. *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007).

Mr. McCann gave various bases for determining which statements to be believed by Trooper Domingue on when, where, how, and why she shot Mr. Dilley. He attributes inconsistencies in her statements to the stress of the incident, stating her memory was "clouded" and later accounts were more accurate because she had time to process. (Ex. 1, at p. 77, ll. 21-25.) He even states her perceptions were "different than the actual" events. (Ex. 1, at p. 88, ll. 7-8.) He further opines that the object in Mr. Dilley's hand would definitely have had an "impact" on her decision to shoot Mr. Dilley, even though she specifically said in her initial interview that it played no role. (Ex. 1, pp. 132-133, ll. 20-4.)

In his report and testimony, he explained that he was taught that, optimally, interviews of officers after their involvement in a shooting should take place more than forty-eight hours after the shooting, and that Trooper Domingue's statements taken before then were inaccurate because of that. (Ex. 1, at p. 76, ll. 13-18.) On the important issue of whether Trooper Domingue saw Mr. Dilley getting out of the car as she stated initially, or did not see him until the last possible moment, as she stated later, Mr. McCann testified:

> **Q. Okay. Yes. And on this particular issue, though, that she didn't see Dilley until the last possible moment, you think that that -- those statements that would undermine that contention are inaccurate?**
> A. I believe that her -- the part that I quoted in my report, the Bates Interview [referring to her Internal Affairs Interview], is probably the most accurate aspect of what took place.
> **Q. And what's -- what is your basis of that?**
> A. Again, her interview, Bates 35.20. [Internal Affairs Interview described in his report, Ex. 2 as factor 16, p. 17.]
> **Q. But -- I'm sorry. What's the basis of your opinion that it's probably the most accurate statement of what happened?**
> A. Because she had enough time to process what went on.
> **Q. And I guess my question is, what gives you the expertise to comment on that which you just commented?**
> A. I don't have the expertise, sir, but what I did do is, again, my report speaks about how initial inquiries are typically messed up, if you will.

(Ex. 1, at p. 51, ll. 4-21.)

In addition to being taught when interviews should be conducted Mr. McCann also based this testimony on Trooper Domingue's perception and recollection on a mental health study, Exhibit 3, which he initially identified as a "DOJ report." (Ex. 3, and Ex. 1, at pp. 67-68, ll. 25-10.) After acknowledging later in the deposition that the "DOJ report" was in fact a mental health study, which had some unattributed statements regarding officer perceptions, he claimed there was another DOJ report on which he relied. (Ex. 1, at p. 94, ll. 1-25.) He eventually

admitted in his deposition there was no other DOJ report. (Ex. 1, at p. 92, ll. 23-25.) He acknowledged he had no training in determining which officer statements should be credited or disregarded, and that he had not done any studies or written any papers on sensory and time distortions. (Ex. 1, at pp. 75-76, ll. 22-4.) He also claimed to have taken courses twenty-five years ago on "statements, fact-finding" and general "research" in the area, but could not cite any specific courses or research. (Ex. 1, at p. 75, ll. 15-21.)

Mr. McCann's admission of lack of expertise and specific training, coupled with the inability to cite reliable research or methodology for opinions on stress-induced memory/perception issues, suggests his testimony on these points is unreliable and not based on a sufficient factual or scientific foundation. Courts have excluded similar opinions on memory and perceptions based on an insufficient factual basis or unreliable methodology.

In *Finch v. City of Wichita,* the tendered expert on use of force and human performance related to law enforcement, James W. Borden, testified:

> Based on the context and movements of Finch, Officer Rapp *believed* Finch was drawing a weapon and that the officers to the east of the target residence were in danger of being shot. The information initially *perceived* by Officer Rapp was inaccurate only in hindsight. This is due to the human limitation of focus of attention and time compression. Perceptual distortions are at work in every critical incident, however, they are not the same for every person.

2020 U.S. Dist. LEXIS 107724, at 78-79 (D. Kan. June 19, 2020) (emphasis added) In striking this testimony, the court explained:

> Opinions about the limits and characteristics of human attention, its relation to memory, and why these things allegedly show that the "most accurate information" likely came from Officer Rapp are matters clearly outside the scope of Borden's training and experience as a law enforcement officer. Similarly outside his expertise as a law enforcement officer are opinions that Rapp's "inaccurate perception" was "due to the human limitations of focus of attention and time compression." Borden may have read studies or attended courses relating to attention and memory, but no showing is made that he has the training, experience, or learning necessary to make informed judgments about issues within specialized fields of the behavioral sciences such as psychology and cognitive science.

*Finch v. City of Wichita*, 2020 U.S. Dist. LEXIS 107724, at *79-80 (D. Kan. June 19, 2020).[2]

*See also*, *Cole v. Perry* (2019), *Bao Xuyen Le v. Reverend Dr. Martin Luther King, Jr. Cnty.* (2019), *Farmer v. Las Vegas Metro. Police Dep't* (2020), and *Alves v. Riverside Cty.* (2023): where the courts either struck Borden or his opinions on similar grounds).

