# EXPERT REPORT OF HARRY C. MCCANN, JR.
## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

## CLIFTON DILLEY V. STATE OF LOUISIANA, DEPT. OF PUBLIC SAFETY AND CORRECTIONS AND OFFICE OF STATE POLICE AND KASHA DOMINGUE

## INTRODUCTION

I, Harry C. McCann, Jr., have been retained on behalf of defendant, Trooper Kasha Domingue as a use of force expert. If called to testify at hearing or trial, I expect to give testimony concerning my opinions discussed in this report.

I submit this statement of – and the factual basis for – my opinions. The opinions and facts contained in this statement are based in part on information made available to me in this case on or before the date of this report. I expressly reserve the right to supplement or modify this statement if and when I acquire additional relevant information before the trial. I reserve the right to modify this report based upon that information should it become available.

I have been asked by counsel for the defendant to provide my opinions regarding the claim of excessive use of force in the above-captioned case. This report contains my opinions regarding these issues and the bases for them.

### Background and Qualifications

I am currently retired as of September 2014. From 2002 until I retired, I served as Director of Law Enforcement Training for Bucks County, Pennsylvania. Prior to that position, I served as Director of Police Training for Bucks County from 1989 to 2002. The more recent title reflects additional responsibilities given to me by the Bucks County Commissioners, which included assisting the Bucks County Department of Corrections in the oversight of its in-service and correctional academy program.

My duties in both positions included the development of lesson plans, instruction, instructor certification, and the development of an ongoing training curriculum. I had also been tasked to assist various county law enforcement agencies in developing and writing policy and procedures relating to the use of force, patrol procedures, special response team, legal aspects, arrest powers, strategic threat groups and staff training.

I was an adjunct instructor at Bucks County Community College teaching various criminal justice programs in the school of Behavioral and Professional Sciences for 30 years. I had taught in the Police Officer Basic Academy Program (Act 120) for Temple University for 22 years.

In addition, I held certifications to teach from the Municipal Police Officers Education and Training Commission and the Pennsylvania Department of Corrections.

I have also been an adjunct faculty member in the Criminal Justice Department at Delaware Valley College, Bucks County Community College and Montgomery County Community College.

1

Exhibit 2

I am a graduate of LaSalle University in Philadelphia, PA, with a Bachelor of Arts degree in Criminal Justice. I earned a Master's degree in Public Administration from Pennsylvania State University in 1983.

I have been acknowledged as a "Best Practices Leader" in Bucks County in 2007, have received numerous awards from various organizations such as the Bucks County Police Chiefs Association, the Bucks County Police Association, the Fraternal Order of Police, Bucks County Lodge #53, the United States Department of Justice, Drug Enforcement Administration, the German American Police Association, and a Governor's Highway Safety Award.

A copy of my curriculum vitae is attached as <u>Exhibit A</u>.

In rendering this opinion, I have utilized my training, education and expertise in law enforcement and academia. In particular, I have utilized my 37 years of experience as an instructor, trainer and administrator in developing lesson plans, policy and procedure in numerous areas, such as the use of force, strategic threat groups, checkpoints, police management, human relations, case preparation, introduction to law enforcement, responding to special needs, handling arrested persons, legal updates, patrol procedures and operations, ethics and moral issues, report writing, perceptions of human behavior and communication, behavior management and crisis intervention, crime scenes and evidence collection, courtroom testimony and demeanor, incident command, mental illness, community oriented policing, the Pennsylvania criminal justice system, supervisory development, Field Training Officer, institutional treatment of the offender, criminal procedure and laws of arrest and officer response to emergencies.

**Fees**

I am an independent expert. I receive compensation of $200/hour, plus reimbursement for any expenses incurred. To date, I have received a $5,000 retainer for this case and have not yet invoiced counsel for any additional time, which is projected at approximately 10-20 additional billable hours. My fee for trial and or deposition is $2,500 plus expenses. My compensation does not depend on the opinions I express in this report, my testimony, or the outcome of this litigation.

**List of Trial or Deposition Experience in Previous 10 Years**

*Farvardin vs. Trp. Santos et al*, C.A. No. 12-6680 (E.D. Pa. 2014)

*Noonon vs. York Co. (Maine) Dept. of Corrections* 2016

*United States vs. Dwight Hamilton* (2016-17)

*Commonwealth of Pennsylvania vs. Gregory, et. al.* (2019)

*Young vs. Campbell County, Kentucky* (2019)

*Hillman vs. Soroye* (2020)

*Fredella vs. Toms River (NJ) et al.* (2022)

*Anthony Key vs. Montgomery County, Maryland, et al.* (2022)

*United States vs. Maxwell Bryan* (2023)

*State of New Jersey vs. Tabatha Roman* (2024)

**List of Publications**

Lock Up USA video productions - "Use of Force in the Correctional Facility"

**Preparation and Basis for Opinions**

My opinion is based upon my review of the materials and information made available to me.

