UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
CLIFTON SCOTT DILLEY         \*
                             \*   NUMBER 3:19-CV-00391
                             \*
                             \*   DISTRICT JUDGE:
VERSUS                       \*     BRIAN A. JACKSON
                             \*
STATE OF LOUISIANA, DEPT.    \*   MAGISTRATE JUDGE:
OF PUBLIC SAFETY AND         \*     ERIN WILDER-DOOMES
CORRECTIONS, OFFICE OF STATE \*
POLICE AND KASHA DOMINGUE    \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


        The deposition of Clifton Scott Dilley taken in

connection with the captioned cause, pursuant to the

following stipulation before Melissa J. David,

Certified Court Reporter, at the offices of Cazayoux

Ewing Law Firm, 257 Maxmillian Street, Baton Rouge,

Louisiana, on the 8th day of December, 2022,

beginning at 9:30 a.m.




        Reported by:

        Melissa J. David
        Certified Court Reporter.

Exhibit 10

```
 1    APPEARANCES:

 2        For the Plaintiff:

 3            DONALD J. CAZAYOUX, JR & J. LANE EWING, JR
              CAZAYOUX EWING LAW FIRM
 4            257 Maximillian Street
              Baton Rouge, LA 70802
 5            don@cazayouxewing.com
              lane@cazayouxewing.com.

 6

 7        For the Defendants:

 8            Special Assistant Attorney General and
              counsel for Kasha Domingue,
 9            ALLEN J. KROUSE, III
              FRILOT LLC
10            1100 Poydras St. Ste 3700
              New Orleans, LA 70163
11            akrouse@frilot.com

12            JENNIFER M. ARDOIN
              NEUNERPATE
13            One Petroleum Center
              1001 West Pinhook Rd., Ste. 200.
14            Lafayette, LA 70503
              JArdoin@NeunerPate.com.

15

16        Also present via telephone,

17            JAMES H. BROWN, JR.
              FRILOT, LLC.
18            1100 Poydras St. Ste 3700
              New Orleans, LA 70163

19

20            KASHA DOMINGUE, Defendant.

21

22

23

24

25
```

1               I N D E X

2

3    STIPULATION ............................7

4    EXAMINATION BY:

5    MR. KROUSE .............................8

6    MR. CAZAYOUX .........................136

7    CERTIFICATION PAGE ...................141

8

9

10              E X H I B I T S

11

12   Exhibit/No.                    Page No.

13   Exhibit 1- Driver's license ...............11

14   Exhibit 2- Drawing of passengers by .......45
          deponent

15

16   Exhibit 3- DPSC7 .........................78

17   Exhibit 4- DPSC9 .........................79

     Exhibit 5 - DPSC10 .......................80

18

19   Exhibit 6- DPSC11 ........................80

20   Exhibit 7- DPSC12 ........................80

21   Exhibit 8- DPSC13 ........................81

22   Exhibit 9- DPSC15 ........................81

23   Exhibit 10- DPSC17 .......................81

24   Exhibit 11- DPSC20 .......................82

25   Exhibit 12- DPSC21 .......................82

     Exhibit 13- DPSC22 .......................83

1
   Exhibit 14- DPSC23 ........................84
2
   Exhibit 15- DPSC26 ........................85
3
   Exhibit 16- DPSC27 ........................86
4
   Exhibit 17- DPSC28 ........................86
5
   Exhibit 18- DPSC29 ........................87
6
   Exhibit 19- DPSC58 ........................88
7
   Exhibit 20- Photo of marker "2" and .......88
8        "3" from scene
9  Exhibit 21- DPSC563 .......................90
10 Exhibit 22- DPSC564 .......................93
11 Exhibit 23- DPSC565 .......................94
12 Exhibit 24- DPSC566 .......................96
13 Exhibit 25- 2018-07-1002:16:32: ..........97
14 Exhibit 26 - DPSC568 ......................98
15 Exhibit 27- DPSC569 ......................102
16 Exhibit 28- DPSC570 ......................104
17 Exhibit 29- DPSC571 ......................105
18 Exhibit 30- DPSC572 ......................108
19 Exhibit 31- DPSC573 ......................112
20 Exhibit 32- DPSC574 ......................114
21 Exhibit 33 - DPSC575 ..................116So
22 Exhibit 34- DPSC576 ......................119
23 Exhibit 35- DPSC577 ......................121
24 Exhibit 36- DPSC578 ......................123
25 Exhibit 37- DPSC579 ......................125

CLIFTON DILLEY

1    Exhibit 38- DPSC580 .....................127

2    Exhibit 39- DPSC581 .....................130

3    Exhibit 40- DPSC582 .....................132

4    Exhibit 41- DPSC583 .....................133

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 3:19-cv-00391-BAJ-EWD    Document 143-11    04/28/25    Page 6 of 142

12/08/2022

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              S T I P U L A T I O N

2   It is hereby stipulated by and among counsel for

3   plaintiff and counsel for the defense that the

4   deposition,  of

5              CLIFTON SCOTT DILLEY

6   be taken before Melissa J. David, Certified Court

7   Reporter, by counsel for the defense for all

8   purposes, pursuant to notice and to the provisions of

9   the appropriate statutes of the Federal Code of Civil

10  Procedure of the State of Louisiana.

11  The parties hereto waive all formalities in

12  connection with the taking of said deposition, except

13  the reading and signing thereof, except the swearing

14  of the witness and the reduction of the questions and

15  answers to typewriting.

16  Per Article 1443 (D) of the Louisiana Code of Civil

17  Procedure, counsel for all parties reserve all

18  objections until trial or other use of the

19  deposition.

20

21              *        *        *

22  MELISSA J. DAVID, Certified Court Reporter in and for

23  the State of Louisiana, officiated in administering

24  the oath to the above-named witness.

25

```
 1                    Clifton Dilley,
 2       After having been duly sworn, did affirm, and
 3                   testified as follows:
 4                    - EXAMINATION -
 5   BY MR. KROUSE:
 6   Q.   I just want to say a couple of things.  First of
 7        all, you go by Scotty; is that correct?
 8   A.   Yes, sir.
 9   Q.   Okay.  Can I call you Scotty?
10   A.   Yes, sir.
11   Q.   Okay.  Just some of the housekeeping matters
12        that we have, first of all the deposition today
13        is limited to a qualified immunity issue which
14        is a legal issue that I think your attorneys
15        probably explained to you.  And we are going to
16        reserve our rights to retake your deposition if
17        necessary at a later date to review your
18        medical, your damages, life care plans.  You
19        have listed several witnesses, you have several
20        doctors.  So, all of the medical and that type
21        of thing would be done at a later date, okay.
22        So, we are going to talk about, basically, the
23        traffic stop that gives rise to his lawsuit.
24             So, housekeeping matters are, and I want
25        you to understand these, is that you have the
```

1      right to read and the deposition.  There will

2      be a transcript.  Your attorneys will advise

3      you you will read and sign or waive it at the

4      end of the deposition.  Please give verbal

5      responses, yes or no, but please and articulate

6      an answer, because the court reporter, as you

7      see, cannot get down a shake of the head.  You

8      understand that as well?

9  A.  Yes, sir.

10 Q.  Okay.  Thank you.  And let me finish my question

11     before you answer, and I will give you the same

12     respect.  I will listen to your answer and will

13     ask another question until you're done, okay?

14     Is that a yes?

15 A.  Yes, sir.

16 Q.  Thank you.  Please don't speculate.  It is okay

17     to say I don't know or I don't remember.  I

18     understand that this incident occurred over, you

19     know, four-and-a-half years ago and, your

20     memory -- you may not -- you may remember some

21     things.  If you don't, that is okay.  I may ask

22     it several different ways, but if you don't know

23     don't speculate.  If you answer a question I

24     will assume that you completely understand the

25     question.  Do you understand that?

```
 1   A.   Yes, sir.
 2   Q.   If you need a break at any time, you know, I
 3        understand you are in a wheelchair, you recently
 4        had surgery.  Please, just tell me I need to
 5        take a break, and we will take a break to
 6        accommodate you, okay?
 7   A.   Yes, sir.
 8   Q.   Does the surgery that you underwent in late
 9        October of this year, 2022, in any way impair
10        your ability to provide truthful testimony here
11        today?
12   A.   No, sir.
13   Q.   Okay.  And have you taken any type of
14        medications prior to this deposition?  Let me
15        just ask that question first:  Have you taken
16        any type of medications?
17   A.   You mean, like list them?
18   Q.   Anything.
19   A.   I mean, just my pain meds that I normally take
20        and my spasm medicine and nerve medicine.
21   Q.   Okay.  Would the taking of those medications in
22        any way impair your ability to give truthful and
23        accurate testimony?
24   A.   No, sir.
25   Q.   Let's see.  All right.  Do you have a driver's
```

```
 1          license with you today, or some sort of
 2          identification?
 3     A.   Yes, sir.  I think.
 4     Q.   While you are doing that, can you tell me how
 5          you arrived here today?
 6     A.   By cab.
 7     Q.   By cab.  You took a cab from your home in
 8          Zachary?
 9     A.   Yes, sir.
10     Q.   Okay.  Are you able to drive a vehicle?
11     A.   Yes, but no.
12     Q.   Okay.
13     A.   Because I feel like my medicine makes me too
14          sleepy.
15     Q.   Okay.  Fair enough.
16               MR. KROUSE:
17                    We are going to attach a copy of this
18               exhibit.  Don, Lane if you can be kind
19               enough to make a copy of it, but I just
20               want to read this in to the record.
21                         (Exhibit Number Exhibit 1 was
22                         marked for identification
23                         purposes.)
24     BY MR. KROUSE:
25     Q.   Your license number is 011662070.  Your date of
```

CLIFTON DILLEY
12/08/2022
Page 12

```
 1            birth is September 24, 1998; is that correct?
 2    A.   Yes, sir.
 3    Q.   Your name is Clifton Larry Scott Dilly; is that
 4            correct, your full name?
 5    A.   Yes, sir.
 6    Q.   You live at 4945 Saint Louis Street in Zachary,
 7            Louisiana 70731; is that correct?
 8    A.   Nine one.
 9    Q.   Nine one.  Okay.  This says you are five feet
10            eleven, 180 pounds when this was issued on
11            9-29-2022; is that correct?
12    A.   Yes, sir.
13    Q.   At the time of this incident, your weight was a
14            little greater than that; is that correct?
15    A.   About in the two hundreds.  I was chunky.
16    Q.   So, five eleven, two hundred or so in the time
17            of July 2018?
18    A.   Yes, sir.
19    Q.   Okay.
20    A.   Yeah, I dropped about 20 pounds in a three-day
21            span just from throwing up.
22    Q.   You haven't gained back that weight, obviously?
23    A.   Not really.
24    Q.   Okay.  Okay.  And did you have any problems when
25            you obtained the driver's license?  I assume you
```

```
 1            were in a wheelchair at that time?
 2   A.    No, the class was moderately easy.
 3   Q.    And you didn't have to drive a car or anything,
 4            right?
 5   A.    Yeah.
 6   Q.    Oh, you did?
 7   A.    I had to do like a two-hour drive, like, a ride
 8            around BR and then ride back to my house.  They
 9            made me do the hand controls for, like, the
10            first half, and then try to use my feet if I
11            could, because it was easier with the brace.  I
12            wanted to ask them if I could try it without, I
13            mean, he's in the car so if anything went wrong
14            it would be good.
15   Q.    So -- I'm sorry.  I didn't mean to interrupt.
16            But you were able to pass the driving test?
17   A.    Yes.
18   Q.    And is your car that you drive specially
19            equipped for your needs?
20   A.    I don't have a car right now.
21   Q.    Okay.  Family car?
22   A.    It's not equipped.
23   Q.    Okay.  Fair enough.  Have you resided at this
24            address since 2018?
25   A.    Yes, sir.
```

CLIFTON DILLEY

```
 1   Q.   Was this where you were born and raised?

 2   A.   No.

 3   Q.   Where were you born and where were you raised?

 4   A.   You mean like Woman's Hospital?

 5   Q.   What city?

 6   A.   Baton Rouge, but I'm not -- I just know where my

 7        memory starts is in Zachary, but not there.

 8        It's Robert Street, down the street a little bit

 9        from where I live now.

10   Q.   Okay.

11   A.   And then moved from there to Live Oak or

12        Livingston Parish for seventh grade.  Then

13        eighth through tenth in Central, and then

14        finished out at Zachary Career and Technical

15        Center.

16   Q.   Where did you graduate from high school?

17   A.   Zachary Career and Technical Centers.  So, it's

18        like a sub genre of Zachary High School?

19   Q.   Is it a vocational type of school?

20   A.   More focused on trade.

21   Q.   Trade.  Okay.  What was your trade?

22   A.   Carpentry.

23   Q.   Okay.  And what year did you graduate from that

24        school?

25   A.   2016, I'm pretty sure.
```

```
1    Q.    What is your Social Security Number?
2               MR. KROUSE:
3                    I will ask the court reporter, for
4               the record, just to get the last four on
5               the record.  The rest of it will be
6               blacked out.
7    BY MR. KROUSE:
8    Q.    But if you could state your --
9    A.    XXX-XX-2033.
10   Q.    How long have you been a licensed driver?
11   A.    Since 18.
12   Q.    Since you were 18 years old?
13   A.    Yes.
14   Q.    How old are you today?
15   A.    Twenty-four.
16   Q.    Okay.
17   A.    But, I mean, only one year of, like, normal
18         driving and then I guess the rest in a
19         wheelchair.
20   Q.    Gotcha.  Who resides in your home with you?
21   A.    My stepfather, Richard Higginbotham, and my
22         mother, Debra Higginbotham (spelled
23         phonetically).
24   Q.    Do you have any sisters or brothers?
25   A.    Not in the house, but I have one blood sister
```

| | | |
|---|---|---|
| 1 | | and a stepbrother. |
| 2 | Q. | **And your blood sister's name is?** |
| 3 | A. | Caitlin (spelled phonetically) Dilley, and then |
| 4 | | stepbrother is Cameron (spelled phonetically) |
| 5 | | Higginbotham. |
| 6 | Q. | **How old is Caitlin?** |
| 7 | A. | Thirty.  I had to remember. |
| 8 | Q. | **What is her address?** |
| 9 | A. | Hammond. |
| 10 | Q. | **In Hammond.  That's all you know?** |
| 11 | A. | Yeah. |
| 12 | Q. | **And is she married with children or?** |
| 13 | A. | She has a boyfriend. |
| 14 | Q. | **Okay.** |
| 15 | A. | They've been together five years I think.  So, |
| 16 | | you know, could be any time. |
| 17 | Q. | **Okay.  And Cameron Higginbotham, how is she?** |
| 18 | A. | He. |
| 19 | Q. | **Oh, he.  I'm sorry.** |
| 20 | A. | He is -- I think, 26.  He's only a couple of |
| 21 | | years older than me. |
| 22 | Q. | **And where does he reside?** |
| 23 | A. | Denham right now. |
| 24 | Q. | **In Livingston, Denham Springs?** |
| 25 | A. | Yeah. |

```
 1   Q.   Is he married with children?

 2   A.   He has a child.

 3   Q.   He has a child.

 4   A.   But not married, girlfriend.

 5   Q.   Okay.  I assume you met with your attorneys to

 6        prepare for the deposition.  My question is

 7        this:  Did you have an opportunity to review any

 8        documents before this deposition to prepare for

 9        it?

10   A.   What do you mean by documents?

11   Q.   Paper.

12   A.   No, sir.

13   Q.   Any type of reports, investigative reports,

14        statements, photographs?

15   A.   Yes.

16   Q.   Okay.  Tell me what you reviewed, videos?

17   A.   Yes.

18   Q.   So, I'm trying to understand what you

19        specifically reviewed.

20   A.   Video of the shooting and the voice recording of

21        when I originally got shot and the detective,

22        and the detective's recording.

23   Q.   Okay.  Did you review anything else?

24   A.   That's all.

25   Q.   Have you been back to the scene where this
```

```
 1        happened off of Perkins since this event in
 2        2018?
 3   A.   Yes, I had a school project and it asked about
 4        my life, so I just kind of did like that.
 5                        (Deponent motions with his
 6                        hands.)
 7   BY MR. KROUSE:
 8   Q.   I don't understand what you're saying.
 9   A.   I took pictures of, like, the grocery store and
10        was like -- it didn't get an 'A'.
11                   MADAM COURT REPORTER:
12                        I'm sorry.  I didn't understand you.
13   A.   It was for a school project, but I just took
14        pictures of the thing and that was about it.  It
15        was a photography class.
16   BY MR. KROUSE:
17   Q.   Did you go behind it where --
18   A.   Yeah.
19   Q.   -- the events happened?  Okay.  And what year
20        did you take these pictures?
21   A.   2020 maybe.
22   Q.   Okay.  Do you still have those pictures?
23   A.   Somewhere I guess on the computer.
24             MR. KROUSE:
25                        We will call for the production of
```

```
 1                the pictures if they are available.
 2   BY MR. KROUSE:
 3   Q.   If you can provide them to your attorney.  If
 4        they're not available that's fine.  Just tell us
 5        one way or the other.
 6   A.   All right.
 7   Q.   Did you take any video of the area?
 8   A.   No.
 9   Q.   Okay.  It was for a school project?
10   A.   Yes.
11   Q.   When you were there after this event, what was
12        going through your mind?
13   A.   Damn.
14   Q.   What do you mean by that?
15   A.   Trying to find the words.  I didn't say much, I
16        can tell you that, when I was there.
17   Q.   What was going through your mind?
18   A.   If this camera wasn't here I don't know how this
19        would've turned out.
20   Q.   Okay.  And you are speaking of the surveillance
21        camera on the back side of the grocery store; am
22        I correct?
23   A.   Yes, sir.
24   Q.   Okay.  Did you ever talk to anybody associated
25        with the grocery store?
```

```
1   A.   No.
2   Q.   Okay.  Did you meet with anybody else to discuss
3        or prepare for the deposition today, any type of
4        experts?
5   A.   No, sir.
6   Q.   Nobody?
7   A.   Just Don and Lane.
8   Q.   Okay.  Have you discussed your deposition today
9        with any of your family members that we just
10       discussed?
11  A.   My mom.
12  Q.   Okay.  Just because?
13  A.   Yeah.
14  Q.   What did you discuss with your mom?
15  A.   I don't know.  Not much.
16  Q.   She knows you are here today, right?
17  A.   Yeah.
18  Q.   Okay.
19  A.   That's basically it.  Just talking about like
20       speak the truth, that type of deal.
21  Q.   Okay.  Have you spoken with any of the
22       individuals who were in the car with you --
23       we're going to get into that -- but prior to
24       this deposition?  So, let's go through them:
25       Mr. Mire?
```

```
 1   A.   Who?

 2   Q.   Mire, the driver of the car.

 3   A.   I just know him by Jamaal.  I didn't know his

 4        last name.

 5   Q.   Okay.  Have you talked to him in the four years?

 6   A.   I will say only once.  It was at Mike's.  I just

 7        happened to run in to him.  Mike's in Tigerland

 8        to specify.

 9   Q.   Okay.

10   A.   But it wasn't a good interaction, because I was

11        pissed.  If he wouldn't have told me to run I

12        wouldn't have ran, because I didn't know what

13        the hell was going on.  So, yeah.  So, I was

14        like you just left me there like a piece of

15        meat.  That's how I felt.  Felt like I was bait

16        or some shit.

17   Q.   So, you blame Jamaal?

18   A.   I wouldn't say blamed him, but it definitely

19        didn't help the situation.

20   Q.   Okay.

21   A.   So, I was mad.  I mean, that was the first time

22        I seen him since the whole thing.  He didn't,

23        like, come to the hospital or nothing after all

24        that.  I was mad.

25   Q.   Did you have an altercation?
```