In *State v. Dunning*, an expert opined that the recollection of a witness involved in a traumatic event, such as a shooting, improved over time, so that the witness' later account was the more accurate account of what happened. 245 Ore. App. 582, 585, 263 P.3d 372, 374 (2011). The expert presented the following as the basis of his opinion:

> • As the department firearms instructor, he taught students what they could expect to experience psychologically after a use of force situation.
>
> • He read "a number of things" by Lieutenant Colonel Dave Grossman, an Army psychologist and "noted expert in the field."
>
> • He read "quite a bit of literature from an organization called the Force Science Institute" focusing on what police officers might experience after a deadly force encounter.
>
> • He read other unspecified "publications on memory."
>
> • He was aware of Oregon and Wallowa County policies that called for letting at least 48 hours pass before interviewing a police officer who had been involved in a deadly force encounter.
>
> • On one occasion two years before trial, he "had an opportunity to talk to an officer shortly after he was involved in a deadly-force incident just to verify some of the things I had researched earlier ."
>
> • He relied on other unspecified "multiple sources" and "independent interviews of people."
>
> • He recalled his "own personal experience" as a Marine in Desert Storm, where he obtained "personal knowledge of those things."

---

[2] It must be noted that the *Finch* court did allow Borden to testify on reaction time and video analysis because he identified sufficient basis for both. *Id*. at 84.

*Id.* at 377. The court pointedly observed: "That is not the stuff of expertise; if it were, any literate person with access to a library or an internet connection could become an expert in anything over one long weekend." *Id*.

Similarly, courts have excluded state-of-mind expert testimony. *E.g.*, *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992). Mr. McCann states repeatedly in his report and deposition that Trooper Domingue was in fear for her life. The court in *Salas* determined that the conclusory opinion of the expert that the defendant acted with deliberate indifference and conscious disregard "as those mental states are conventionally defined" would not be helpful to a jury and would not be admissible. *Id.* Similarly, Mr. McCann's conclusory statement that Trooper Domingue was fearing for her life at the moment of the shooting should not be allowed.

### B. Mr. McCann's opinions which attempt to bolster one of Trooper Domingue's accounts should be excluded

Mr. McCann makes numerous statements about what he believes actually occurred based on his understanding of the effect of the traumatic nature of officer shootings. Mr. McCann first discounts all statements that Trooper Domingue has made, except for one of her recent stories that she was focused on the other individuals when Mr. Dilley suddenly appeared and attacked her. (Ex. 1, at pp. 48-49, ll. 9-25.) He specifically said this is the "most accurate" of her statements. (Ex. 1, at p. 51, ll. 4-10.)

Notwithstanding his lack of qualifications to do so, this testimony attempts to usurp the role of the jury in determining the facts. As this Court has explained, "[t]here is a critical distinction between an expert testifying that a disputed fact actually occurred . . . and an expert giving an opinion based upon factual assumptions, the validity of which are for the jury to determine. The former is manifestly improper, the latter is not." *Bargher v. White*, 2021 U.S. Dist. LEXIS at 8, quoting *Richman v. Sheahan*, 415 F. Supp. 2d 929, 942 (N.D. Ill. 2006). Just as

this Court determined in *Bargher*, that the use of force expert, W. Lloyd Grafton's, opinions "impermissibly usurp the jury's role and improperly adopt and endorse Plaintiffs version of events," *Id*., so should it disallow Mr. McCann from attempting to adopt and endorse Trooper Domingue's latest version of events.[3] *See also, e.g., Day v. Baton Rouge City Police*, 2020 U.S. Dist. LEXIS 223670, at *13-15 (M.D. La. Nov. 30, 2020) (where this Court found where expert simply accepted Defendant's version of the facts, he artificially bolstered that party's credibility); *Guillory v. Domtar Indus.*, 95 F.3d 1320, 1331 (5th Cir. 1996) (where court excluded expert testimony, which was not based upon the facts in the record but on altered facts and speculation designed to bolster a party's position.); *McNabb v. Graham Gulf, Inc.*, 2005 U.S. Dist. LEXIS 8031, at 6-8 (E.D. La. Apr. 27, 2005) (where the court disallowed expert testimony that is admitted for the sole purpose of vouching for the credibility of a fact witness); & *Bao Xuyen Le v. Reverend Dr. Martin Luther King, Jr. Cnty*., 2019 WL 2289681, at 1 (W.D. Wash. May 29, 2019) (where court precluded the expert Borden from opining "about which version of events is more credible or which facts actually occurred," and instructed him not to "speculate about the intent, motive, or state of mind of anyone involved.")