I have reviewed at least the following documents in rendering my opinions:

1. John Desmedt, *The Use of Force Paradigm for Enforcement and Corrections*
2. Pennsylvania Municipal Police Officers Education and Training Commission; Use of Force
3. Video of the event
4. Depositions of Clifton Dilley, Kasha Domingue, Jamaal Mire, Kalief Sconiers and Trooper Barry Ward (part 1 and 2)
5. "The reactionary gap: Reminders on threats and distances" by Dave Grossi, Police1 article, 6/3/13
6. U.S. Dept. of Justice; NCJRS Library; "Is 21 feet enough?" by S. Ribolla, 1998, NCJ # 175597
7. Officer Survival Spotlight; "What is a Safe Distance" Marcus Young, July 13, 2016
8. U.S. Dept. of Justice, Federal Bureau of Investigation, Criminal Justice Information Services Division, Law Enforcement Officers Killed and Assaullted, 2014, accessed June 23, 2016
9. U.S. Dept. of Justice, Federal Bureau of Investigation, Criminal Justice Information Services Division, Law Enforcement Officers Killed and Assaulted (LEOKA) Program, 2014
10. Imminent Threat Solutions: The Tueller Drill Myth: "Why the 21-foot rule isn't a rule at all" Chad McBroon, May 9, 2016
11. Declaration of John J. Ryan, Exhibit M dated 3/30/23
12. National Criminal Justice Reference Services; Office of Justice Programs, The Law Enforcement Journal, May/June 1998
13. Redacted investigation report of Trooper Ward; Exhibit 2
14. Diagram of the scene by Trooper Ward; Exhibit 1A
15. Google map search overhead
16. Video stills of the event; Exhibit 3A-U: DPSC 563-583
17. Scene pictures provided by the Louisiana State Police 1-4: Exhibit 4A-D
18. Use of Force report of the event: Tab 3; Bates 083-086
19. Plaintiff's 3rd and 4th updated initial disclosures
20. Plaintiff's initial and updated initial disclosures
21. Audio interview of Kasha Domingue 121520 A Bates 203.mp3: B Bates 204.mp3: and C Bates 205.mp3

22. Dept. of Justice, Office of Justice Programs; International Journal of Emergency Mental Health "Officer Involved Shooting: Reaction Patterns, Response Protocols, and Psychological Intervention Strategies" by Laurence Miller, 2006
23. DPSC 588 – Trooper Internal Radio Communication
24. DPSC 738 – Interview of Domingue
25. DPSC 1-751
26. DPSC Axon 1-52
27. DPSC Employment 1-165
28. DPSC Investigation 1-35
29. DPSC Policies-Procedures 1-21
30. DPSC Recruiting 1-8
31. DPSC Training 1-396
32. ORM 1-36
33. DPSC 189 – Full Surveillance Video
34. Kasha Domingue 12/15/20 Interview
35. 2855 12.15.2020 Transcription Full.pdf
36. Audio file of Bill Shirley 120820 – bates 208.mp3
37. Audio file of Brian Jefferson 112420 – Bates 209.mp3
38. Audio file of Burnell Thompson 112420 – Bates 212.mp3
39. Audio file of James McGehee 112420 – Bates 210.mp3
40. Audio file of Mark Jones 120820 – Bates 207.mp3
41. Audio file of Matthew Wallace 112420 – Bates 211.mp3
42. Supplemental video – 061518 0953 pm – Bates 220.mp4
43. Supplemental video – 062918 0109 pm – Bates 219.mp4
44. Supplemental video – 070418 0703 pm – Bates 218.mp4
45. Supplemental video – 070518 0226 am – Bates 217.mp4
46. Supplemental video – 070518 0407 am – Bates 216.mp4
47. Supplemental video – 070918 0855 pm – Bates 214.mp4
48. Village Grocery Store Video – Bates 213.mp4
49. Expert report of Jack Ryan R-26 dated 2/13/25
50. Jack Ryan current CV schedule A-cases
51. Jack Ryan schedule B-Publications
52. Jack Ryan schedule C- Speaking and training
53. Jack Ryan; Dilley vs. State of Louisiana material reviewed: Schedule D
54. Jack Ryan; Dilley vs. State of Louisiana after R-26 submitted: Schedule E
55. IA File:
    - Tab 1 – Bates 001-159
    - Tab 2 – Bates 060-082
    - Tab 3 – Bates 083-086
    - Tab 4 – Bates 087-122
    - Tab 5 – Bates 123-131
    - Tab 6 – Bates 132-143
    - Tab 7 – Bates 144-173
    - Tab 8 – Bates 174-178
    - Tab 9 – Bates 179-189
    - Tab 10 – Bates 190-192

#3923504

- Tab 11 – Bates 193-194
- Tab 12 – Bates 195-202

I reserve the right to change or modify this report should additional facts, documents or evidence become available to me.

## SUMMARY OF OPINION

Counsel for defendant Kasha Domingue asks that I opine to a reasonable degree of professional certainty on whether the force used and applied by Trooper Domingue was objectively reasonable and appropriate or contrary to generally accepted law enforcement policies and practices.

My focus does not involve hindsight. I have taught various programs on police practices about these types of events in the police academy, police professional updates, corrections and academia and have been involved in numerous cases involving the use of force. In rendering my opinions, I place myself in the shoes of the police officers facing the totality of the circumstances presented.

This opinion is based on the time, type, location of the incident; the suspect to officer ratio (4-1); the pre-arrest actions of the suspects; the limited lighting at the scene; the suspected and acknowledged drug and alcohol usage by the subjects; the driver, Mire yelling "now" or "run" to the other occupants in his vehicle; the fleeing of the suspects to an unknown location; the total disregard of the verbal commands given by Trooper Domingue to the suspects; Dilley leaving the vehicle; Dilley's size differential to the trooper; Dilley's running toward Trooper Domingue rather than away, thereby reducing the reactionary/survival gap between himself and Trooper Domingue to mere feet; Dilley maintaining an object in his hand during the incident, and, with Trooper Domingue fearful of losing her life, it is my professional opinion, that based on my specialized background, education, experience and research, the use of force deployed in this case by Trooper Domingue, given the totality of the circumstances, was objectively reasonable and understandable.

## CHRONOLOGY AND SUMMARY OF TESTIMONY

The following is a summary of the events obtained from the videos, depositions and documents noted.