CLIFTON DILLEY

```
 1   A.   No, I got loud.  That's about it.

 2   Q.   But there were no --

 3   A.   No, I think he ended up buying me a drink and I

 4        was, like, whatever and then left.

 5   Q.   Were you in the wheelchair at Mike's?

 6   A.   Yes.

 7   Q.   Did he ask about your condition or anything?

 8   A.   Yeah, we had that talk.  Just in therapy, I

 9        think was as far as that went.

10   Q.   What year was this?

11   A.   2019.

12   Q.   Okay.  Three years ago, before the pandemic and

13        all that?

14   A.   Yeah, right in that little window.

15   Q.   Have you talked to him since?

16   A.   No.

17   Q.   Okay.  Do you have his phone number?

18   A.   No, sir.

19   Q.   Address?

20   A.   No, sir.  I think he lives somewhere in Texas if

21        I remember what he told me at the bar, but that

22        could have changed.  I have no idea.

23   Q.   Yeah.  Okay.  What about Tokyo?

24   A.   I mean, right after yeah, because he was the

25        only person I really knew in that car.  So, I
```

```
 1          mean, he was there the next day.
 2   Q.     At the hospital?
 3   A.     Yes, sir.
 4   Q.     So, he did visit you?
 5   A.     Yeah.
 6   Q.     Okay.
 7   A.     That's what I was saying, that was my actual
 8          friend.
 9   Q.     Right.
10   A.     Then he ended up getting arrested for something
11          he did.
12   Q.     Where was he arrested?
13   A.     Atlanta, because of some prior stuff he had.
14          And then he apparently got picked up for expired
15          tags or something on a car that he just bought,
16          because I was on the Facetime with him signing
17          the deed or whatever it's called.
18   Q.     For the car?
19   A.     Yeah, and then he drives off, like, okay, drive
20          safe.  Don't do nothing stupid.  He gets pulled
21          over for tags and then got extradited to
22          Louisiana.  Got out on bail, tried to go pick
23          the car back up, and got pulled over for the
24          same exact thing.
25   Q.     So, is he in prison in Georgia right now?
```

```
 1   A.   Yes, sir.  He gets out in January, I think.
 2   Q.   Okay.  Have you had conversations with Tokyo
 3        while he's been in prison?
 4   A.   Originally, yes, but I kind of lost contact.  I
 5        got a new number and then I don't know how all
 6        works.
 7   Q.   Okay.  And, Jeremiah, did you have any
 8        conversations prior to the deposition with
 9        Jeremiah?
10   A.   I saw him, like, I think, so I guess, 2021 when
11        I started stand-up or -- is that 2020?
12   Q.   When you say stand-up you were --
13   A.   Stand-up comedian.
14   Q.   Stand-up comedian.  How long were you doing
15        standup comedy?
16   A.   To answer your first question --
17   Q.   Right.
18   A.   -- I would say between the end of -- well, I
19        guess, that answers both questions because it
20        was kind of in the same zone.  I'm trying to
21        think.  It was the same, it was the anniversary
22        of my dad's death and I was dealing with this
23        girl, and it wasn't working out.  So, I was in a
24        bad place and I wanted to do comedy so, I was
25        like, do it.  You ain't got nothing better to
```

```
 1           do.  So, I think it was, like, June or July of
 2           2020.
 3      Q.   Okay.
 4      A.   Because of Covid it was, like, just being a
 5           thing.
 6      Q.   So, you saw Jeremiah in June or July 2020?
 7      A.   Yeah, something like that.
 8      Q.   Were you at a club doing standup?
 9      A.   The Station.
10      Q.   At where?
11      A.   The Station.
12      Q.   What is The Station?  I'm not familiar with
13           that.
14      A.   A sports bar and grill.
15      Q.   In Baton Rouge?
16      A.   Yes, sir.  It's off of College.
17      Q.   Okay.
18      A.   Bennington Avenue.
19      Q.   What propelled you to be a standup comedian?
20      A.   People were saying I was a funny.  When I was
21           sitting in the hospital that's all I was
22           watching was standup and this show.  There's a
23           podcast called YMH and I watched that, Tom
24           Segura, all that.  A couple -- this dude Michael
25           Laird.  He's a dude in a wheelchair.  He's got
```

```
 1         like -- what's it called?  ALS.
 2    Q.   Right?
 3    A.   And he was still doing it, so I was like he's
 4         half saying his words and still getting major
 5         laughs.  I was like if he could do it I could
 6         try it.
 7    Q.   How did you do?
 8    A.   What do you mean?
 9    Q.   Were you a good standup comedian?  Were you
10         making the audience laugh?
11    A.   I was there last night and I was doing pretty
12         good.
13    Q.   Oh, you were there last night?
14    A.   Yes, sir.
15    Q.   At The Station?
16    A.   Yes, sir.
17    Q.   So, how long is your routine?
18    A.   Last night it was kind of short because I ended
19         on a good note.  Normally, on a good night if
20         there's not a whole bunch of people, because The
21         Station kinda gets a big crowd of comedians,
22         normally around 25 to 30.  But if it's like 21,
23         we'll get five minutes.  If it's 30 we'll get
24         like four minutes.  So, my set was four minutes
25         but I only used like three, because I ended on a
```

```
 1          good note.
 2   Q.     And how often do you perform as a standup
 3          comedian?
 4   A.     Every week Monday and Wednesday.
 5   Q.     Does that bring joy to your life?
 6   A.     Very much.
 7   Q.     Are you getting better at it?
 8   A.     Very much.
 9   Q.     Has anybody contacted you to take the next step?
10   A.     I had one and then it was going to be like a $30
11          gig in New Orleans for ten minutes --
12   Q.     Thirty dollars for ten minutes?
13   A.     Yes.
14   Q.     Okay.
15   A.     Yes, sir.  I told the dude I was like well, I
16          don't know if I can get out there, because I
17          don't have a ride and he said what about 30
18          bucks.  I said maybe my mom will bring me.  I
19          can say it's a paid gig.  But he didn't end up
20          contacting me back, so I was like, well, damn
21          and I haven't seen him again to say something to
22          him.
23   Q.     Right.  Right.  So, you're still working your
24          craft?
25   A.     Yes, sir.
```

```
 1   Q.   But you enjoy it?

 2   A.   Because I'm --yes.

 3   Q.   You do enjoy it?

 4   A.   Very much.

 5   Q.   Okay.  So, you've got kind of a steady gig twice

 6        a week from here on end?

 7   A.   Yes.

 8   Q.   Okay.  Does it pay?

 9   A.   No, that's the only bad part.

10   Q.   You're just trying out?

11   A.   At open mics.

12   Q.   Gotcha.  All right.  Besides the standup

13        comedian, what is your current status as far as

14        employment is concerned?  Are you doing

15        anything?

16   A.   I'm unemployed.  I'm about to start looking for,

17        like, a Walmart greeter or something in the

18        meantime.

19   Q.   But you were at BRCC at some point, right?

20   A.   Yes, sir.

21             MR. CAZAYOUX:

22                  AJ, excuse me.  I don't mean to be

23        picky --

24        MR. KROUSE:

25                  We're getting in to too much
```

```
 1              background?  That's fine.  I'm going to
 2              try to keep this -- I'll move on.
 3          MR. CAZAYOUX:
 4              Thank you.
 5          MR. KROUSE:
 6              And I'm sorry.
 7   BY MR. KROUSE:
 8   Q.  Okay.  Let's turn to the incident, July 10 2018,
 9       but I want to start in the morning of July 2018.
10       And, actually, July 9 the day before, because
11       this event happened about 3:02 a.m. on Perkins
12       Road in Baton Rouge, correct?
13   A.  Yes, sir.  Perkins and Potwin.
14   Q.  Yes.  So, on July 9 that morning, first of all,
15       where were you living?
16   A.  Saint Louis Street 4945.
17   Q.  What's the address?
18   A.  4945 St. Louis Street.
19   Q.  In Baton Rouge?
20   A.  Zachary.
21   Q.  Zachary.  Okay.
22   A.  I was still with my parents.
23   Q.  Okay.  Did you go anywhere during the morning
24       that day?
25   A.  I don't think so.
```

```
 1   Q.   Okay.
 2   A.   I think I was just chilling at the house.
 3   Q.   Did you meet up with anyone during the morning,
 4        any of these three other guys?
 5   A.   Not the morning.
 6   Q.   Okay.  When did you meet up with them?
 7   A.   I mean, it would be a guess if I said.  I mean,
 8        maybe around five something I guess.
 9   Q.   Where did you meet them?  Was this at Reggie's
10        or somewhere in Tigerland?
11   A.   I am trying to remember.  I think at AJ's house.
12   Q.   Who is AJ?
13   A.   A dude.
14   Q.   Okay.
15   A.   That I knew at the time.
16   Q.   Does he have last name?
17   A.   I don't know.  I just knew him by AJ.
18   Q.   Okay.  Do you have your cell phone with you?
19   A.   Yes, sir.
20   Q.   Would you able to look up AJ --
21             MR. CAZAYOUX:
22                  No, we're not going to do that right
23             now, AJ.
24             MR. KROUSE:
25                  Okay.  All right.  Let me keep going.
```

```
 1   BY MR. KROUSE:
 2   Q.   That morning did you consume any type of
 3        alcohol?
 4   A.   No, sir.
 5   Q.   Did you take any type of medication that
 6        morning?
 7   A.   No, sir.
 8   Q.   Were you prescribed any type of medications
 9        before this incident?
10   A.   No, sir.
11   Q.   Did you take any type of illegal drugs,
12        marijuana, meth, anything like that that morning
13        or any time during that day?
14   A.   I might've smoked marijuana at some point.
15   Q.   Okay.  Do you recall how much marijuana you
16        smoked?
17   A.   Not a lot.  I was broke.
18   Q.   Okay.  Was it your marijuana or somebody else's?
19   A.   I was broke so it was somebody else's.
20   Q.   Somebody else's.  Okay.  So, can you give me a
21        general idea of how much marijuana you smoked
22        before this incident?
23   A.   A blunt.
24   Q.   Okay.  And what does that mean in layman's
25        terms?
```

CLIFTON DILLEY

```
1   A.   A gram.

2   Q.   Was it laced with anything?

3   A.   No, sir.

4   Q.   And when I use the term, laced, do you know what

5        that means?

6   A.   Yes, sir.

7   Q.   Okay.  Have you ever used marijuana with

8        anything that it's been laced with?

9   A.   No, sir.  I hope not.

10  Q.   Did you take any type of gummies, oils, things

11       that are now available, you know, on the street

12       these days?

13  A.   No, sir.

14  Q.   Okay.

15  A.   Those are expensive.

16  Q.   Okay.  And how were you smoking the blunt, was

17       it just the bong or straight --

18  A.   Cigar.

19  Q.   Cigar.  And were you sharing it with somebody or

20       was it just all yours?

21  A.   Sharing.

22  Q.   With how many people?

23  A.   Maybe a couple, like, three probably.

24  Q.   Okay.

25  A.   I'm just guessing on that one.
```

1    Q.    This smoking of this blunt, what time did that
2          occur on the 9th of July?
3    A.    Say again.
4    Q.    What time were you smoking the blunt on the 9th
5          of July?  Can you give me a range,
6          approximately?
7    A.    2:00.
8    Q.    Okay.  And how long were you smoking for.
9                MR. CAZAYOUX:
10                    I'm wondering -- AJ, I guess --
11               THE WITNESS:
12                    Are you talking about before the
13         shooting?
14               MR. KROUSE:
15                    Before the shooting.
16               MR. CAZAYOUX:
17                    We're calling it the 9th of July or
18         the 10th of July?
19               MR. KROUSE:
20                    The 9th of July.
21               MR. CAZAYOUX:
22                    So, not the 10th of July, the morning
23         of the shooting.  Not that.
24               MR. KROUSE:
25                    Right.

```
1              MR. CAZAYOUX:
2                   He's talking about the 9th, the day
3          before.
4              MR. KROUSE:
5                   Right.
6    A.   I have no idea.
7    BY MR. KROUSE:
8    Q.   Did you go anywhere during that afternoon, or
9         did you stay at home?
10   A.   I was at that house, AJ's.
11   Q.   Anybody with you?
12   A.   Tokyo and Jamaal.
13   Q.   Okay.
14   A.   They had a couple of people there, but just a
15        couple of girls and then my buddy, David.
16   Q.   Okay.
17   A.   But they didn't come with us.  The only people
18        that went to Reggie's was -- from the house was
19        me, Jamaal and Tokyo.
20   Q.   Tell me about your relationship with Tokyo.  How
21        long have you known him?
22   A.   At the time just that year, yeah.  And I had
23        came back from Texas and my buddy David was
24        hanging out with Tokyo.  And so, I met him
25        through David.  And since me and David are so
```

```
 1            close we just kind of all meshed together and it
 2            was the trio.  So --
 3   Q.   And the trio is you, Tokyo, and --
 4   A.   David.
 5   Q.   David.  Go ahead.
 6   A.   I was doing videography at the time, after
 7            trying to do videography at the time.  And Tokyo
 8            is a rapper.  And then David was the manager,
 9            was the -- was what we were trying to do.
10   Q.   Okay.  And so, you knew -- what's your
11            relationship with Jamaal Mire?  How long had
12            that been going on?
13   A.   Maybe a couple of months.  I met him through
14            Tokyo and, yeah.
15   Q.   What did Jamaal Mire do for a living?
16   A.   I don't know.
17   Q.   Don't know.  So, did you consume any alcohol
18            during that afternoon, either at Reggie's, at
19            David's house, AJ's house?
20   A.   At the bar, yes.
21   Q.   Okay.
22   A.   I had a couple of beers and a couple Red Bull
23            vodkas.
24   Q.   Red Bull vodkas in what size glass?
25   A.   Reggie cup, so, basically I just, like, a coffee
```

```
 1        cup.
 2   Q.   Like a coffee cup.  Is that your drink of
 3        choice?
 4   A.   To start the night, yes.
 5   Q.   Okay.  Throughout that afternoon and, you know,
 6        up until this incident how much did you have to
 7        drink?
 8   A.   What I said.
 9   Q.   Anything more than that?  A couple of beers and
10        couple of vodka Red Bulls?
11   A.   No, sir.
12   Q.   What did you say?
13   A.   Like, two beers and, like, maybe two or three
14        Red Bull vodkas.
15   Q.   And type of vodka?
16   A.   Well.  Remember, I said I was broke.
17   Q.   Right.  I gotcha.  You didn't take any type of
18        medications?
19   A.   No, sir.
20   Q.   Did you smoke any more marijuana that night?
21   A.   Not until 2:00.
22   Q.   2:00 a.m.
23   A.   2:00 a.m.
24   Q.   A.m.  On July --
25   A.   July 10th, right.
```

```
 1   Q.   Right.  So, this would have been about an hour
 2        before the incident?
 3   A.   Yes.
 4   Q.   So, tell me what you smoked and how much you
 5        smoked at 2:00 a.m.
 6   A.   Same thing: cigar, gram, blunt.
 7   Q.   So, that would've been your second blunt?
 8   A.   Yes, sir.
 9   Q.   In say, a 12-hour period?
10   A.   Yeah.
11   Q.   Okay.  Prior to the stop, did you take any other
12        type of drugs?
13   A.   No, sir.
14   Q.   What was -- let me get to that.  So, between
15        6:00 p.m. on July 9, 2018, and the time of this
16        incident at about 3:00 a.m. on July 10th,
17        starting about 6:00 p.m., do you recall what you
18        were doing?  Were you at Reggie's?
19   A.   Say that one more time.
20   Q.   So, at 6:00 p.m. on July 9th, the night before
21        this happened, where were you?
22   A.   Still at AJ's.
23   Q.   Okay.  At his house.  When did you move from
24        AJ's to go to Reggie's?
25   A.   I guess maybe 9:00 or 10:00, and then moved into
```

```
 1        --
 2   Q.   From Reggie's did you go to any other bars?
 3   A.   No.
 4   Q.   Okay.
 5   A.   No, sir.
 6   Q.   All right.  Tell me about Reggie's, what type of
 7        bar is that?  Just a regular Tigerland bar?
 8   A.   Trashy.
 9   Q.   Trashy.  Okay.
10   A.   Trashy, cheap, where the college kids go.  If
11        you're 18 it's the first bar you can get in
12        normally.
13   Q.   Did you meet up with anyone during that evening?
14   A.   Not until we were leaving did we meet, did I
15        meet Jeremiah for the first time.  That was the
16        first time I ever met him.  Yeah, we were just
17        walking out and there was Jeremiah and I was,
18        like, all right.  You are with us now.  I mean,
19        they knew him.  I didn't know him until then,
20        yeah.
21   Q.   What is Jeremiah's last name?
22   A.   I have no idea.
23   Q.   This was the first time you met him?
24   A.   Yes, sir.
25   Q.   Okay.  Were you -- is it a fair statement that
```

```
 1         you, Jamaal Mire, Tokyo, and Jeremiah were all
 2         smoking marijuana that night?
 3    A.   Yes, sir.
 4    Q.   Were you all four smoking mariuana inside the
 5         Saturn VUE that night?
 6    A.   Yes, sir.
 7    Q.   Okay.  Is it fair to say that Jamaal, Tokyo, and
 8         Jeremiah were all drinking that night, alcoholic
 9         beverages?
10    A.   I'm sure they had a few.
11    Q.   Okay.
12    A.   I don't know about Jeremiah, because, I mean, I
13         don't know.  There is no telling.
14    Q.   Okay.  You weren't keeping track of what they
15         were drinking?
16    A.   No.
17    Q.   You were just concerned about --
18    A.   Partying on my own.
19    Q.   Okay.  All right.  But it's fair to say
20         everybody was smoking marijuana and everybody
21         was drinking that night?
22    A.   Yes, sir.
23    Q.   And it was kind of a party then, correct?
24    A.   Guys' night.
25    Q.   Guys' night.
```