### C. Mr. McCann's opinions that Mr. Dilley was attacking or running toward Trooper Domingue are also unreliable because they are based on erroneous facts and without foundation

In his report and initially in his deposition, Mr. McCann adopts one of Trooper Domingue's versions of the shooting that Mr. Dilley "charged" her. (Ex. 1, at p. 58, ll. 15-18, and Ex. 2, at p. 17.) When pressed, Mr. McCann testified that Mr. Dilley charged in her

---

[3] This court did not exclude Grafton altogether. It ruled, "As an expert in law enforcement and correctional officer policy compliance, Grafton may testify as to applicable standards and well-established correctional officer policy and procedure. However, Grafton will not be permitted to offer opinions that draw legal conclusions, make findings of fact, or speculate as to the thoughts and motivations of individuals involved in the incident." *Id*. at 10-11.

direction. (Ex. 1, at p. 114, ll. 13-15.) The video shows nothing of the sort.[4] Compounding the error, Mr. McCann testifies that the shooting did not occur when he was past her but instead when parallel. (*Id*. at p. 123, ll. 8-11.) Again defying the evidence that he was shot in the back rather than the side, he bases this latter opinion on another opinion that the object in the video when Mr. Dilley was past her could not have been the bullet casing. (Ex. 4, at pp. 128-129 ll. 11-3, and Ex. 1, at p. 109, ll. 1-7.)  He testified that a 9mm bullet casing (Trooper Domingue was using a 9mm firearm) was much smaller than what was shown in the video. (Ex. 1, at p. 109, ll. 1-7.) He denied that it could be related to the object moving and the light catching it in such a way that it appeared bigger. (*Id.* at p. 109, ll. 13-16.) He also stated that the shooting occurred before he was past her because he saw no "muzzle flash" in the video. (*Id*. at p. 124, ll. 11-16.)

Under Fed. Code of Evid. art. 702(b) an expert's opinion must be "based on sufficient facts or data," and opinions based on facts that are "indisputably wrong" or on a "fictitious set of facts" are unreliable and should be excluded. *Guillory v. Domtar Indus*., 95 F.3d 1320, 1330-31 (5th Cir. 1996).

Mr. McCann's option that there was no "muzzle flash" cannot form the basis of any other opinion whatsoever. There is no dispute that Trooper Domingue shot Mr. Dilley in the back; so the absence of a muzzle flash is irrelevant to any issue. Mr. McCann's opinion that the object in the air in the video could not be a 9mm bullet casing lacks any foundation. Neither his report nor deposition provides any basis for allowing him to testify regarding the interpretation of a video to rule out a particular object in the video. Finally, the video itself cuts against his opinion that Mr. Dilley was either charging Trooper Domingue or charging in her direction. Accordingly, Mr.

---

[4] This Court previously opined that the surveillance video "shows that when Trooper Domingue fired her gun, Dilley was already running away from her, and not towards her, and therefore he no longer posed a threat." (Doc. 120 at p. 9.) The Fifth Circuit agreed that "the video undermines that assertion [that Dilley charged her] and shows Dilley running away before Domingue shot him in the back." (Doc. 106 at p. 9.).

McCann's opinion that Mr. Dilley was either charging Trooper Domingue or charging in her direction when she shot him should be struck, as not based on fact.

### III. <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests that his Motion to Exclude or Limit the Testimony of Harry McCann, Defendant's purported expert witness, be granted, and that Mr. McCann's opinions be excluded and/or appropriately limited.

Respectfully submitted,

<u>/s/ Donald J. Cazayoux, Jr.</u>
Donald J. Cazayoux, Jr., #20742
J. Lane Ewing, Jr., #29854
Cazayoux Ewing, LLC
257 Maximilian Street
Baton Rouge, LA 70802
Telephone: (225) 650-7400
Facsimile: (225) 650-7401
don@cazayouxewing.com
lane@cazayouxewing.com
*Attorney for Plaintiff*

# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| CLIFTON SCOTT DILLEY : | |
| *Plaintiff,* : | |
| : | |
| VERSUS : | |
| : | CIVIL NO. 3:19-cv-00391-BAJ-EWD |
| STATE OF LOUISIANA, : | |
| DEPARTMENT OF PUBLIC SAFETY : | |
| AND CORRECTIONS, AND : | |
| OFFICE OF STATE POLICE, : | |
| AND KASHA DOMINGUE : | |
| *Defendants.* : | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing *Plaintiff's Memorandum in Support of Plaintiff's Motion to Exclude or Limit the Testimony of Harry McCann, Defendant's Purported Expert Witness* was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all counsel by operation of this court's electronic filing system.

Baton Rouge, Louisiana, this 28th day of April, 2025.

                                                Respectfully submitted,

                                                /s/ Donald J. Cazayoux, Jr.
                                                Donald J. Cazayoux, Jr., #20742
                                                J. Lane Ewing, Jr., #29854
                                                Cazayoux Ewing, LLC
                                                257 Maximilian Street
                                                Baton Rouge, LA 70802
                                                Telephone: (225) 650-7400
                                                Facsimile: (225) 650-7401
                                                don@cazayouxewing.com
                                                lane@cazayouxewing.com
                                                *Attorney for Plaintiff*