### July 10, 2018 Use of Force Incident

On July 10, 2018, at approximately 0215 hours, while on routine patrol, Trooper Kasha Domingue of the Louisiana Dept. of Public Safety, observed a red Saturn SUV traveling on La. 427 make an illegal U-turn. Deploying her emergency lights and siren, the red Saturn failed to immediately stop and quickly turned behind a commercial business identified as the Village Grocery.

In the Use of Force report written by Domingue on July 16, 2018, the driver, later identified as Jamaal Mire, "immediately exited the vehicle but continued to reach into the vehicle. Driver was advised to show his hands and he leaned in (the SUV) and grabbed what was later known to be his identification. Driver approached LSP patrol unit and was asked if he had any weapons on his

body or in his vehicle. Driver stated that he did not have anything on him and laughed. When asked again if there were any weapons in the vehicle, driver stated he did not know but did not think there was. There were three other subjects in the vehicle that continued to move around causing the SUV to shake." "A strong odor of alcoholic beverage and strong marijuana scent emitted from the driver. The driver stated they left "Reggie's", a bar, and was "taking some guys home." The driver stated he had an alcoholic beverage earlier in the evening and looked back to the passengers and smiled at them."

"The driver put his hands in his pockets and was advised to keep his hands on the hood of the LSP unit. The driver placed his hands on the hood and as the license plate was keyed into the MDT (Mobile Data Terminal), he began to slowly drop his hands toward his waist. I noticed the vehicle was not insured and was registered to the driver. The driver was again advised to keep his hands on the hood where I could see them. The driver continued to look toward the vehicle, moved his hands again, yelled "now" as he ran toward the passenger side doors."

The video and investigation report of the July 10, 2018 event shows the following:

1) At 02:13:48 the suspect vehicle and front portion of the patrol vehicle come into view of the camera.
2) 02:14:15 the driver (Mire) exited his vehicle, retrieved his drivers license and held it up in the air. Mire then walks up to the front of the patrol vehicle.
3) 02:14:39 Trooper Domingue comes into view and takes the drivers license from Mire. Mire places his hands on the hood of the patrol vehicle shortly afterwards. During this time, Mire was moving about the area and placed his hands near his trouser pockets. The occupants of the vehicle can be seen moving around inside the SUV.
4) At 02:16:29 Mire suddenly began running toward the passenger side of the SUV and at 02:16:30 pauses at the passenger side and is reported to have said either "now" or "run".
5) At 02:16:32 Trooper Domingue's vehicle is placed approximately 15-20 feet to the left rear of the SUV driven by Jamaal Mire. Trooper Domingue is located near the left front of her vehicle and Mire is seen running away from Trooper Dominigue, past the right front of the SUV
6) One second later, at 02:16:33, Trooper Dominigue is seen approaching the SUV. The left rear occupant, identified as Dilley, is seen exiting the vehicle. The distance between Dilley and Trooper Dominigue has now been significantly compressed.
7) At the same time, another passenger, only identified as "Jeremiah" is seen exiting the vehicle from the front passenger side.
8) Less than a second later, at 02:16:34, Dilley has successfully exited the vehicle and the distance between himself and Trooper Domingue is now mere feet apart.
9) At 02:16:34 Dilley runs **toward** Trooper Domingue, with an unidentified object in his hand, significantly reducing the distance between himself and Trooper Domingue.
10) In less then a second, the distance between Dilley and Trooper Domingue is reduced to the point where they are almost parallel and in close contact with each other.

11) At the same time, Trooper Domingue's right arm is raised as Dilley continues to evade Trooper Domingue.

12) At 02:16:35 Dilley and Trooper Domingue are seen falling to the ground. Less than two seconds from the initial interaction.

Immediately following the event, the video and use of force report indicate that Trooper Domingue "crawled toward the suspect (Dilley) as he struck the payment and told him to drop it (object in hand). Suspect had his arms beneath his body as he lay on his stomach." Both the use of force report and Dilley's own statements concur that Dilley had a dark object, later identified as his phone, in his hand during the altercation and that the "Trooper vigorously shook the left hand of the subject and a black cell phone fell to the ground."

As Dilley was being cuffed by Trooper Domingue, other Louisiana State Troopers arrived and began to search the area and vehicle, inside which drugs were found. Trooper Dominigue and Dilley were then cared for by EMS personnel with Dilley being transported via ambulance to the local hospital and treated for a gunshot wound to the lower back area.

**It is my opinion, to a reasonable degree of professional certainty, that based on my specialized background, training, education and experience, that the level and use of force deployed by Trooper Dominique, based on the totality of the circumstances, which includes among other considerations, the time of the event, the number of suspects, the officers readiness, officer-subject situational factors, subject factors, lighting conditions, the remoteness/seclusion of the scene, the suspect's resistance, the threat assessment, the reactionary distance or survival gap, were objectively reasonable given the actions and circumstances deployed by Clifton Dilley and his associates.**

### 1. *Law Enforcement Standards for Applying Physical Force*

Professional police officers are often called upon to intervene in situations involving disruptive or combative persons. There are several steps a professional police officer knows he or she must take prior to engaging in physical contact with a disruptive person, which have been to protect self or others against the use of unlawful force. Every decision, which is made in real time and usually in a millisecond, is second guessed. It is important that we consider the use of force from the perspective of the rank-and-file officer. Such an officer is, as stated properly by the plaintiff's expert, governed by the Graham standard, which is relatively straight forward. It stipulates that an officer should apply constitutionally appropriate levels of force to control restive or aggressive behavior toward involved personnel, other personnel, third parties or property. Simply put, the level of force in response to a given situation must be "reasonable".