CLIFTON DILLEY

```
 1   A.   We didn't get no chicks, but just guys' night.

 2   Q.   Okay.  Were you celebrating anything?  Was there

 3        anything of significance that night, or --

 4   A.   Just bored.

 5   Q.   Bored.  Okay.  What was the common thread that

 6        if there was one between you, Jeremiah, Jamaal

 7        and Tokyo?  Just four guys?

 8   A.   All cool people, and that's about it.

 9   Q.   Okay.  Were you friends as well?

10   A.   I mean, I was friends with Tokyo.

11   Q.   But that's it, right?

12   A.   Yeah, I mean, if you're his friend you're my

13        friend.  That's how it goes.

14   Q.   Right.  But the other two --

15   A.   If he vouches for you then, yeah.

16   Q.   The other two guys you really didn't know?

17   A.   Not really.

18   Q.   Okay.

19   A.   Because I hadn't figured out how I felt about

20        Jamaal yet, and apparently I was right on that

21        assumption.

22   Q.   Okay.  What was the assumption you had before

23        going into this about Jamaal?

24   A.   He is kind of a dick.

25   Q.   What led you to that conclusion?
```

```
 1   A.   The way he talked about Tokyo's music.  He kept
 2        acting like, he kept putting him down, like, he
 3        was bad.  I was like he's not bad you're just
 4        being a dick.  If you want to do some criticism,
 5        do some criticism, but you ain't gotta be an
 6        asshole about it.
 7   Q.   Uh-huh.  So, you thought he was over the line
 8        with their friend?
 9   A.   Yeah, it just kind of rubbed me the wrong way.
10        Especially, like, you're just gonna down him
11        like that and just trash him.
12   Q.   Uh-huh.
13   A.   Especially behind his back as well.  I was like
14        wow, okay.
15   Q.   So, what else, if anything, led you to that
16        conclusion about Jamaal?
17   A.   He's kind of bossy.
18   Q.   How so?
19   A.   Like it's kind of -- he's got that ego like it's
20        his world type of deal.
21   Q.   Was he a controlling type of individual?  Told
22        you what to do and how to do it?
23   A.   Not all that.  Just kinda -- I just don't want
24        to go do this.  And if we did it would, you know
25        -- I only knew him a handful of times, hung out
```

```
 1        with him handful of times but it was his plan,
 2        you know what I mean.  Not to make him sound
 3        like super controlling.  It wasn't like he was
 4        whipping us or something.
 5   Q.   But you really didn't like Jamaal?
 6   A.   I wasn't the biggest fan.
 7   Q.   Not the biggest fan.  Okay.
 8   A.   I was kind of being a little fake.  I'll be
 9        honest just for the sake of Tokyo.  You know
10        what I mean?
11   Q.   But Tokyo introduced you to Jamaal Mire,
12        correct?
13   A.   Yes.
14   Q.   Now, Jamaal Mire was the owner of the Saturn VUE
15        that was involved --
16   A.   I think it was his mom's Saturn.
17   Q.   His mom's Saturn.  Who made the decision that at
18        some point that you were going to get into the
19        car, the four of you guys, and head down Perkins
20        Road?
21   A.   Going home because we were going back to AJ's,
22        because remember I said there was girls there.
23        Well, we missed our shot at the bar, so we were
24        gonna go over there.
25   Q.   And AJ lived off of Perkins somewhere?
```

1    A.    Orleans, I think.

2    Q.    **Okay.  Which is off of Perkins?**

3    A.    Yes, sir.

4    Q.    **Okay.  Did you ever make it there?**

5    A.    No, sir.  We were about a street away.

6    Q.    **When you were -- you would have to take a left**

7          **if you were going from --**

8    A.    To Orleans.

9    Q.    **-- from Siegen to Orleans, correct?**

10   A.    I don't know it that well.  I just know the way

11         I was heading so it probably would be on the

12         right, because we were passing Jack-in-the-Box

13         to go from Jack-in-the-Box on the left like that

14         way.

15   Q.    **Right.**

16   A.    So, then it would be on your left heading that

17         way.

18   Q.    **So, as you were -- I want you to, there's four**

19         **people in this car -- I'm just giving you a**

20         **piece of paper with four boxes.  You can use my**

21         **pen.  Show me, first of all who the driver was**

22         **and his position.**

23                        (Deponent draws as requested by

24                        counsel.)

25   BY MR. KROUSE:

1   Q.   And just write his name.

2   A.   Driver, Jamaal, front seat, left side.  Tokyo,

3        passenger, front seat, right side, me, Scotty,

4        back left, behind the driver.  And I don't know

5        how to spell Jeremiah, but he was on the back

6        right behind Tokyo.

7   Q.   So, J-E-R-E-M-I-A-H, or "J" for Jeremiah.

8   A.   It's spelled with a "I".

9   Q.   Okay.

10  A.   That's about all.

11  Q.   Let's just put "J".  But he was sitting next to

12       you in the back seat?

13  A.   Yes, sir.

14  Q.   Had you ever before rode with all of these

15       individuals in this Saturn VUE before this

16       occasion?

17  A.   No, was the first time I met Jeremiah.

18  Q.   Okay.  My question is had you ever ridden with

19       all four of these guys?

20  A.   No, fir.

21  Q.   Okay.  Had you ever driven before with --

22  A.   The only combination would be Tokyo and Jamaal.

23  Q.   Okay.

24  A.   Like, a handful of times.

25  Q.   But you had ridden before with Jamaal?

```
 1   A.     Yeah.
 2   Q.     So, if I can get that back from you, I'm going
 3          to mark that as "Exhibit 2".
 4                          (Exhibit Number Exhibit 2 was
 5                          marked for identification
 6                          purposes.)
 7              MR. KROUSE:
 8                  Thank you.
 9              THE WITNESS:
10                  No problem.  Is it okay if I --
11              MR. KROUSE:
12                  Do you want to take a break?
13              MR. CAZAYOUX:
14                  Let's just go off the record for a
15          second.
16                          (Counsel stipulates to go off
17                          the record momentarily.)
18   BY MR. KROUSE:
19   Q.     Did you or any of the passengers have any
20          weapons in this vehicle as you were going down
21          Perkins Road?
22   A.     No, sir.
23   Q.     How do you know that?
24   A.     I didn't see any.
25   Q.     You didn't have any?
```

```
 1   A.   Yeah, I know that much for a fact.
 2   Q.   I'm sorry?
 3   A.   I said I know that much for a fact that I did
 4        not have any.
 5   Q.   But you don't know for a fact whether there were
 6        --
 7   A.   For a fact, no.
 8   Q.   Can you describe for me the drive, the place
 9        that they left from until Mire was pulled over
10        by Trooper Domingue?
11   A.   Say that again.
12   Q.   Where were you going, or coming from, and where
13        were you going?
14   A.   I think you told me AJ's -- Yeah.
15   Q.   -- right before you --
16   A.   So, we went from Reggie's to Jamaal's house, I
17        guess, to get some weed, because I didn't get
18        out the car.  And then got back in, we were
19        going to AJ's to go hang out with the girls.
20   Q.   And Jamaal lives where?
21   A.   Couldn't tell you.  I have no clue.
22   Q.   Do you have the subdivision within Baton Rouge?
23   A.   I mean, I could just can tell you what the house
24        looks like.
25   Q.   Okay.
```

```
 1   A.   It was one of them houses when they got the tin
 2        roof parking lot type of deal.
 3   Q.   Okay.
 4   A.   Like, and then a little fence and the house
 5        would be up in there.
 6   Q.   So, this was just like a temporary stop so he
 7        could get the weed and get back in the car?
 8   A.   Yes, sir.
 9   Q.   Okay.  This was at approximately 1:00 a.m.?
10   A.   Best guess, yes, sir.
11   Q.   Okay.  How long had you been in the car before
12        being pulled over?
13   A.   I guess 40 minutes to an hour.  I guess that
14        timing, I guess.
15   Q.   At some point Mr. Jamaal Mire who was the driver
16        of that vehicle made a U-turn on Perkins Road;
17        is that accurate or do you remember any of that?
18   A.   I don't know where he did the illegal U-turn if
19        I'm honest.
20   Q.   Okay.
21   A.   But so, but it was on Perkins for sure.  I mean
22        --
23   Q.   Okay.  Do you know why he made an illegal
24        U-turn?
25   A.   No, that's what I'm saying I don't know where
```

```
 1          the illegal U-turn was.  I mean, I think we were
 2          turning around to go right, yeah.
 3     Q.   But you were turning around in the middle of a
 4          state road?
 5     A.   That's what I'm saying, I don't know where the
 6          U-turn was.
 7     Q.   Okay.  So, you don't remember anything about it?
 8     A.   The initial U-turn, no.
 9     Q.   Did you ask him what he was doing?
10     A.   I didn't know he did it.
11     Q.   Gotcha.
12     A.   I just saw the lights after that I was like,
13          what are you doing, you know what I mean.
14     Q.   So, he makes the illegal U-turn, and then do you
15          see lights from the trooper's vehicle?
16     A.   Yes, sir.
17     Q.   And at that time did Mr. Mire pull over the
18          vehicle on Perkins?
19     A.   He made -- yes, sir.  He pulled over behind the
20          Village Grocery.
21     Q.   So, he did not pull it over on Perkins where you
22          were?
23     A.   Well, I guess then --
24     Q.   I'm just asking.
25     A.   Not directly on the street, no.
```

CLIFTON DILLEY

```
 1   Q.   Okay.  He could have?

 2   A.   Probably, but that's not me.

 3   Q.   Okay.  I might have to ask him?

 4   A.   Yes, sir.

 5   Q.   Okay.  Do you know why you went down Potwin --

 6   A.   No, sir.

 7   Q.   -- and then behind this Village Grocery store?

 8   A.   No, sir.  It's just what he chose, I guess.

 9   Q.   Was there any discussion among the four of you

10        once the vehicle stopped behind the Village

11        Grocery store?

12   A.   No, sir.

13   Q.   Was there any discussion of you or any of the

14        four of you running from the vehicle when

15        approached by the trooper?

16   A.   No, sir.

17   Q.   Did you have any discussions of any type of

18        codes or signals given by Mire or anyone to run

19        before the trooper approached the vehicle?

20   A.   No, sir.

21   Q.   There were drugs, marijuana, in the vehicle when

22        it was stopped; is that correct?

23   A.   Yes, sir.

24   Q.   Did you understand that this was a stop made by

25        a Louisiana State Trooper?
```

```
 1    A.    No, sir.  I just knew it was the police.  I
 2          mean, all I could see was red and blue lights.
 3    Q.    Okay.  Describe for me what happened once the
 4          vehicle was stopped?
 5    A.    I mean --
 6    Q.    Behind the Village Grocery.
 7    A.    I remember, I mean, she had her gun up, getting
 8          him out, telling him to get out the car.
 9    Q.    You're saying Trooper Domingue had her gun out?
10    A.    Or taser.
11    Q.    Okay.
12    A.    Something, because I mean, I just happened to
13          look back to may left and see her holding
14          something up.
15    Q.    Okay.
16    A.    Telling him to get out the car from like the
17          back left taillight, about that far.
18    Q.    Okay.
19    A.    And then -- what was the question again?
20    Q.    What do you recall what happened rafter that
21          vehicle was stopped?
22    A.    And then he gets out and walks back to her car.
23          They're doing whatever and here he is next to
24          Tokyo in the -- he's in the passenger seat on
25          the front right.  He runs up and says run.  And
```

```
 1        we all looked at each other like what the fuck,
 2        and I just kinda ran, yeah.
 3   Q.   So, Jamaal Mire told everybody to run, correct?
 4   A.   Yes, sir.
 5   Q.   Okay.  And Trooper Domingue didn't tell you to
 6        exit the vehicle, correct?
 7   A.   Yes, sir.
 8   Q.   You told me before that Mire told you to run.
 9            MR. CAZAYOUX:
10                I'll object to the form of the
11            question.
12            MR. KROUSE:
13                Okay.  I'll rephrase it.  I'll strike
14            the question.
15   BY MR. KROUSE:
16   Q.   Jamaal Mire told you to run?
17   A.   Yes, sir.
18   Q.   Okay.  There was one individual in the car that
19        did not run; is that correct?
20   A.   That would be Tokyo Sconiers.
21   Q.   And did you ever learn why Tokyo did not run?
22   A.   He knew the law lot better.  I didn't know you
23        could just sit there and be like yeah I don't
24        have nothing to do with all this.  Because if
25        I'd have known there I'd have sat there like a
```

```
 1          good little boy.  I didn't know you could just
 2          do that.  I thought I was about to get in
 3          trouble for something I didn't do.
 4     Q.   When you say that Tokyo knew the law better, did
 5          you have a conversation with him later about
 6          that specific aspect of the law?
 7     A.   Yes, because I was, like, well why did you sit.
 8          He was like, well, I'm not stupid.  I guess,
 9          that's more or less what when it came down to.
10     Q.   Was he calling you stupid?
11     A.   Not actually but he just was more informed on
12          it.
13     Q.   What specifically was he more informed on?
14     A.   That he could sit there and then go be
15          interviewed and do all that, and him -- if he
16          didn't do anything you don't have to run.
17          Simple as that.  That's what I'm trying to say.
18     Q.   Right.
19     A.   And my high, drunk ass says, I'm out because I
20          didn't know all that.
21     Q.   Were you drunk at the time you ran from the car?
22     A.   I'd say more high than drunk since I had freshly
23          smoked a blunt.
24     Q.   Okay.  How high were you?
25     A.   I mean, I really don't know how to judge that
```

```
 1          scale.  I'd say a seven, I guess, seven out of
 2          ten.
 3     Q.   Ten being the worst or extremely high?
 4     A.   Yes, sir.
 5     Q.   Okay.  When you -- at the time that you did run,
 6          were there any outstanding warrants for your
 7          arrest?
 8     A.   No, sir.  I hadn't even had a parking ticket.
 9     Q.   No problems with the law before this?
10     A.   Oh, I had an altercation walking out -- walking
11          home from Tigerland, and I was the aggressor.
12          But I was really hammered.  I thought I was
13          helping the guy, but I was drunk and just swung
14          on a random dude, and his buddy tried to hit me,
15          and I hit him because I was, like, what, I
16          thought I was helping you and he was punching
17          me.  Then, knocked him out and tried to run and
18          then by the time I swung my hand there was a cop
19          five feet that way and he put his lights on,
20          came down, got his car where he was beating me
21          and said freeze or I'm gonna tase you and I
22          stopped.
23     Q.   What year was this?
24     A.   2018, I'm pretty sure.
25     Q.   Were you arrested?
```

```
 1   A.   No, sir.  He put me in handcuffs.  I --
 2   Q.   He, the police officer?
 3   A.   Yes, sir.  He sat me in the car, and the people
 4        were doing their statement right here on the
 5        trunk.  He was saying all kind of crazy stuff
 6        like I flipped him.  I was like, I didn't do
 7        that.  But, okay.  And then, so, I was telling
 8        the cop that.  I said I'll tell you the real
 9        story what happened.  I drunkenly confessed
10        everything.  So, I mean, in court's eyes that
11        was cut and done.  Pled guilty.  And -- oh, the
12        cop brings me over to where I was going.  And,
13        yeah then I did my -- what's it called -- anger
14        management class and paid my fine.  That was
15        that.  I had just got done paying everything the
16        night of July 9th.
17   Q.   Your fines were fully paid at that time?
18   A.   Yes, that might have been the celebration.  I
19        didn't have to pay no more of that.
20   Q.   Okay.  And how much were the fines total?
21   A.   I think $650.
22   Q.   So, as a result of this were you given any jail
23        time or probation?
24   A.   No, sir.
25   Q.   Just the --
```

```
 1   A.   That was the first thing I had ever done.
 2   Q.   Right.
 3   A.   So, I mean, I just got kind of the orange slip.
 4        I don't remember -- preliminary maybe.  I don't
 5        know.
 6   Q.   Well, you were a first offender.
 7   A.   Yeah.
 8   Q.   Is that basically it?  And because of that you
 9        were --
10   A.   They were kind of nice to me, yes.
11   Q.   Right.  But you hadn't had any other incidents
12        up to this point?
13   A.   No, the only thing prior to that was a warning
14        ticket on the way home from Texas.  I was going
15        five over.
16   Q.   Okay.  What were you doing in Texas?
17   A.   That was for surveying.  That was before I went
18        to Texas to rebuild homes.
19   Q.   Okay.
20   A.   There are two different Texas times.
21   Q.   Okay.  Tell me -- let me cover that later.  All
22        right.  So, can you give me a description of
23        Jeremiah since we don't know his last name?  To
24        the best of your knowledge, can you tell me his
25        height, weight, race, any other distinguishing
```

```
 1          factors about him.

 2    A.    Light-skinned, black man, maybe six foot to 6'1,

 3          because he is a little bit taller than me,

 4          muscular.  I noticed that because he didn't have

 5          a shirt on.

 6    Q.    He had no shirt on when --

 7    A.    Yeah, when we picked him up, he didn't have a

 8          shirt like on.  Like, when we were at Reggie's

 9          and -- yeah.  So, when I met him, originally, he

10          didn't have a shirt on.

11    Q.    Okay.

12    A.    Pretty sure he put a shirt on, obviously.

13    Q.    Was he an athlete or?

14    A.    At one point I think.

15    Q.    So, he was a big guy?

16    A.    Yeah, muscular, fit.  You know what I mean.

17    Q.    When Jamaal Mire yelled run, did you hesitate?

18    A.    Yeah, I just didn't know what the hell was going

19          on.  So, I just wanted to get out of there.  I

20          realize it was stupid.

21    Q.    Do you know the direction that Mire and Jeremiah

22          were headed?

23    A.    When I was getting out the car, no.  I didn't

24          know none of that later until I saw the video.

25    Q.    Okay.
```

```
 1   A.   But they ran straight.
 2   Q.   They ran --
 3   A.   They ran towards the front of the car, so they
 4        went to the fence on the right.  It was, like, a
 5        ten-foot fence or something to our right, and
 6        they went down and jumped over that.
 7   Q.   Okay.  And what direction did you run?
 8   A.   I had to round the car as close to the light,
 9        the back -- back, left taillight as possible and
10        I then -- I know I can't jump a ten-foot fence
11        so there was like a three-foot white one once I
12        rounded that corner that I saw, because I didn't
13        really have a plan of getting out the car.  I
14        just kind of ran.  Once I rounded the corner I
15        saw the white fence, so I said I'm going to jump
16        over that.  But I didn't make it that far.
17   Q.   At any time, did you when you were running did
18        you notice the police officer and that you were
19        running in the direction of the police officer?
20   A.   Well, I wouldn't say I was running in the
21        direction of the police officer, because she
22        was -- it was a angled lane I would say, because
23        she was angled to my right and I had to go
24        through this gap which was the amount of
25        distance I have before she's close to me and the
```

```
 1           edge of this car.  So, I made -- I made the gap
 2           and as I passed her that's when she shot.
 3   Q.   So, would you agree with me that you were
 4        running in the direction of the trooper's
 5        vehicle?
 6   A.   No, sir.  I'd say the fence.
 7   Q.   The fence?
 8   A.   As close to the back left, back left taillight
 9        as possible was what I did.
10   Q.   Because your objective was to jump the fence and
11        start running out of that scene?
12   A.   Away.
13   Q.   Okay.
14   A.   Because, I mean, I thought she was gonna, at
15        least, be able to tackle me because I thought
16        she was running at me.  You know what I mean.
17   Q.   Mm-hm.  But at the time you are 5'11.  You say
18        you weighed about 220?
19   A.   No, just maybe about two-something.
20   Q.   Two-something.
21   A.   Nowhere near to 220.  I lost -- 200 to 210.
22   Q.   Okay.
23   A.   I'd be --
24   Q.   Do you know the height and weight of Trooper
25        Domingue at the time?
```

```
 1    A.    No, I didn't look that hard.  I just saw a
 2          person was over there, a police officer and I
 3          don't want her to touch me and I don't want to
 4          touch her.  I'm out.  I saw her and then I
 5          looked away to go to where I needed to go.  She
 6          was not my mind.
 7    Q.    Was there any reason to run?
 8    A.    For me, no.  They probably had -- Jamaal
 9          probably had reason, because he was out on bail,
10          his mom's car didn't have insurance, and he was
11          probably gonna get a DWI.  That's not me though.
12    Q.    You're not driving.
13    A.    Yeah.
14    Q.    You were a passenger, correct?
15    A.    As I said before, I didn't know that law you
16          could just sit there.  I was freaking out.  This
17          man's telling me to run.  I feel all this about
18          to get pinned on me or some shit.  So, I'm out.
19          This is not my car.  I'm not going to have
20          anything to do with this.  I'm going to call my
21          mom around the corner, and get her to come pick
22          me up.
23    Q.    Why didn't you just remain in the car?
24    A.    Scared, high.
25    Q.    Scared of what?
```

```
 1   A.   Police.
 2   Q.   What did the police do to you?  This was a
 3        traffic stop.
 4   A.   It more begins with my father, because he was
 5        incarcerated my whole life.  And, basically, all
 6        I hear from him is that him running away from
 7        the cops, him having to hide, and then getting
 8        beat up by some cops in the back room of the
 9        Texas Club.  Just crazy stories like that.  And
10        so, it doesn't put the safest image in your
11        head, you know what I mean.  And then at the
12        time of 2018 it was real big when cops were
13        literally killing everybody.  So, I mean -- you
14        see what I'm saying?  I wasn't necessarily
15        feeling safe.  And then he's running, so I don't
16        know.  Just freaked me out.  I didn't know what
17        to do.
18   Q.   At the time this happened was your father still
19        alive?
20   A.   No, sir.  He had died I would say that year.
21   Q.   That had a big impact on this decision to run;
22        is that that you are trying to tell me?
23   A.   Or the background behind it, yeah.
24   Q.   Okay.  The background being that he had to run
25        from police officers in other experiences that
```