Use of the word "reasonable" is less straightforward. It is a subjective term, but it was well defined in the Graham v. Connor decision by then Chief Justice William H. Rehnquist: "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 hindsight. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgements-in circumstances that are tense, uncertain and rapidly evolving- about the amount of

force that is necessary in a particular situation. The test of reasonableness is not capable of precise definition or mechanical application."

Based on my training, experience, and knowledge, a trained and professional police officer is keenly aware of the process of what is reasonable and the steps that must be taken when deciding and implementing force on a subject. In all encounters and confrontations, the community expects the officer to respond professionally and with sound judgement.

A reasonable officer uses his perceptions of the suspects' actions and other circumstances to respond with reasonable amounts or levels of force. A balanced totality of the circumstances approach is what the force continuum is all about. In addition to the suspects' actions, the totality of the circumstances includes the following:

    a. Is anyone in immediate danger of death or serious bodily injury?

    b. Are there exigent circumstances that require immediate action?

    c. Has anyone been injured?

    d. Is the location inherently dangerous?

    e. Actions of third parties?

    f. Is there any pertinent information available regarding the disruptive person?

    g. Feasibility or availability of force alternatives?

    h. Officer-subject-situational factors?

    i. Subject factors, such as size, strength, age, training, number of suspects, weapons, demeanor, and apparent intoxication or drug influence?

    j. Situational factors, such as availability of backup, presence of innocent bystanders, lighting conditions, terrain, and remoteness or seclusion of scene?

    k. Does the officer who has decided to escalate the use of force have sufficient personnel, and the proper personnel, on the scene to control the situation?

Understanding how force is evaluated assists the officer in explaining why his or her actions were appropriate. When evaluating the use of force, justifiable force must be evaluated as being one of the following: (1) a "trained technique" performed when appropriate based on the "totality of the circumstances" known to the officer at the time of the incident; (2) a Dynamic Application of a trained technique performed appropriately based on the "totality of the circumstances" known to the officer at the time of the incident; or (3) "not trained but justifiable force based on the circumstances" performed when appropriate based on the "totality of the circumstances" known to the officer at the time of the incident.

Questions such as: What were the subject's actions or pre-attack postures? Did the individual take

on a bladed boxer's stance or did he shift his shoulders into an aggressive position? What was the hostility level? Was the individual belligerent, rebellious, pugnacious? Did the individual make advancements toward you or continue to walk or run away? Did the individual act as if you were not even there and attempt to ignore you? All of these questions and more are critical in evaluating the situation and whether the use of force is necessary.

The officer must be able to take the perceived data concerning the resistance or dangers caused by the individual, taking into consideration the factors previously labeled in the above paragraphs concerning the totality of the circumstances.

To measure and analyze actual situations in which force was used, may have been used, or should have been used by the officer, one must perform these steps in order:

1. Determine and list the actual sequence of subject/officer transactions during the entire situation in chronological order with the greatest degree of accuracy possible, and

2. Determine the critical level of each of the subject's actions and the corresponding officer reaction.

This is the implementation of the Use of Force model, and the standard which federal, state and local police, corrections and law enforcement officers' follow. The model was used in my evaluation based on over 37 years of law enforcement experience, training and knowledge and it is my intent to examine and review each step taken by Trooper Domingue in her interaction with Clifton Dilley.

### 2. *Evaluation of the incident.*

A reasonable police officer uses his perceptions of the suspects actions and other circumstances to respond with reasonable amounts or levels of force. A balanced totality of the circumstances approach is imperative in an officer's decision-making.

***Threat of death or injury?*** In this case, Trooper Domingue's perspective and belief was that she was in immediate danger for her life ("I had a reason to believe that my life was in danger. I thought I was gonna die" (Domingue deposition, page 21 and 22), and it is my contention that this perception and belief was well founded, objectively reasonable and a cornerstone to the events that unfolded.

Contrary to the plaintiff's expert response that "there were no facts that would an officer, based on generally accepted practices and training, to conclude that Dilley posed an immediate threat of serious bodily harm or death to Domingue" (Pg. 42, Ryan report) are the following issues and concerns generating the totality of the circumstances, to conclude that Dilley did pose an immediate threat of serious bodily harm or death to Domingue. These include, but are not limited to: the time of the event; the number of suspects; the number of officers involved; the actions of the suspects; Dilley's running toward the officer, rather than away; Dilley holding an object in his hand, Dilley's failure to obey legitimate, legal verbal commands given by Domingue, the closing of the officers reactionary/survival gap between herself and Dilley, the size difference between Dilley and Trooper Domingue etc. Each of these variables will be further discussed, provide the

reasonableness of Trooper Domingue's actions and state the objectively reasonable facts or evidence to support the actions taken.

*Exigent circumstances?* As noted by the plaintiff's expert, "Dilley was stopped for a motor vehicle violation, specifically an illegal U-turn, a very minor offense that was not committed by Dilley but rather the driver (Mire)." (Ryan Pg.41) However, Mr. Ryan glosses over or ignores to note the fact that, even after cruiser lights and siren were deployed by Trooper Domingue to have the vehicle stop, the driver, Mire, failed to immediately pull over and instead, continued to drive onto the secluded rear of a commercial building complex and away from road view sightlines, a potentially dangerous environment which would increase the level of suspicion and concern by Trooper Domingue. (DPSC scene pictures 4 A, B, C and D; Exhibit 4A-D)

The video and depositions taken indicate that after the stop was made, four individuals could be seen inside the vehicle who are compliant and remain in the vehicle. It is at this juncture, that the driver, Mire, exits his vehicle and proceeds to walk over to Trooper Domingue's cruiser.