CLIFTON DILLEY

```
 1        he had?
 2   A.   It's not like everything was bad about cops in
 3        my life, because my mom dated the chief of
 4        police when they were in high school so, I mean
 5        we had better relations with them in Zachary.
 6   Q.   Chief of Police of Zachary?
 7   A.   Yes, sir.  Now, Mayor David McDavid.
 8   Q.   Okay.
 9   A.   I think he won.  I voted for him.
10   Q.   Okay.
11   A.   And he had tried to help my sister become, I
12        think, a PI or just a cop.
13   Q.   A PI you mean a private investigator?
14   A.   Private investigator.
15   Q.   Okay.
16   A.   Or something kind of like law and police because
17        she was kinda trying to fight for the little
18        guy, like, help people in jail, maybe do
19        corrections officer or something because of my
20        father being incarcerated and all that.  She
21        kind of wanted to make sure that everybody got
22        treated as she would want her father to.
23   Q.   What was your father incarcerated for?
24   A.   I didn't find this out until after he died, but
25        I just -- kinda reading papers, but it had to do
```

```
 1        with methamphetamines and other fighting and
 2        other kind of stuff, running away, missing
 3        court, stuff like that.
 4   Q.   Was he - I'm sorry.
 5   A.   As my family will tell you they all had times
 6        where once us kids were taken away from them
 7        with the full custody my mom got, or something
 8        like that, so he kind of went down a real dark
 9        path with the meth and all of that, and that led
10        to him getting arrested and all that.
11   Q.   How many years was the incarcerated?
12   A.   Life.
13   Q.   Life?
14   A.   Twenty-five.
15   Q.   And he died in prison?
16   A.   He died at the 11th year of his sentence.
17   Q.   Where was that?
18   A.   I couldn't tell you the prison.
19   Q.   In Louisiana?
20   A.   Yes, sir.  The main one -- I stopped having
21        communications with him after 16, because I was
22        a bratty little kid, and, like, if you wanted to
23        do all this instead of be a father and dah, dah,
24        dah.  But, I mean, just shut up and see your dad
25        because you never know what could happen.
```

1  Q.  Did you ever visit him in jail?

2  A.  Up until 16, yes, because I had to get an ID and

3      I never went and got an ID until I got a

4      driver's license.  And then I stopped answering

5      all the phone calls and everything.  Probably

6      didn't help.

7  Q.  Okay.  What you're saying is that at some point

8      your mother was awarded full custody of you and

9      your sister?

10 A.  Yes, because he was going down said path so she

11     had a lot to -- a lot to win the case with.

12 Q.  Do you know -- give me your best description,

13     height, weight of Jamaal Mire.

14 A.  He was shorter.  So, I mean, I would have to say

15     maybe 5'5, 5'6.  Maybe, like, 5'4 to 5'6.

16 Q.  And weight, 150, 160?

17 A.  That night I was wearing his shirt that he let

18     me borrow, so I mean, and it was tight on me

19     because I got a gut.

20 Q.  So, his weight was approximately?

21 A.  That's what I'm trying --

22 Q.  Yeah?

23 A.  Maybe 170.

24 Q.  Okay.

25 A.  He had a little weight on him.

1  Q.  And Tokyo, his height and weight?

2  A.  He's probably 140, maybe 5'8.

3  Q.  Okay.

4  A.  Little shorter as well.

5  Q.  When you started to run, did you have anything

6      in your hands?

7  A.  My phone.

8  Q.  Your cell phone?

9  A.  In my right hand.

10  Q.  Okay.  And was that an iPhone?

11  A.  iPhone 8, black.  Very cracked.

12  Q.  Okay.  And did you have a spinner?

13  A.  A fidget spinner in my pocket.

14  Q.  What is a fidget spinner?

15  A.  It's like for ADHD or you can't like stay still,

16      fidgety, and you hold the middle of it and you

17      flip the sides, and it spins.  That's about it.

18      Keeps your brain busy.

19  Q.  Was your phone a black phone?

20  A.  Yes, no case.  Completely, about shattered

21      because I don't have a case on it.  It's a all

22      glass iPhone 8.

23  Q.  Okay.  At any point when you are running did

24      Trooper Domingue tell you to stop?

25  A.  From my memory, no.

CLIFTON DILLEY

```
 1   Q.   She could have but you don't remember it,
 2        correct?
 3   A.   Yes, sir.
 4   Q.   At any point did you put your hands up or stay
 5        where you were?
 6   A.   Say again.
 7   Q.   At any point when you were running, did you put
 8        your hands up and stop --
 9   A.   No, sir.
10   Q.   -- and say where you were?
11   A.   No, sir.
12   Q.   Why not?
13   A.   Because once I was out the car it was -- the
14        flight has enacted you know what I mean?  They
15        say fight or flight.  I was fleeing.  There was
16        no fight in me.
17   Q.   Right.
18   A.   Just flee, get out of here.
19   Q.   So, if Trooper Domingue did tell you to stop,
20        you weren't going to stop because your intention
21        was to jump that fence?
22   A.   Well, I don't know.  In my head I was
23        remembering what happened with that fight, and
24        the dude said freeze or I'm gonna tase you and I
25        stopped almost immediately.  I knew I'm done.  I
```

```
 1        didn't hear that.  So, I probably would have
 2        stopped.
 3   Q.   Okay.  Because of what happened before?
 4   A.   Yes, sir.
 5   Q.   Were you in fact tased the first time?
 6   A.   No, because I stopped.
 7   Q.   Okay.  What happened after you ran toward that
 8        fence and the trooper's car?
 9   A.   Say that again.
10   Q.   What happened after you ran in the direction of
11        the fence and the trooper's vehicle?
12   A.   I passed her up and then got shot in the back.
13        Then she hopped on top of me and she was shaking
14        my right hand, I guess, to maybe drop my phone.
15        And I didn't want to break my phone at the time,
16        so I kind of resisted a little bit to set my
17        phone down.
18   Q.   So it wouldn't crack?
19   A.   Yes, because as I said, I was a videographer and
20        that's where all of it's at.  I don't break want
21        to break that.  Side note, the phone broke a
22        month later.  So, just to tell you how messed up
23        it was.
24   Q.   Where you videoing and/or recording with your
25        phone any events that give rise to this?
```

```
1   A.   No, sir.  Like, you're saying was recording at
2        the time?
3   Q.   Yes.
4   A.   No, sir.
5   Q.   You just were running with your phone in your
6        hand?
7   A.   Yea.
8   Q.   Okay.  So, go ahead.  She had you on the ground.
9   A.   She gets on top of me.  She shoots.  Gets on
10       top.  Hand, goes for hand.  Shakes it.  And I
11       resist to put it down.  Then I put my arms
12       behind my back, and then she goes, wallet, keys,
13       phone.  What is this, talking about the fidget
14       spinner.  I said fidget spinner, spin it.  And
15       she threw it on the ground.  And then she goes
16       -- that's what Tokyo is like, I'm over here, you
17       can come get me and he's got his hands out the
18       window.
19  Q.   In the car?
20  A.   Yes, sir.  And she walks over there, gun up.
21       Got the -- I am handcuffed and I'm kind of
22       looking back to see like if he's okay, because I
23       mean I didn't know what the hell happened to me.
24       And then he walks past me.  He says are you
25       okay.  I said I think so or I guess so.  And
```

```
 1        that's when I think he turned to the car, I
 2        mean, she puts him in the car.  And then all
 3        that goes by and then the ambulance and then
 4        another officer appears.  That is when she sat
 5        me up, and I was able to kind of scuffle my legs
 6        under me.  She said, kinda, do like that.  Try
 7        to get your legs under you.  I was able to --
 8        these are my legs.  I was able to kind of get
 9        like an open Indian-sitting crisscross, and then
10        what felt like one arm pulled up, nothing.  Put
11        down, up, down, and I was like what's wrong with
12        my legs?  She says it's a taser after effect.
13        It will wear off.  Then I remember a spiky
14        haired blonde dude and another officer kind of,
15        like, a taser, like a soft --
16   Q.   Are you telling me that Domingue told you that
17        she tased you?
18   A.   Yes, sir.
19   Q.   And she didn't tell you that she shot you?
20   A.   Yes, sir.
21   Q.   We're straight on that?
22   A.   Yes, sir.
23   Q.   So, you thought that you had been tased?
24   A.   Yes, sir.
25   Q.   Because she told you that?
```

```
 1   A.    Yes, sir.
 2   Q.    Okay.  And --
 3   A.    At this point I had never been tased or shot,
 4         because remember I stopped.  I didn't want to
 5         know what that felt like.
 6   Q.    So, the sensation that you were feeling in your
 7         legs at that time was what, no sensation?
 8   A.    Yeah, I would say so.  No sensation.
 9   Q.    Would you agree with me that your judgment was
10         impaired since by your own admission you were
11         drunk and high when you were running towards the
12         fence?
13   A.    Can you restate the question?
14             MR. KROUSE:
15                 Can you repeat the question for him?
16                 (At this time the court reporter
17                 conducted a read-back as
18                 requested.)
19   A.    I mean, my judgment, what do you mean?  Like --
20   BY MR. KROUSE:
21   Q.    Your ability to think rationally.  Do you think
22         that was impaired?
23   A.    Yes, I'd say it was impaired, because my dumb
24         ass got out the car and ran.
25   Q.    Right.  Would you agree with that if you stayed
```

```
 1            in the car this incident would not have happen?
 2   A.   Yes, sir.
 3   Q.   At any point, did Trooper Domingue physically
 4        assault you?
 5   A.   When she shot me passing, as I passed her.
 6   Q.   Did she ever lay her hands on you or strike you
 7        with her hands or fists?
 8   A.   Just the shaking of the phone.
 9   Q.   To let it go on the ground?
10   A.   Yes, sir.
11   Q.   Okay.  Because you wouldn't drop it; is that
12        correct?
13   A.   I didn't want to break it, yes, sir.
14   Q.   Did Trooper Domingue -- did you hear Trooper
15        Domingue call for EMTs and ambulance to, you
16        know, deal with your physical condition at that
17        time?
18   A.   Not personally, because if she did it was
19        probably like, numbers or something I'm sure.
20   Q.   You didn't hear the conversation?
21   A.   I didn't hear codes or whatever, you know.
22   Q.   Okay.  So you --
23   A.   I think she went to, like, her side of the door
24        and did all that.
25   Q.   Okay.  So, you didn't hear any of that
```

```
 1          conversation?
 2   A.     Uh-huh.
 3   Q.     Okay.  That's a no?
 4   A.     No, sir.
 5   Q.     Do you recall undergoing a urine drug screen or
 6          test at the hospital?
 7   A.     No, they just kind of told -- because, I mean,
 8          they didn't have to use a catheter.  It just
 9          kind of came out.
10   Q.     Okay.
11   A.     When they did it.  They came and told me and
12          starting asking me if I had done whatever the
13          scientific name for Morphine is, like.  I was
14          like, what?  No.
15   Q.     You're talking about opiates or opioids?
16   A.     Yeah, that's what they said.  They said opiates.
17          I was like no just weed and drink.
18   Q.     Okay.  So, you didn't do opiates or heroin or
19          anything?
20   A.     Prior, no.
21   Q.     Okay.  But you were given Morphine at some point
22          before being transported?
23   A.     I think in the ambulance.
24   Q.     Okay.  You think?
25   A.     Yeah, I mean, that would seem the logical place.
```

1  Q.  But do you actually recall that or you guessing?

2  A.  Well, yeah.  I remember her saying we're going

3      to give you the Morphine.

4  Q.  Okay.

5  A.  I was pretty awake the whole time.  I didn't go

6      to sleep at all.