This, in addition to the driver Mire not obeying verbal commands to keep his hands on Trooper Domingue's cruiser hood, the smell or use of drugs and alcohol on Mire, Mire's continued dropping of his hands toward his pockets, Mire's running away from Trooper Domingue toward his vehicle and beyond, the number of suspects in Mire's vehicle, Mire's inappropriate laughing at Trooper Domingue, Mire's pausing at his vehicle to exclaim "Now or Run", would indicate to a trained, professional police officer that her guard must now be raised to a very high level of awareness for possible danger. As her Field Training Officer (FTO) noted in his evaluation of Trooper Domingue "Your safety is paramount. A mistake like this could be your last. Remember your safety, everyday, always."

*Injuries?* Both Trooper Domingue and Dilley were treated at the scene by EMS, with Dilley being transported to the local hospital by EMS for a gunshot wound to the lower back and Trooper Domingue for a knee abrasion. Trooper Domingue acknowledged that she shot Dilley in his side and that the subject, Dilley, was close to her.

*Inherently dangerous location?* This event takes place in a secluded, rear section of a low-rise commercial complex with, after reviewing Google maps and overheads, having limited sight lines from the road, limited overhead lighting, and residential homes across the street (overhead and DPSC scene photos). The incident occurs a little after 0200 hours when most residence and commercial activity would be limited. It is my professional opinion that this location is inherently dangerous, as outside observation would be curtailed should assistance be needed. The lighting is also poor, generating shadows from the rear store lights and from Trooper Domingue's patrol vehicle.

*Actions of third parties?*

It is my professional opinion that, as described earlier, Jamaal Mire, the driver, exhibited behaviors that initially might be considered inappropriate, such as laughing at Trooper Domingue during the stop, to eventually alarming (taking his hands off the cruiser, dropping his hands to near the pant pocket area), to then unlawful (his running away from Trooper Domingue). All are indicators of probable or potential harm to Trooper Domingue.

Of the four occupants in the vehicle, Mr. Sconiers, who sat in the passenger side front compartment of the vehicle, testified in his deposition that he heard Mire say as he returned to his vehicle after running away from Trooper Domingue to "Drop everything and run" and then his turning to Dilley and say "Dude don't run. Like, why are you going to run?" (Sconiers deposition, panel 26) Sconiers decided to stay in his seat with his seatbelt on and exited the vehicle only when Trooper Domingue pulled him out of the vehicle. However, Sconiers also testified that, in spite of this warning, Dilley did decide to run, which he described as "a little jig move" (Sconiers pg.27) and a "100% stupid." (Sconiers pg. 33)

It is important to note that Mr. Sconiers also recalled hearing Trooper Domingue say to Dilley, "Yes. I believe she said "Stop right there." (Sconiers, panel 38) Sconiers also added that Dilley did not comply.

In addition to Dilley, Mire, and Sconiers, there was a fourth individual in the vehicle only identified in the reports received and reviewed as "Jeremiah". In the video of the event, "Jeremiah", who was seated in the passenger rear right side of the vehicle, is seen running away from Trooper Domingue almost immediately after Mire has run back to his vehicle, pausing and telling the occupants to run.

It is also important to note that at this juncture, Trooper Domingue did not know the whereabouts of both Mire and "Jeremiah" after they had run from the vehicle. Based on my training, education, background and experience, this poses a significant challenge and hazard for Trooper Domingue, as a trained, professional police officer would be concerned with determining such things as "where are they hiding?", "are they planning an attack?", "is this an ambush", "why are they fleeing?" All unknowns which increase the potential for danger to the officer.

***Pertinent information available?*** There was limited information available to Trooper Domingue during this event as she was in the process of running the driver, Mire's, license and registration in her cruiser's mobile data terminal (MDT). The three other occupants in the vehicle with Mire were unknown and unidentified.

This lack of information, along with the actions of the occupants inside and outside of the vehicle (movement inside the vehicle, Mire and Jeremiah running away, etc.), would heighten the awareness of potential danger to a trained, professional police officer.

***Does anyone know what precipitated the event?*** Prior to the altercation with Dilley, Trooper Domingue was in the process of stopping a vehicle, driven by Mire, for an illegal U-turn on LA 427. Reports indicate that Mire did not stop his vehicle even after Trooper Domingue deployed her lights and siren. Instead, Mire turned south onto Potwin St. and then turned quickly left in a secluded area behind a commercial business, the Village Grocery.

***Officer-subject-situational factors?*** Every incident in which an officer faces a subject is comprised of many time frames just as each motion picture is comprised of picture frames. The motion picture is a dynamic compilation of the individual frames. The use of force is a dynamic compilation of time frames prior to, during, and after the actual use of force.

The officer must *perceive and evaluate* many factors which together dictate the amount of time and the action alternatives available to the officer. Some of these considerations are distance,

shielding, obstruction and the type of attack or resistance encountered, risk and the probable effects on others. However, we cannot author an all-inclusive list. Even more to the point, the officer on the scene does not have the reliable ability to accurately list all of the specific considerations, just the most obvious. They, in turn, are only made obvious by training or experience. Distance is one major consideration.

In this case, as confirmed by the video and the plaintiff's own expert, Dilley, as he exits the vehicle runs **toward** and **not away from** Trooper Domingue, thereby reducing the distance between himself from car length to an arm's length away. It is my professional opinion that this action and behavior of Dilley would indicate to Trooper Domingue that he, Dilley, was an immediate threat requiring immediate action. This, combined with the prior actions of the suspects, the location, number of subjects etc. are being evaluated by Trooper Domingue. She must now respond to the questions of "why did he exit the vehicle?", "why is he running toward me and not away like the other suspects?", "he is a large person", "what's in his hand?", "why isn't he listening to me?". All of these and more are now paramount in Trooper Domingue's mind and an indication that Dilley now poses an immediate threat of serious bodily injury or death, objectively reasonable under the circumstances with which the officer is faced.