7  Q.  Right.

8  A.  Until --

9  Q.  You never lost consciousness?

10 A.  No, maybe like a little bit before the detective

11     came in but that's about it.

12 Q.  Okay.

13 A.  Yeah, I remember talking to every single nurse

14     while I'm butt naked on this table.

15 Q.  Okay.  Do you recall what the results of the

16     drug test were in the hospital for THC and

17     alcohol, was that ever advised?

18 A.  They just asked about the opiates.

19 Q.  No, I'm referring now about the results for

20     alcohol and THC?

21 A.  I never received, like, results.

22 Q.  Okay.  So, you have no knowledge of that?

23 A.  No, that's why I was saying they just came in

24     and asked if I was on opiates and that was about

25     it.

1    Q.    What was your diagnosis at the hospital, if you
2          know?
3    A.    I rolled in and then a Dr. Scott came up to me
4          and said -- we did a fist bump, what's up.  He
5          said, well you have been shot, and I was, like,
6          well, thanks for being the first person to be
7          honest.
8    Q.    That's the first person that told you that you
9          had been shot?
10   A.    Yes, sir.
11   Q.    Was the doctor in the hospital.  And this is Our
12         Lady of the Lake; is that correct?
13   A.    Yes, sir.
14   Q.    Okay.
15   A.    Then after that a priest was reading me a prayer
16         which I figured was my last prayer.  I was just
17         told I was shot, and now I got a priest reading
18         a prayer to me and I'm like what is going on.
19         So, I said to the priest, I said well, I don't
20         know what this is but if I'm about to die or
21         arrested or whatever this is, I need y'all to
22         call my mom.  So, I just kind of started
23         shouting out my mom's number so somebody could
24         call my mom.
25   Q.    Let her know?

```
 1   A.   Yes.  Yeah, my mom was not contacted until about
 2        10:00 I think,  10 or 11.
 3   Q.   That morning?
 4   A.   Yes, sir.
 5   Q.   Okay.
 6   A.   I was trying but the detective said I had to
 7        wait until he did his whatever, his interview.
 8        I kept telling him to just come on and do it.
 9        I'm ready.  But he waited and waited and waited.
10        I don't know what time he did it exactly.
11   Q.   But you were interviewed by a police officer at
12        some point in the hospital?
13   A.   Yes, sir.
14   Q.   Okay.  Were you still high and drunk from the
15        night before or what?
16   A.   I mean, I was definitely messed up on something,
17        that Morphine.
18   Q.   Okay.  Were you competent to give a statement at
19        that time?
20   A.   Probably not but I did.
21   Q.   Okay.
22   A.   I figured I wasn't about to get a lawyer, so I
23        just kind of was honest and told him what's up.
24   Q.   Okay.  Have you seen a copy of that statement?
25   A.   Say again.
```

```
1   Q.   I have you seen a copy of that statement or that
2        interview that he did?
3   A.   The recording, yes.
4   Q.   The recording?
5   A.   And I sound crazy on there like I was messed up.
6   Q.   And did you --
7   A.   I remember because at one point I kind of dozed
8        off and he poked me with the clipboard to wake
9        me up.  So, I know I was messed up for sure.
10  Q.   Do you think he should have interviewed you
11       while you were in that state?
12  A.   No, sir.
13  Q.   Should've waited a little while?
14  A.   Yes, sir.
15  Q.   Is there anything on the statement that you
16       listen to later that you regret saying?
17  A.   No, sir.
18  Q.   Was everything in the statement truthful and
19       accurate?
20  A.   Yes, sir.
21  Q.   Other than you sounding messed up?
22  A.   Yes, sir.
23  Q.   Okay.  Do you ever text or e-mail or communicate
24       in any way anyway with Tokyo or Mire or the
25       other passenger, Jeremiah?
```

```
 1   A.   Not since I've gotten a new phone.  I haven't
 2        been able to talk to Tokyo, so, no.  That would
 3        be the only one I would talk to or want to talk
 4        to, care to talk to.
 5   Q.   Was Tokyo injured on the night of this incident
 6        since he remained in the car?
 7   A.   No, sir.
 8   Q.   So, when you were running there were also two
 9        other individuals running, so the record is
10        clear, and --
11   A.   Away.  They were gone.
12   Q.   Right.  But they were gone --
13   A.   Yes, sir.
14   Q.   -- but they were running from the scene of this
15        traffic stop --
16   A.   Yes, sir.
17   Q.   -- in the opposite direction you were going so
18        there were actually three passengers from that
19        car that were running away from the police
20        officer; is that correct?
21   A.   Yes, sir.
22   Q.   And one remained in the car?
23   A.   Yes, sir.
24   Q.   Do you know why the driver, Mire and Jeremiah,
25        ran a different direction than you did?
```

```
 1   A.   Smarter I guess.  I don't know.  That's what I'm
 2        saying, we didn't talk about it or nothing, so
 3        it's not like you run that way, I run this way.
 4        None of that.  Just kind of spur of the moment
 5        get out the car and run.
 6   Q.   Is there any reason that you didn't follow their
 7        lead and run in their direction?
 8   A.   No.
 9   Q.   Okay.
10   A.   Just kind of ran.
11   Q.   Okay.
12   A.   That's what I'm saying I didn't have a plan.
13        Once I saw the fence-- no plan.
14   Q.   Okay.
15             MR. KROUSE:
16                  I want to take a break at this
17             minute, because I've got some photographs
18             I want to show you and I need to kind of
19             mark those.  So, we're going to go off the
20             record for a second and we'll take a
21             break, okay?
22             MADAM COURT REPORTER:
23                  It's 11:03 and we're off the record.
24                  (Whereupon, a break commenced
25                     for all parties present.)
```

```
1              MADAM COURT REPORTER:
2                   It is 11:24 a.m.  Mr. Dilley has been
3              previously sworn and we're back on the
4              record.
5    BY MR. KROUSE:
6    Q.   Okay, Scotty.  Now, we're going to turn to some
7         photographs.  You have in front of you "Exhibit
8         3".
9                        (Exhibit Number Exhibit 3 was
10                        marked for identification
11                        purposes.)
12   A.   Yes, sir.
13   BY MR. KROUSE:
14   Q.   First of all, have you ever seen this photograph
15        before?
16   A.   I think so.
17   Q.   You think so.  Okay.  Can you identify it for
18        me?
19   A.   That is Jamaal's red Saturn or maroon Saturn.
20        It is -- then there is the state trooper behind
21        it to the left a little bit, and then it's
22        marked out where the cars are, where I fell, I
23        think that's what that is, yeah.
24   Q.   And then to the right there is a three-foot,
25        looks like white picket fence there.  Was that
```

```
 1          your objective that we were talking about
 2          earlier in your testimony that you were trying
 3          to get to to jump over?
 4    A.    Yes, sir.
 5    Q.    As opposed to the larger fence which looks like
 6          it's -- it might be ten feet tall or so.  You
 7          weren't trying to jump that?
 8    A.    No, sir.
 9    Q.    Okay.  Let's turn to "Exhibit 4".  This is the
10          location of this -- correct me if I'm wrong --
11          is behind the Little Village Grocery store off
12          of Perkins and off of Potwin; is that the name?
13    A.    Yes, sir.
14    Q.    Okay.  So, can you identify "Exhibit 4" for me?
15                    (Exhibit Number Exhibit 4 was
16                    marked for identification
17                    purposes.)
18    A.    It is Jamaal's maroon Saturn, again, in front --
19          it's a side view of the scene.
20    BY MR. KROUSE:
21    Q.    Okay.  And, again, this is -- you don't know the
22          time this was, correct?  It's just dark outside?
23    A.    I would say it looks like after everything.
24    Q.    Okay.
25    A.    Because there is another cop car there.
```

```
 1   Q.    "Exhibit 5"," can you identify that for me?
 2                       (Exhibit Number Exhibit 5  was
 3                       marked for identification
 4                       purposes.)
 5   A.    This is a, basically, the same angle of Jamaal's
 6         car but a little bit to the right.
 7   BY MR. KROUSE:
 8   Q.    Okay.  "Exhibit 6".
 9                       (Exhibit Number Exhibit 6 was
10                       marked for identification
11                       purposes.)
12   A.    This is the front view or north west view.
13   BY MR. KROUSE:
14   Q.    Of the Saturn?
15   A.    The Saturn and the police trooper behind it.
16   Q.    Trooper's car.  Okay.  "Exhibit 7".
17                       (Exhibit Number Exhibit 7 was
18                       marked for identification
19                       purposes.)
20   A.    A straight on view of the scene of Jamaal's
21         Saturn and the police trooper.
22   BY MR. KROUSE:
23   Q.    It's "Exhibit 8".
24                       (Exhibit Number Exhibit 8 was
25                       marked for identification
```

```
 1                              purposes.)
 2    A.    A view directly in front of the Saturn.  You can
 3          barely see the trooper's vehicle.
 4    BY MR. KROUSE:
 5    Q.    Okay.  "Exhibit 9",  can you identify that,
 6          please?
 7                              (Exhibit Number Exhibit 9 was
 8                              marked for identification
 9                              purposes.)
10    A.    Jamaal's Saturn close up, marked out.
11    BY MR. KROUSE:
12    Q.    The passenger, is that the driver's door open or
13          the door that you exited?
14    A.    That is the driver door.
15    Q.    The door that you exited from, the left
16          passenger, or rear passenger is closed; is that
17          correct?
18    A.    Yes, sir.
19    Q.    "Exhibit 10", can you identify that for me,
20          please?
21                              (Exhibit Number Exhibit 10 was
22                              marked for identification
23                              purposes.)
24    A.    A side view of Jamaal's Saturn with the
25          passenger window -- I mean, passenger door open
```

```
 1          and the driver door open.  And the back windows
 2          appear to be cracked midway.
 3     Q.   Cracked open?
 4     A.   Yes, sir.
 5     Q.   Okay.  Did you --
 6     A.   Like, rolled down.
 7     Q.   Did you close your right -- I'm sorry -- the
 8          left rear door before you -- or as you exited
 9          the vehicle, running?
10     A.   I don't think so.
11     Q.   Okay.
12     A.   I just opened it and ran.
13     Q.   Okay.  Number "11", can you identify that for
14          me?
15                        (Exhibit Number Exhibit 11 was
16                         marked for identification
17                         purposes.)
18     A.   That would be my black iPhone 8 all glass.
19     BY MR. KROUSE:
20     Q.   Okay.  Number "12"?
21                        (Exhibit Number Exhibit 12 was
22                         marked for identification
23                         purposes.)
24     A.   Would be the fidget spinner.  So, see, you would
25          hold the middle part right there and then spin
```

```
 1            the edges.
 2    BY MR. KROUSE:
 3    Q.    Got it.  And that helped you with ADHD; is that
 4          what you're saying?
 5    A.    Yeah, focus.
 6    Q.    Okay.  And you said the cell phone was in your
 7          right hand in "Exhibit 11", and the fidget,
 8          "Exhibit 12" was in your pocket?
 9    A.    Yes, sir.
10    Q.    Okay.  If you could turn to "Exhibit 13", could
11          you identify that?
12                        (Exhibit Number Exhibit 13 was
13                         marked for identification
14                         purposes.)
15    A.    It is a very close up image of the state
16          trooper's hood and bumper and something on the
17          hood.
18    BY MR. KROUSE:
19    Q.    Okay.  Do you know whether or not this is a
20          photograph of the marijuana found in the car?
21    A.    That's what that is?
22    Q.    Do you know?
23    A.    I mean, it looks like that kinda.
24    Q.    Was there a scale in the Saturn at the time that
25          you were in there?
```

```
 1   A.   To my knowledge, no.

 2   Q.   But there may have been?

 3   A.   Could have been.

 4   Q.   Could have been in the front seat?

 5   A.   Yes, sir.  It could have.

 6   Q.   Okay.  Turn to "14", "Exhibit 14".  Can you

 7        identify that for me?

 8                    (Exhibit Number Exhibit 14 was

 9                     marked for identification

10                     purposes.)

11   A.   That is a closer image of the weed on a scale.

12   BY MR. KROUSE:

13   Q.   Okay.

14   A.   Found it in the car I'm guessing.

15   Q.   Okay.  And was that your scale?

16   A.   No, sir.

17   Q.   Whose scale did that belong to?

18   A.   I mean, it was Jamaal's car so I'm going to

19        guess Jamaal.

20   Q.   Okay.  Was there -- what was the amount of

21        marijuana in that bag, do you know?

22   A.   That looks like, a guess of, I don't know,

23        two grams or something, two, three.  I'm just

24        guessing.

25   Q.   What is the purpose of the scale in this
```

```
 1           context?
 2   A.    I do not know.  It is not mine, so I don't know.
 3   Q.    Okay.
 4   A.    If that was there, that was them.
 5   Q.    I'd have to ask Jamaal?
 6   A.    Yes, sir.  Yes, sir.
 7   Q.    Okay.  "Exhibit 15", could you identify that for
 8         me?
 9                       (Exhibit Number Exhibit 15 was
10                        marked for identification
11                        purposes.)
12   A.    That would be a portrait picture of the front
13         door of the Saturn with the driver door open and
14         everything that was in the car, I guess, on the
15         front seat, and the passenger door open as well.
16   BY MR. KROUSE:
17   Q.    So, can you identify all this stuff that's in
18         the front seat?
19   A.    Not a clue.  Looks like receipts.  There might
20         be a gar paper, a cigar paper.  And that looks
21         like a vape maybe.  That's about it.  That's all
22         I got other than the papers and stuff.
23   Q.    All right.  Next photograph, Number "16", can
24         you identify that for me?
25                       (Exhibit Number Exhibit 16 was
```

```
 1                          marked for identification
 2                          purposes.)
 3    BY MR. KROUSE:
 4    Q.    Jamaal's car?
 5    A.    This is Jamaal's car taken from the passenger,
 6          side and the doors are open, the driver and the
 7          passenger, and the car is very dirty.  There is
 8          a Glade or Febreze on the ground, a Dr Pepper
 9          can, and looks to be like a Cheetos bag.  I
10          don't know what that is.  Looks like a purple --
11          I don't know what that is.  Maybe oil, an oil
12          thing, and that is all I can legibly see.
13    Q.    Okay.  Can you identify "Exhibit 17", please?
14                          (Exhibit Number Exhibit 17 was
15                          marked for identification
16                          purposes.)
17    A.    This is the back seat on the -- this is Jamaal's
18          Saturn on the passenger side, the back seat.
19          And it appears to have what looks like a bunch
20          of clothes and maybe a Walmart bag, some
21          chargers, and something silver.
22    BY MR. KROUSE:
23    Q.    So, can you identify, it looks like a flashlight
24          or some cylinder?
25    A.    I don't know what that is.  That's why I was
```

```
 1          saying something silver.  I don't know what that
 2          is.
 3     Q.   Okay.  You were sitting on the other side.
 4          Jeremiah would've been sitting on this side; is
 5          that correct?
 6     A.   Yes, sir.
 7     Q.   And all these clothes, they didn't belong to
 8          you, huh?
 9     A.   No, sir.
10     Q.   You just had to squeeze yourself in there amidst
11          all this?
12     A.   They weren't all on the seat like that.
13     Q.   Okay.
14     A.   They were definitely on the ground.  I'm sure I
15          was stepping on it or something.
16     Q.   Okay.  Anything else you can identify in "17"?
17     A.   No, sir.
18     Q.   Okay.  "Exhibit 18"?
19                    (Exhibit Number Exhibit 18 was
20                    marked for identification
21                    purposes.)
22     A.   This is a closer image of the last image of
23          "Exhibit 17".
24     BY MR. KROUSE:
25     Q.   Okay.
```

```
 1    A.   You can clearly now see it is a bunch of
 2         clothes.  And still don't know what that silver
 3         thing is and chargers again.
 4    Q.   Okay.  "Exhibit 19"?
 5                        (Exhibit Number Exhibit 19 was
 6                        marked for identification
 7                        purposes.)
 8    A.   This is a view from the -- a little bit to the
 9         right of the patrol car, or the state trooper's
10         vehicle, and it is a view of the back of
11         Jamaal's Saturn with the markings of everything
12         I guess.
13    BY MR. KROUSE:
14    Q.   Okay.  And, finally, I think "Exhibit 20", can
15         you identify that please?
16                        (Exhibit Number Exhibit 20 was
17                        marked for identification
18                        purposes.)
19    A.   It is my phone to the right, and my fidget
20         spinner to the left.
21    BY MR. KROUSE:
22    Q.   Okay.  Thank you.  The last exhibit you had
23         there was "20".
24              MR. KROUSE:
25                   Is that correct?
```

CLIFTON DILLEY

```
 1                    MADAM COURT REPORTER:
 2                         Yes, sir.
 3                    MR. KROUSE:
 4                         Let's go off the record and let me
 5                    mark these.
 6                              (Counsel stipulates to go off
 7                               the record.)
 8                    MADAM COURT REPORTER:
 9                         It's 11:38 a.m. counsel, and you're
10                    on the record.
11      BY MR. KROUSE:
12      Q.   So, Scotty, we're starting with a new group of
13           photographs.  As I understand it, these are
14           still photographs taken from the video that you
15           mentioned earlier in your testimony.  And you
16           said that you had reviewed the videotape prior
17           to your testimony, so my first question is:
18           Have you reviewed these still photographs taken
19           from that videotape?
20      A.   The still images, no.
21      Q.   So, never seen these images before?
22      A.   Not like still.
23      Q.   Like still.  Okay.  So, we're going to go
24           through the still images with you at this point,
25           and as you can see at the top right hand portion
```

1      of each of these, there is a time stamp,

2      July1021629, right.  And, of course, at the

3      bottom for the court reporter's review, DPSC563

4      is the first one.  That's your Bates stamp that

5      will be used for our purposes, but for our

6      purposes right now "Exhibit 21".  Can you

7      identify this photograph, please?