In Desmedt's Use of Force Paradigm, he states that "an increased distance from the subject allows the officer more time to form a reflexive reaction movement sequence, evaluation or consideration option-in ascending order. The greater the distance, the more time available for perceiving situational clues more precisely, evaluating problems, alternatives, and selecting the appropriate reaction in view of future implications. The direct relationship between the subject's actions and the officer's actions is bound by the reaction limitations of human physiology." In other words, proximity equates to vulnerability, with the subjects' actions always faster than the officer's reaction. Trooper Domingue was responding to a perceived threat. Distance between herself and Dilley was closing to mere feet. She thought she was going to be killed.

Desmedt also states that "The perception of the officer are also subject to judgment. Perceptions, however, also must be judged according to timeliness. That is, the shorter the time period involved, the faster events occur, and the more confusion present in the environment, the less accurate the officer's probable total perception will be".

He further states that "human perceptions are limited by scope, amount of information taken into account, and time. Therefore, mistakes in perception and resultant mistakes in actions are not just probable, but predictable. Given that no human can be aware of all occurrences in the immediate environment, some allowance must be made for this human imperfection, even in the most serious cases. The officer should not be judged for acting upon an imperfect data base if other responsible officers in the situation may have come to similar inaccurate perceptions."

"An officer's actions must be judged on perception, not on absolute fact. The training standards for judging the use of force and standards for judging the actual use of force should be synonymous. They must allow latitude both for errors in perception and for less-than-perfect performance of complex open skills."

This is exactly what had occurred in this case. The total amount of time Trooper Domingue had to respond to Dilley's actions, was less than 3 seconds. Less time than reading these last 2

sentences. Multiple suspects were running. Verbal commands were ignored. There were 4 suspects and she was alone. One of the subjects, Dilley, a taller, larger male was running toward her with an object in his hand and this was a secluded area near a residential neighborhood. She thought she was going to be killed. It was 2:10 in the morning in a dark alley. All of these factors and more, explain the decisions and recollections of Trooper Domingue.

Plaintiff's expert correctly states in his expert report of 2/13/25 that Federal Law Enforcement Training Center's (FLETC) Use of Force instructors train in the section titled Legal Misunderstandings (Myths v. Realities) that: (1) Minimal force (a) many officers have been taught (according to agency policy) that police officers must use the minimal amount of force available during a use of force incident. (b) the correct standard for use of force is "objective reasonableness" not minimal force". "Minimal force" is a subjective standard, inconsistent with the precedent set forth in Grahm v. Connor (1989). (2) Exhaustion of alternative force options not required (a) Some officers may believe that "deadly force" is employed as a last resort and only when all lesser means have been exhausted. (b) The legal standard of reasonableness does not require officer to select the least intrusive means, only a reasonable one. (c) A domino effect occurs when reasonable use of force is not applied immediately to gain control. Circumstances of the incident may become more dangerous, out of control, or unmanageable for the officer. (d) The officer's ability to choose a reasonable force option quickly and efficiently erodes as the complexity of the situation increases. (3) Officers "have" a duty to retreat. (a) Police officers have no duty to retreat in an effort to avoid using force on a suspect. (b) Officer must remember that based on the totality of circumstances, disengaging from a threat in order to gain a tactical advantage and puts themselves into a position of advantage may be a reasonable response to a critical incident." (Ryan, Pg. 45)

I agree and this confirms my analysis. Trooper Domingue's actions were consistent with FLETC's training and were objectively reasonable given the totality of the circumstances. She was in fear for her life, and used a level of force objectively reasonable given the circumstances presented. The entire event took place in seconds under perilous circumstances in a dangerous environment, an extremely complex situation.

To further emphasize the relationship between officer/subject distance and reaction time, statistics published annually by the FBI's Law Enforcement Officers Killed and Assaulted Program (LEOKA) suggests that in incidents involving firearms, close distance encounters feature more officers killed by offender compared with situations involving greater distances. Over a 10-year period between 2005-2014, 62.2 percent of officers murdered with firearms in the line of duty were shot within 0-10 feet of the perpetrators. Of those incidents, 44.8 percent included events where offenders within 0 to 5 feet killed officers with firearms.

While the statistics include close-proximity murders using firearms, offenders may employ other weapons at close range. Although the distances between the officers and offenders are not published for these weapons, their use inherently requires close proximity. Of the 1,880 total victim officers, the 1985 to 2014 statistics indicate that in addition to the 1,665 officers killed with firearms, offenders murdered 19 with knives or other cutting instruments, 12 with personal weapons (e.g. hands, fists, feet), and 10 with blunt objects.

Trooper Domingue was fearful for her life. Dilley, described as a large man, was running toward her, ignoring her commands to stop, possessed an object in his hands and was mere feet from the

trooper. She responded as a trained professional police officer.

*Subject factors?* As discussed earlier, there were a total of four (4) subjects involved in this event. Mire, the driver was listed as a young muscular 5'6", 140 lb. male. Sconiers, who was in the rear passenger side of the vehicle, was described as a young 5'9" 125 lb. male, while Dilley was listed as 5'11" 198 lb. male. The fourth suspect, "Jeremiah", who sat in the front passenger seat, was only described as an unidentified male. Trooper Domingue however, is described as a 5'4" 145 lb. female. She is outnumbered 4 to 1, two of the subjects have fled, disobeying her legitimate commands to stop. She has no idea why or where they may be lurking. The smell of alcohol and the probability of drugs has been detected. It is Dilley, who is younger, 7 inches taller and 50 pounds heavier, has a black object in his hands, has been drinking and possibly intoxicated or under the influence of drugs, that rushes toward her. It is her perception and belief that she is now in a life-or-death situation and must make an instant decision.