8    A.  Would you like me to read the numbers each time

9      at the top?

10   Q.  Yes, whatever you prefer, yeah.

11                    (Exhibit Number Exhibit 21 was

12                    marked for identification

13                    purposes.)

14   A.  Okay.  So -- you want to restate the --

15   BY MR. KROUSE:

16   Q.  So, "Exhibit 21" -- let me read it.  It's 2018

17      710 216:29 [sic], correct?

18   A.  Yes, sir.

19   Q.  So, we've got the time straight.  My question

20      is:  Can you identify what's going on in this

21      photograph?

22   A.  It is Jamaal taking off for the first time I

23      guess.  He's running away from the car, from the

24      trooper's car at her bumper.  He is running

25      toward the Saturn.

CLIFTON DILLEY

```
1   Q.   So, Jamaal, if you will circle him on that
2        "Exhibit 21".  Let's use the Sharpie.
3   A.   Say again.
4   Q.   Let me see what you're doing here.  Okay.  So,
5        why don't you circle where Jamaal is in that
6        photograph.
7                     (Deponent draws as requested.)
8   BY MR. KROUSE:
9   Q.   Okay.  So, you're understanding is -- where are
10       you at this time?
11  A.   Right here.
12  Q.   So, you're going to mark an "X" on the Saturn
13       and you're putting what?
14  A.   I am putting an arrow to Scotty.
15  Q.   Okay.  So, your rear passenger seat or door is
16       closed.  Is the window rolled down or up or do
17       you recall?
18  A.   It seems to be rolled down halfway.
19  Q.   Okay.  So, how do you know that Jamaal is
20       running at this point?
21  A.   His left foot is in front of his right foot, and
22       he appears to be heading toward his Saturn.
23  Q.   Is he running toward the Saturn, or is he
24       running toward the fence line?
25  A.   Well, from knowledge he is running toward the
```

```
 1              car, but I mean, it just looks like he is
 2              running forward.
 3      Q.      Okay.  In this exhibit, to your recollection,
 4              was this the point that Jamaal yelled out "Run"
 5              to the remaining people in the car, or are we
 6              going to get to that as we go through the
 7              sequence?
 8      A.      No, sir.
 9      Q.      No, it wasn't at this point, correct?
10      A.      No, he did not say "Run" at this time.
11      Q.      Okay.  All right.  Were you looking at him or
12              not at that point?
13      A.      No, I didn't know he was running.
14      Q.      Okay.
15      A.      I didn't know about any of this until he was at
16              that window.
17      Q.      Okay.  You would agree with me it's pretty dark
18              in this alley, parking lot, behind the Village
19              Grocery except for the lights from the vehicles
20              that are out there, correct?
21      A.      Yeah, I'd say everything is a little dark except
22              for the lane, for the trooper's vehicle to all
23              the way to this -- what appears to be where the
24              dumpsters are is completely lit up.
25      Q.      Okay.  By the headlights?
```

```
 1   A.   By the headlights of the trooper vehicle.
 2   Q.   And also the headlights --
 3   A.   And the Saturn.
 4   Q.   -- of the Saturn?  Yeah.  Okay.  So, is there
 5        anything else noteworthy in "Exhibit 21" that
 6        you want to share with us?
 7   A.   No, sir.
 8   Q.   Okay.  Let's turn to "Exhibit 22".  This is
 9        2018-07-10-216:29.
10                       (Exhibit Number Exhibit 22 was
11                       marked for identification
12                       purposes.)
13   BY MR. KROUSE:
14   Q.   We see an individual to the rear of the Saturn,
15        and who is that?
16   A.   That would be Jamaal.
17   Q.   Can you circle Jamaal, please and write a "J"
18        next to the circle?
19   A.   Want me to do that on the other one?
20   Q.   Yes, please.
21                       (Deponent draws as requested.)
22   BY MR. KROUSE:
23   Q.   And from your -- is he running between the
24        Saturn and the fence line?
25   A.   Yes, sir.  He is on the right side of the Saturn
```

```
 1              near the bumper.  He appears to be running, yes.
 2              He appears to be running between the fence and
 3              the car on the right side.
 4    Q.   Now, when you see him running at this time, and
 5         I'm asking you to kind of reflect back, are you
 6         saying to yourself why is he running?
 7    A.   I don't know he's running yet.
 8    Q.   You don't know he's running yet, because he's
 9         behind you?
10    A.   Yeah.
11    Q.   Okay.  All right.  Fair enough.  Is there
12         anything else about "Exhibit 22" that you care
13         to share with us that you notice?
14    A.   No, sir.
15    Q.   Okay.  Let's turn to "Exhibit 23".  This is
16         2018-710-2:16:31.  yes
17                        (Exhibit Number Exhibit 23 was
18                        marked for identification
19                        purposes.)
20    BY MR. KROUSE:
21    Q.   Can you circle where Jamaal is in this
22         photograph?
23    A.   Well, you could only see the top of his head.
24    Q.   Right.  Why don't you circle that?
25                        (Deponent draws as requested.)
```

```
 1   A.   He has passed the car, so this is after he said
 2        "Run", because he stopped at the window for a
 3        second, I guess, at 2:16:30.
 4   BY MR. KROUSE:
 5   Q.   And did he yell in the window where Jeremiah
 6        was?
 7   A.   No, the passenger window was.  The window was
 8        down so he yelled it in that window.
 9   Q.   Okay.  And when you heard the word run at that
10        time you ran, right?
11   A.   Yes, sir.
12   Q.   Okay.  You can see --
13   A.   I didn't at the very second obviously.
14   Q.   Right, but soon thereafter, correct?
15   A.   I was just answering to your question earlier,
16        there is my hesitation.
17   Q.   Right.  But at this point he's in front of you,
18        correct?
19   A.   Yes, he has already said it.
20   Q.   He's running towards --
21   A.   What seems to be that dumpster area, or whatever
22        that is, that white square box area.
23   Q.   So, when you are thinking of what to do are you
24        saying I'm going to follow him?
25   A.   No.
```

1  Q.  Are you saying --

2  A.  I'm saying I'm going to get out of here.

3  Q.  Okay.  And I'm going to run in the opposite

4      direction towards the police car?

5  A.  I'm going to run away.

6  Q.  Okay.  Let's turn to "Exhibit 24".

7                  (Exhibit Number Exhibit 24 was

8                  marked for identification

9                  purposes.)

10  BY MR. KROUSE:

11  Q.  Can you circle Jamaal in this paragraph?

12  A.  Yes, sir.

13  Q.  And this is 2018-07-10-2:16:32.  And would you

14      agree with me that it appears that Jamaal is in

15      a full sprint towards that dumpster area?

16  A.  Yes, sir.

17  Q.  Is he saying anything else as he is running

18      passed you?

19  A.  No, sir, because he is well ahead of the car.

20      Well, not well, but five to six feet I guess.

21  Q.  Okay.  And now -- go ahead.  I'm sorry.  I

22      didn't want to interrupt you.

23  A.  I was going to say and I appear to be opening

24      the door this time.

25  Q.  Right.  So, can you circle where you are and the

CLIFTON DILLEY

```
 1            door, and write Scotty next to that.
 2                      (Deponent draws as requested.)
 3    BY MR. KROUSE:
 4    Q.    And if we can turn to "Exhibit 25",
 5          2018-7-10-2:16:32.
 6                      (Exhibit Number Exhibit 25 was
 7                      marked for identification
 8                      purposes.)
 9    BY MR. KROUSE:
10    Q.    Can you circle where Jamaal is located even
11          further away from the Saturn, correct?
12    A.    Yes, he is probably 10 to 12 feet away from the
13          car now in the front of it.
14    Q.    Okay.  Can you put a "J" next to his name?
15    A.    I am, yeah.
16    Q.    Your door appears to be fully open?
17    A.    Just about.
18    Q.    Okay.  Can you put "Scotty" next to that and
19          circle it?
20                      (Deponent draws as requested.)
21    BY MR. KROUSE:
22    Q.    So, you're exiting the Saturn, and you're
23          running towards --
24    A.    Not running yet.
25    Q.    Not running, but you are beginning to run?
```

```
 1   A.   Foot has not touched the ground yet.
 2   Q.   Okay.  Let's turn to the next one, "Exhibit 26",
 3        2018-07-10-2:16:32.
 4                       (Exhibit Number Exhibit 26 was
 5                       marked for identification
 6                       purposes.)
 7   BY MR. KROUSE:
 8   Q.   It looks like your foot is near the ground in
 9        that photograph; is that correct?
10   A.   It is near the ground, yes.
11   Q.   Okay.
12   A.   Probably about, maybe a foot off the ground.
13   Q.   Can you circle that and put Scotty?  Can you put
14        a circle around Jamaal and a "J" next to it?
15                       (Deponent draws as requested.)
16   A.   I don't think that's Jamaal.
17   BY MR. KROUSE:
18   Q.   Who do you think that is?
19   A.   I think that might be Jeremiah.
20   Q.   That might be Jeremiah.
21   A.   But I'm not 100 percent.
22   Q.   Wouldn't there be two people in the photograph?
23   A.   Well, he had a head start.  Jamaal had a head
24        start.
25   Q.   Okay.  So, this could be Jeremiah, but you're
```

```
 1        just not sure?
 2   A.   Yeah.
 3   Q.   Okay.
 4   A.   I mean, we'll probably figure that out as we go
 5        through this.
 6   Q.   Okay.  And we also --
 7   A.   So, where do you want me to put --
 8   Q.   We don't know.  I don't want you to guess or
 9        speculate if you think it might be Jeremiah.
10        So, it's one of the two, correct?
11   A.   Yes, sir.
12   Q.   It's either Jeremiah or Jamaal, and there's not
13        two people in that paragraph; is there?  Looks
14        like just one.
15   A.   There's the one in front about 10 to 12, maybe
16        15, and then there's me, and then at the far
17        right you see Kasha.
18   Q.   Kasha.
19   A.   Kasha.
20   Q.   Yes.  Why don't you circle her?
21   A.   At the front left bumper of her trooper vehicle.
22   Q.   Okay.  And put a "K" next to that.
23   A.   Yes, sir.
24   Q.   Now, when you are getting out of the car, do you
25        see or do you recall seeing Kasha Domingue in
```

CLIFTON DILLEY

```
 1        that position?

 2   A.   At this very moment I don't think so.

 3   Q.   Okay.

 4   A.   I don't think I had turned my head to look at

 5        her yet if I'm honest.

 6   Q.   But you knew, did you not, that you had been

 7        pulled over by a trooper and she was somewhere

 8        behind you?

 9   A.   In my head I'm thinking she is chasing him.

10   Q.   Him being?

11   A.   Jamaal.

12   Q.   Jamaal.

13   A.   I figured she rounded -- I figured she was way

14        already out of her car and, like, chasing

15        Jamaal.  I thought that's what was happening,

16        and then I was going to get out and see the cop

17        or something chasing Jamaal.

18   Q.   Okay.

19   A.   That's where my head was.  So, I thought, oh,

20        I'm out.  I'm just gonna dip down because I mean

21        she is gonna be chasing him.  That's what I was

22        thinking.

23   Q.   All right.  But we also see an individual in

24        front end of the Saturn, and again, we don't

25        know whether that's Jamaal or Jeremiah; is that
```

```
 1              correct?
 2    A.   Yes, sir.
 3    Q.   But we don't see Trooper Domingue anywhere close
 4         to that individual whoever it is, correct?
 5    A.   Yes, sir.
 6    Q.   Is that correct?
 7    A.   Yes, sir.
 8    Q.   So, your assumption that she was chasing
 9         Jeremiah or Jamaal was wrong?
10    A.   Yes, sir.
11    Q.   Okay.  Were you -- were the headlights, head
12         lamps on the trooper's vehicle in any way
13         blinding you from seeing where you were going?
14    A.   I mean, they were bright, so when I looked back
15         not in this photo, maybe, maybe not.  I'm not
16         100 percent.
17    Q.   You don't recall one way or the other?
18    A.   But --
19              MR. CAZAYOUX:
20                   He's trying to finish his answer, AJ.
21              MR. KROUSE:
22                   Yeah, go ahead.
23    A.   I mean, I basically saw a outline not a full
24         like face or nothing.
25    BY MR. KROUSE:
```

```
 1   Q.   Outline of a person?

 2   A.   Yeah.

 3   Q.   Okay.  Let's go to "Exhibit 27".

 4                    (Exhibit Number Exhibit 27 was

 5                    marked for identification

 6                    purposes.)

 7   BY MR. KROUSE:

 8   Q.   This is 2018-7-10-2:16:33.  SO, let's start from

 9        right to left.  And, again, person to the far

10        right, is that Trooper Domingue?

11   A.   Yes, sir.  She appears to be maybe two to three

12        more feet in front of her left headlight.

13   Q.   Okay.

14   A.   And I am completely covered in light about to

15        step, putting my first step on the ground.

16   Q.   Okay.

17   A.   And I should be looking back, I guess, at this

18        point.

19   Q.   So, let's put a circle around Trooper Domingue

20        and put a "D" next to her name.

21   A.   Okay.  You want me to do the "K" on that one?

22   Q.   "K".  I'm sorry.  Let's be consistent.  Let's

23        circle yourself and put Scotty, and we don't

24        know who that is.

25   A.   At this point, it's got to be Jeremiah because
```

CLIFTON DILLEY

1        there's no one else.

2   Q.   Do you believe the person running in "Exhibit

3        27" is Jeremiah and not Jamaal?

4   A.   Hold on.

5   Q.   Do you want to just wait to go through all of

6        them?

7   A.   That is Jamaal.

8   Q.   So, in "Exhibit 27" where we are, and I don't

9        know what you're looking at right now, but is

10       that Jamaal?

11  A.   Yes, sir.

12  Q.   In "Exhibit 27"?  Okay.  So, can we put --

13  A.   Do you want me to go back to the last one?

14  Q.   Yeah, if you are now sure that in each of these

15       photographs in "24", "25", and "26" because we

16       do have two "Js" we better write Jamaal out.

17  A.   Yes, I did that on "26".

18  Q.   Yeah, "25", "26", "27" is Jamaal.

19            MR. CAZAYOUX:

20               AJ, not to interrupt but so the

21            record is clear, what we did is we fast

22            forwarded through the slides, and went to

23            DPSC578 which we think is going to be

24            "Exhibit 36" and he was able to see the

25            difference between Jamaal and Jeremiah and

```
 1              that's how he -- I'm thinking --
 2              THE WITNESS:
 3                   Yes, sir.
 4              MR. CAZAYOUX:
 5                   So, anyway, that's what cleared it
 6              up.
 7              MR. KROUSE:
 8                   Thank you.  We'll clear it up.
 9   BY MR. KROUSE:
10   Q.   So, we are on "27".  You have circled Jamaal.
11        Looks like he's getting closer to the dumpster
12        area and the fence line, correct?
13   A.   Yes, sir.
14   Q.   And you are taking your first step out?
15   A.   Of the Saturn.
16   Q.   Of the Saturn.  Okay.  Let's go to "28".  This
17        is 2018-7-10-2:16:33.
18                        (Exhibit Number Exhibit 28 was
19                        marked for identification
20                        purposes.)
21   BY MR. KROUSE:
22   Q.   Let's again go from right to left.  If you will
23        circle Trooper Domingue with a "K".
24   A.   Trooper Domingue.  Then you have me stepping out
25        a little more.  Seems maybe my right knee is
```

```
 1         starting to come out.
 2    Q.   Looks like there's a lot of light on you in --
 3    A.   I'm completely covered in light.  I am actually
 4         white on this paper, because there's so much
 5         light on me.
 6    Q.   In every picture, correct?
 7    A.   Yeah.
 8    Q.   Correct.
 9    A.   Completely lit up.
10    Q.   With you leaving or departing that vehicle,
11         correct?
12    A.   Yes, sir.
13    Q.   Okay.  And that light is coming from the
14         trooper's vehicle?
15    A.   Trooper's vehicle, yes, sir.
16    Q.   Right.  Okay.  Can you circle yourself and put
17         your name?
18    A.   Yes, sir.
19    Q.   Can you circle Jamaal, and put his name?
20    A.   Yes, sir.
21    Q.   This is.  Let's do "Exhibit 29".
22                        (Exhibit Number Exhibit 29 was
23                         marked for identification
24                         purposes.)
25    BY MR. KROUSE:
```

1    Q.   This is 2018-7-10-2:16:33.  Let's go from right
2         to left again.
3    A.   Trooper Domingue appears to be maybe five to six
4         more feet.  So, I guess, a total maybe
5         seven feet now in front of her car to the left.
6    Q.   And how far from you?
7    A.   If I had to guess I would say maybe --
8    Q.   Don't guess.  I mean, if you don't know.
9    A.   From the picture I'm doing a measurement of
10        this.  Looks to be about 10 to 12 feet.
11   Q.   Okay.  Do you recall Trooper Domingue at this
12        point in time 2:16:33, "Exhibit 29" saying
13        anything to you?
14   A.   No, sir.
15   Q.   Do you recall at any time in all the sequence of
16        events before you were shot Trooper Domingue
17        saying anything to you?
18   A.   No, sir.
19   Q.   Which would include "stop" or anything like
20        that; you don't recall anything like that?
21   A.   No, sir.
22   Q.   Okay.
23   A.   I heard nothing.
24   Q.   So, you've circled yourself in "Exhibit 29" and
25        Jamaal?