## CONCLUSION

Law enforcement officers do not use force, they respond with force when objectively reasonable under the totality of the circumstances. In this case, the plaintiff's expert opines that "Officers are trained that use of force decisions have to be based on objective facts available to them at the time force was used" (Ryan, pg. 43). However, as stated earlier, it is my contention that the officers' actions must also be judged on perception and reasonableness, not on absolute fact.

For example, an officer shoots a subject who suddenly points a squirt gun at the officer. The officer fires, striking the subject but only afterwards realize that it was a toy weapon. If the officer were to be judged by other than a reasonable perception standard, he would have been guilty of shooting an unarmed suspect, because he did. However, because of the officer's inability to perceive perfectly, according to his/her perceptions, the subject was actually armed and about to shoot.

Trooper Domingue reasonably believed Dilley posed a weapon of some sort. Her perception and belief at the time indicated an immediate threat to her safety because of the object in Dilley's hand and the prior actions of Dilley and the other subjects. It is only after the situation allowed Trooper Domingue the time to clarify her perception with more specific information, did she realize that what Dilley had in his hand was a cell phone.

Contrary to the opinion expressed by Mr. Ryan that "there were no facts that would an officer, based on generally accepted practices and training, to conclude that Dilley posed an immediate threat of serious bodily harm to Domingue" (Ryan pg.41), my report lists the multiple reasons why Trooper Domingue believed that Dilley posed a threat, such as ignoring her commands, leaving the vehicle, his size, weight, possible/probable drug and alcohol usage, the object in his hands etc., but most troubling, and of most concern to Trooper Domingue, would be Dilley's decision to leave the vehicle and quickly move toward her, thereby compressing the distance and reactionary time/survival gap between himself and the trooper to mere feet.

It has been my experience, that subjects who are wanting to avoid contact with law enforcement, <u>run away from the officer, not toward them.</u> This closing of the reactionary/survival gap affords the officer little opportunity in time and reaction to evaluate and respond and would indicate to the officer probable hostile intent by the subject.

Officers are trained to maintain a reactionary or survival gap to successfully defend themselves in an attack is crucial to police officer survival. Dilley's actions did not afford Trooper Domingue the opportunity to maintain this gap and evaluate the situation. Survival was her immediate response.

Finally, Mr. Ryan also opines that "the location of the gunshot wound on Dilley, it is clear that Dilley, in accord with law enforcement training, practice and policy, was not an immediate threat to Domingue at the time of the shooting" (Ryan pg. 42). I disagree. Mr. Ryan disregards the totality of the circumstances which have been discussed in this report, which involves officer perception, distance, the reactionary/survival gap and timeliness.

Mr. Dilley was wounded in the lower right back area, but was shot, according to Trooper Domingue, in his side while Dilley was very close to her. He was charging at Trooper Domingue, the reactionary/survival gap was closing, he was a large man with something in his hand, in a moment best described as milliseconds, Trooper Domingue tenses and shoots. She does not recall pulling the trigger of her weapon or the exact moment Dilley was shot.

According to the Dept. of Justice, Office of Justice Programs, "line of duty deadly force actions are most likely to occur in the following situations, in descending order of probability: (1) domestic or other disturbance calls; (2) robbery in progress; (3) burglary in progress; (4) traffic offense; (5) personal dispute and/or accident; and (5) stake out and drug busts (Blau 1994; Russell and Biegel, 1990).

Trooper Domingue was involved in a traffic stop. It has been my experience as an instructor and trainer of police officers in the academy and throughout their careers, that there is no such thing as a "routine" traffic stop. Each has their own variables and potential issues. This stop by Trooper Domingue was anything but routine. She was in immediate danger and feared for her life.

In my prior position as Director of Police Training for Bucks County, Pa., I had the unfortunate experience to observe firsthand the result of an officer killed in the line of duty in circumstances which somewhat mirrors this event. On September 29, 2005 an individual was taken into custody for suspected drunk driving, a motor vehicle offense, and taken to the local hospital for blood alcohol testing. He was unarmed and uncuffed while blood testing was being conducted. While at the hospital, the individual suddenly charged the officer and his backup, taking one of the officers' weapon, firing, killing the officer and wounding his partner and a hospital employee.

The officer who was killed was one of my students, one of my cadets in the academy and my colleague. He was a trained and professional police officer. The shooter in this event, posed no initial harm to the officers. However, he closed the reactionary/survival gap in an instant and gave the officers no time to respond to his deadly actions. Elements similar to this deadly event.

To this day, I still reflect on this event which left a widow and young boy fatherless. As stated earlier in the section headed "Summary of Opinion", I have placed myself in the shoes of the officer involved and have asked myself the question "what would an objectively reasonable officer have done in these circumstances?" Like the officer from Bucks County, it is my professional opinion, given the totality of the circumstances, that Trooper Domingue's actions were both appropriate and understandable. As stated numerous times, she was in fear for her life. She was

not the aggressor. It was Dilley's actions that caused her reaction.

There are also questions as to Trooper Domingue's recollection of the event. The Dept. of Justice, in its report titled "Officer Involved Shooting: Reaction Patterns, Response Protocols, and Psychological Intervention Strategies," states that "most of the officers who have been involved in a deadly force shooting episode have described one or more alterations in perception, thinking, and behavior that occurred during the event. Most of these can be interpreted as natural adaptive defensive reactions of an organism under extreme emergency stress."