1    A.    And it appears Jeremiah popped his head -- is
2          starting to get out the car as well.  If you
3          look at the back of the car you see what appears
4          to be a head popping out.
5    Q.    Okay.
6    A.    And I've circled that put Jeremiah next to it.
7          I'm circling Jamaal.  I already put his name.
8    Q.    And you're putting Jeremiah -- circle his head?
9    A.    Yes, sir.
10   Q.    And you've got that on there.  Would you agree
11         with me that Trooper Domingue, at this point in
12         time, is facing at least three individuals
13         fleeing from this vehicle?
14   A.    You say facing like we were trying to attack
15         her.
16   Q.    No, I said fleeing, like, running from this
17         vehicle; would you agree with that statement?
18   A.    Everyone is trying to run, yes.
19   Q.    Okay.  Except for Tokyo?
20   A.    Yes, sir.
21   Q.    Tokyo remains in the car?
22   A.    In the front passenger.
23   Q.    Okay.  Let's go to "Exhibit 30".
24                         (Exhibit Number Exhibit 30 was
25                          marked for identification

```
 1                      purposes.)
 2   BY MR. KROUSE:
 3   Q.   This is 2018-7-10-2:16:33.  Again, let's go from
 4        right to left.  Circle Trooper Domingue.
 5   A.   She appears to be mid way between both of the
 6        cars.
 7   Q.   Would you circle yourself?
 8   A.   Well -- yeah.
 9   Q.   Would you circle Jeremiah.
10   A.   Yes, sir.
11   Q.   Would you circle Jamaal?
12   A.   Yes, sir.
13   Q.   Okay.  Now at this point in time do you see
14        Trooper Domingue approaching you?
15   A.   Yes.
16   Q.   You do.  And what is your reaction when you see
17        this trooper?
18   A.   I mean, I'm out the car and I basically have to
19        commit to this now is what's going on in my
20        head.
21   Q.   Right.
22   A.   So, I then go from looking to her to looking at
23        my exit which is around the car in to that
24        fence.  I didn't know the fence was really,
25        like, the size I'm looking at once I get there.
```

| 1 | | But I knew I needed to get around the car. |
|---|---|---|

1       But I knew I needed to get around the car.

2       That's the only way I could go which was to

3       left.

4  Q.   **Well, Scotty, once you saw her and she looks**

5       **fairly close to you --**

6  A.   About ten feet.

7  Q.   **-- did you ever say, running is not a good idea**

8       **I think I better just get back in the car?**

9  A.   No, not at that point.  No, I was scared.  I

10      didn't know what was going to happen.  I mean,

11      I'm out the car.  She can do whatever.  I mean

12      you see how it turned out.

13 Q.   **Right, but I'm just asking whether you were**

14      **reconsidering your plan to run and jump the**

15      **fence line to get out of this situation since**

16      **she was that close to you?**

17 A.   I don't know about that close.

18 Q.   **Well, 10 feet away as you say.**

19 A.   No, I felt like I still had enough room to get

20      out of there.

21 Q.   **Okay.**

22 A.   Just shoot by gap between her and the car and

23      get to the fence.

24 Q.   **And you don't recall Trooper Domingue ever**

25      **saying stop, don't run, or any words to that**

```
 1        effect?
 2   A.   No, sir.
 3   Q.   You circled yourself in this photograph?
 4   A.   Yes.
 5   Q.   "Exhibit 30" and you circled Jamaal and his
 6        name?
 7   A.   Yes, sir.
 8   Q.   Thank you.  Let's turn to "Exhibit 31".  This is
 9        2018 --
10   A.   I would like to state --
11   Q.   Yes, sir.  Go ahead.
12   A.   Actually, hold up.  I would like to state that
13        the trooper in Number "29" has started to reach
14        for her right side.  And then that continues
15        throughout "30" and "31".  You may continue.
16   Q.   Okay.  So, the record is clear, what your
17        testimony is is that --
18   A.   She is reaching.
19   Q.   She is reaching for what?
20   A.   Her right side.  I don't know what's on the
21        right side of the police officer.  It turned out
22        to be her gun --
23   Q.   Right.
24   A.   -- but I don't know what she's doing.
25   Q.   So, are you saying that you can see --
```

```
 1   A.   I couldn't see that at the time, no.
 2   Q.   At the time but from this photograph now --
 3   A.   From the photograph, yes.
 4   Q.   -- you can see that she's reaching for something
 5        on her right side with her right hand, correct?
 6   A.   Yes, sir.
 7   Q.   And that's shown, as you said, in "Exhibit 29",
 8        "30", "31"; is that correct?
 9   A.   Yes, because in "28" you can't see her right
10        side at all, but yeah.
11   Q.   Understood.  Anything else that you wanted to
12        add?  I didn't mean to interrupt you.
13   A.   No, sir.
14   Q.   Okay.  So, let's turn to "Exhibit 32"?
15   A.   We didn't do anything on "31".
16   Q.   I'm sorry.
17   A.   I just wanted to get that clear.
18   Q.   Gotcha.  All right.  So, again, from right to
19        left if you could circle Trooper Domingue?
20   A.   Yes, sir.  She is continuing to approach.
21   Q.   Approach you?
22   A.   Yes, sir.
23   Q.   Okay.  And can you circle you?
24   A.   Yes, sir.
25   Q.   Circle Jeremiah.
```

```
 1   A.   And Jamaal has almost just made it.
 2   Q.   Jamaal looks like he's at the finish line,
 3        right?
 4   A.   Yeah.
 5   Q.   Again "Exhibit 31" you don't recall hearing any
 6        words from Trooper Domingue to stop, don't run,
 7        anything like that?
 8                      (Exhibit Number Exhibit 31 was
 9                      marked for identification
10                      purposes.)
11   A.   No, sir.
12   BY MR. KROUSE:
13   Q.   Did you realize that your car was legally
14        stopped for a traffic stop for an illegal left
15        turn?  Did you realize that?
16   A.   No, I didn't know what we were getting pulled
17        over for.  I didn't find that out until way
18        later.
19   Q.   Right.
20   A.   Way, way, way, way later.
21   Q.   Is that due to your impaired state of mind due
22        to the marijuana and drinking?
23   A.   It's not like she told us.  That would be the
24        only way we would know is if were told, you know
25        what I mean.  Because I didn't know, like, what
```

CLIFTON DILLEY

```
 1        we did.  I just saw the lights come on.
 2   Q.   Right.  But if you didn't know what you did, why
 3        did you run?
 4   A.   Because as I said before I didn't know what was
 5        happening, scared, all this law, and I'm about
 6        to get this pinned on me or something.  I didn't
 7        know.
 8   Q.   You just didn't know?
 9   A.   Yes, sir.
10   Q.   Okay.  And what you're saying is you don't
11        recall Trooper Domingue ever telling you
12        anything about this stop or the reason for this
13        stop; is that correct?
14   A.   Yes, sir.
15   Q.   Do you know whether Trooper Domingue had -- I
16        guess this question is for Jamaal Mire -- but
17        you don't have any knowledge of any of the words
18        or conversation between Trooper Domingue and
19        Jamaal Mire when he got out of the car and they
20        had a brief conversation?  Did you hear my
21        question?
22   A.   Say it again.
23             MR. KROUSE:
24                  Let me get her to read it back.
25                  (Court reporter reads back as
```

CLIFTON DILLEY

```
 1                           requested.)
 2    A.   No, sir.
 3    BY MR. KROUSE:
 4    Q.   Okay.  So, you heard the question again?
 5    A.   Yes, I heard the question and no is the answer.
 6         I didn't hear anything they said.
 7    Q.   Okay.  Is there anything about "Exhibit 31" you
 8         want to add?
 9    A.   "32."
10    Q.   "31".
11    A.   Oh, I thought you flipped over.  No, sir.
12    Q.   Okay.  All right.  Let's go to "32".  That is a
13         2018-07-10-2:16:34.
14                           (Exhibit Number Exhibit 32 was
15                           marked for identification
16                           purposes.)
17    BY MR. KROUSE:
18    Q.   Again --
19    A.   2:16 --
20    Q.   2:16:34.
21    A.   I heard 17.  My bad.
22    Q.   Okay.  Sorry.  Now, can you circle Trooper
23         Domingue?
24    A.   Yes, sir.  She is --
25    Q.   What do you notice about her?
```

1    A.   She is reaching for her right still.  Still has
2         hand on her right hip.
3    **Q.   Right.**
4    A.   And is still approaching me, and I am --
5    **Q.   If you'll circle yourself, please.**
6    A.    -- In a full sprint to the left.  You can tell
7         because of my foot placement.
8    **Q.   Okay.**
9    A.   I am about to push off my right foot and keep
10        going left.
11   **Q.   All right.  And, again, you don't recall any**
12        **words from Trooper Domingue in this point:**
13        **Stop, don't run; anything like that?**
14   A.   No, sir.
15   **Q.   Okay.  Do you see Jeremiah in this photograph?**
16   A.   I do not.
17   **Q.   Okay.  Do you see Jamaal in this photograph?**
18   A.   Yes, he is --
19   **Q.   At the end?**
20   A.   Yes, disappearing into the darkness near the
21        garbage can.
22   **Q.   You want to circle that for me?**
23   A.   Yes, sir.
24   **Q.   And write his name?**
25   A.   Yes, sir.

```
 1    Q.    Let's go to "Exhibit 33", 2018-7-10-2:16:34.
 2                      (Exhibit Number Exhibit 33 was
 3                      marked for identification
 4                      purposes.)
 5    BY MR. KROUSE:
 6    Q.    So, it looks like -- Trooper Domingue if you
 7          will circle her?
 8    A.    I was about to say, yeah, you want me to do
 9          arrows, because if I circle I'm going to be
10          cutting both of us off?
11    Q.    Okay.  Why don't you do arrows.  It's fine.
12    A.    And she is now pulling up what appears to be the
13          weapon.
14    Q.    Can you see this photograph?
15    A.    It seems to be a handle.
16    Q.    Okay.  Did you see her pulling out the weapon as
17          you were running?
18    A.    No, at this point I'm fully blinded.  I'm not
19          even looking at her.
20    Q.    Okay.
21    A.    I'm looking dead ahead at the fence.
22    Q.    Do you realize that she is there?
23    A.    Yes, but as I said I was waiting to hear
24          something.
25    Q.    Like what?
```

```
 1   A.   Like stop, stop running, freeze, freeze or I'm
 2        gonna tase you, freeze, freeze, freeze.
 3   Q.   Right.
 4   A.   Didn't hear none of that.  I kept running.
 5   Q.   Uh-huh.  And the fact --
 6   A.   If she said it she said that shit under her
 7        breath.  My bad.  Excuse my language.
 8   Q.   Right.  What are you saying she said under her
 9        breath?
10   A.   No, scratch that.  I was talking off record type
11        of deal.
12   Q.   But are you saying that she said something, but
13        it was under her breath?
14   A.   No, I'm saying I didn't hear anything.
15   Q.   Okay.
16   A.   Yeah.
17   Q.   But she may have said something that you just
18        didn't hear?
19   A.   Maybe.  That's a guess.
20   Q.   Is it fair to say because of your impaired state
21        you tuned that out?
22   A.   No.
23   Q.   Any type of warnings?
24   A.   No.  No.
25   Q.   Is it fair to say --
```

```
 1   A.   Reminded me my ears were fine.
 2   Q.   Your ears are fine.  Your hearing was good,
 3        right?
 4   A.   Yeah, I heard him say run.
 5   Q.   Right.  I guess what I am trying to understand
 6        is with the trooper being that close to you in
 7        "Exhibit 33" --
 8   A.   And you see I'm rounding the car.
 9   Q.   I understand.
10   A.   I don't mean to interrupt you.
11   Q.   What do you think the distance is between you
12        and the trooper at this point in time in
13        "Exhibit 33"?
14   A.   Five to seven.
15   Q.   Feet?
16   A.   Yes, sir.
17   Q.   And that doesn't give you pause to stop?
18   A.   I'm not looking at her.  I don't see her.  I
19        don't know how really close we are.  I don't
20        know how close she really is.
21   Q.   So, you've kind of blocked her out?
22   A.   Yeah, she -- I have horse blindered my way to
23        that fence.
24   Q.   Okay.  So, have we marked in "Exhibit 33"
25        Trooper Domingue, yourself, with arrows?
```

```
 1   A.   You can see Jeremiah's head peeking over the
 2        side right there.
 3   Q.   And he's starting to run, following in the same
 4        direction as Jamaal.
 5   A.   As Jamaal, yes, sir.
 6   Q.   And Tokyo remains in the vehicle?
 7   A.   Yes, sir, front passenger.  Yes, sir.
 8   Q.   Okay.  So, "Exhibit 34", 2018-7-10-:216:34.
 9        What does this photograph depict?
10                        (Exhibit Number Exhibit 34 was
11                        marked for identification
12                        purposes.)
13   A.   Going right to left?
14   BY MR. KROUSE:
15   Q.   Yes.
16   A.   It is me being shot in the back by the police
17        officer, or passing.  There is a flash around
18        me.  I could just be covered in light at this
19        moment, or it's the gunfire, but I am running
20        well -- I'm definitely in front of her, like,
21        she is behind me and I have run passed her
22        already.
23   Q.   And what do you estimate the distance is looking
24        at this photograph between you and the police
25        officer?
```

1    A.    From where her feet stand I say three to four,
2          hand looks about two feet.
3    Q.    **Two feet from you?**
4    A.    Yes, sir.
5    Q.    **Now, in this photograph does the police officer**
6          **look like she is falling forward?**
7    A.    Looks like she is aiming.  She has got her right
8          hand up --
9    Q.    **Right.**
10   A.    -- and pointed at me.  And, I mean, she appears
11         to be chasing behind me with the gun pointed.
12   Q.    **Okay.  I guess what I would direct your**
13         **attention to is the police officer's feet, and**
14         **does it appear that she is flat on her feet or**
15         **is she falling forward or can you --**
16   A.    She seems to be flat.
17   Q.    **Seems to be flat.**
18   A.    Because I mean, her left foot hasn't really
19         moved yet so don't know.
20   Q.    **Okay.**
21   A.    Her right foot is flat though.
22   Q.    **Okay.  Can you again mark with arrows?**
23   A.    Seems Jeremiah is moving a little too fast for
24         the camera in front of the car.
25   Q.    **So, we can't --**

```
 1   A.   Can't really tell if that's him or not, or a
 2        white blob if I'm honest.
 3   Q.   Is it a shadow?
 4   A.   That's what it kinda looks like.
 5   Q.   Can you mark the shadow?
 6   A.   Yeah.  The more you look at it, kinda figures
 7        out, but, yes, sir.  That is Jeremiah.
 8   Q.   Just an arrow next to his name.  Jamaal was out
 9        of the picture?
10   A.   It looks like -- if you could call that that's
11        him, that's the last speck of his back.
12   Q.   Okay.  Anything else you want to comment like
13        this picture, "Exhibit 34"?
14   A.   No, sir.
15   Q.   Okay.  "Exhibit 35".
16                      (Exhibit Number Exhibit 35 was
17                       marked for identification
18                       purposes.)
19   A.   Well, now, looking at this I'd say it definitely
20        is the moment of impact.  Well, take that back.
21   BY MR. KROUSE:
22   Q.   Go ahead.  I just asked an open question, did
23        you have any other comment about "Exhibit 34"
24        that you wanted to tell me?
25   A.   No, sir.
```

```
 1   Q.   Okay.  So, you want to turn to "Exhibit 35"?

 2   A.   Yes, sir.

 3   Q.   All right.  This is 2018-7-10-2:16:35.  Before

 4        we mark anything, as you look at this what do

 5        you notice?  What jumps out at you?

 6   A.   Me falling forward, legs have come together, so,

 7        I'm definitely falling.  It's really bright and

 8        there is Kasha, the trooper, behind me and still

 9        arm up.  I mean, you can't really see the arm on

10        this one, but she is definitely pursuing still.

11        And I am falling face first, so.  She is chasing

12        behind.

13   Q.   Okay.

14   A.   And Jeremiah is continuing to run.  He is at the

15        front of the car continuing toward Jamaal's path

16        toward the dumpster.  There is still a small

17        speck of Jamaal by the dumpster.

18   Q.   And you marked and arrowed everybody?

19   A.   Yes, sir.

20   Q.   Again, Tokyo remains in the car?

21   A.   Yes, sir.

22   Q.   Any other comments you have for "Exhibit 35"?

23   A.   She still does not appear to be following

24        because you can't really see her legs.

25   Q.   Okay.  But you were saying you appear to be
```