"Most common are *distortions in time perception*. In the majority of these cases, officers recall the shooting event as occurring in slow motion, although a smaller percentage report experiencing the event as speeded up."

"*Sensory distortions* are common and most commonly involve *tunnel vision*, in which the officer is sharply focused on one particular aspect of the visual field, typically the suspect's gun or weapon, while blocking out everything in the periphery. Similarly, *tunnel vision* may occur, in which the officer's auditory attention is focused exclusively on a particular set of sounds, most commonly the suspect's voice, while background sounds are excluded. Sounds may also seem muffled or, in a smaller number of cases, louder than normal. Officers have reported not hearing their own or other officers' gunshots."

Trooper Domingue did not recall the exact moment or actually if she shot Dilley. Her focus was on the driver, Mire. In her deposition she stated that "I didn't even see him (Dilley) until he was right next to me" (Panel 23-24) She did not hear the sound of her weapon being discharged, nor did Dilley. According to the Dept. of Justice, this should not be unexpected. As she stated in her interviews and deposition, she did not recall the exact moment Dilley was shot. She was not being evasive or untruthful toward the investigators. She could not recall the actual sequence of events.

Finally, the object in Dilley's hand must be addressed. Trooper Domingue believed that the object, described as being black and protruding from Dilley's hand, could be used against her in a life-or-death struggle. Objects that fit this description include knives, switchblade, brass knuckles, pipes, a small firearm etc. A trained and professional police officer would know, that with the totality of the circumstance presented at that time, a serious altercation is about to occur and that her life is in danger.

The fact that the assailant, Dilley, was shot in the back does not necessarily mean that he wasn't a threat to Trooper Domingue when he was shot. An aggressor might start out presenting a face-to-face threat, but in the time it takes for the officer to perceive the threat, decide to shoot, draw his/her weapon, and pull the trigger, the assailant can potentially turn away exposing his back or be slightly past the officer, as took place in this event. Furthermore, suspects frequently fire weapons behind them as they run.

Trooper Domingue feared for her life. Objectively reasonable under the circumstances which the officer faced. If Dilley had obeyed her commands to stop, not run towards her to within feet, not have an object in his hands and with the totality of the circumstances presented in this report, this entire event would not have occurred. As Dilley stated in his deposition when asked "Would you agree that if you had stayed in the car this incident would not have happened?" answered "yes sir"

(Dilley deposition pg. 69-70) and further explained when questioned about his ability to think rationally and if he was impaired, stated "Yes, I'd say it was impaired, because my dumb ass got out of the car and ran." (Dilley deposition pg. 69).

**Therefore, it is my opinion to a reasonable degree of professional certainty that, based on the totality of the circumstances presented, which include: (1) the early morning hour; (2) a motor vehicle offense, which the Dept. of Justice designates as a high probability of a deadly force action; (3) the subject to officer ratio of 4 to 1; (4) the driver, Mire, not immediately pulling his vehicle off the road; (5) the driving of the vehicle into a secluded area in back of a commercial complex next to a residential neighborhood; (6) the lighting at the scene; (7) the smell and acknowledged use of drugs and alcohol by the subjects; (8) the driver dropping his hands to his waist area when questioned; (9) Mire's smiling when looking at the occupants in his vehicle; (10) Mire's running away from Trooper Domingue and toward his vehicle; (11) Mire's pausing at his vehicle and hollering "now" or "run" to the other occupants in the vehicle and continued running away; (12) the ignoring of the verbal commands to "stop" given by Trooper Domingue to the subjects; (13) the leaving of the vehicle by a second occupant identified as "Jeremiah" toward the same direction as Mire, away from Trooper Domingue; (14) the continued unknown whereabouts of both Mire and Jeremiah; (15) the possibility of ambush by the subjects; (16) the focus or tunnel vision of Trooper Domingue toward both Mire and Jeremiah, as she said in her interview with the detectives that she didn't see Dilley until the last possible moment (Bates Interview A 35.20 mark); (17) Dilley, described as a large man, also exiting the vehicle; (18) Dilley running *toward* Trooper Domingue instead of away from her thereby reducing the survival gap and reactionary time available for Trooper Domingue to respond; (19) Dilley's ignoring Trooper Domingue's verbal commands; (20) a fellow passenger in the vehicle, Sconiers, who remained in the vehicle during the altercation, confirming the verbal commands given by Trooper Domingue (21) Sconiers had also stated to Dilley not to run, stating "Dude don't run. Like, why are you going to run"; (22) that Dilley, in addition to his physical advantage, had an object in his hand, a possible weapon; (23) that Dilley came to within mere feet of Trooper Domingue (24) that the total time between Dilley leaving the vehicle and charging toward Trooper Domingue with an object in his hands, being less than 3 seconds, (25) that Trooper Domingue was in danger at the moment of threat, fearing for her life, and, with (26) Dilley acknowledging that this event would not have happened if he stayed in the vehicle, it is my professional opinion that Trooper Domingues' actions and use of force were compromised, not excessive and therefor objectively reasonable and understandable based on her perception of the events.**

All of the opinions I have offered in this report are based on the data listed in the Preparation and Basis for Opinions section of this report. In forming these opinions, I have relied on the training, education and experience that I have garnered in 37 years as a parole officer, Probation/Parole Staff Development Specialist, Training Coordinator for the Department of Justice, Director of Police Training, Director of Law Enforcement Training, 30 year academician at numerous colleges and universities and as a correctional and police trainer in the areas of the use of force and related topics.

I reserve the right to supplement my opinions in light of further information disclosed in the case. I also reserve the right to supplement my report to rebut any opinions expressed by any experts

retained by the Plaintiff.

_____  
Harry C. McCann, Jr.

_____3/13/25_____  
Date