CLIFTON DILLEY

| | | |
|---|---|---|
| 1 | | falling? |
| 2 | A. | Yes, I am falling face first. |
| 3 | Q. | Okay. |
| 4 | A. | Legs are not even touching the ground.  I mean, |
| 5 | | yeah.  I'm falling. |
| 6 | Q. | Okay.  "Exhibit 36". |
| 7 | | (Exhibit Number Exhibit 36 was |
| 8 | | marked for identification |
| 9 | | purposes.) |
| 10 | A. | Now -- |
| 11 | BY MR. KROUSE: | |
| 12 | Q. | Well, just let me finish.  This |
| 13 | | 2018-7-10-2:16:35. |
| 14 | A. | Same second. |
| 15 | Q. | So, what do you notice in this photograph?  What |
| 16 | | comes immediately? |
| 17 | A. | I am getting shot.  You can see the weapon, and |
| 18 | | the bullet.  I am trying to catch myself with my |
| 19 | | hands, so I have my hands in front of me. |
| 20 | Q. | At this point in time, do you recall Trooper |
| 21 | | Domingue saying anything to you? |
| 22 | A. | No, sir. |
| 23 | Q. | Did she say anything about being tased at this |
| 24 | | point in time? |
| 25 | A. | Not at this point in time. |

```
 1   Q.   That's later as we talked about earlier?
 2   A.   That's once the other trooper arrives.
 3   Q.   Right.  Right.
 4   A.   She didn't really talk to me.
 5   Q.   At any point in time was her taser used on you?
 6   A.   No, sir.
 7   Q.   Or anybody?
 8   A.   No, sir.
 9   Q.   Okay.  So, if you can mark yourself.
10   A.   I am marking the bullet casing coming off of the
11        bullet.
12   Q.   Okay.
13   A.   And the gun itself in her hand as you can see
14        that right there.  That ain't a finger.  Kasha.
15        Jeremiah is in a full sprint at this point
16        towards the dumpster area.  I spelled that
17        wrong.  I've been spelling it wrong this whole
18        time.  And Jamaal appears to be completely
19        passed the dumpster.
20   Q.   He's gone.
21   A.   He's gone.
22   Q.   He jumped the fence and he's gone?
23   A.   Not yet just from prior knowledge of the video.
24   Q.   Okay.
25   A.   I know he's not there yet, because I remember
```

```
 1           watching him miss the jump.
 2    Q.     Oh, he didn't make it the first time?
 3    A.     Yes, sir.
 4    Q.     I remember that.  Okay.  And Tokyo remains in
 5           the car?
 6    A.     Yes, sir.
 7    Q.     He hadn't come out of the car.  You said that he
 8           did later to check on your condition, right?
 9    A.     She brought him out of the car.
10    Q.     Okay.
11    A.     He put his hands out the window and said come
12           get me and --
13    Q.     She did?
14    A.     Yes, sir.
15    Q.     Anything else you want to comment on "Exhibit
16           36"?
17    A.     No, sir.
18    Q.     Let's turn to "Exhibit 37".
19                      (Exhibit Number Exhibit 37 was
20                      marked for identification
21                      purposes.)
22    BY MR. KROUSE:
23    Q.     This is 2018-7-10-2:16:35.  So, look at this
24           photograph.  What is your immediate reaction?
25    A.     I am to the point where my knees have hit the
```

```
 1          ground and all you can see is my legs sticking
 2          out from the front of the trooper vehicle
 3          starting at her guardrail.  She appears to be
 4          falling, well, there is the little bullet
 5          fragment thing, the bullet casing, the gun is
 6          still in her hand while she's falling.  Then
 7          she's falling.
 8     Q.   She, being Kasha?
 9     A.   Kasha.  I am trying to circle her.  I fucked up.
10     Q.   Why don't you straighten it out?
11     A.   Okay.  I circled her.  That's all marked.  Cool.
12     Q.   Okay.  All right.  What are you writing now?
13     A.   Scotty.
14     Q.   Scotty.  Okay.
15     A.   Jeremiah.  Yeah, he is moving.
16     Q.   Is he a big guy?
17     A.   Six one, muscular.  That boy is moving.
18     Q.   Right.  Right.
19     A.   Towards the dumpster area.
20     Q.   Put his name there please.  Any other comments
21          on "37"?
22     A.   No, sir.
23     Q.   Okay.  Thank you.  I think we are almost there.
24          Just a couple more.
25     A.   Would you call that still there?
```

1    Q.    What are we talking about?

2    A.    The gun appearing but I don't think you can tell

3          if it's still a gun, but I mean, it's definitely

4          still in her hand.  She's falling.  She can't

5          put it in her -- at least while she's falling.

6    Q.    You think it's a gun?

7    A.    I mean, it's determined in the last picture that

8          it is a gun and she didn't drop it from our

9          knowledge, so.

10              MR. CAZAYOUX:

11                  You're up to "38" nor, right?

12              THE WITNESS:

13                  Yes, sir.

14   A.    Looking at "Exhibit 38".

15   BY MR. KROUSE:

16   Q.    "38" is 2018-7-10-2:16:35.

17                      (Exhibit Number Exhibit 38 was

18                       marked for identification

19                       purposes.)

20   BY MR. KROUSE:

21   Q.    So, again, you were on the ground in the prone

22          position; is that correct?

23   A.    Yes, sir.  It seems all you see is my feet kinda

24          barely sticking out right there kinda mixed in

25          with the headlights.  You can kind of see my

1       shoes.  And she is completely about to fall, and

2       we are just waiting for that still, and --

3   Q.  Did you at any time turn back to Trooper

4       Domingue and have any words with her after you

5       were shot?

6   A.  No, not at this moment I don't think.

7   Q.  At any moment?

8   A.  I said something about my phone, like, it's my

9       phone.  I don't want to break my phone.

10  Q.  Right.

11  A.  And then the fidget spinner.  That's about all

12      the words I had with her.

13  Q.  Okay.  And did she secure the phone and the

14      fidget spinner?

15  A.  Yes, sir.

16  Q.  It wasn't cracked as a result of this, it was

17      cracked a month later; is that what you said?

18  A.  Well, it was already cracked, and then -- it was

19      on the left side when the pictures were took --

20  Q.  Yeah.

21  A.  -- and it was in my right hand and it got slung

22      somewhere along the line, so.

23  Q.  When you fell?

24  A.  No, I had it in my hand.  I fell with it in my

25      hand.

```
 1   Q.   Oh, okay.
 2   A.   I fell like this.  My left hand hit the ground
 3        because I had scrapes and everything and then my
 4        elbow is all messed up.
 5   Q.   So, you were protecting the phone from hitting
 6        the ground?
 7   A.   Yes, sir.  And shook it out, but I placed it
 8        down right here on the right, but on these
 9        pictures it's -- from where I was on the ground
10        it was on my left side.
11   Q.   You really can't see the phone in these
12        pictures.
13   A.   I'm talking the after.
14   Q.   Yeah, yeah.
15   A.   The aftermath.
16   Q.   We covered all that.
17   A.   Just clarifying.
18   Q.   Okay.  So, have we circled you, your position in
19        "38"?
20   A.   Yes, sir.
21   Q.   Identified yourself and Trooper Domingue?
22   A.   And then Jeremiah is about 10 feet in front of
23        the car still headed toward the dumpster.
24   Q.   Okay.  And you've circled him?
25   A.   Yes, sir.  Tokyo remains in the front seat,
```

```
 1            passenger.
 2    Q.     Okay.  "Exhibit 39".
 3                       (Exhibit Number Exhibit 39 was
 4                       marked for identification
 5                       purposes.)
 6    A.     I am completely covered by the light of the
 7            headlights.  I'm sure they've got a toe sticking
 8            out, but we cannot see that.  So, I am basically
 9            out of the picture.
10    BY MR. KROUSE:
11    Q.     Okay.
12    A.     Or, yeah.  I'm, like, I have fallen behind the
13            trooper's vehicle at this point completely.
14    Q.     Behind it or in front of it because of the
15            headlights?
16    A.     On the front right by the headlight would be
17            where my feet would be.
18    Q.     Yeah.  So, the -- you're whited out, if you
19            will, because of the headlights?
20    A.     Yes, sir.
21    Q.     Right.  Okay.  So, why don't you circle where
22            you think your position would be?
23    A.     I am gonna do a little arrow.
24    Q.     Yes.  Circle Trooper Domingue, Jeremiah.
25                  MR. CAZAYOUX:
```

```
 1              You're asking him to say where he
 2         would be.  That white light is not --
 3         MR. KROUSE:
 4              You don't think that's him?
 5         MR. CAZAYOUX:
 6              No.
 7         MR. KROUSE:
 8              Okay.
 9    BY MR. KROUSE:
10    Q.   If you don't think that is you then don't circle
11         it.  I didn't mean to -- I thought we had agreed
12         that you were whited out because of the
13         headlamp.  That's my --
14         MR. CAZAYOUX:
15              Unfortunately, these pictures don't
16         show the car.  That would give him a
17         little more frame of reference.
18         MR. KROUSE:
19              Yes, you're right.
20         MR. CAZAYOUX:
21              And in the last picture maybe helps
22         him figure out where he is.
23         MR. KROUSE:
24              Why don't we get to that.
25         MR. CAZAYOUX:
```

```
 1                    Okay.
 2              MR. KROUSE:
 3                    And we'll wrap it up with that.
 4    BY MR. KROUSE:
 5    Q.   With "39" do you have anything else to add to
 6         that?  You've circled Jeremiah?
 7    A.   I did not circle Jeremiah, no.
 8    Q.   Under "39".
 9    A.   "39" I haven't circled anything yet.  I am
10         circling the Officer Domingue.  Putting a "K"
11         next to her name.  She's falling.
12    Q.   Okay.  That's go to "40".
13                        (Exhibit Number Exhibit 40 was
14                         marked for identification
15                         purposes.)
16    BY MR. KROUSE:
17    Q.   And what do we see in this picture?
18    A.   We see the Trooper Domingue falling on top of
19         me.
20    Q.   Literally on top of you or next to you?
21    A.   I would say, I guess, on my feet.
22    Q.   Or next to your feet?
23    A.   I would say I guess on my feet, because I felt
24         her jump on me.
25    Q.   Do you know why she jumped on you?
```

```
 1  A.   Doing the rest of her arrest I guess.
 2  Q.   But you don't know?
 3  A.   Don't know.
 4  Q.   Okay.  So, can you circle her?
 5  A.   Yes.
 6  Q.   An arrow.  And can you put an arrow where you
 7       believe you are or can you tell?
 8  A.   I mean, it kind of goes out in this one, but you
 9       can kind of see it.  I would say I see the edge
10       of my feet right in front of her.
11  Q.   Okay.  If you can draw an arrow out from there?
12  A.   Yes, sir.  I put my name is next to it.
13  Q.   And Jeremiah?
14  A.   Jeremiah has reached the end of that big white
15       fence still heading toward the dumpsters, and
16       Tokyo remains in the car.
17  Q.   Okay.  "41", I think this is our last exhibit
18       here.
19                      (Exhibit Number Exhibit 41 was
20                       marked for identification
21                       purposes.)
22  BY MR. KROUSE:
23  Q.   Tell me what you see in this photograph please?
24  A.   I see Kasha on what appears to be all fours I
25       guess, catching herself from her fall.  And you
```

```
 1            can no longer see me, so I will just put an
 2            arrow towards her.
 3    Q.    Okay.
 4    A.    So I don't mess that up. Jeremiah is still
 5            running toward the dumpster area, and Tokyo
 6            remains in the car.
 7    Q.    Any other comments on this photograph Number
 8            "41"?
 9    A.    No, sir.
10    Q.    All right.  Can you -- were you cuffed at this
11            point in time, handcuffed?
12    A.    No, sir.
13    Q.    No.  Okay.  All right.  Were you aware that
14            Jamaal Mire was later arrested after this
15            incident and charged with driving on a divided
16            highway, resisting officer, penalty for
17            distribution or possession with intent to
18            distribute narcotic drugs listed in Schedule I;
19            were you aware of that?
20    A.    At A later date, yes.  I'm trying to remember
21            who told me.
22    Q.    Was he -- do you know whether he was convicted
23            for these offenses?
24    A.    Yes, I think he served a year or something like
25            that.  I'm not 100 percent.
```

CLIFTON DILLEY

```
 1   Q.   Okay.
 2   A.   I think he served like maybe six months or
 3        something.  I remember something about that.  I
 4        don't know the full details.
 5   Q.   Okay.  And Mr. Kalief Rasean Sconiers --
 6   A.   Sconier.
 7   Q.   -- Tokyo, also served time in jail after this
 8        incident that we talked about earlier.  When you
 9        when met Jamaal Mire at the bar --
10   A.   A year later.
11   Q.   -- a year later, had he served his time?
12   A.   I guess.  We didn't talk about that.  I was just
13        pissed.
14   Q.   You were pissed at him?
15   A.   Yeah.
16   Q.   Okay.  And we've talked about that.  Is there
17        anything else you need to add about that
18        altercation or confrontation with Mr. Mire?
19   A.   No, sir.
20   Q.   Okay.  And you haven't seen him since?
21   A.   No, sir.
22            MR. KROUSE:
23                All right.  Let me take a break.  I
24            probably need to talk to my people on the
25            phone there and my co-counsel.
```

```
 1              MADAM COURT REPORTER:
 2                  I'll take you guys off the record.
 3                      (Whereupon, a break commenced
 4                      for all parties present.)
 5              MADAM COURT REPORTER:
 6                  It's 1:20 p.m., sir.  You are on the
 7              record.
 8                  - EXAMINATION -
 9      BY MR. KROUSE:
10      Q.  Mr. Dilley, could you just tell us briefly what
11          your overall injuries were from this shooting?
12      A.  The bullet hit my spine.  It went in my spinal
13          canal, so the injuries, the residual injuries
14          from that were -- kind of a quick summary.  Left
15          foot does not move, it has drop foot; the right
16          foot at the time did not move.  It came back
17          within therapy.  Everything was pretty weak.  I
18          could basically just wiggle my legs.  My upper
19          body was decent enough to be able to pick my
20          butt up to do a transfer.  But they had -- to
21          give an example they had to use the little
22          sliding board and do like that to get me in the
23          transport wheelchair to go to the therapy place.
24      Q.  And so, you suffered partial paralysis; is that
25          correct?
```

1    A.    Yes, sir.

2    **Q.    And some issues related to your digestive system**

3    **as well?**

4    A.    I use a catheter or intermittent cath which is,

5          just go in to pee, take out and then do ditch

6          stem for bowels and that all depends on the

7          flow.

8          MR. CAZAYOUX:

9                I think that's all the questions I

10         have.  And, obviously, y'all reserve your

11         rights to dispute any of these claims, and

12         then also to go in to the damages.

13         MR. KROUSE:

14               Yeah, to re-depose him on the damages

15         and medical thing.

16               Go ahead.

17         THE WITNESS:

18               The last thing is constant spasms.

19         MR. KROUSE:

20               In your leg?

21         THE WITNESS:

22               In my left leg, mainly, but if it

23         gets too bad it just continues throughout

24         the body.

25         MR. KROUSE:

Case 3:19-cv-00391-BAJ-EWD    Document 143-11    04/28/25    Page 138 of 142

12/08/2022

```
 1                 Right.  I just wanted to say I wanted
 2         to ensure the exhibits that have been
 3         marked and identified "1-41" are attached
 4         and made a part of the record of this
 5         proceeding today.
 6                 Don, Lane, I don't know if you had
 7         any more exhibits to add or whether that's
 8         --
 9         MR. CAZAYOUX:
10                 No, sir.  Reading and signing, is he
11         going to read and sign?
12         MR. CAZAYOUX:
13                 Yes, sir.
14         MR. KROUSE:
15                 Okay.
16         MS. ARDOIN:
17                 But also, y'all just said take
18         additional deposition on damages, but I
19         just want to refer to our conversation we
20         had during the break that we'll deal with
21         the excessive force portion if necessary
22         hereafter.
23         MR. CAZAYOUX:
24                 Okay.  Thank you.
25         MADAM COURT REPORTER:
```

CLIFTON DILLEY

1              I'll take you off the record at 1:22

2         p.m.

3              Deposition concluded at 1:22 p.m.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    REPORTER'S PAGE

 2      I, MELISSA J. DAVID, Certified Court Reporter in

 3   and for the State of Louisiana, the officer, as

 4   defined in Rule 28 of the Federal Rules of Civil

 5   Procedure and/or Article 1434(B) of the Louisiana

 6   Code of Civil Procedure, before whom this proceeding

 7   was taken, do hereby state on the Record:

 8         That due to the interaction in the spontaneous

 9   discourse of this proceeding, dashes (--) have been

10   used to indicate pauses, changes in thought, and/or

11   talkovers; that same is the proper method for a Court

12   Reporter's transcription of proceeding, and that the

13   dashes (--) do not indicate that words or phrases

14   have been let out of this transcript;

15      That any words and/or names which could not be

16   verified through reference material have been denoted

17   with the phrase "(spelled phonetically)."

18

19

20                    MELISSA J. DAVID
                      Certified Court Reporter
21

22

23

24

25
```

| 1 | REPORTER'S CERTIFICATE |

2  This certification is valid only for a transcript
accompanied by my original signature and original
3  required seal on this page.

4

5      I, Melissa J. David, Certified Court Reporter in
and for the State of Louisiana, as the officer before
6  whom this testimony was administered, do hereby
certify that Clifton Scott Dilley,after having been
7  duly sworn by me upon authority of R.S. 37:2554, did
testify as hereinbefore set forth in the foregoing
8  138 pages;
       That this testimony was reported by me in the
9  stenomask reporting method; was prepared and
transcribed by me or under my personal direction and
10 supervision, and is a true and correct transcript to
the best of my ability and understanding;
11      That the foregoing transcript has been prepared
in compliance with the transcript format guidelines
12 required by statute or by the Rules of the Louisiana
Certified Shorthand Reporter Board; and that I am
13 informed about the complete arrangement, financial or
otherwise, with the person or entity making
14 arrangement for deposition services; that I have
acted in compliance with the prohibition on
15 contractual relationships, as defined by the
Louisiana Code of Civil Procedure Article 1434 and in
16 rules and advisory opinions of the Board;
       That I have no actual knowledge of any
17 prohibited employment or contractual relationship,
direct or indirect, between a court reporting firm
18 and any party litigant in this matter, nor is there
any such relationship between myself and a party
19 litigant in this matter;
       That I am no of counsel, not related to counsel
20 or the parties herein, nor am I otherwise interested
in the outcome of this matter.

21

22

23 _____
       Melissa J. David
24     Certified Court Reporter
       CCR No. 2020005

25

 1    Errata Sheet

 2

 3    NAME OF CASE: CLIFTON SCOTT DILLEY VERSUS STATE OF LOUISIANA

 4    DATE OF DEPOSITION: 12/08/2022

 5    NAME OF WITNESS: Clifton Dilley

 6    Reason Codes:

 7         1. To clarify the record.

 8         2. To conform to the facts.

 9         3. To correct transcription errors.

10    Page _____ Line _____ Reason _____

11    From _____ to _____

12    Page _____ Line _____ Reason _____

13    From _____ to _____

14    Page _____ Line _____ Reason _____

15    From _____ to _____

16    Page _____ Line _____ Reason _____

17    From _____ to _____

18    Page _____ Line _____ Reason _____

19    From _____ to _____

20    Page _____ Line _____ Reason _____

21    From _____ to _____

22    Page _____ Line _____ Reason _____

23    From _____ to _____

24

25                            _____